O2T4PER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.                         23 CR 117 (DLC)

LAURA PERRYMAN,

         Defendant.

------------------------------x      Trial

                              New York, N.Y.
                              February 29, 2024
                              9:00 a.m.
Before:

                  HON. DENISE COTE,

                              District Judge
                              -And A Jury-

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
STEVEN JOHN KOCHEVAR
MONICA PILAR FOLCH
JACOB MAX BERGMAN
KIMBERLY RAVENER
     Assistant United States Attorneys

WALDEN MACHT & HARAN LLP
     Attorneys for Defendant
BY:  DEREK COHEN
     JENNIFER BERGER
     SEAN T. HARAN
     JOHNSON LIN

O2T4PER1

(Trial resumed; jury not present)

THE COURT:  So let me begin by listing the issues I know we need to address and counsel may have more.  Using the defendant's witness list order as a guide, I think it's most important we address the three defense witnesses to the extent that the government is still making a motion with respect to each of them, Arcos, Haider and North.  I would like to be able to discuss at 315 or 16, wherever we take our afternoon break the schedule we expect I should advise the jury of at 5:00, so we have a sense of where we are going.  We will wait until later in the day.

At 5:00 I would like to allocute the defendant about her decision not to take the stand.  So I want to give counsel lunch time if you haven't already talked about that allocution with her, to could so.

We have some less important issues than what I just listed that remaining issue about any charge about reliance on an attorney or attorney involvement in these events.  I don't understand actual that the defendants are going to make any argument or representation with respect to that issue.
Mr. Cohen, am I right?

MR. COHEN:  Yes, your Honor.  We don't think that was necessary.  We think this was a passing references.

THE COURT:  We will talk about it with each other and see if we are making it more of a big deal than it needs to be

by mentioning it again.  Good, you'll consult.

And this morning I received a letter from defense counsel on what I'm going to call the MDSAP issue and Defendant's Exhibit 623.

Does the government have other issues to address besides those I've just listed?

MR. KOCHEVAR:  No.  We have an update about Dr. North, but I believe that's all right on your list.

THE COURT:  Mr. Cohen, do you want to add to the list?

MR. COHEN:  No, your Honor.  Thank you.

THE COURT:  Good.  It's already long enough.  I appreciate that.

So let's take it then with respect to Dr. Arcos first.

MR. KOCHEVAR:  We wish to limit Dr. Arcos's --

THE COURT:  Pull that mic up.  Keep your voice up.

MR. KOCHEVAR:  The government is looking to limit Dr. Arcos's testimony to exclude what is essentially unnoticed expert witness testimony.  We are not -- I think we are not moving to preclude him entirely.  He is a percipient witness in some respects.  But to the extent he would opine about areas in which he is not a qualified expert, we would limit his testimony along those lines.

THE COURT:  So I seem to have misplaced about my two pages about Dr. Arcos, but I did read them last time so let me just tell you what I remember.

O2T4PER1

Dr. Arcos was one of three individuals -- if somebody has another copy for me, I would appreciate it -- individuals who ran cadaver labs, that's my recollection, as part of the Stimwave training process. And he was trained in how he should train the doctors by Chad Andresen. And I take it there is no objection to him describing that Chad Andresen trained him and this is what he did in running his cadaver labs to demonstrate to doctors attending the courses how they should implant and use the Stimwave device. Am I right?

MR. KOCHEVAR: No, there is no objection to that.

THE COURT: So what do you object to?

MR. KOCHEVAR: I think to the extent he is going to opine about the functionality of the device and the purposes of the White Stylet along engineering lines. He is not an engineer so commentary like that would be unnoticed expert witness testimony.

THE COURT: To the extent that he says that Mr. Andresen said the following to him and he conveyed that information to the doctors during the lab, you are not objecting to that?

MR. KOCHEVAR: No, that would be fine.

THE COURT: OK. So as long as he confines himself to what he did in the historical course of events here during the training sessions he led, you are not objecting to that?

MR. KOCHEVAR: No, if he is a proper percipient

O2T4PER1

witness and is going to testify about that, yes, no objection to that.

THE COURT:  Mr. Haran?

MR. HARAN:  Your Honor, the government has spoken to Dr. Arcos.  We are going to limit ourselves to everything that is his own direct personal knowledge, what he saw, what he heard, what he did.  He also, however, did buy the device.  He used it in his personal practice, based on what he understood about what the White Stylet was, what it was for, what the Pink Stylet was, what it was for.  How the device worked, the embedded receiver in this.  How he, in his own personal, practice billed it.  What his understanding of what the appropriate code was.  The relevance of whether the White Stylet made a difference for that code, or the Pink Stylet made a difference for that code.  All the stuff which understood, did in his general practice, learned from.  Not only Mr. Andresen, but perhaps for Ms. Perryman, he can speak about what her role was in these cadaver labs and these training and webinars.  He was one of the go-to people to, sort of, present. He'll talk about Mr. Andresen's role as a facilitator.  One of the people they would go to for understanding of some of the technology, *et cetera*.  It's about what he did at the time, working with Stimwave, working with the defendant, working with Chad, working with others, *et cetera*.

THE COURT:  So two buckets.

O2T4PER1

MR. HARAN:  Yes, thank you.

THE COURT:  One bucket, no dispute about.  He worked as a trainer in the cadaver labs as part of the Stimwave process for training doctors.  The government is not disputing his ability to testify to what Chad Andresen told him about how he should run those labs and what he should say and explain during those labs, nor is it objecting to describing what he did when he conducted those labs, so that's fine.

The second bucket of information -- and thank you for describing that, Mr. Haran -- I don't remember that being laid out really in the two pages, I do not now have before me so someone will get me another copy at some point here.  Because we need to mark it as an exhibit, and we'll mark everything as an exhibit, a court exhibit at least.

So with respect to the second bucket -- you can be seated.  This is similar to the kind of testimony that Dr. Haider is prepared to give, that is his own use of the device in the field, what he understood, it was how it functioned, what codes he used, *et cetera*.  And to that, the government has an objection.  And I think we began exploring that last night, and we should talk about that more today and resolve that.  But what we talk about, I'm going to describe the second bucket then, is for Dr. Arcos may also apply to our analysis of Dr. Haider's testimony, which we described last night.

So with respect to the second bucket of Dr. Arcos's testimony, that is his use of the device in the field and what he understood about its functionality in the field and the use of the codes in connection with his own practice of medicine in the fields, does the government have an objection?

MR. KOCHEVAR:  We don't believe that is going to be relevant along the similar lines we raised yesterday.

THE COURT:  Make your complete argument, Counsel. This is your record.

MR. KOCHEVAR:  In terms of his own use of the codes separate from what the company told him or something like that we don't think is going to be a relevant consideration.  As we said yesterday, doctors out in the field, what they were doing that the defendant is unconnected to is not relevant -- is not a defense to the fraud charged here and is not a relevant consideration unless it was linked back to what was happening at Stimwave or the defendant's actions.

THE COURT:  Mr. Haran?

MR. HARAN:  Your Honor, I'm just going to reference the two pages that you --

THE COURT:  That I don't have right now.  Does anyone have a copy for me?

MR. KOCHEVAR:  Would your Honor like Dr. Arcos's or Dr. Haider?

THE COURT:  I think I have Dr. North and Dr. Haider,

O2T4PER1

but I don't seem to have Dr. Arcos.  Thank you so much.

Mr. Haran?

MR. HARAN:  I only referenced the two-page initial 26.2 disclosure.  We made some minor disclosures last night on 26.2 on ongoing conversations with Dr. Arcos.  My point is, the government also interviewed Dr. Arcos last night.  There is more information now that's been exchanged between the parties about Dr. Arcos.  I just want to set that to you.

Our view is it's exceedingly relevant because he was --

THE COURT:  We are talking about the second bucket.

MR. HARAN:  We are talking about bucket two.

It's exceedingly relevant.  The entire theory of their case is that the defendant tricked doctors into unwittily submitting fraudulent insurance claims by tricking them into thinking that the White Stylet was a receiver when it really wasn't and by lying to them and suggesting to them that the White Stylet had copper in it, and that would be the component that they needed to bill if they weren't going to use the pink in order to trigger this code, 64950.  Under the theory that the embedded receiver isn't enough, that's their theory of the case.  Dr. Arcos will explain what he learned from Chad, what he understood from the defendant because she was involved in these trainings as well.

THE COURT:  OK.  Now we're in a problem area.

O2T4PER1

MR. HARAN:  OK.

THE COURT:  I think there was acknowledgment last night that there would not be an effort to put in the defendant's conversations through these witnesses.  So this is the first I'm hearing of this.

Secondly, in the two-paged document, he says it was Chad who trained him, not the defendant.

MR. HARAN:  Fair enough.  He will testify that he learned Chad was the person with the technical questions.  Chad was the person who explained this to him.  Chad was the person who he went to in respect for his trainings, and he relied on this information and understood this himself when he was submitting to the extent he used the White Stylet when he billed.  I don't know -- I think it was rare that he would implant the White Stylet in his own practice.  His sense of the billing code at the time what he understood was that the key to it was the fact that the lead had an embedded receiver in it already.  That was the code 64590.  It was the code for the procedure with respect to the PNS device.  He never had any problems.  He never, sort of, misled an insurance company.  He didn't falsify any of his claims, *et cetera*.  And we think it's highly relevant, given the allegations.

THE COURT:  OK.

MR. HARAN:  Thank you.

MR. KOCHEVAR:  We disagree with that characterization

O2T4PER1

of his testimony.  Our understanding is that he says he never used the White Stylet, and he billed just like the company told him to and didn't think about it much.  Also, his understanding of the device is based off of representations that came from the defendant or coconspirators.

So, you know some of this is, again percipient witness things about Stimwave, but as you move further away from it, he is just, sort of, opining as a doctor about things that he shouldn't be allowed to provide an expert unqualified opinion on.

THE COURT:  So these are the layers of issues I have based on what I heard last night, and what I'm hearing this morning.  Again, I'm only addressing the testimony associated with the practice in the field, what we've referred to as the second bucket of testimony, and that is similar to what I understand Dr. Haider would be testifying to, his practice in the field.  These doctors were not disclosed as experts.  So there is a separate analysis, and they are really not being offered as experts now.  I don't have that argument, so I don't have to do that analysis whether I should preclude an expert for untimely disclosure, which I think I would, but I won't go through that analysis because they are not being offered as experts.  But they are giving, in essence, expert testimony disguised as fact witnesses.

Let's talk about what the issues before this jury are.

O2T4PER1

The crimes here are the defendant's participation in a scheme to defraud or to make false statements with the intent to deceive.  And it does not matter for the jury to decide whether anyone, who was the intended victim was actually deceived.  The jury's decision is about whether there was a scheme to deceive, a scheme to defraud and the defendant was involved in that scheme.  So it doesn't matter if Medicare was deceived, and it doesn't matter if a doctor in the field was deceived.  The government has no obligation to prove reliance, no obligation to prove loss, and no obligation to prove that any patient was injured.  That's why we tried to take, and the defendant opened the door, I tried to take the patient harm issue off the table.

So the fact a doctor was deceived or not about functionality or coding or the purpose of the White Stylet or its relationship to the Pink Stylet and whether it had copper or not is irrelevant to the charges in the indictment.  As in any fraud scheme, a victim of fraud may still have faith in the person they were defrauded by.  This often happens in romance schemes and other mail fraud schemes in which people lose a lot of money.  So the fact that someone wasn't deceived doesn't make the scheme any less a criminal endeavor.  And of course, this can't be a back door to admitting the defendant's conversations or statements, as Mr. Haran just suggested. There are a line of Second Circuit cases, I refer to them as the meatpacking cases, but they have some relevance here.  The

O2T4PER1

fact that you didn't actually deceive one person is not a defense to the fact that you didn't engage in the scheme itself.

So there is a problem with relevance from testimony from practitioners in the field. There is also is a significant 403 issue here of confusing the jury and substantially prejudicing the government by introducing irrelevant evidence, making it seem like it is relevant when it is not. So I think the second bucket of testimony must be excluded under Rule 401 and Rule 403, and that's true for Dr. Arcos's testimony as a practitioner in the field and Dr. Haider's testimony.

Now, I want to give Mr. Cohen an opportunity to be heard on this. But I want to know what the government's view is with respect to these issues.

MR. KOCHEVAR: We agree with the Court as stated there and particularly with respect to Dr. Haider. We don't really see what's left in terms of what he would be talking about at this point. I think, again, with Dr. Arcos, there is maybe some core stuff with these trainings and things like that but --

THE COURT: We're talking with Dr. Arcos about the second bucket, his practice in the field. Is it the government's position that that should be precluded or not?

MR. KOCHEVAR: So, yes, we think his generalized

O2T4PER1

testimony about his practice should be excluded.  That being said, we would expect to cross-examine him on if he ever used the White Stylet, particularly if he was teaching people about it.

THE COURT:  Great.  You can cross-examine and it may very well open the door.  So it's your decision entirely.  If you don't, the same rules are going to apply.  So if you open the door, great.  I'll let the defendant walk through it.

MR. KOCHEVAR:  Thank you.

THE COURT:  Yes, Mr. Cohen.

MR. COHEN:  Thank you, your Honor.

Let me just restate, we will not seek to backdoor in Ms. Perryman's statements to any doctors.  Full stop.  We will not do it.  We will instruct doctors to not go there.  That's not our intent.

I do want to talk about two points here, this is really, really critical, as I think you know my view on this. In addition to the way the government has charged the case, the overall theme of the case, which I think we heard 14 times in their opening, was that this was a useless piece of plastic. Every single government witness that's called seeks to elicit exactly that.  None of them have the expertise to weigh in on that.  Yet all of them have weighed in on that.  We have allowed every single witness to talk about the fact -- and I understand they can say it doesn't have receiver

capabilities -- but this is a state of mind with regard to a scheme. And the scheme that the government charged was that in 2017 there was a problem with reimbursement codes so Ms. Perryman created this device, not to improve the device, but in order to start the scheme to defraud and cause fraud in billing. So we got two things why these witnesses are relevant. And I understand the Court's ruling on our expert and one of the things the Court said to us was it's got to be a percipient witness.

THE COURT: No, I didn't say that. There are any number of ways an expert can become an expert in an area about which he is or she is going to testify.

MR. COHEN: I don't want to engage the Court on this --

THE COURT: The witness could have done testing, could have tried to validate his theories in any number of ways. He did not offer any basis for his testimony except experience in the field and citations to two documents, each of which I address.

MR. COHEN: I respectfully disagree. We don't have to go there. I don't want to go there with the Court. I'm not trying to provoke the Court. I do want to point out, and I understand the Court's position on the scheme, but we do need to have a little bit of nuance here. It's true that one does not have to prove that they were lied on and they were fooled.

But they do have to prove that they tried to.  So that's the scheme; right?

THE COURT:  Yes.  That's why we have testimony about the cadaver lab teaching.

MR. COHEN:  But we also should -- their testimony was we would do this and we would tell doctors there was copper in it, and we would try to fool them with our materials and we would do all of that.  And to have a doctor, like Dr. Haider, who would be pretty much the only doctor, the primary doctor who we would call, who was experienced.  He does this all the time.  He would say, in the normal course of my practice I used Stimwave products.  I understood fully what each of the components did, and I felt like it had a function, and I was doing it in the regular course of my medical practice.  What could be more relevant than that?  He wasn't fooled by it.  Nobody attempted to fool him.  He didn't feel as though there was a scheme to fool him, and it had a function.

We have to be able to battle the government's unsubstantiated, over and over again allegation that there was no other function for it.  Because they have to prove in Ms. Perryman's mind was to enter into a scheme to defraud.  Our defense is she did not enter a scheme to defraud at that point because she was doing it for a proper purpose.  She thought that this was going to fill the lumen, and it was going to do all of these things.  The fact that it does.  The fact that now

we know, although late, we now know that other people were trained on it.  Ms. Spruce, which we got in the middle of trial, that corroborates exactly the ASIC chip.  The fact that we have a trainer that said I'm training the doctors on that point.  All those are relevant.

We also shouldn't be deprived of having a doctor come and say I used this product.  It's not a useless piece of plastic.  It's not making him an expert.  That's what he does.  In the same way we ask investors how they invest.  It didn't make them experts in investing.  Is that not what happened?  I think he declared himself, Mr. Funtleyder declared himself an expert, but he was talking about what he does.  He was explaining what he does in his daily work as an investor.  The same would be true of this doctor.

An expert gets to opine on something in which they don't have personal knowledge.  We don't have to provide expert disclosure when we are not calling for an expert.  If the issue involved how the trash is picked up and we called the sanitation worker, we wouldn't have to ask them about being an expert in sanitation.  We would say, what do you do on your job that day.  And that's what where he asking here.  It's a really important point for us, if the government is going to have every witness say it was a useless piece of plastic, to have a credible witness say, I know exactly what it was, and I used it in my practice.  We would ask, on that narrow to point -- if

you don't want us to get into opining about other things on discussion -- but on that narrow point I think it's highly relevant, and it would be unduly prejudicial to us not to allow us to put that evidence in.

THE COURT:  Thank you, Mr. Cohen.

So it's 9:30, and I want to be able to give you a break, if I haven't heard from Mr. Whertvine yet if we have a jury.  He is just checking now.

So if you have some reduced testimony you wish either Dr. Arcos to give with respect to his practice in the field or Dr. Haider to give with respect to his practice in the field, feel free to discuss that with the government.  I'm happy for counsel to reach agreement with respect to some limited proffer.

As of now, on this record, the testimony about practicing physicians in the field using the device including the White Stylet and how they billed for it if they use the White Stylet is precluded.

MR. COHEN:  Your Honor, given the Court's stance I'm not sure I'm going to have a very receptive audience with the government to try to reach an agreement.

THE COURT:  I'm confident you will reflect on this and the government will reflect with care as well.

Let me see if we have a jury.  So we will take a brief recess.

O2T4PER1

MR. COHEN:  Could I ask one question?

THE COURT:  Sure.

MR. COHEN:  If we took out the coding part of it and we just talked about how I used the device and how I implanted it in the procedure that I did with it, would that make it acceptable to the Court?  Because I think that's the only proposal I could think of with this.  Otherwise, I'm going to talk to the government, and they are going to say why would I agree to anything.

THE COURT:  I have no idea what the government's reaction is going to be.  Feel free to have a discussion with them.

We are going to take a very brief recess, and we have a jury.

(Recess)

(Continued on next page)

O2T4PER1

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.  I assure you we've been working hard.  We are sorry for the short delay.  We understand that yesterday one of you had a question about what precisely the defendant is charged with, which crimes.  So I'm going to repeat to you the description I gave during the jury selection process.  It's very brief.

The defendant is charged in an indictment with three separate crimes.  She is charged in one count of the indictment with conspiring or agreeing with others to commit healthcare fraud and wire fraud.  She is also charged with the crime of healthcare fraud and with the crime of securities fraud.

Now, the burden is on the government to prove the defendant guilty beyond a reasonable doubt based on the evidence received in this courtroom and pursuant to my instructions as to the law.  The defendant has pleaded not guilty, and she is presumed innocent unless and until the government carries its burden of proof beyond a reasonable doubt.

At the end of today, I hope to be able to give a firmer idea of where we stand in the progress of the case.  But I want to assure you we are making good progress.  That's in large part to your attendance, and we know you have been listening carefully to the evidence.  So thank you very much.

I want to remind the witness he is still under oath.

Counsel?

DIRECT EXAMINATION Continued

BY MS. FOLCH:

Q.  Good morning, Dr. Gharibo.

A.  Good morning.

MS. FOLCH:  Mr. Carbone, can we pull up what's already been admitted as GX 315.

Q.  You will recall these are the instructions for use for the PNS kit that we were talking about yesterday?

A.  Yes.

MS. FOLCH:  And Mr. Carbone, if you could turn to page 13 of this document, please.

Q.  Dr. Gharibo, we were talking yesterday about the steps for implanting the PNS device.  And step four here describes an incision to insert the stimulator; is that right?

A.  Correct.

Q.  We talked about that incision yesterday?

A.  Yes.

MS. FOLCH:  Then Mr. Carbone, if you could turn to page 15 of this document.

Q.  Step three here describes the insertion of the receiver component.  We discussed that yesterday; right?

A.  We did.

MS. FOLCH:  And if you could turn to page 17 and up at the top.

Q.  Dr. Gharibo, this describes the anchoring of the stimulator once the receiver is placed inside the lumen; is that right?

A.  Next to the nerve, yes.

Q.  And at the end here, the fourth step is closing the incision?

A.  Yes, it is.

Q.  Doctor, did you see anything in here about a second incision for implanting the PNS device?

A.  I did not.

Q.  Did you see any mention of any tunneling described in order to implant the PNS device?

A.  No.

Q.  Did you see any mention of creation of a receiver pocket for implanting the device?

A.  No.

        MS. FOLCH:  Mr. Carbone, we could take this down and replace it with what's already been entered into evidence as GX 317.

Q.  And we discussed these instructions for use yesterday as well, Doctor; right?

A.  We did.

Q.  And if we could go to page 22 of this document.

        If you look at these steps, Dr. Gharibo, can you generally compare these steps to the ones we discussed yesterday in the instructions for use from October 2017?

A.   They're similar.

Q.   It describes an initial incision there?

A.   Yes.

        MS. FOLCH:  And if you could go to the next page.
Keep scrolling, Mr. Carbone, thank you.

Q.   Dr. Gharibo, what are the steps now for placing the
receiver?

A.   The steps are as follows:  Remove the stylet from the
stimulator receiver.  That's -- for example, the Blue Stylet
that's used to navigate the lead.  Insert the receiver, so that
is the Pink Stylet or the White Stylet into the center lumen of
the stimulator, the lead itself.  The third step is continue
advancing the receiver until it reaches the end of the
stimulator, which is the final position of the receiver.  So
this is the conductor wire or presumably the conductor wire
being put in the stimulator lead.  The fourth step is remove
handle from the proximal end of the receiver and confirm that
it has advanced as far as possible.  So that is the pink handle
or the white handle, you take that out, and you make sure the
wire is all the way into the lead receiver component.

Q.   Dr. Gharibo following down to the next section, there is
securing the stimulator, is that similar to the instructions
that we just looked at?

A.   It is similar, yes.

Q.   OK.  And moving on to the section for subcutaneous receiver

pocket.  Was this in the last instructions for use that we just looked at?

A.  No.

Q.  What are the instructions here?

A.  The instructions here are to create a subcutaneous receiver pocket.  So that is something that is going to house the so-called receiver.  Step one is to make a second incision that is bigger than the first incision, which is just a stab wound. Since this is going to house a receiver or a coil it is bigger in nature.  So there is a bigger initial incision of about 1 inch.  And then you actually create a pocket within there.  You put your hand in and you dissect into the wound that is right under the skin that is going to house the receiver, and that's the pocket creation.

        MS. FOLCH:  Mr. Carbone, if we could turn to the next page and highlight the receiver tunnel section.

Q.  Is this section in the instructions for use from October 2017 which are marked GX 315?

A.  No.

Q.  Can you describe briefly for the jury what this section instructs doctors to do?

A.  The purpose is to create a receiver tunnel where the lead is going to communicate with the receiver pocket.  So here, for example, we are trying to create a surface level access to the neuromodulation system.  So you created a pocket, and you got

to communicate with that pocket by creating a tunnel.  The first step is to use the introducer assembly, that's that the yellow over the needle.  And tunnel the externalized portion of the stimulator containing the receiver lateral from the first incision to the pocket incision.  You take the needle itself, that is 13 gauge, and you literally go through the second wound to the first wound.  Now you have a metal tunnel that's within the body.  You created a tunnel under the skin.  And then you take the proximal tip of the stimulator, that is the tip that is towards us that is out of the body.  And you put it through the opening of the needle.  And you have it exit through the second stab wound, that's about 1 inch.

So now the proximal end of the lead is by the pocket.  You've tunneled it.  Now there is a path about the same size of the needle itself.  In addition to the first -- which adds additional distance to the tip of the electrode or the tip of the lead.  Once the receiver is within the -- begin to pull the receiver through.  And once the receiver tubing is at the vertical incision and has no more slack, retract the introducer latterly from the second incision.

In other words, once the stimulator is at the pocket, you take out the introducer.  So now all of have is the lead assembly in the patient and the needle or the tunneler is out of the patient.

MS. FOLCH:  Mr. Carbone, if we could turn to the next

O2T4PER1                    Gharibo - Direct

page and just highlight the anchoring the receiver stimulator.

Q.  Dr. Gharibo, is this section on anchoring the receiver stimulator, is this different from the October 2017 instructions for use marked GX 315?

A.  It is different.

Q.  How so?

A.  It's additional.

Q.  Which part is additional?

A.  Now you are anchoring the receiver, the wiring component that is essentially at the pocket.

Q.  Dr. Gharibo, with regard to the October 2017 instructions for use that we saw yesterday and earlier this morning, is there an anchoring step to that procedure?

A.  Yes.

Q.  And what does it involve?

A.  It involves putting a suture through the lead itself to anchor the stimulator lead closer to the nerve.

Q.  And so the difference between that procedure and this one is what?

A.  So you can anchor the lead very close to the stimulator array itself.  And you can also choose to anchor it more proximately by the pocket too just to be able to secure the lead down.

Q.  And Dr. Gharibo, when we are talking about anchoring the receiver versus anchoring the stimulator, those are two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

different components of the defendant PNS device?

A.   It's the same wire being anchored at different points.

Q.   I'm sorry.  What do you mean by the same wire?

A.   It's the same stimulator lead.  You can anchor it closer to the nerve where the nerve is being stimulated.  But if there is enough distance there within the lead then you brought to the second incision, you can choose to anchor it there as well.

Q.   So it's all one lead and then the receiver component is inserted into the lumen of the lead?

A.   Yes.

Q.   And you anchor it at different points inside the body?

A.   Yes.

Q.   And were there differences in the anchoring positions between the October 2017 instructions for use and the August 2018 instructions for use?

A.   There would probably be a second anchor here by the second incision.

        MS. FOLCH:  We can take that down.  Mr. Carbone, can we please bring up what's already been entered into evidence as GX 608.

Q.   I'm sorry.  Before we do that, Dr. Gharibo, do you have experience reading product schematics for medical devices?

A.   I do.

Q.   What is your experience?

A.   I've consulted for companies.  I worked with an implantable

company about seven, eight years ago where they had a intrathecal drug delivery pump that went into the body and entered drugs into the spinal column.  And I've seen engineering schematics for that.

Q.  Can you describe that device in layman's term for the jury?

A.  Sure.  Intrathecal means into the spinal canal.  It's a reservoir that can be programmed to deliver drugs into the spinal canal.  It's also an implantable system that houses a drug that is infused into the spinal canal.  It is also used for pain management.  It's also known as an implantable drug delivery system.

Q.  And why were you reviewing product schematics in connection with that device?

A.  I was involved in the development of the device.  I was one of their key consultants.  As a result of that, the pump wasn't FDA approved yet.  It was in development.  So I looked at a lot of engineering schematics as they were developing the pump.

Q.  Dr. Gharibo, do you have any other experience reviewing product schematics involving medical devices?

A.  I've come across them for various companies at different types, including for this particular case.

         MS. FOLCH:  Mr. Carbone, if we could please pull up what's already been entered into evidence as GX 308.

Q.  Dr. Gharibo, do you recognize this document?

A.  I do.

O2T4PER1                    Gharibo - Direct

Q.   What is it?

A.   This is the engineering schematic for the White Stylet.

Q.   Did you review it in connection with this case?

A.   I did.

Q.   Do you see the bottom right of the document, the part number is MD0724.  Do you see that?

A.   I do.

Q.   And what is the name of that part there?

A.   The title is REEL receiver.

Q.   And what does that part number and that title refer to? What component?

A.   It refers to the White Stylet.

Q.   And how do you know that?

A.   Just based on review of the materials, I think you can cross reference that part number with the kit itself and it would be the same.

Q.   And Dr. Gharibo, I direct your attention to the bottom of the page where it says "material"?

A.   Yes.

Q.   What does it say there?

A.   PEEK.

Q.   What is PEEK?

A.   Medical plastic, implantable plastic.

Q.   Is there any other material listed there?

A.   No.

Q.  Just plastic?

A.  Just plastic, PEEK.

MS. FOLCH:  Mr. Carbone, could you please pull up what's already been entered into evidence as GX 313.

Q.  Again, if we could look at the part number there.  Do you see that part number, Dr. Gharibo?

A.  I do.

Q.  What is it?

A.  MD0724.

Q.  And what does that part number correspond to?

A.  It corresponds to -- it's supposed REEL receiver, the PEEK receiver.

Q.  What component of the kit does that correspond to?

A.  It's the White Stylet receiver.

Q.  If we look at the material section, what does that say?

A.  PEEK, medical plastic.

Q.  And is there any other material listed there?

A.  No.

Q.  What does the composition of the White Stylet tell you about the capabilities of that component as a receiver?

A.  It physically cannot function as a receiver.  It has zero conductive ability.  I would add it's a potential insulator, and in some of the Stimwave documentation it's actually referred to as a insulator.

Q.  Dr. Gharibo, is the White Stylet capable of transmitting

energy from an outside battery to the electrode array?

A.   It's physically incapable of receiving current, no.

Q.   Dr. Gharibo, what is your opinion as to the functionality of the White Stylet as a receiver?

A.   It has no physical means to be able to function as a receiver where it doesn't have any conduct ability.  It's not an electrical wire that can receive the energy and transmit it.

Q.   Dr. Gharibo, what's the basis for your opinion?

A.   The basis is my knowledge about PEEK material and medical-grade plastic and just general knowledge that an insulating material cannot be conductive, similar to electrical wires we deal with.  We can hold an electrical wire with insulation material, and we will not get shocked.  This is outside plastic and this is in the body plastic.

Q.   Is your opinion also based on your review of the documents in this case?

A.   Yes.

         MS. FOLCH:  Mr. Carbone, if we could pull this down and pull up what's already been admitted to evidence as GX 701-A.  If you could publish for the jury.

Q.   Dr. Gharibo, do you recognize this?

A.   I do.

Q.   What is it?

A.   This is the video about the implantation.

         MS. FOLCH:  If you could pause it for a moment,

Mr. Carbone.

Q.   Did you review this video for your work on this case?

A.   I did.

          MS. FOLCH:  Mr. Carbone, we're going to go to minute 238, please.

Q.   Dr. Gharibo, if I could ask you to explain to the jury what's happening in this video?

A.   Sure.  First you identify your target site and you put a needle there.  You localize the skin, and you know where the nerve is based on the anatomy knowledge.  You put a marker needle, which is where your lead is going to end up at.  This is for the genicular nerve to treat knee pain.  That is your introducer.  You approximate -- your second entry point, which is for the introducer.  You numb the skin and then you take -- put a stab wound.  And then you take your introducer needle with the yellow housing over it and guide it towards your target.  You aim is so that the needle is parallel to the nerve.  You take out the stylet.  And then you take your lead receiver and advance it towards the nerve so is lies parallel to the nerve.  You take out your navigating stylet with the bent tip.  And you put in your so-called receiver stylet, the White Stylet.  It's labeled as a receiver stylet.  It has no means to be a receiver stylet.  And then you actually stimulate on the lead itself here.  You are not stimulating at the White Stylet.  So this to confirm that you are next to the nerve.

O2T4PER1                    Gharibo - Direct

You are asking the patient, do you feel the nerve stimulation, the pins and needles?  And then you pull out your cannula.  So now your need is bigger than the anchor because the anchoring points have come out of this introducer.  Now you create a tunnel to do that you identify a second entry point to house the so-called receiver this is a bigger incision of about an inch or so.

(Continued on next page)

O2TDPER2                      Gharibo - Direct

(In open court; jury present)

A.   Now you create a tunnel.  And to do that, you identify your second entry point, which is going to house the so-called receiver.  Now this is a bigger incision, about an inch or so. You reintroduce your introducer from the second wound to the first wound.  You take out your needle.  You put your lead through the tip, and take it out through the second stab wound, and that's the tunnel.

Now you create a pocket.  You can use a scissor or you can use your fingers.  Now you tie a knot, and you coil your so-called receiver, and you tie the coil together.  You insert it into the pocket, and then you close -- you can choose to additionally anchor the receiver here, but now you close your wound.

Now, notice that you're stimulating the lead again. You retest your position relative to the nerve, but this stimulation here has nothing to do with the White Stylet now. This is a key point, that the nerve is still being stimulated at the lead, not at the white receiver stylet, because it cannot function as that.

Q.   Dr. Gharibo, based on your understanding of the composition of the White Stylet, what is your opinion regarding the appropriateness of the implantation procedure we just saw for the White Stylet?

A.   There is no receiver functionality to the White Stylet.

That is distinctly different to the general purpose of the Pink Stylet, for example, where it can function as a receiver component. So all those extra steps that you're seeing there in terms of the second stab wound and the tunneling becomes clinically unnecessary.

Q. How would the procedure change, if the doctor did not use the White Stylet when implanting the PNS device?

A. It would change considerably. The white receiver doesn't serve any receiver function. So, therefore, what you can do, you can keep it very simple. You have an integrated system. You have a lead receiver, and you don't need that -- and the nerve is superficial, you have ready access to the nerve.

Let's say your ulnar nerve at the elbow or your occipital nerve at the back of the head, you can simply put the lead receiver next to the nerve and be done with it. You can anchor it similar to the first set of instructions in 2017 and have that be your only wound and close that up. You don't have to create a second stab wound for so-called receiver access, because that receiver access doesn't accomplish anything. Those you need to create a tunnel --

Q. Dr. Gharibo, what is your basis for your opinion that those additional steps are unnecessary when implanting the White Stylet?

A. The basis is my review of the materials, hundreds of pages of materials on Stimwave and what each component does, and my

general knowledge of different neuromodulation systems, both where the battery is inside the body or the battery is outside the body, and having attended really two decade of meetings on such topics.

Q. Based on your experience, Dr. Gharibo, how does the fact that the White Stylet is made completely out of plastic affect the device's ability to transfer energy to the patient's nerve?

A. So the White Stylet doesn't have any conductive receptive function. I mean, so basically it's being placed under the understanding by physicians that this is going to serve a receiver function. Now, once it doesn't do that, what happens is there are consequences from that where it can lead to, for example, failure of the device. If you lose access to stimulating the lead at the lead itself, this is a lead receiver, you cannot rely on the White Stylet to recapture access to the lead, so it can lead to treatment failure and redevelopment of exacerbation of the chronic pain syndrome.

Q. Dr. Gharibo, what do you mean by access to the lead?

A. Sure. So notice on the individual, yes, that there is wireless access where the stimulation itself and confirmation of the stimulation is being done directly at the lead. The White Stylet or even the Pink Stylet is not serving any purpose at that point, because stimulation is occurring directly at the receiver that is on the lead, which is in direct communication with the electrodes.

Now, let's say, as you're moving, wherever that nerve may be, the battery pack is going in and out as you're moving about the body, as you're doing your daily activities.  So that's going to result in unreliable stimulation where it's going to go in and out, which is going to be unpleasant; or the lead simply moves in deeper into the soft tissue, where all of a sudden you can't electrically communicate with it anymore to be able to transmit the energy; or the patient gains weight; there are regional tissue changes as we age, and the area begins to get some additional soft tissue to it.  So as time goes on, you may not be able to communicate with the stimulator receiver at the lead.

So then, what's happening there, the physician may think, well, I put the White Stylet in, which is a white receiver, so let me access the lead through there.  But the white receiver doesn't have any receiver functionality.  It is made of plastic.  So you can have complete treatment failure over time, in a short amount of time or in a long amount of time, that would necessitate removal of the device and reoperation.

Q.  Dr. Gharibo, you also used the word "capture."  What do you mean when you say you might lose capture?

A.  So during the trial or during -- during the implant let's say, you can easily capture things, because they are -- you have very good control over how deep that electrode is, because

you put it there.  The physician put there.  So you're able to capture the lead.  You're able to communicate with the lead wirelessly.

So you take your battery pack.  You put it over your receiver, and it talks with the receiver.  So that's capture.  Electrical coupling.  Now, there's going to be -- let's say there's weight gain, tissue change, whatever.  The lead just simply moves in deeper.  You can lose that electrical communication, so there's loss of capture as a result.

Q.  Dr. Gharibo, what's the basis for your opinion that implantation of the White Stylet could lead to loss of capture or loss of access to the lead?

A.  So the physician is being told that the White Stylet is a receiver, and we like to put in systems that are durable.  We do know what the White Stylet is made up of at that time -- at present, but when I'm putting the device in, I'm being told this is a receiver.  I'm thinking that, well, this is essentially an antenna; this is a way to communicate with the lead, and it's going to give me some flexibility as circumstances change for the patient that I just treated, six months, years beyond the -- after the implant period.

So at first everything is fine, but if I lose access -- so the best case scenario here is that everything is fine. I maintain access to the lead over the stimulator receiver, over the lead receiver, and everything's fine.  All the

additional steps are done. But I have the White Stylet in there, in my mind I'm thinking as my backup, if I lose access to the lead at the lead receiver. And let's assume I lose that access, and now I'm going to rely on the White Stylet, but the White Stylet is not going to deliver, because it doesn't have conductive or any receiver capability, so it's going to fail. The system is going to fail, and it would have to be revised or removed.

Q. Dr. Gharibo, is your opinion based on the review of documents for this case?

A. Yes.

Q. And is it also based on your experience with neuromodulation devices generally?

A. Yes.

Q. In your experience working with these neurostimulation devices, how would implantation of the White Stylet affect the patient's treatment for chronic pain?

A. It would affect it such that -- I mean, a variety of different things. So you can't rely on -- as I mentioned, so there's a higher probability of implant failure with the White Stylet if circumstances change, if the device goes in deeper. So you have an op -- there would be -- there would be opportunity for the pain to exacerbate where you can't all of a sudden control the pain. And clinically that's very meaningful, because that would mean you have to bring up the

dosages, additional pharmacotherapy non-opioid and opioid therapy may need to be prescribed to the patient to control their pain again.

Q. Dr. Gharibo, in your view, are there any health risks associated with the fact that the White Stylet could not function as a receiver when implanted in a patient?

A. Yes.

Q. What are those risks?

A. The most common complication that we run into with implantable devices is pocket pain.

MR. COHEN: Objection, to the extent we're not talking about this device.

THE COURT: You may lay your foundation for the testimony you are about to elicit.

Q. Dr. Gharibo, you've implanted neurostimulation devices in your career?

A. Yes.

Q. And the implantation procedures that we just discussed, are you familiar with those implantation procedures in your own practice?

A. Yes.

Q. And are they substantially the same procedures that you employ in your own practice?

A. Yes.

Q. So in your view, are there health risks associated with

implanting the White Stylet in the PNS -- from the PNS system?

MR. COHEN:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  What are those?

A.  They're additional steps that are being implemented here, because of what we think are implantation of a receiver stylet, that are unnecessary.  And they start with the second stab wound, which is bigger, dissection of a pocket, and the tunneling itself.  And that, the tunneling, the stab wound, and the pocket creation are being done for the White Stylet, thinking that it's going to serve as a receiver.

Now, when we create a pocket, one of the health risks is pocket pain.  You simply form neuromas.  There's a foreign body there.  And that's one of the most common, I would say, complications you run into with implantable devices, but also you're making the decision more invasive as well.  Pockets are also the first things that get infected as well.  If there's going to be an infection, generally speaking, it's right at the pocket.  So now you've created an infection opportunity.  The tunneling site may also get infected, too.

It adds additional time to the procedure.  The physician has gone through extra steps thinking they're benefiting the patient under a false understanding of what that device actually does.  There is additional anesthesia that's

being delivered to the patient.  The procedure's being prolonged in the form of a second stab wound, the tunneling, and creation of the pocket.  Additional drugs are being administered to the patient because of that, thinking that you're implanting a receiver that cannot function as a receiver.

MS. FOLCH:  If I may have a moment, your Honor?

Q.  And, Dr. Gharibo, can you describe any long-term health related risks associated with implantation of the White Stylet?

A.  So the -- essentially, for example, you have -- I mean, the pocket pain, as I went over it before, and device-related discomfort, but I think the main thing is loss of capture and device failure.  So long term you have a device that's not going to be as durable than if -- it would be if there was -- it was an actual working receiver attached to the lead, so the long -- the biggest risk here is loss of capture, and all of a sudden you don't have control of the device anymore, because the lead has moved.

But the additional risk is that additional components are going into the patient, and an additional surgical invasiveness is occurring that can result in complications. That could be neuroma formation, for example, at the incision sites.  That can produce additional pain problems for the patient, in addition to the pocket pain, tunnel pain, and other things that we reviewed.

O2TDPER2                    Gharibo - Cross

MS. FOLCH:  Nothing further.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Good morning, Dr. Gharibo.  How are you?

A.  Good morning.  Well.

Q.  My name's Derek Cohen. I represent Ms. Perryman.

We haven't met before, right?

A.  Correct.

Q.  I think you testified you've been an expert witness on a number of occasions; is that right?

A.  Correct.

Q.  And you've been an expert witness in particular for the U.S. Attorney's Office on a number of occasions, right?

A.  I'm been for and against.

Q.  With regard to this particular U.S. Attorney's Office, how many times have you been an expert witness for the U.S. Attorney's Office for the Southern District of New York?

A.  I don't -- I can't count that.  I'm not familiar.

Q.  Numerous times?

A.  I'm sorry?

Q.  Numerous times?

A.  Numerous times.

Q.  Okay.  And on a wide variety of topics in the medical field?

A.  I believe mostly opioid cases.

Q.   Mostly opioid cases?

A.   Yes.

Q.   Okay.  And that's not what we're testifying about today, correct?

A.   I'm sorry?

Q.   That's not what we're testifying about today?

A.   That is correct.

Q.   In fact, this is an alternative treatment to opioids, right?

A.   Yes.

Q.   And I think at the very beginning we've established you've never actually done a procedure with the Stimwave PNS device, correct?

A.   Correct.

Q.   And you've never done a procedure with any PNS device, correct?

A.   That's correct, not on a live patient.

Q.   Not on a live patient.

     And you refer that work out, right?  You said --

A.   Yes.

Q.   And why do you refer it out?

A.   Because I'm very busy.  Most of my patients are spinal patients.  I treat a lot of neck pain, cervical spine, and lumbar spine, but I'm beginning to get into peripheral, hip, and knee, and other areas as well.

O2TDPER2                         Gharibo - Cross

Q.   Right.  So they're different, right?  So some folks specialize in PNS and some folks specialize in SCS, right?

          MS. FOLCH:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  I disagree.  They're very comparable. In fact, PNS was born out of SCS, because they're so comparable.

Q.   But you refer them out?

A.   It's not something I've gotten into in a spine practice, but I'm very familiar with neuromodulation.

Q.   Okay.  And you said that to prepare for this, you reviewed documents; is that right?

A.   I did.

Q.   And those documents were provided to you by the government?

A.   Yes.

Q.   And so they decided what you would see?

A.   Yes.

Q.   Okay.  And you didn't do any independent research with regard to your testimony; is that right?

A.   No.

Q.   You didn't run studies on functionality of the White Stylet, correct?

A.   Correct.

Q.   And you didn't run any studies about patient harm, correct?

A.   No.  Correct.

O2TDPER2                     Gharibo - Cross

Q.   This is just your opinions?

A.   Review of the materials.

Q.   Review of the materials that the government provided you?

A.   Correct.

Q.   Okay.  Let's pull up government -- Defense Exhibits 415 and 407, and can we put them side by side, in evidence?

You can show the jury.

Have you seen these?

A.   I have.

Q.   Okay.  These were among the materials provided by the government to you?

A.   Yes.

Q.   And do you see the one on the left?

A.   I do.

Q.   And you understand that to be the Pink Stylet?

A.   Yes.

Q.   And the one on the right, you understand that to be the White Stylet?

A.   Yes.

Q.   And could you explain for the jury the difference between the two?

A.   So the one on the left, 415, is the Pink Stylet, because it has a copper core.  That's the conductor part.  Whereas the one on the right is MD0724, and that is only made of PEEK material. It doesn't have copper.  It is pure PEEK.

Q.   Okay.  And so both were made of PEEK, right?

A.   Both have --

MS. FOLCH:  Objection.

A.   -- PEEK.

THE COURT:  Overruled.

Q.   Both.  Okay.  And PEEK you said was medical grade plastic?

A.   Yes.

Q.   And that means it's approved to go into the human body, correct?

A.   Correct.

Q.   It's not just plastic you could buy at the store and put it in?

A.   Yes.

Q.   And on the picture we see it kind of prominent, the copper, but have you actually seen the Pink Stylet?

A.   Yes.

Q.   Have you actually held the device?

A.   Yes.

Q.   Okay.  I'm going to show you -- I'm handing up Government Exhibit Three in evidence.

Would you pull out the device, please?

Now, is that the device that you saw as part of your preparation?

A.   Yes.

Q.   Can you pull out the Pink Stylet and the White Stylet?

O2TDPER2                    Gharibo - Cross

Now, to you visually, Doctor, are there differences to the human eye between the two?

A.  No.

Q.  You can't see a difference between the pink and the white?

A.  No.

Q.  Do you have -- is your eyesight good?

A.  Yes.

MS. FOLCH:  Objection.

THE COURT:  Overruled.

Q.  Just checking.

How about the feel?  Do they feel different to you?

A.  They're generally the same.

Q.  Don't feel any different?

A.  Correct.

Q.  Okay.  Are they the same length?

A.  They should be.  Yes.

Q.  Okay.  You haven't felt them when you're actually using it in a procedure, correct?

A.  I've put it into the lead itself.

Q.  Okay.  But not in an actual procedure?

A.  Correct.

MS. FOLCH:  Objection.

THE COURT:  Overruled.

Q.  Now, you spent a significant amount of time --

Can we pull up Government 315 in evidence?

Can we go to page 24 of this?

Before we go there, do you recall being asked a number of questions about this document, and specifically with the directions on how to do the procedure?

A.   I do.

Q.   And you were being asked as to -- you were asked to compare it to another different instruction for use?

A.   I recall it.

Q.   Okay.   Can we go to the last page of this?

When you were doing that, were you aware that this, 315, was the European IFU?

A.   I didn't pay particular attention to that.

Q.   So now that you see that -- you know what CE is?

A.   Yes.

Q.   And I would reflect to you that it's European?

A.   I'm not -- I've seen it in many different places.   I'm not sure exactly what it reflects.

Q.   So in part of your preparation for your testimony here today, you didn't determine whether the IFU you were looking at was actually even distributed to doctors in the United States?

MS. FOLCH:   Objection.

THE COURT:   Overruled.

THE WITNESS:   Correct.

Q.   So if this was not distributed to doctors in the United States, all of the discussion that you gave with regard to the

directions being given to doctors would have been given to doctors not in the United States, correct?

A.   I'm not sure exactly what would be given to the U.S. doctors.

Q.   But as part of your prep -- when you came here, I assume you wanted to be as prepared as possible, correct?

A.   Yes.

          MS. FOLCH:  Objection.

          THE COURT:  Overruled.

Q.   And you wanted to give the jury the benefit of your review of the materials, correct?

A.   Yes.

Q.   And would it be pertinent to find out if the materials that you're relying on were actually provided to doctors in the United States?

A.   I don't think it would.  This is about implantation into humans, whether it was Europe or here.

Q.   Okay.  Do you understand the charges in this case?

          MS. FOLCH:  Objection.

          THE COURT:  You may answer -- well, sustained.

Q.   Okay.  You understand that this case is being brought by the United States Department of Justice?

A.   I do.

Q.   And so is it your understanding that this would have anything to do with what happened in Europe?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

Q.  Okay.  So you didn't know when you were going through all this that this was a European IFU, right?

THE COURT:  Sustained.

Q.  We can take that down.

Doctor, speaking of IFUs, it's your view that doctors don't really pay any attention to IFUs, correct?

A.  It depends.

Q.  Well, did you tell the U.S. Attorney's Office that, in your experience, doctors don't rely on IFUs?

A.  It really depends on the doctor.  Some may.  Some may not. All the time they may rely less and less, but initially they may.

Q.  My question to you, sir, is did you tell the U.S. Attorney's Office that doctors generally don't rely on IFUs?

Do you recall saying that to the U.S. Attorney's Office?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  It depends on the context.  For somebody who's learning, they would rely on IFUs, but as you gain specialties, you may not.

Q.  Can we pull this up just for the witness?

Can you take a look at what I'm showing you?

Just read it to yourself, and then I'm going to ask you again, does this refresh your recollection?

THE COURT:  You need to give the exhibit number, counsel.

MR. COHEN:  It's Defense 3545-17.

THE COURT:  Thank you.

Q.  Can you take a look at that and see if it refreshes your recollection if, in your opinion, doctors don't generally refer to IFUs?

A.  It's consistent with what I just stated, that fellows, who are doctors, may look at it, and once they've been trained in implanting a stimulator, it's pretty much the same procedure with all the same devices.  As you gain experience, you don't look at it as much.

Q.  Okay.  You can pull that down.

A.  But you may refer back to it if you have a question.

Q.  Okay.  You said -- I think one of the things that you said with regard to the different -- if we could pull up 415 and 407 again.  You had said that with regard to 415, the Pink Stylet, you believed that it acted as an antenna?

A.  Yes.

Q.  But you didn't believe that it was a receiver, correct?  Is that what your testimony was on direct?

A.  It's semantics.  It depends on how you define it.  But it is conductive.

Q.   But did you say on direct that you didn't think it should be called a receiver?

A.   Technically, it's not a receiver.

Q.   Okay.

A.   Yeah.

Q.   So if it was called a receiver, in your view, that would have been incorrect?

A.   As long as you have an understanding of what each device does, it can be -- it's not a receiver per se.  It's a wire. It's not a receiver.

Q.   Okay.  So my question, sir, was, would it be incorrect?

A.   It would be incorrect.

Q.   Okay.  And you said on direct that there were some advantages to the White Stylet.

     Do you recall that testimony?

A.   Yes.

Q.   What are the advantages to the White Stylet?

A.   The advantage is that you have a smaller system, because you can cut it closer to the electrode array.

Q.   Okay.  And I'm going to talk for a minute about what you're calling -- you said if you used the White Stylet, you wouldn't need a second incision.

     Is that your testimony?

A.   Yes.

Q.   And so, in your view, that is a unnecessary --

THE COURT:  I'm sorry.  If you use or if you don't use?

Q.  If you use the White Stylet --

MR. COHEN:  I'm sorry, your Honor.

Q.  -- you would not need a second incision in your view?

A.  It depends on the length that you're going to have in there, but the White Stylet allows you to really -- it's not doing anything meaningful from a receiver perspective, so you can make the system a lot smaller.

Q.  Thank you, Doctor.  I'd appreciate it if you could answer my question, which is, was it your testimony that the second incision would not be required for white -- for the insertion of a White Stylet?

A.  You can do away with the latter part of the procedure if you use the White Stylet.

Q.  Are there instances in which you would need a second incision for the White Stylet based on your review of the documents?

A.  No.

Q.  You can't think of any instance in which you would need a second incision for a White Stylet?  Is that your testimony?

A.  Yes.

Q.  And that's based on your review of other people doing the procedure, correct?

A.  Yes.

Q.   Not you doing the procedure, right?

A.   My review of the materials, my knowledge of the components and what the White Stylet does.

Q.   Okay.  Can you pull out the electrode array and the blue stylet?  Can you pull that out for the jury, and can you open up and show them, give them a sense of the length?

     Do you know how long it is?

A.   This is about 20 inches or so.

Q.   Forty -- would 43 centimeters sound right?  Would that be consistent with your review of the materials?

A.   Sounds about right.

Q.   All right.  So that -- and there's a little blue stylet that's about 2 centimeters at the end -- or a handle I should say?

A.   Yes.

Q.   And could you pick up the introducer?

     The introducer is about 13 centimeters?  Does that seem right, Doctor?

A.   Yes.

Q.   And it has two centimeters at the end of it?

A.   Yes.

Q.   Okay.  So could you show the jury then how you would guide it if you did these procedures, how you would guide it with the introducer?  How would that work?

A.   It depends on where the nerve is, but, for example, at the

knee, it was the genicular nerve.  You have to line it up so the tip of the introducer is parallel to the target nerve, the genicular nerve.

So once you localize, you create your stab wound, and then you take out the cover.  So this is a two-piece item. There is a needle within the yellow plastic part, and you guide it so that the tip, this tip is next to the nerve and parallel to the nerve.  You literally just push it based on your knowledge of the anatomy, so that the tip is parallel to the nerve.

Q.   And it's important it has to be parallel, right?

A.   Yes.

Q.   And why is that?

A.   Because the contact points need to be optimized so that they're in close proximity.  So this is a four-electrode system.  There are four electrodes here, and they need to be parallel to the nerve so that all 4-contact points can stimulate the nerve.

Q.   Okay.  So it's important that it stay flat, because it's not going to work -- you don't have the ability to sort of go in at angles, right?

A.   You want a shallow angle, correct.

Q.   And so if you are dealing with sort of tight spots, knee, or the arm, or some of the places it will go, you have to go in at a very sharp angle to keep it flat; is that right?

A.   It's going to be a shallow angle.

Q.   Shallow angle.  That's probably a more precise way to do it.

        And if the device is 43 centimeters and the introducer is 13 centimeters, how much of the device is going to be sticking out once you've introduced it?

A.   There's going to be some of it that's sticking out.

Q.   About 30 centimeters?

A.   It could be that.

Q.   Let's do the math together.  It's 43 minus 13 is 30 centimeters, Doctor?

A.   Sounds about right.

Q.   And 30 centimeters is about 12 inches?

A.   Probably.

Q.   Okay.  And some port portion of that -- you're aware when the device was first approved, it was approved without any additional stylet, without the white or pink, right?

A.   Correct.

Q.   And it will function without that, right?

A.   It would.

Q.   Because it has a better receiver in it, right?

A.   Yes.

Q.   And you basically just have to get the power source to it, right?

A.   Yes.

Q.  So the question with respect to the stylet is where do you ultimately have to have the power source, where do you have to put it?

A.  I didn't understand.

Q.  I'm sorry.  Ultimately, then, it's a question of where you put the power source, depending on whether you have a Pink Stylet, a White Stylet or no stylet, right?

A.  Yes.

Q.  And if you have no stylet, you have to get right on top so it's going to be near the embedded receiver, right?

A.  Yes.

Q.  And if you have the white one, you have to do the same thing because it's not going to be extended, right?

A.  Correct.

Q.  And the pink one will let you go back, because it's got about 10 centimeters of copper in it, a trace of copper in it that will let you spread it out, and you can put the battery further away, right?

A.  That's correct.

Q.  So sometimes it's advantageous to have the battery further away, right?

A.  Yes.

Q.  And sometimes you want to be able to put it closer, right?

        MS. FOLCH:  Objection.

        THE COURT:  Do you understand the question?

O2TDPER2                       Gharibo - Cross

A.  I'm not clear.  It's sort of a run-on question.

Q.  I'm sorry.  Sometimes you want the ability to have the battery pack farther away?

A.  Yes.

Q.  And sometimes you don't need that, and you'd rather be able to have it closer, depending on the tightness of the space, correct?

MS. FOLCH:  Objection.

THE COURT:  Overruled.  You may answer.

A.  If the nerve is superficial, you don't need all that extra distance.

Q.  Okay.  So is that a yes?

A.  Yes.

Q.  Okay.  Now, let's say you had no stylets at all, there is no pink and no white, and you've now got the 12 inches that is sticking out.  That's literally coming out of the arm.  If we're doing it here, you have a foot of that tubing coming out, correct?

A.  Yes.

Q.  And some portion of it you can cut, right?

A.  Yes.

Q.  But we've made our introduction.  You said you want to make the incision sort of near where you're putting the nerve in, right?

A.  Yes.

Q.   So now we have a foot of it that we have to account for, right?

A.   So basically -- not necessarily.  I mean, the active part here is you have your electrodes, you have your receiver, and then this is the proximal marker.  This is the distal marker. You can cut this as short as that.  So you don't have to extend it all the way, and you can just suture it right there.

Q.   Okay.  Do you need -- do you -- as part of your review, do you understand that you need to have enough to suture and put in?

A.   Yeah, but that's not so much material, that's not so much tubing.

Q.   Okay.

A.   So you don't need to add that additional.  I mean, that's the good thing about the system.  It's very compact.  You can directly stimulate a particular superficial nerve, and you can make it very compact, unlike other systems.

Q.   As part of your review today did you talk to any of the medical trainers on how physicians were being trained to do this procedure?

A.   No.

Q.   Okay.  Did you think that that might be helpful?

         MS. FOLCH:  Objection.

         THE COURT:  Sustained.

Q.   Okay.  You said you didn't do any other testing or

O2TDPER2                        Gharibo - Cross

independent research with regard to other functionality of the

White Stylet, correct?

A. Correct.

Q. And so are you aware of any literature or anything with

regard to your review and preparation for today that would

suggest there might be other functions for the White Stylet?

A. I can think of other functions and repurposes for it, but

it doesn't serve its primary function and label function of

serving as a receiver.

Q. Okay. Understood. I'm asking you about other functions.

So, for instance, would it fill the lumen?

A. It would.

Q. And would it provide a little tensile strength to the

lumen?

A. That may not be a desirable function, but it can.

Q. It would do that, right? Okay.

You also testified about potential health risks that

would -- that would potentially come with it.

You can take these down.

Is that right?

A. Yes.

Q. And that's what they were, potential, right?

A. It's a risk/benefit analysis: What is the benefit you're

getting for the risk that you're putting the patient under.

Q. Okay. But now, now we have the benefit of some time, don't

O2TDPER2                      Gharibo - Cross

we, Doctor, to see what happened?

MS. FOLCH:  Objection.

THE COURT:  Sustained, as to form.

MR. COHEN:  I understood.

Q.  You didn't do any independent study with regard to whether there were actually any health risks with regard to the White Stylet, correct?

A.  I'm familiar with the health risks of neuromodulation in general and unnecessary components --

Q.  Okay.

A.  -- of an unnecessary incision and tunneling.

Q.  Okay.  I'm going to ask you again, sir, did you do any independent research with regard to whether there were health risks with regard to the implantation of the White Stylet?

A.  Yeah, there are some common risks that are associated with implantation of the White Stylet.

Q.  Okay.

A.  I didn't do any studies on that, but I'm aware of them.

Q.  So you haven't looked at anything in particular with regard to the White Stylet; is that true?

MS. FOLCH:  Objection.

THE COURT:  Sustained.  But you may inquire.

Q.  Doctor, do you understand my question?  Not generally.  I'm asking you specifically, specifically with regard to your research, have you done any independent research with regard to

your testimony here today about the potential health risks of the White Stylet?

A.  It doesn't need research.  We are aware of the health risks of unnecessary surgery, unnecessary cuts, and tunneling.

THE COURT:  So, Doctor, I'm going to try my best to read back the question that you were asked, and if at all possible, I want you to answer it with a yes or a no.  If you can't in fairness answer it with a yes or no, that's fine.  You may give a longer answer.

THE WITNESS:  Yes, your Honor.

THE COURT:  So have you looked at anything in particular with -- well, I think we need a complete question.

Q.  Okay.  Doctor, yes or no, have you personally conducted any study with regard to the health risks in relation to implantation of the White Stylet?

A.  I haven't conducted studies with respect to the White Stylet.

Q.  Thank you.

And so your testimony here today was based on your general views of implantation, correct?

MS. FOLCH:  Objection.

THE COURT:  You may answer.

A.  My knowledge of surgical complications is what it's based on.

Q.  Okay.  But now you're aware that the White Stylet has been

O2TDPER2                        Gharibo - Cross

off -- has not been used since 2020; is that correct?

A.   Yes.

Q.   You know that from your review of the documents?

A.   Yes.

Q.   So it's been almost four years, correct?

A.   Yes.

Q.   Are you aware of any actual patient harm caused by the White Stylet, you personally?

A.   I can't point to a specific individual case that I can name, but I'm aware generally speaking as to what can happen.

Q.   I didn't hear the last part.

A.   I'm very familiar with what the possibilities are as to what may happen.

Q.   Okay.  I'm asking you, sir, not about the possibilities. I'm asking you about what happened.  So I'll ask you again, you know, four years later, can you identify for the jury a single instance of any patient harm?

         MS. FOLCH:  Objection.

         THE COURT:  Overruled.

A.   I can't name a name or an individual that was harmed by it.

Q.   Okay.  So that means you're not aware of it, correct?

A.   I'm not aware of it.

Q.   And as part of your review of the document, were you aware there was a study done of patient harm?

A.   Yes.

Q.   And it concluded that there was none, correct?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

Q.   What's your understanding of what the study found?

A.   That the highest risk is loss of capture.

Q.   And that that risk was not a real risk, because you took care of that as a part of the trial, correct?

A.   No.

MS. FOLCH:  Objection.

Q.   All right.  Let's pull up 236 in evidence.

Loss of capture just means you wouldn't get the therapy you would otherwise get?

A.   Yes.

Q.   Okay.  Let's go to page 35.

Okay.  Can we pull up the top now?

These are the folks who actually study it, correct?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

Q.   Are you aware that this was a study directed specifically at this issue?  Correct?

A.   Yes.

MS. FOLCH:  Objection.

THE COURT:  Overruled.

Q.   And they looked at this issue of loss of therapy, correct?

A.   Yes.

Q.   And they determined it wasn't an issue because you would test it during the trial stage, and you would find if there was a problem then, right?

          MS. FOLCH:  Objection.

          THE COURT:  Sustained.

Q.   What's your understanding of what they found?

A.   What -- their understanding is quite flawed.  I'm an editor for Pain Physician, so I look it at these studies.  So what they state in this study is since you're stimulating the lead directly and you're capturing the stimulation of the nerve, that should be reliable.  And the White Stylet is really inconsequential.  So, therefore, it doesn't really matter if the White Stylet has receiver functionality or not.

          But the problem with that, as I explained before, is that our bodies change, the lead's position changes.  You can't just rely upon the intraoperative stimulation and expect that to be the same for years.  And if the body's configuration ended -- if the lead gains depth or if tissue builds up around the lead, you're going to lose capture independent of the intraoperative stimulation.

Q.   Okay.  So if you lose capture, it just means they're not getting the therapy, right?

A.   Right.

Q.   It's not patient harm per se, right?

          MS. FOLCH:  Objection.

THE COURT:  Sustained.

Q.  Okay.  They're not going to suffer an adverse health consequence from that?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

Q.  Do you have an opinion as to -- what does it mean if they lose that?

A.  It means very serious -- it's a consequence to the chronic pain patient, because neuromodulation is more advanced treatment after many things have failed.  So once many things have failed, some people think of this as a treatment of last resort.  And now the devices is working, and let's say a year later it fails because of, let's say, weight gain, and now you can't use the White Stylet as a receiver anymore that you put the patient through, that you subjected -- the risk of that procedure was worsened because we implanted the White Stylet, because we tunneled, because of the second stab wound that was an inch, because of the pocket that you created, that the physician thought that you can rely on, now you cannot rely on.  So the treatment fails, and there's additional anxiety, depression, worsening of the pain, additional pharmacotherapy, additional procedures, you know, that the patient will have to go through because of the White Stylet's failure as a receiver.

Q.  Can we pull up page 33?

And can you pull up the middle?  Unlike the receiver

--

Doctor, can you read the sentence beginning "it is possible that stimulations of strength?"

A.   "It is possible that stimulation strength could be impacted resulting in a loss of therapy and/or no stimulation."

Q.   And the next one?

A.   "However, this scenario would not ultimately cause or contribute to an adverse health consequence."

Q.   Okay.  And did you say that this study was flawed?

A.   Yes.

Q.   And in science, you have the ability, as scientists, to do your own study, correct?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.   You can.

Q.   Did you do a study to show that this was flawed?

A.   I didn't, because it doesn't need a study, because it is flawed.  It is very clinically consequential to have a device failure.

Q.   Because that's your opinion?

A.   Yes.

Q.   Okay.  Nothing further.

THE COURT:  Any redirect?

REDIRECT EXAMINATION

BY MS. FOLCH:

Q.  Dr. Gharibo, you were just asked some questions about a health hazards evaluation.

Do you remember that?

A.  Yes.

Q.  I think it's DX 236.

MS. FOLCH:  Can we pull that up, Mr. Carbone?

Q.  In the meanwhile, Dr. Gharibo, you were asked some questions about some other functionality that the White Stylet might have?

A.  Yes.

Q.  And you were asked whether it might fill the lumen.

Do you remember that?

A.  I do.

Q.  In your opinion, is that necessary?

A.  No.

Q.  Why not?

A.  Because that lumen is kept open in some systems.  I've put in many such systems where there's nothing in there.

Q.  And, Dr. Gharibo, you were also asked some questions about the correct terminology for the Pink Stylet, whether it's a receiver, an antenna, or some other terminology.

Do you remember those questions?

A.  I do.

Q.  Dr. Gharibo, in your view, based on your experience with neuromodulation devices and your review of the documents for

this case, did the Pink Stylet conduct energy to be able to transmit it from a battery outside to the electrode array?

A.  Yes.

Q.  And did the White Stylet do that?

A.  No.

MS. FOLCH:  Mr. Carbone, are we able to pull up DX 236?  Oh.

MR. COHEN:  Can you pull it up, please?

MS. FOLCH:  Thank you.

Q.  Dr. Gharibo, do you see up at the top there under "product information," that first line, it says HHE number?

A.  I do.

Q.  And next to it it says -- well, some letters, and then it says "report 2020 05-11."

Do you see that?

A.  I do.

Q.  Is that the date of the report, May 11, 2020?

A.  I believe so.

Q.  And approximately how long ago was that?

A.  About four years.

Q.  So this reflects only the analysis as of four years ago?

A.  Yes.

Q.  Dr. Gharibo, you were asked some questions about the instructions for use that we looked at earlier during your testimony.

Do you remember that?

A.  Yes.

Q.  And in your -- have you seen instructions for use for neuromodulation devices before?

A.  Yes.

Q.  And as a physician, is it your expectation that they would be accurate?

A.  Yes.

Q.  And in your practice with implanting patients with neuromodulation devices, are you also sent videos by companies that manufacture neuromodulation devices?

A.  Yes.

Q.  And do you rely on those videos to learn about how to implant neuromodulation devices?

MR. COHEN:  Objection.

THE COURT:  Overruled.

A.  Yes.

MS. FOLCH:  May I have a moment?

And you can take this down.  Thank you.

Q.  Dr. Gharibo, you were asked some questions about whether there might be an advantage to using the White Stylet, because it might be closer.

Do you remember that?

A.  I do.

Q.  Cutting it closer to -- do you remember that testimony

about there being an advantage to cutting closer to the nerve?

A.   Yes.

Q.   And compared to what?  Cutting it closer compared to what?

A.   To the Pink Stylet.

Q.   And does that affect your opinion as to the functionality of the White Stylet as a receiver?

A.   No.

Q.   Does it affect your opinion with regard to the appropriateness of the implanting procedures for implanting the White Stylet?

A.   No.

Q.   Nothing further.

RECROSS EXAMINATION

BY MR. COHEN:

Q.   Doctor, are you aware of any PNS device currently on the market in the U.S. that leaves its lumen open?

         MS. FOLCH:  Objection.

         THE COURT:  Overruled.

A.   I think just about -- there's a stim router.  I'm trying to recall that.

         I can't specifically tell you, but I can tell you that it's something that's done.

Q.   Okay.  I'll ask you again, sir.  Can you right now for this jury identify any PNS device on the market in the U.S. that leaves the lumen open?

A.   Not as I --

         MS. FOLCH:  Objection.

         THE WITNESS:  -- sit here.

Q.   Thank you.  Nothing further.

         THE COURT:  Any redirect?

         MS. FOLCH:  Nothing further.

         THE COURT:  You may step down.

         Next witness.

         MR. BERGMAN:  The government calls Staff Operation

Specialist Isabella Fuchs.

         THE COURT:  Ms. Fuchs, if you could come up here,

please, and take the witness stand.

         If you could remain standing.

         Counsel, if you could remove the material from the

witness stand.

         Ms. Fuchs, face me and raise your right hand.

         (Witness sworn)

         THE COURT:  Please be seated.

         State your full name.

         THE WITNESS:  Isabella Fuchs.

         THE COURT:  Spell your first name.

         THE WITNESS:  I-s-a-b-e-l-l-a.

         THE COURT:  And your last name?

         THE WITNESS:  F-u-c-h-s.

         THE COURT:  Counsel.

ISABELLA FUCHS,

     called as a witness by the government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BERGMAN:

Q.   Good morning, Ms. Fuchs.  Where do you work?

A.   I work for the Federal Bureau of Investigation.

Q.   And what is your position there?

A.   I'm a staff operation specialist.

Q.   And how long have you been a staff operation specialist
with the FBI?

A.   Since October of 2021.

Q.   And what are your duties as a staff operation specialist?

A.   As a staff operation specialist, I work as an analyst on
the health care fraud squad, which means that I assess data
related to health care fraud investigations.

Q.   And you said you were part of the health care fraud squad.
What does your squad do?

A.   We investigate health care fraud investigations.

Q.   And can I use the abbreviation SOS for your position?

A.   Yes.

Q.   Thank you.

     SOS Fuchs, have you reviewed certain documents
provided to you by the government in preparation for your
testimony here today?

O2TDPER2                        Fuchs - Direct

A.   Yes.

Q.   And other than reviewing those documents and preparing to testify, have you participated in any other way in the investigation or prosecution of this case?

A.   No.

Q.   So I want to talk about some of the documents you reviewed. First, I'd like to offer into evidence a stipulation previously entered by the parties.

          MR. BERGMAN:  Mr. Carbone --

          THE COURT:  Is there an exhibit number?

          MR. BERGMAN:  Yes.  It's GX 1602.

          THE COURT:  You don't need to read the preface.

          MR. BERGMAN:  I will read the other part, your Honor.

          So, "Government Exhibits 405 and 501 are true and accurate copies of records maintained by Western Reserve Hospital in the regular course of its business.

          The records were made by or from information transmitted by a person with knowledge of the matters set forth in the record at or near the time of their creation.

          The records were kept in the course of a regularly conducted activity of Western Reserve Hospital as a regular practice of that activity.

          The parties stipulate to the following facts:

          On August 1st, 2019, Dr. James Sable implanted a trial Stimwave peripheral nervous system device in patient Jean Ford

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O2TDPER2                        Fuchs - Direct

at Western Reserve Hospital.

On December 12, 2019, Dr. James Sable implanted a Stimwave peripheral nervous system device in patient Jean Ford at Western Reserve Hospital.

Government Exhibit 502 is a true and accurate copy of records maintained by SummaCare, a provider of medical insurance in the regular course of its business.

The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of a regularly conducted activity of SummaCare as a regular practice of that activity.

The parties also stipulate to the following facts:

SummaCare paid Western Reserve Hospital $5,068.43 for the August 1st, 2019, procedure performed by Dr. James Sable on Jean Ford, and SummaCare paid Western Reserve Hospital $16,482.54 for the December 12, 2019, procedure performed by Dr. James Sable on Jean Ford.

The stipulation and the government exhibits referred to herein may be received in evidence as government exhibits at trial subject to objections on the basis of relevance."

And it is dated February -- it's dated New York, New York, February 23, 2024, Damian Williams, United States Attorney of New York; Jacob Bergman, Monica Folch, Steven J. Kochevar, Kimberly Ravener, United States Attorneys; and also

O2TDPER2                        Fuchs - Direct

by Jennifer Berger, Esq., Derek Cohen Esq., Sean Haran, Esq.,

attorneys for Laura Perryman.

          (Continued on next page)

O2T4PER3                         Fuchs - Direct

MR. BERGMAN:  The government would like to offer GX 1602 into evidence.

MR. HARAN:  No objection.

THE COURT:  1602 and the exhibits identified therein are received.

(Government's Exhibit 1602 received in evidence)

MR. BERGMAN:  I apologize.  The government would also like to offer GX 405 and 501 into evidence as well.

THE COURT:  I think I just received.  Thank you.

(Government's Exhibits 405 and 501 received in evidence)

MR. BERGMAN:  Mr. Carbone, if you could please show what's already in evidence as GX 405.  Sorry.  If you could go back to GX 1602 for one moment.  And could you publish that, please.  Thank you.

Q.  Just focusing in on Paragraph 2A.  Ms. Fuchs, do you see where the parties stipulate --

A.  Yes.

Q.  If I could just finish.

A.  Sorry.

Q.  That's OK.

The parties stipulate to the following facts, that on August 1, 2018, Dr. James Sable implanted a trial Stimwave peripheral nervous system device in patient Jene Ford at Western Reserve Hospital?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

          MR. BERGMAN:  Mr. Carbone, could you show what's already in evidence GX 405.

Q.   Do you see where it says Western Reserve Hospital at the top of the page?

A.   Yes.

Q.   What is the name on the top right of page 1 of this document?

A.   It says Ford, comma, Jene R.

Q.   And in the middle of the document below this line, what is the title in the middle there?

A.   Operative report.

Q.   And who is the surgeon listed on the top right of this document?

A.   J. Tim Sable.

Q.   And do you see where it says operation?

A.   Yes.

Q.   Somewhat listed under operation?

A.   Peripheral stimulator trial, Stimwave for stimulation of the right infrapatellar branch of the saphenous nerve.

          MR. BERGMAN:  Mr. Carbone, could you show what's already in evidence as GX 501.

Q.   In the box in the top left corner, could you just read what's in the top left box, please?

A.   Western Reserve Hospital.

Q.   Who is listed under patient name below that?

A.   Ford, comma, Jene R.

          MR. BERGMAN:  If we could pull out from this a little bit and go to Box 38.

Q.   What is listed in Box 38?

A.   Is that the date?

Q.   Sorry.  Do you see where there is --

A.   Oh, I see.  SC Medicare Advantage.

Q.   Do you see where it says occurrence date, right above where what you just read.

A.   08/01/19.

Q.   And moving down to the middle of the page where you see pharmacy is listed at the first part.  Do you see the numbers 64555 listed in?

A.   Yes.

Q.   And do you see the number 64590 listed there?

A.   No.

          MR. BERGMAN:  OK.  Mr. Carbone, could you please show GX 1602 again, and can you go to Paragraph 4A.  I think it's the next page.

Q.   And SOS Fuchs, how much does is it say SummaCare paid Western Reserve Hospital?

A.   $5,068.43.

          MR. BERGMAN:  And we could come out of this box.  If you could go up to the previous page, please, Mr. Carbone.

Q.   And Ms. Fuchs, do you see Paragraph 2B?

A.   Yes.

Q.   Where it says that the parties stipulate on December 12, 2019, Dr. James Sable implanted a Stimwave peripheral nervous system device in patient Jene Ford at Western Reserve Hospital?

A.   Yes.

MR. BERGMAN:  And Mr. Carbone, could you please show us DX 405 again, and turning to page 11 of this document.

Q.   SOS Fuchs, what is the date in the upper left here?

A.   12/12/2019.

Q.   And who is listed in the top right of this document?

A.   Ford, comma, Jene R.

Q.   Who is listed as the surgeon underneath Ms. Ford?

A.   J. Tim Sable.

Q.   Turning to page 12, three lines down underneath post-op diagnosis, do you see where it says operation?

A.   Yes.

Q.   Can you read what it says under operation?

A.   Peripheral stimulator implant Stimwave for stimulation of the right infrapatellar branch of the saphenous nerve.

MR. BERGMAN:  Mr. Carbone, can you show what's already in evidence as GX 501 and turn to page 4, please.

Q.   And SOS Fuchs, what does it say in the top left box of this document?

A.   Western Reserve Hospital LLC.

Q.  Below that under patient name, what's listed?

A.  Ford, Jene R.

Q.  Turning to Box 38 of this document.  Can you read for me what's in Box 38?

A.  SC Medicare Advantage.

Q.  And do you see where it says service date in the middle of this document in the middle column?

A.  I see occurrence date.  Just above --

Q.  Below where it says SC Medicare Advantage and pharmacy and things like that are listed.  Do you see a Box 4 over that lists service date?

A.  I don't see it yet, but I see creation date.

MR. BERGMAN:  If you could scroll out of that.

Q.  Right where it says pharmacy at the top.  If you go over to the two more boxes over to the right.  Do you see where it says service date?

A.  12/12/19.  Yes, sorry.  I see it, yes.

MR. BERGMAN:  And, Mr. Carbone, if you could just pull back and highlight this entire portion, just blow up this entire portion here.

Q.  Do you see 64555, the number 64555 listed here?

A.  Yes.

Q.  And do you see the number 64590 listed here?

A.  Yes.

MR. BERGMAN:  And, Mr. Carbone, could you please show

O2T4PER3                           Fuchs - Direct

GX 1602 again.  And moving to Paragraph 4B on the second page.

Q.  How much does it say Summacare paid Western Reserve Hospital for the 12/12/19 implant of the PNS system in which both 644555 and 64590 were billed?

A.  $16,482.54.

Q.  Thank you.  I want to turn to some of the other documents that you reviewed.

        MR. BERGMAN:  Mr. Carbone, can you show what's already in evidence as GX 819.

Q.  And SOS Fuchs, what is this document?

A.  This is an email.

Q.  Is it an email chain?

A.  Yes.

Q.  I'd like to start at the bottom of this email chain.  Who is this email from?

A.  This is from Laura Perryman, Laura@stimwave.com.

Q.  And who is this email to?

A.  Andrea Trescot MD, Atrescot@stimwave.com.

Q.  What is the date of this email?

A.  Saturday, August 11, 2018.

Q.  And what is the subject of this email?

A.  Genicular training.

Q.  Can you please read this aloud for the jury.

A.  Hi, Andrea.  The boys worked up this training module.  I'm not sure it is accurate as to what you want to recommend the

reps learn and to basically pass along to clinicians who may not be coming to labs. Could you review and edit as necessary? Thanks, Laura.

Q. Scrolling to the top of this email, is there an attachment?

A. Yes.

Q. And can you read aloud what that attachment is?

A. 1.5 Day 3 peripheral nerve stimulation genicular PowerPoint.

MR. BERGMAN: Mr. Carbone can you please go to page 2 of this document, which is the attachment of this email.

Q. And can you please read what's on this attachment.

A. At the top it says Stimwave and peripheral nerve stimulation genicular nerve.

MR. BERGMAN: Mr. Carbone, can you please go to page 12 of this document.

Q. Can you read what's in the upper right hand title.

A. StimQ tray for PNS.

Q. And can you please read the sixth bullet down in this slide.

A. RF stylet white and pink handles.

MR. BERGMAN: And Mr. Carbone, can you please show what's already in evidence as GX 825.

Q. What is this document?

A. This is an email.

Q. And who is this email from?

O2T4PER3                        Fuchs - Direct

A.   Laura Perryman.

Q.   And who is this email to?

A.   Andrea Trescot MD.

Q.   What is the date of this email?

A.   1/13/2019.

Q.   And what is the subject of this email?

A.   Can you review?

Q.   And can you read this email allowed for the jury, please.

A.   I think it has some clinical mistakes.  I think it is missing layouts for planning and showing the products.  Not near ready but would love your feedback.  Chad is pushing it through approvals, and I rejected in current form.

Q.   Is there an attachment to this email?

A.   Yes.

Q.   What is it called?

A.   LLFR8A1915 procedure training presentation PNS cluneal.

        MR. BERGMAN:  Mr. Carbone, can you go to the attachment of this email.

Q.   Can you please read the title of this slide deck.

A.   Peripheral nerve stimulation, cluneal nerve.

        MR. BERGMAN:  Mr. Carbone, can you please go to page 20 of this attachment.

Q.   What is the title of this slide?

A.   StimQ tray for PNS.

Q.   What is the last bullet and sub bullet let of this slide?

O2T4PER3                        Fuchs - Direct

A.   RF stylet white or pink handle.

             MR. BERGMAN:  Mr. Carbone, can you show what's already
in evidence GX 336.

Q.   Is this an email chain, SOS Fuchs?

A.   Yes.

Q.   I would like to start at the second and last email here.
Who is this email from?

A.   This is from Antoinette Akkermans.

Q.   Who is this email to?

A.   Laura Perryman, Laura@stimwave.com.

Q.   Is anyone cc'd on this email?

A.   Yes.

Q.   Who is cc'd on this email?

A.   Marielle, I apologize for the pronunciation.  Marielle
Hoefnagels.

Q.   What is the subject line of this email?

A.   CE certificate.

Q.   What is the date of this email?

A.   Thursday, September 12, 2019.

Q.   Can you read this email.

A.   Dear Laura, in our phone call last week we spoke about the
CE certificate of the European approval of the devices.  We
would like to receive this certificate to verify to which
company it is provided.  Could you please send it to us.
Kindly regards, AWN, Antoinette Akkermans.

O2T4PER3                          Fuchs - Direct

Q.   Moving to the top email, here, who is this email from?

A.   Laura Perryman.

Q.   And who is this email to?

A.   Antoinette Akkermans.

Q.   And is anyone CC'd?

A.   Marielle Hoefnagels.

Q.   What is the subject of that email?

A.   Regarding CE certificate.

Q.   Are there any attachments to this email?

A.   Yes.

Q.   Can you please read the first attachment.

A.   06-01326-5LASTMQ1-869-receiver instructions for use.

           MR. BERGMAN:  Mr. Carbone, if you could turn to page 3
of this document, which is page 1.  Go back one.  Thank you.

Q.   And could you please read, what is the -- what is the title
of this document?

A.   StimQ peripheral nerve stimulator system receiver kit
instructions for use.

           MR. BERGMAN:  And Mr. Carbone, if you could go to page
16 of this attachment or this document.

Q.   And focusing in on where it says "steps," and Step 3 in
particular.  Can you read Step 3A of this attachment sent by
Ms. Perryman?

           MR. COHEN:  Objection.  Asked and answered.

           THE COURT:  Overruled.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

A.   White handle receiver cut proximal of distal band.

          THE COURT:  Counsel, is this a good time for a midmorning recess?

          MR. BERGMAN:  Yes, it is, your Honor.

          THE COURT:  Ladies and gentlemen of the jury, tell Mr. Whertvine when you are ready to resume.

          (Continued on next page)

(Jury not present)

THE COURT:  So we still have a number of items to work through on our list, but let, me just see if there is anything new.

Mr. Kochevar, anything new to add to the list?

MR. KOCHEVAR:  No, nothing new to add.  We have some points about Dr. North but nothing new to add.

THE COURT:  Mr. Cohen, anything new?

MR. COHEN:  No, your Honor.

THE COURT:  OK.  So I'm going to mark as court exhibits the pages I received last night concerning Dr. North, Dr. Haider, which is spelled N-A-I-D-E-R on the document I received, and a document for Dr. Arcos.  Those are Court Exhibits --

THE DEPUTY CLERK:  3, 4, and 5.

THE COURT:  Thank you.

Why don't we take a brief recess and then we will come back and continue working through our list.  Good.  Thank you.

(Recess)

THE COURT:  Please be seated.

So is there anything else to discuss with respect to Dr. Arcos or Dr. Haider before we move to Dr. North.

MR. KOCHEVAR:  An update on Dr. Haider, I just spoke to Dr. Haider.  He was at one of the trainings.  I'm not sure that's entirely -- I'm not saying it was omitted.  I'm just

saying for the Court's consideration of the analysis here, he may have some, you know, percipient witness dimension that I'm not sure was fully captured before.  So I want to make sure that is clear, and I disclosed to the defense the notes of that call.  I think we are on the same page, but I want to put the Court on the same page on that point.  My understanding is the defense still wishes to call him.  I will let them speak to that.  We've asked, in light of the disclosure, we asked them for a proffer of what they actually intend to call him for beyond what was already provided.

THE COURT:  Well, let's take the government's position.  One, is there any objection to Dr. Haider testifying to what he learned or heard or saw at the training, the Stimwave training?

MR. KOCHEVAR:  No objection to that.  Again, with the same idea that we don't -- if they were at trainings to talk about what they were told, that's one thing.  But going beyond that to provide engineering or medical advice from the mouth of a doctor, that strays into unnoticed expert testimony, that is what our concern is it.  And we would object to any statements that he got from Ms. Perryman for the truth of the matter.

And there is a specific point there that we want to flag.  Some of these doctors, including, I believe, Dr. Arcos, he got his information about this functionality of the device idea from Ms. Perryman.  And I understand that the defense

would be offering those statements from the doctors precisely for their truth because they want to have testimony about the functionality of the device, how the White Stylet filled the lumen and strengthened it. I believe Dr. Arcos said he learned that from Ms. Perryman, and that is hearsay. That is Ms. Perryman's testimony coming in through the doctor. There is the one training Dr. Haider attended, Ms. Perryman was also present at that. So that is our concern there.

THE COURT: So there are two questions. One, are the defense witnesses planning to report what Ms. Perryman said at the training?

MR. COHEN: No, your Honor.

THE COURT: OK.

MR. COHEN: They would testify that she was present during the training. I'll leave it at that.

THE COURT: Fine.

MR. HARAN: There probably will be a question or two, did you ever hear Ms. Perryman tell anybody that there was copper in the White Stylet. Only because the testimony from Mr. Andresen that there was hubbub among doctors in Boca Raton and the master class. The hubbub about these doctors asking what's the deal with this White Stylet? What's it for? And Mr. Andresen testified that Ms. Perryman stood up and said there is copper in it. You can't see it, but there is copper in it. So I understand your Honor ruling with respect to try

O2T4PER3                          Fuchs - Direct

to elicit the defendant's testimony through a witness, and we will steer clear of it.  He testify who was the head of training, Chad.  This stuff came from Mr. Andresen.  The defendant was present, maybe in and out, but we will limit it to what she learned.  She learned it from Mr. Andresen.  There may be a question did you ever hear that sort of thing.

MR. COHEN:  At that particular meeting where there was testimony.

THE COURT:  Did you ever hear, at that meeting, the defendant say there is copper in the White Stylet?  And do you expect the witness would say, no, I did not hear that?

MR. HARAN:  I think, just to be clear with the Court, I believe the witness will say he did the trainings in Boca. He believes he was at this master class.  He was the person who would do the trainings in Boca.  He believes he was there.  He doesn't have a specific recollection of that particular master class, but he never heard that.

THE COURT:  He can't testify about something that was or wasn't said at a place he wasn't in attendance.  So unless he can recall that he was at the master training, he can't testify about what the defendant didn't say.

MR. HARAN:  We'll lay a foundation.  We'll ask the questions.

THE COURT:  OK.  But guesswork won't do it.

MR. HARAN:  Understood.

O2T4PER3                        Fuchs - Direct

THE COURT:  Great.

Is there any objection, assuming that the witness can lay a proper foundation, to testifying as just described by defense counsel, that he did not hear the defendant say there is copper in the White Stylet?

MR. KOCHEVAR:  With the caveat that I think the foundation needs to be more than simply he was at this master class.  It was a specific huddle, as I understand it, according to Mr. Andresen's testimony where it happened. Perhaps this is not the proposal, but --

THE COURT:  Fine.  You can do a *voir dire*.  If a foundation is laid, you can ask to do a *voir dire* if you think an insufficient foundation has been laid.

Good, assuming foundation is appropriately laid, I will receive that testimony.

OK.  Mr. Whertvine will tell us when the jury is ready.  Oh, they are ready.

MR. COHEN:  So we will notify the government with regard to Dr. Haider after the lunch break.

THE COURT:  Well, in terms of whether you are calling him, you mean?

MR. COHEN:  Yes, given the sort of parameters it seems are coalescing around.

THE COURT:  Thank you.  So much.

MR. KOCHEVAR:  I have an issue to flag for Dr. North.

O2T4PER3                         Fuchs - Direct

I can do that now or later, as the Court prefers.

          THE COURT:  Can we do that at lunch?

          MR. KOCHEVAR:  Yes.

          THE COURT:  Great.

          Bring in the witness.  Bring in the jury.

          (Continued on next page)

(Jury present)

THE COURT:  Counsel.

MR. BERGMAN:  Mr. Carbone, can you show what's already in evidence as GX 812.

BY MR. BERGMAN:

Q.  SOS Fuchs is this an email chain?

A.  Yes.

MR. BERGMAN:  I would like to start at the bottom of this email.  Mr. Carbone, can you please go to page 5.

Q.  Who is this email from?

MR. BERGMAN:  Pull out just a little bit.

Q.  Who is this email it from?

THE COURT:  I think we cut off the --

A.  Well, I can tell you who it's signed by at the bottom.

Q.  Right above where it says, good morning, Dr. Purvez.  Can you tell me what it says on the line right above?

A.  That it says on Thursday, March 21, 2019 at 8:47 a.m. Jim Straub, JStraub@stimwave.com.

Q.  Can you read this email stopping at the second paragraph?

A.  Good morning, Mr. Purvez.  After last Friday's meeting at Monticello Community Surgery Center with Andy Pool CEO, the focus changed from educating an Andy's coder on 64950 to Medicare denying 64590.  According to Andy, Medicare denied 64590 based on the procedure not being medically necessary. You pointed out that they paid for the leads 64555 and denied

O2T4PER3                         Fuchs - Direct

64590.  I agree with you, this does not make sense.

MR. BERGMAN:  Mr. Carbone, can you please go beginning with the next email in this chain.

Q.  And who is this email from?

A.  AnaMir555@gmail.com.

Q.  Who is this email to?

A.  JimStraub@stimwave.com.

Q.  Who received on this email?

A.  Akhtar Purvez, Mike Baja, Michael@stimwave.com, and Mike Cioffi, MCioffi@stimwave.com.

Q.  What is the subject of this email?

A.  Regarding notes for Medicare PMS case billing.

Q.  What is the date of this email?

A.  Thursday, March 21, 2019.

Q.  Can you please read this email stopping after the first sentence.

A.  Hi, Jim.  Below is the PNS perms note for the procedure performed February 4, 2019, for a Medicare patient.

Q.  Moving one email up from this one.  Sorry, just go next page down.  Starting at the top of this page, can you read at the top of this page where it says, starting on Tuesday?

A.  On Tuesday, March 26, 2019, 12:24:41 a.m. EDT Laura Perryman, Laura@stimwave.com wrote:

Q.  And what does Ms. Perryman write here?

A.  This is the OP note for 64950, see attached.  This

O2T4PER3                          Fuchs - Direct

description below only describes electrode placement and doesn't discuss the separation incision for the receiver pocket and placement.  If you do not separate the procedures, you cannot bill for both codes.  This confusion is created by SPR devices and Bioness.  Best Laura.

Q.  Moving up one page.  Can you look at the second email from the top.  It's one more up.

Can you please read the portion beginning with "on Friday."

A.  On Friday, March 29, 2019, 2:08 p.m. Laura Perryman, Laura@stimwave.com wrote.

Q.  And can you please read what Ms. Perryman wrote?

A.  Hi, Dr. Purvez.  It is never easy, as we are really the first to to be utilizing these codes outside of Medtronic that uses this coding in our stim products.  We've had to explain that receiver equals generator many times.  Whatever we can do to assist, we are happy to do that.  We will work to get a meeting with Dr. Bahket from CMS next.  I know sometimes the pain can be treated with DRG/TSCS instead of PNS, and that pair process does seem much more straightforward.

I would love to visit with you next time I'm up that way.  We really are thankful for your support and thrilled to help the patients -- sorry, thrilled to hear the patients are doing so well.  The most important thing on a perm is to denote the procedures are separate.  One has a process for electrodes

and then completely separately, a procedure for a receiver with tunnel fixation and pocket separately.  Let me know if you would like to catch up by phone any time.  Best, Laura.

MR. BERGMAN:  Mr. Carbone, can you pull up what's already in evidence as GX 800.

Q.  Is this also an email chain?

A.  Yes.

Q.  And I want to start at the bottom this email.  Sorry, just the email.  Who is this email from?

A.  Kris Drewery, Kris@stimwave.com.

Q.  Who is this email to?

A.  Michelle Smith, MichelleS@stimwave.com

Q.  Who is received on this email?

A.  Jennifer Spruce, JSpruce@stimwave.com, Chad Andresen, Chad@stimwave.com, and Shelen Garcia, Shelen@stimwave.com.

Q.  What is the date and time of this email?

A.  Friday September 6, 2019, at 2:47 p.m.

Q.  And what is the subject line of this email?

A.  Surg center development coding issues.

Q.  And can you please read this email.

A.  Michelle, I wanted to get an update on the issue with PNS perms at surg center development facilities.  I spoke to Jennifer Spruce about this issue on Wednesday, and she was with you at the time of the call.  I didn't know if you needed any other info from me, but I'm just sending it just in case.  I

have three accounts involved, which house five active implanting physicians.  So I definitely need to get ahead of this quickly if we can.

Jennifer, I attached you just because I know you are having the same issues.

I am attaching all of the information I received from my facilities.  The issue is that the AMA is stating our receiver is integrated into our lead.  In the question to our AMA it is worded similar to our October 2018 letter in Dropbox, but the AMA brings up the word "integrated."  According to my contacts at these facilities, the AMA reviewed our coding in May and their decision has changed.  Any updates or info you can provide is appreciated.  Thanks.  Kris Drewery.

Q.  Moving up to the top of this email chain, who is this email from?

A.  Laura Perryman.

Q.  Who is this email to?

A.  Shelen Garcia, Mike Cioffi, and Michelle Smith.

Q.  What is the date of this email?

A.  9/11/2019.

Q.  Can you please read Ms. Perryman's response to Ms. Smith's email.

A.  This procedure is being done wrong.  There is no tunneling.  There is no description of the separate placement and fixation.  We need to review the procedure again with the doctors if they

are going to do the a receiver billing.  They have to do the steps included in the attached OP notes including tunneling fixation of a receiver and interoperative testing.  Why didn't they reach out to us first on this from the surgery center?

Q.  Are there any attachments to the email sent by Ms. Perryman?

A.  Yes.

Q.  Can you read what those attachments are?

A.  Stimwave inquiry 11812.  Information sent to AMA. Integrated electrode, May 2019.  Stimwave PNS implant procedure notes.

MR. BERGMAN:  Mr. Carbone, can you go to page 3, the first attachment sent by Ms. Perryman with this email.

Q.  SOS Fuchs, what does it say at the top of this page?

A.  Frequently asked questions.

Q.  Moving to the bottom of this attachment, what does it say at the bottom center of this page?  Just the words starting in the italics there.

A.  CPT assistant May 2019, Volume 29, Issue Five.

Q.  Thank you.

And do you see on the bottom left where it says surgery nervous system?

A.  Yes.

Q.  And can you -- can you please read underneath surgery nervous system, the question?

O2T4PER3                          Fuchs - Direct

A.   What is the correct CPT code to report percutaneous implantation of a multielectrode neurostimulation lead with an integrated receiver?

Q.   Going to the top right of this document.  Do you see where it says answer?

A.   Yes.

Q.   And can you please read the answer to this question?

A.   Current category one codes describe only the implantation of a neuro stimulator electrode array, not an array with an integrated receiver.  Therefore, the correct code to report for this procedure is 64999 unlisted procedure nervous system.

          MR. BERGMAN:  Mr. Carbone, can you please go to page 4 of this document, the next attachment sent by Ms. Perryman.

Q.   SOS Fuchs, can you read the heading at the top of this page.

A.   PNS implant procedure notes.

Q.   Do you see the heading in bold midway through where it says, receiver placement procedure 64590?

A.   Yes.

Q.   And right below where it says, receiver placement procedure 64590, can you read the first full paragraph through the first sentence of the third paragraph?

A.   Sorry, you said first paragraph through the first sentence of the last paragraph?

Q.   Yes.

O2T4PER3                           Fuchs - Direct

A.   OK.  Patient has been appropriately prepped and anesthetized, an electrode array has been previously placed at the nerve target level and TENS deployed.  The receiver is removed from the packaging and kept in the sterile field. Local anesthetic is administered at a receiver pocket incision site about 6 to 10 centimeters distal for the incision location for the electrode array.  An incision is made at the receiver pocket location allowing for a subcutaneous placement and fixation of the receiver element.  After thorough irrigation with solution, hemostasis was confirmed with the aid of cautery.  The tunneler was past below the skin and directed into the receiver pocket incision towards the initial entry incision for the electrode array.  The tubing from the electrode array is tunneled in the proximal direction from the electrode array entry point to the secondary receiver pocket incision through the length of the tunneler.  The tubing attached to the electrode array is mated with the receiver element, which is a coil receiver placed in the receiver pocket incision.

Q.   Thank you.

        MR. BERGMAN:  Mr. Carbone, if you could for one moment go back to GX 812.

Q.   SOS Fuchs, do you see this email from Ms. Perryman to Dr. Purvez?

A.   Yes.

MR. BERGMAN:  Could you scroll down to the next page -- to the bottom of this email.  One more down, I think. Maybe one more, sorry.  It may have been a five page email, if I remember.  Thank you.  And now, just turning to GX 810, please, Mr. Carbone.

Q.  SOS Fuchs, is this an email chain as well?

A.  Yes.

Q.  And going to the bottom of this email chain, are the two emails at the bottom familiar?

A.  Yes.

Q.  And how are they familiar?

A.  I reviewed them.

Q.  Okay.  And are they similar to the emails in GX 812 that we just reviewed?

A.  Yes.

Q.  And now is this all from the same email chain of GX812 that we just reviewed?

A.  Yes.

Q.  Turning to the bottom of page 1 of this email chain, could you please tell me who this email, at the bottom of page 1 into page 2, is from?

A.  From Laura Perryman, Laura@stimwave.com.

Q.  And who is this email to?

A.  Michelle Smith, MichelleS@stimwave.com, Chad Andresen, Chad@stimwave.com, Kris Drewery, Kris@stimwave.com, and Shelen

O2T4PER3                           Fuchs - Direct

Garcia, Shelen@stimwave.com.

Q.   And what is the date and time of this email?

A.   Wednesday, September 11, 2019, at 1:11 p.m.

Q.   And what is the subject line of this email?

A.   Regarding surg center development coding issues.

Q.   And could you please read what Ms. Perryman wrote.

A.   This is a flawed question.  It is not descriptive of our two-part system.  It about wakes about leads and doesn't talk about only about receivers.  Who submitted it?  Why is Jennifer involved?  The procedure note is not the same as whoever wrote the inquiry.  Her coding has not changed.  The question is not descriptive of our procedure because it doesn't state that this is a separate receiver.  There is going to have to be more training to assist you guys to explain the differences when in working with coding people at your facilities, Laura.

Q.   Moving now to the next email in this email chain, whom is this email from?

A.   From Michelle Smith.  MichelleS@stimwave.com.

Q.   Who is this email to?

A.   Laura Perryman, Laura@stimwave.com.

Q.   And what is the date and time of this email?

A.   Wednesday, September 11, 2019, at 2:29 p.m.

Q.   And SOS Fuchs, what does Ms. Smith write to Ms. Perryman?

A.   Agreed, this is what's happening, the new news that I was referencing in the other email.  Sorry for the confusion.  I've

presented to Chad for us to have three deliverables for our field team to use in response to this. One, a response letter. Two, a direct mail piece, which includes a link to our PNS video perfectly demonstrating the steps. I've already sent the video to the accounts struggling with this most recently. Three, a one-sheeter piece of collateral which focuses on the steps that highlights that we're not integrated. It's an acute issue. In the training I led this morning via Zoom Mike, Spruce, Chad, and myself made sure to highlight the steps and to combat the negative claims.

Please let me know if we can do more or anything different. Michelle W. Smith, COSS, Director of Healthcare, economics and reimbursement.

Q. Moving to the last and top email. Who is this email from?

A. Laura Perryman.

Q. Who is it to?

A. Michelle Smith.

Q. What is the date and time of this email?

A. I'm sorry, September 11, 2019, at 2:30 p.m.

Q. And how does Ms. Perryman respond to Ms. Smith?

A. OK. I understand we need to educate all of our reps to ensure the doctors correct the procedure notes, ASAP.

MR. BERGMAN: Mr. Carbone, can you please pull up what is already in evidence as GX 804.

Q. Who is this email from?

O2T4PER3                         Fuchs - Direct

A.   Laura Perryman.

Q.   And who is this email to?

A.   Mike Vallie, mike.vallie@westwicke.com and Mark Klausner, mark.klausner@westwicke.com.

Q.   Who is cc'd on this email?

A.   Chad Andresen.

Q.   What is the subject line of this email?

A.   Reimbursement additional mails.

Q.   Are there any attachments to this email sent by Ms. Perryman?

A.   Yes.

Q.   What are they?

A.   Reimbursement strategy and tactics 2019 and BOD reimbursement strategy 8 2019.

Q.   And can you please read the first paragraph of this email.

A.   Mike, Mark, we often get asked about the applicability of 63685 to our device because our receiver is small, and the incision is small.  Our competitors, all five of them, constantly try to undermine us and work to try to say our coding is inappropriate, and we should not be able to bill for the receiver even though we do the same exact work.

          (Continued on next page)

(In open court; jury present)

MR. BERGMAN:  Mr. Carbone, can you please go to the attachment to this email, beginning on page two?

Q.  What is the title of this, SOS Fuchs?

A.  Stimwave reimbursement strategy and tactics.

MR. BERGMAN:  And, Mr. Carbone, can you please go to the attachment to this email, beginning on page four?

Thank you.  And could you just blow that up a little bit?  Thanks.

Q.  What is the title at the top of the slide?

A.  Reimbursement codes.

Q.  And do you see in the middle -- do you see where it says PNS on the left side?

A.  Yes.

Q.  And can you read the shaded portion in the middle, and then the portion -- the table -- the table with the shaded portion in the middle, and then the sort of white portion below that?

A.  "Existing CMS codes, permanent procedure description."

And the two lines underneath that?

Q.  Yes, please.

A.  "Electrode array, CPT 64555, implant neuroreceiver, CPT 64590."

Q.  And then what is the heading above the numbers just to the right of that?

A.  "2019 Medicare Reimbursement for Typical PNS implant."

Q. And then moving left to right, you see where it says "electrode array, CPT 64555?"

A. Yes.

Q. And then to the right of that, what is the dollar figure just underneath ACS?

A. 4,543.

Q. And what is the dollar figure just under "hospital" on that same line with 64555?

A. $5,979.

Q. And, last, what is the dollar figure underneath "physician" on the same line as 64555?

A. $1,597/$355.

Q. And for line below, where it's 64590, what is the dollar figure under ACS?

A. $16,957.

Q. And, again, on the same line as 64590, what's the dollar figure under hospital?

A. $18,707 J1 bundle.

Q. And, last, what is the dollar figure under "physician" for the line with 64590?

A. $167.

MR. BERGMAN:  And, Mr. Carbone, can you please turn to page six of this slide deck?

And, apologies, can you go one back?

Oh, that's -- this is seven I think.  Sorry.  And can

O2TDPER4                          Fuchs - Direct

you blow this up?

And can you please read the heading on the top of this?

A.   "Background."

Q.   And can you please read the first and last bullets of this slide?

A.   "2015 integrated receiver and electrode array information circulated on four electrode SCS clearance.  Stimwave abandoned integrated SCS product and released two part, two procedure device family in 2016."

MR. BERGMAN:  And, Mr. Carbone, can you pull up what's already in evidence as GX 802?

Q.   And just staying at the top of this email, who is this email from?

A.   Laura Perryman.

Q.   And who is this email to?

A.   Tenkhoff, Kirk, Kirk.Tenkhoff@HCAhealthcare.com.

Q.   And what is the date of this email?

A.   September 15, 2019.

Q.   And what is the subject line of this email?

A.   Regarding coding clinic for HCPCS, first quarter, 2019, page five.

Q.   And are there attachments to this email?

A.   Yes.

Q.   And what are they?

O2TDPER4                         Fuchs - Direct

A.   May 2019 summary, CPT panel actions, PAL-tab 48, Perryman, et al., tab 48 on-site option C, and response letter to AANS PNS procedure inaccuracies.

Q.   And, SOS Fuchs, can you please read this email from through the first -- through the first full paragraph, please?

A.   "Hi, Kirk.  I am so sorry.  This was lost in my spam mailbox.  What we are seeing is submissions to the CPT advisory panel about integrated receivers.  Our devices have a separate receiver, and, as such, we utilize the separate coding for each.  We continue to see incorrect submissions, leading to incorrect guidance.  The same descriptors were in the HCPCS page that you sent over."

Q.   And turning to the attachment to this email on page 18.

Can you please read just the first four paragraphs of this letter?

A.   "Regarding response to AANS procedure inaccuracies-receiver procedure for StimQ peripheral nerve stimulator system.  StimQ peripheral nerve stimulator system receiver placement procedure description:

There has been some confusion concerning the StimQ peripheral nerve stimulator PNS system, as to whether it is a single device with an integrated receiver.  That is incorrect. The StimQ PNS system contains a separate receiver component implanted after the electrode array placement in a separate receiver implant procedure.  The receiver is not integrated,

and is a -- requires separate mating, tunneling, pocket creation, and fixation. Listed below are the steps of the procedure specific to placing the separated receiver component. The stimulator electrode array has already been placed prior to these steps."

Q. And could you just read what the header is on -- if you could just blow up the steps.

And just read what the header is on the left of those steps.

A. CPT Code 64590 vignette excerpt.

Q. And what is the header on the right side?

A. System waiver receiver permanent implant procedure.

MR. BERGMAN: And, Mr. Carbone, could you show what's already in evidence as GX 817?

And just blowing up the top portion of this.

Q. Who is this email from?

A. Laura Perryman.

Q. And who is this email to?

A. JTCoger@gmail.com, Jeffrey.Dann@AUIHealth.com, and Michelle Smith.

Q. And what is the date of this email?

A. 9/23/2019.

Q. And what does the subject line read?

A. 64590 procedure.

Q. And are there attachments to this e-mail?

A.   Yes.

Q.   And what are they?

A.   Stimwave PNS procedures and product, Stimwave 64590 receiver procedure comparison without images, and Stimwave PNS implant procedure notes.

Q.   And can you please read the beginning of this email through the first two -- first two paragraphs, please?

A.   "Dear Dr. Dann, thank you for taking the time today to speak with us.  Attached is our side-by-side comparison for the current devices, the two-part device, for 64590.  I also have this presentation I did for AANS reps yesterday, Rosenow and Schwab, that are saying the work is not the same, even with the separate incision and pocket and tunnel.

Q.   And what is the signature line on this email?

A.   Laura.  Laura Tyler Perryman, M.S., M.B.A., Chairman and CEO Stimwave Technologies, Incorporated.

        MR. BERGMAN:  And, Mr. Carbone if you can go through pages two through -- just scroll 2 through 16 of this attachment, please.

        And if you just go back to page 2 for a moment.

        And could you put up next to this -- next to what you have on the screen now what's already in evidence as GX 104?

        And can you scroll just through GX 104?

Q.   And, SOS Fuchs, have you reviewed the attachment on the left side against the document on the right side?

A.   Yes.

Q.   And are they identical?

A.   One is in color, and one is in black and white, but otherwise they appear identical.

Q.   Thank you.

     And we can take down the black and white version on the left.

     And so I just want to focus you on the top slide of the color version of this attachment that was just sent by Ms. Perryman.

     What is the title of this slide deck?

A.   Products and Technology Freedom System.

     MR. BERGMAN:  And, Mr. Carbone, could you please go to page three?

     Oops.  Sorry.  One more page up.  Sorry.  Page two. And can you just focus in on the top slide?

Q.   And what does it say at the top of this slide, SOS Fuchs?

A.   Microsystem chip sets are not receivers.

Q.   And zoom out of this slide.

     Can you go to the next slide, please?  Actually, one more down.  And can we just blow up the top slide?

     And what is the title at the top of this slide?

A.   FR8A and FR4A receivers separate from electrodes and chip.

Q.   And just zooming in on the circled diagram on the left, the two circle diagrams.

O2TDPER4                          Fuchs - Direct

And for the diagram on the left, what number in a circle is pointing to -- do you see a yellow diagram on the left with a blue circle in the middle?  What number is pointing to that blue circle in the middle?

A.   Three.

Q.   And what number is pointing to that sort of yellow shaded section outside that blue circle?

A.   Two.

Q.   And if we can just zoom out from this and focus in on a table in the middle of this slide.  And blow that up.

And maybe where it says item number description and material, if there's a way to make that a little bit larger?  Thank you.

And if you could read, for that blue, what you just identified as the blue circle with the number three, what's listed as -- can you read the line that says "three?"  Starting with three, straight across?

A.   Conductor, silver plated copper.

Q.   Thank you.

And for that outside, which was the two, are you able to read what it says across from the two?

A.   I believe it says "core," and to me it looks like pipe.

Q.   Okay.  I don't know if coming out a little bit makes it a little less blurry, but -- perhaps not.

And do you see a diagram?  Do you see a diagram on the

O2TDPER4                        Fuchs - Direct

right, bottom right?

A.  Yes.

Q.  And do you see where it says "skin barrier?"

A.  Yes.

Q.  And what is the item on the sort of rectangle on the upper left above skin barrier?

A.  Wearable antenna assembly.

Q.  And what is identified below the skin barrier and below wearable antenna assembly?

A.  Three lines.

Q.  And what are those three lines moving towards?

A.  The receiver.

Q.  And then what's below what you just identified as the receiver?

A.  Three lines.

Q.  And, again, what are those three lines going towards right below it?

A.  The stimulator.

Q.  And just going to the next slide, or the slide below this one.

        MR. BERGMAN:  Mr. Carbone, if you could just blow that up.  Thank you.

Q.  What is the heading on top of the table on the right?

A.  Adjustable polarity advanced programming separate receivers.

O2TDPER4                         Fuchs - Direct

Q.   And can you just read the next three lines, please?

A.   In the chart?

Q.   Yes, please.

A.   FR4A white receiver stylet, 13 centimeters.

Q.   Actually, you can stop there.

          If you could read the freedom -- what's right above FR4A white receiver stylet?  What's the line right above that one?

A.   Freedom-4A.

          MR. BERGMAN:  And, Mr. Carbone, if you could just go to page six, and just blow up the bottom slide, please.

Q.   What is the heading for this slide?

A.   FR8A and FR4A procedure.

Q.   And can you read the bullets underneath?

A.   PNS procedure, same as interstim vignette.  Placement of electrodes first.  Mating of receiver.  Receiver tunneling. Interactive testing.  Receiver fixation.

          MR. BERGMAN:  And, Mr. Carbone, can you please go to page seven?

Q.   Do you see the portion labeled "step two?"

A.   Yes.

Q.   I'm sorry.  "Step one."

          If we could blow up step one first.

          And can you read the text on the right under where it says "Stimwave receiver permanent implant procedure?"

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

A.   The site of the incision is marked.  The receiver is unpackaged and kept in sterile field.  After anesthetizing with local, make an incision, 1 inch minimum, least 6 centimeters from the electrode array entry position.

MR. BERGMAN:  And, Mr. Carbone, could you please go to page -- can you just blow up what is step two?  And, again, can you read what is underneath "Stimwave receiver permanent implant procedure" on the right?

A.   Create a small subcutaneous pocket to house and fixate the receiver and the receiver housing.

MR. BERGMAN:  And, Mr. Carbone, could you please go to the next page and step three?

Sorry.  Just blow up -- take this out a little bit more.

And can you read what the Stimwave permanent implant procedure is on the top right?

A.   Insert the receiver into the central lumen of the tubing exiting the skin connected to the electrode array to mate the receiver with the electrode array.  Continue advancing the receiver through the tubing until 12 to 20 centimeters has been placed to secure the receiver in the protective plastic housing.  The receiver is now coupled with the electrode array. The receiver housing now must be tunneled and fixated.

Q.   And on the bottom right, can we just blow up that picture, please?

Sorry.  The bottom left I meant.  I apologize.

And what is the color of the sort of piece right below that -- this knee?

A.  White.

Q.  And to the left, what's in that -- what does it say in that blue box?

A.  Couple receiver, insert fully in short strips.

MR. BERGMAN:  And, Mr. Carbone, could you please go to the bottom of this slide under step three?

Q.  And can you please read the text under there, under that -- where it says "Stimwave procedure, permanent implant procedure," beginning with "the tunnel is mandatory?"

A.  The tunnel is mandatory.  The receiver cannot receive energy and signal from the transmitter, unless six to 10 centimeters of receiver length in a straight line is passed under the skin subcutaneously in a straight line.  The end of the receiver housing is now located in the receiver pocket.

MR. BERGMAN:  And, Mr. Carbone, could you please go to page ten of this document?

And going to the top slide, if you could blow that up.

Q.  What is the title of this slide?

A.  Fixating the receiver.

Q.  And could you please read the text on the left, starting with "PNS requires two separate incisions?"

A.  PNS requires two separate incisions.  One, introducer entry

O2TDPER4                         Fuchs - Direct

incision, stab wound.  Two, receiver pocket incision for suturing and anchoring, knot and coil.

MR. BERGMAN:  And, Mr. Carbone, could you please go back to GX 817 and page 16 of that document, please?

It's the next page down.  Thank you.

Q.  And what is the name of this doc -- what is the header on this document?

A.  PNS implant procedure notes.

Q.  And what does it say bolded in the middle?

A.  Receiver placement procedure 64590.

MR. BERGMAN:  And, Mr. Carbone, could you please go to page 17?

Thank you.

Q.  And what is the name of this slide, of the attachment to the email from Ms. Perryman?

A.  Stimwave PNS receiver procedure instructions.

MR. BERGMAN:  And, Mr. Carbone, can you please go to page 20?

Oh, sorry.  One more up I think.  I apologize.  I meant down.  Just one.  Perfect.

Q.  What is the title of this slide?

A.  Myths.

Q.  And can you read the second myth down?

A.  Myth, the StimQ PNS system has an integrated receiver.  Fact --

Would you like me to read the fact as well?

Q.   Yes, please.

A.   Fact, the StimQ PNS system has two components implanted with their own procedures:  One, electrode array, 64555; two, receiver, 64590.

Q.   Thank you.

          MR. BERGMAN:  Mr. Carbone, can you please show what's already in evidence as GX 818?

Q.   SOS Fuchs, who is this email from?

A.   Laura Perryman.

Q.   And who is this email to?

A.   David Kloth, DKMD@CTpaincare.com.

Q.   And what is the date of this email?

A.   9/23/2019.

Q.   And are there any attachments to this email?

A.   Yes.

Q.   And what is the attachment, the name of the attachment?

A.   Stimwave PNS procedures and product.

          MR. BERGMAN:  And, Mr. Carbone, if you could just turn to the attachment, starting on page two of this document.

          Can you just put up again side by side GX 104 and, again, if you want to -- if you could scroll through the attachment to 818.

Q.   And, Ms. Fuchs, is the attachment of the email Ms. Perryman sent to Mr. Kloth in GX 818 the same as the PowerPoint labeled

O2TDPER4                        Fuchs - Direct

GX 104 that we just reviewed?

A.  Except for the black and white versus color difference, yes.

Q.  Thank you.

MR. BERGMAN:  And, Mr. Carbone, can you please show what's already in evidence as GX 816?  Thank you.

Oh, sorry.  806.  I apologize.

Q.  And just zooming in at the top, who is this email from?

A.  Laura Perryman, Laura@Stimguard.com.

Q.  And what is the date of this email?

A.  Sunday, 2/23/2020.

Q.  And can you please read the -- sorry.  Can you please read the recipient to this email?

Not all of them.  Just the first line.

A.  Marc Loev, Lester Zuckerman, Robert Greene, Sunil Panchal, and Tatyana Shine.

Q.  Thank you.

And what is the subject line of this email?

A.  Regarding my reply to you regarding Laura's and Sunil's incorrect statements regarding Stimwave PNS billing codes are in dispute at AMA.  Nine societies reviewing.

Q.  Thank you.

And can we just zoom out from this for a moment and zoom in on just the attachments?

And are there attachments to this email?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   And what are the attachments to this email?

A.   NSPC DOJ fine.  PNS and PENS review LT Perryman.  Novel stimulation LT Perryman.  Perryman wireless DRG FBSS, Stimwave wireless neuromodulation for meralgia paresthetica.  654590 vignette.  Stimwave exit scenarios version new.

Q.   And if we can move down to this second email in this email chain from Ms. Perryman, can you just read, who is this email from?

A.   Marc Loev, Mloev@Comcast.net.

Q.   Who is the email to?

A.   Marc -- it looks to me like it's to himself, MarcLoev@Comcast.net.

Q.   What is the date of this email?

A.   Saturday, February 22, 2020.

Q.   And just zooming out of this, the second full paragraph down, starting with "earlier today," can you read that paragraph, please?

A.   Earlier today I spoke with Dr. David Kloth, who agrees that Laura and Sunil misstated various facts in their emails to the AB Investor Group.  In fact, he sent her a personal email stating such.  Dr. Kloth also stated that his personal position on the coding issues is not being accurately interpreted by Laura and her cohorts, and he has authorized me to convey that statement to you.  Dr. Kloth, Dr. Andrea Trescot, Stimwave's

chief medical officer, and I, with assistance from Hull & Associates, a national third party reimbursement firm, have worked closely on this reimbursement defense over the past three months.

MR. BERGMAN:  And can you please go up to the top of this email, Mr. Carbone?

I'm sorry.  The top of the email chain.  I apologize.

Q.  And do you see where Ms. Perryman writes in her email, beginning of her email, can you please read who Ms. Perryman addressed this email to?

A.  Dear A/B shareholders, Micron members.

Q.  And can you just pull out of this zoom?

And can you please read the beginning with the billing note, and then stopping before "what should done?"

A.  "The billing note was sent to just a small list of shareholders, unclear your motivation for the 90 plus people here.  Your continued libel attacks on my character are a matter for the courts.  As to your false statements, here are the facts.  Your three months of involvement does not replace our five to six years of efforts for reimbursement support.

One, this technology that we invented and these investors invested in includes an embedded receiver that was meant to be injectable.  Please see the attached publications since you seem to be unfamiliar with our products as you have never done a case or seen a case.

Two, the device receiver is integrated, and a second pocket is not most of the time medically necessary nor technically necessary for a PNS case.

Three, starting in 2015, Kloth, North, Racz, Cardony, and Guiyer all assisted Stimwave to work with NASS, ASA, ASIPP, AANS to garner support for the coding. For SCS, we were able to get a positive response with a separate receiver. We had to resubmit to the FDA to get support from CPT advisor. The AMA sanctioned coding advisory. TAMM Net's certified coding expert gave us support to utilize 63685, and we proceeded to market SCS.

Four, working with NASS, the CPT advisor would not support SCS coding and maintained we needed to get a separate code.

Five, for PNS, when the newest FDA clearance was completed, we included an optional second receiver. Initial CPT advisor inquiries said no, you must use == 64999. TAMM Net submitted a request with neuro med having a separate receiver, a '90s technology, and got feedback that 64590 could be used. About one year later, that decision was reversed by AANS. ASA agreed with AANS, and both noted the second pocket contains empty tubing only. They do not consider that a receiver.

These societies are the primary representatives for the 64590 code. ASIPP and NANS, less influence unfortunately.

Six, there are over a dozen CPT advisory inquiries

from customers to the AMA, all receiving the same negative response.  Use 64999 for this PNS technology.

In May 2019 at the AMA meeting, we were able to get approval for an integrated code for tibial.  At least five society representatives encouraged us to proceed with an overall new code for PNS for the integrated receiver.  The chair of MA -- AMA was very supportive of this integrated novel technology with new coding, and commented that it is not the same as existing technologies, and that is why the process of new codes exists.  This is on the AMA record.

Eight, the letter from ASIPP was the result of my personal visit to see LAX, asking for support for the existing products and for our new code for PNS.

Nine, in November I went to see the AUA with our leading clinicians to try to get their support for 64590 as well.  They have yet to comment, but it is doubtful that it will be considered the same work as placements for sacral nerve stimulator IPG."

Q.  And you see the portion that starts with "here's what's going to happen with your suggestions?"

A.  Yes.

Q.  If you could just read this portion, please?

A.  "Here is what's going to happen with your suggestions. One, continuing to promote 64590 without a certified coding specialist.  CCS advisement, which Stimwave no longer has, is

O2TDPER4                          Fuchs - Direct

only a breach of ethics.  It may be illegal and result in liability for the company -- I'm sorry.  I misspoke.  It's not only a breach of ethics.  It may be illegal and result in liability for the company.

Two, Stimwave does not have from Hull Associates an opinion letter stating 64590 can be utilized.  So promotion by Stimwave without that opinion puts the entity at risk.  All other medical device companies have a CCS coding expert opinion from a third party.

Three, Stimwave has a DOJ inquiry, and with this knowledge, as a member of management and our representative, it is fiscally irresponsible to take these actions and make recommendations to use a code without AMA support.  You are putting the company at risk of fines and other long-term liabilities.  I understand you have been fined before -- by the DOJ before, attached.

Four, physicians utilizing 64590 for PNS that does not have a separate receiver, which is what 90 percent of our PNS procedure notes read, will be subjected to a clawback from CMS and private payors.  Meaning, they will have to return the funds to the insurance company.

Five, PNS coding confusion is the number one reason Stimwave has poor revenue collections, resulted in most of the revenue reduction for 2018, and will be the same for 2019 to 2020."

Q.   And can you just scroll to the first attachment to this?

Thank you.  Stop there.

This attachment to Ms. Perryman's email, what's the heading at the top?

A.   Sports medicine orthopedic spine -- am I reading the correct part?

Q.   I apologize.  I inartfully asked the question.

Can you please read the heading, starting with "National Spine?"

A.   "National Spine & Pain Centers involved in a $3.3 million settlement over fraud allegations:  Three key details."

Q.   And can you just read the first paragraph of this attachment sent?

A.   "National Spine & Pain Centers and Physical Medicine Associates will pay the Federal Government $3.3 million to settle allegations that they illegally billed Medicare and other federal health care providers according to the U.S. Attorney's Office for the Eastern District of Virginia."

MR. BERGMAN:  Mr. Carbone, can you please show the attachment to Ms. Perryman's email, starting at page 25?

Is it possible to blow this up, put it on the left side of the screen, and then, on the other side, could you put up GX 104, which we were just looking at, and go to page eight of that?

Q.   And, Ms. Fuchs, on the left -- well, just read the part on

the left first.

Do you see starting with "the physician?"

A. Yes.

"The physician inserts or replaces a peripheral or gastric neurostimulator pulse generator or receiver into a subcutaneous pocket. Peripheral neurostimulators are used to transmit electrical impulses to nerves outside of the brain or spinal cord, such as the sacral nerve, to help the bladder muscles contract and treat cases of urinary incontinence or retention, or for pain relief. Gastric neurostimulators transmit electrical impulses in the same way, to treat nausea and vomiting in patients with gastroparesis. The physician selects a location site, usually the abdominal area, and incises the skin. Using blunt dissection, the physician creates a pocket for the generator or receiver. The unit is connected to a previously placed electrode, which is separately implanted to stimulate the target nerve. After ensuring that the device is functioning, the generator or receiver is sutured into place within its subcutaneous pocket."

Q. Thank you.

Just drawing your attention to the part where it says, "the physician selects a location," is that partially highlighted a bit or grayed?

A. It is.

Q. Now, pulling out from this zoom in and going to GX 104.

MR. BERGMAN:  And, Mr. Carbone, I apologize.  Can you scroll up to step one, and in the left box?

Q.  Do you see underneath CPT Code 64590 vignette excerpt?

A.  Yes.

Q.  And can you just read the excerpt on the left?

A.  "The physician selects a location site, usually the abdominal area, and incises the skin."

Q.  And then can you just zoom out of this, please, and right below it, step two, can you read the 64590 vignette on the left?

A.  "Using blunt dissection, the physician creates a pocket for generator or receiver."

Q.  And just continuing through, can you read the vignette on the left under 64 -- under CPT Code 64590 vignette excerpt?

A.  "The unit is to a previously placed electrode, which is separately implanted to stimulate the target nerve."

Q.  And just continuing on the vignette, can you please read the vignette and the slide on the bottom of page eight on the left?

A.  "The unit is connected to a previously placed electrode, which is separately implanted to stimulate the targeted nerve."

Q.  And going one more down, can you please read what's under CPT Code 64590 vignette excerpt?

A.  "After ensuring that the device is functioning --"

Q.  And the last one, on step five, please.

A.   "The generator or receiver is sutured into place within its subcutaneous pocket."

Q.   Thank you.

And was that the same language we just read in the attachment Ms. Perryman sent in 2020?

A.   Yes.

MR. BERGMAN:   And, Mr. Carbone, can you please pull up what's already in evidence as GX 701?

Q.   And this is an email chain, correct?

A.   Yes.

Q.   And can we start at the bottom of this email, please?

Thank you.

And who is this email from?

A.   Laura Perryman, Laura@Stimwave.com.

Q.   And who is this email to?

A.   Jeffrey.Dann@AUIHealth.com and Michelle Smith, MichelleS@Stimwave.com.

Q.   And what is the date of this email?

A.   Saturday, 21 September, 2019.

Q.   What is the subject line of this email?

A.   Forward planning introductions for Stimwave advisors to AUA CPT members.

Q.   And can you please read the last line of the second paragraph of Ms. Perryman's email?

The last full -- the last sentence of this paragraph?

A.   "Because of length, we are forced to have two separate pieces of our device, the electrodes and then a separate receiver that is mated to the electrodes and placed in its own subcutaneous pocket."

Q.   And pulling out from this, below that there, the paragraph --

          Can you read the paragraph beginning "we are getting push back" in the following paragraph?

A.   "We are getting push back from AANS about utilizing 64590 for this receiver pocket, tunnel, and fixation.  We want to introduce the current product to the AUA members and see if we can get their support for our two-part system.  I have attached our side-by-side comparison to give you an idea what we are dealing with, and here is a link to our PNS placement video for the two-part systems."

Q.   And can you please read, what does it say at the end of this email under "best?"

A.   Best, Laura, Laura Tyler Perryman, M.S., M.B.A., Chairman and CEO, Stimwave Technologies, Incorporated.

Q.   And just going up for a moment, do you see there's a hyperlink in the middle?

A.   Yes.

Q.   And can you read the portion of the hyperlink beginning with PNS and ending right before the percentage sign?

A.   PNS genicular training 4K rev B.

O2TDPER4                        Fuchs - Direct

MR. BERGMAN:  And, Mr. Carbone --

I'm going to now show the attachment from that link, which is marked as seven -- already in evidence as 701-A, which was sent by Ms. Perryman to Dr. Dann.

Mr. Carbone, can you please play 701-A, starting at minute 3:30 through minute four?

MR. HARAN:  Objection, your Honor.

THE COURT:  On what ground, Mr. Haran?

MR. HARAN:  Just asked and answered.

THE COURT:  Okay.  Well, we're going to break for lunch.

Ladies and gentlemen, do not discuss the case.  We'll see you at 2:00.

(Continued on next page)

(In open court; jury not present)

THE COURT:  So, Mr. Bergman, about how much longer do you expect?

MR. BERGMAN:  Your Honor, just that 30 seconds video clip.

THE COURT:  So you're close to ending.

MR. BERGMAN:  We are very, very close.

THE COURT:  Have we seen that visual before?

MR. BERGMAN:  We have, your Honor.

THE COURT:  Okay.  Thank you.

How long do you plan to play this visual again?

MR. BERGMAN:  For 30 seconds.

THE COURT:  Thank you.

So, counsel, I want to give you a lunch break, so let's just make sure we deal with any issues that have arisen this morning, or that you need to address before this afternoon.

Does the government have any new issues?

MR. KOCHEVAR:  Not at this time.  Thank you.

THE COURT:  Mr. Cohen, do you have any new issues?

MR. COHEN:  No, your Honor.  I just -- I was able to get a little bit of clarity with regard to Dr. Haider.  As Mr. Kochevar indicated, he did attend a Stimwave training.  He also was running research with this device on a project funded by Stimwave.  So he was -- he was extensively using the device

O2TDPER4                        Fuchs - Direct

with regard to the study.

THE COURT:  So is that the craniofacial study from this later period of time?

MR. COHEN:  It's not the later period.  It's the same device I believe.  2018, 2019, they're using the same device at the same time.  It's not a different device.  The question is whether they can use it for craniofacial.  So he has used it not only based on training, but also he was running a study with it, so he is extremely familiar with the way the procedure is, the way to do it.

THE COURT:  So the point being?

MR. COHEN:  The point being that he can explain the proper procedure to do it now that the jury's heard some testimony about that from Mr. Gharibo, who has never actually done it, how he was trained by Stimwave staff, and his understanding of the components.

THE COURT:  Okay.  So he's not offered as an expert, just to recover this ground we've talked about before.  So we're not going to have testimony about his use of the device with respect to this research project.  However, as I understand it, there is no dispute that he can talk about what he heard and saw at a training at Stimwave during their conference at which they trained doctors in how to use the device.

Good.  So are we clear with respect to Dr. Arcos then.

O2TDPER4                       Fuchs - Direct

Is that fully resolved?

MR. KOCHEVAR:  I believe so, your Honor.  I mean, I think the devil may be in the details a little bit with the testimony, but, yes, I think it's clear.

THE COURT:  Good.  I think we're clear with respect to Dr. Haider, so I think in our list of issues, we're up to a discussion of Dr. North.  I don't think we had a very complete discussion of that last night.

Have the parties had consultation?  Is there agreement?  Are there remaining disputes?

MR. KOCHEVAR:  Yes, the issue is I believe his testimony -- he was proffered as the inventor and patent holder of the Pink --

THE COURT:  Of the Pink Stylet.

MR. KOCHEVAR:  The Pink Stylet.  However, he is not on the patent for the Pink Stylet.

THE COURT:  I think he said he was added, if I remember his statement.

MR. KOCHEVAR:  He was not added.  Ms. Perryman submitted a statement of correction to the United States Patent Office I believe after the period here, I believe 2021 or so. It was not accepted as far as I understand, and so, yes, it was submitted February 2, 2021, so that's three years ago.  He was not ever added.

In addition, Curonix currently owns the patent, and my

understanding is that -- yes, so basically Ms. Perryman, as I understand it, tried to add him to the patent after she -- yeah, years later after she left Stimwave.  I believe there is intellectual property litigation surrounding a number of these items, and so holding him -- I think it is incorrect to say that he is on a patent for the Pink Stylet.  There's also a separate issue of if this patent is even a Pink Stylet.

My understanding from -- my understanding from Curonix and others is that the Pink Stylet -- this is a more complicated thing than the Pink Stylet, and so it's not really accurate to call it a patent for the Pink Stylet.  And so I believe -- and one reason we're raising this is because I believe in the Court's earlier ruling on this, it seemed important on that that the inventor or co-inventor of the Pink Stylet, if he had direct personal involvement in the creation of a component of the device, his testimony could be important.  But we don't -- there are concerns here that he is -- he is not legally an inventor of the device on the patent as it currently stands.  And it appears Ms. Perryman had some involvement in attempting to put him there.

So we think that the -- the proffer of his relevance was I think not correct.  Perhaps unintentionally so, but I don't think the picture we had of him and his role was accurate.  You know, the defense said that Dr. North is on the patent for the Pink Stylet, so he will be able to speak around

the circumstances regarding the creation of the Pink Stylet and the functions of the Pink Stylet.  He's not on the patent.

THE COURT:  Okay.  Let's just assume he is not on the patent, but both he and the defendant believe he should be on the patent, because he was involved in the creation of the Pink Stylet in a way that would qualify him in the normal course. Let's just assume that and move on.

So the issue is whether or not, the government -- well, there are many issues, but starting with, does the government have an objection to any of Dr. North's statements or testimony as proffered by the defendant?

MR. KOCHEVAR:  Yes.  We continue to think he's a back door expert, and particularly his expertise will be offered on basically a false premise that defendant again appears to have played some role in setting up.  So if he's held out as the inventor and the patent holder of the Pink Stylet, that's inaccurate and will also lend weight and make even more prejudicial if he starts to opine in an unnoticed expert capacity.

THE COURT:  Well, he wasn't noticed as an expert. He's not being offered as an expert.  He's only being offered as a fact witness with respect to issues that are relevant to this trial.  So I think we just have to identify are there any relevant issues for this jury, for this fact witness to describe.

O2TDPER4                         Fuchs - Direct

MR. KOCHEVAR:  We don't believe so.  We're not sure what those would be at this point.

MR. COHEN:  Your Honor, I would just point out that within the last ten minutes the government offered Government Exhibit 806 and read out loud that starting in 2015, Kloth, North, Racz, Cardony, Guiyer, all assisted Stimwave to work with various agents -- associations with regard to CPT coding. Among the things that Dr. North, who was on the medical advisory board of the company at the time will talk about is he assisted Laura Perryman in helping write the vignette sent out to other doctors.  They've shown these vignettes over and over again, and have suggested that there's something improper, and this would be highly relevant testimony that she went to a very respected doctor to have her help do it and send it to other doctors.

In addition, he is going to testify that he was the inventor -- one of the inventors of the Pink Stylet.  His understanding is that -- he has a certificate of correction that we've provided to the government.  I'm not an expert in patent law.  Dr. North factually I think, putting aside whatever his status is, as the Court correctly states -- this would be I guess fodder for cross.  But he will testify I believe he played a role in the invention of the Pink Stylet. He will explain why he helped create that, and he believes that he is on the patent by virtue of the certificate of correction,

O2TDPER4                          Fuchs - Direct

which is exactly what he said in our Rule 26 disclosure.  He's always said that he was added later.  There's no surprise there.  And, frankly, I don't think it would be relevant if he's on the patent or he wasn't.  It's a question of whether his testimony is that, and they can challenge his testimony and prove otherwise if they believe that that's their case.

THE COURT:  Yes.  I don't understand the patent issue being a driver here.

MR. COHEN:  Thank you, your Honor.

THE COURT:  So you've made two proffers with respect to relevance.  One, he helped write the vignettes.  As I understand the description given by Dr. North in the Rule 26(2) disclosure, he's never worked with a White Stylet.

MR. COHEN:  Correct.

THE COURT:  Early on he worked closely with the defendant in creation of the Pink Stylet to address a certain problem that he believed needed a solution.  And, two, he gave the defendant at some point a template of his standard PNS operating notes he indicated he had dictated thousands of times, and then those notes included a reference to the term "receiver."  And I expect the defendant will be able or would hope to be able to argue that the documents that we've looked at so many times, the instructions for use, when they use the term "receiver," at least in connection with the Pink Stylet, can trace back the history of that description to Dr. North's

O2TDPER4                          Fuchs - Direct

use of the term "receiver" to describe the Pink Stylet.  That's what I'm gathering.

MR. COHEN:  Yeah.  I think that's right.  And it's also relevant, your Honor, with regard to Ms. Perryman's state of mind and good faith.  If the idea that she is sending out vignettes that are wrong and that are meant to mislead and so forth -- the fact that she's going to esteemed doctors to help her with this I would suggest undercuts the idea that she's engaged in a scheme, because she's involving here people, a number of the folks you'll hear, they've done this -- where Dr. Dann is similarly situated, where they sent materials, suggest or leave the impression with the jury that this was a doctor receiving misleading materials.  In fact, it's a doctor who she's paying to help her with the codes and figure out how do I present this.  And that we think is very relevant to her state of mind.

THE COURT:  So I have not heard the government argue that the fraud is in connection with the use of the Pink Stylet.  Everyone understands this case is focused on the use of the White Stylet in connection with its description as receiver, and for reimbursement under a code that includes the word receiver.

So there's an issue about how much the Pink Stylet is relevant here.  However, I think it would be helpful to the defendant and appropriate to understand the genesis of the term

O2TDPER4                        Fuchs - Direct

receiver, at least as it describes the Pink Stylet.

MR. COHEN:  Also, your Honor, we spoke about it late in the day yesterday, and I read a passage.  We spoke about it late in the day yesterday, but the government has put in through Mr. Andresen the idea that the Pink Stylet itself was created for fraud, that they needed to be able to call something a receiver, and that's why they created the Pink Stylet.  So this would be highly relevant to that, the fact it was being created to address a need within the device, rather than for fraud.

THE COURT:  Okay.  So this is my feeling.  With respect to Dr. North, and of course folks are entitled to confer over lunch and make their revisions, but agree on, more or less, to take issues on or off the table.  He can give testimony about his historical activity in the creation of the Pink Stylet.  He cannot testify as an expert, but he can describe what he did.  He can describe why he did it.  He can describe sending these notes, PNS operating notes or OP notes to Laura, to the defendant, understanding that she would use them as she wished, as a template, to describe the Pink Stylet, and that in those operating notes -- I don't know if you have documents that show it, but in those operating notes, he used the word receiver.

I don't know that he has any purpose beyond that. Again, he hasn't been offered as an expert.  I don't have a

O2TDPER4                         Fuchs - Direct

proffer beyond that.

So that historical information, whether the defendant wants to bring out that he hopes one day to be recognized as a patent holder on the Pink Stylet I think is unnecessary, but you will address that as you wish, because I let him talk about his role in the creation of the Pink Stylet even if he's not named on a patent.

MR. COHEN:  Understood.  Thank you, your Honor.

THE COURT:  So I'm going to remind you that I want to discuss at our afternoon break what estimate I should give at 5:00 to the jury for when testimony will end in this case, and at 5:00 I'm going to be allocuting the defendant about taking the stand or not taking the stand.

I understand you're still discussing any charge or the necessity for any charge on the attorney consultation, which I think there was just one brief reference.  And that would leave one issue, MDSAP, Defendant's Exhibit 623.  So I haven't heard from the government on that, and I'd ask the parties to consult on that remaining issue during lunch.

MR. COHEN:  Can I ask one question, to maybe inform our discussion on scheduling?  We've had some discussion between the teams.  Assuming we get into sort of the midday tomorrow with testimony, would the Court then want to do a charge conference -- we're actually just trying to figure out what it might look like with an early day ending tomorrow at

O2TDPER4                           Fuchs - Direct

3:30.  In other words, what time would we have to end and do a

charge conference, so we can figure out realistically when

closing would be.

THE COURT:  I bet everyone wants to do their

summations on Monday.  I think I created terror in your hearts

when I mentioned we might start summations tomorrow.

Am I reading that right?

MR. COHEN:  I think you are, but I think we were -- I

was afraid to ask.

THE COURT:  Okay.  So roughly when do you think you

will rest?

MR. COHEN:  I think we could be done by lunchtime

tomorrow.  We can do a charge conference after, and I think

both sides would appreciate the weekend to be able to do their

closing.

MR. KOCHEVAR:  No objection.

THE COURT:  Okay.

MR. HARAN:  Not joined?  Just, not objecting?

MR. KOCHEVAR:  I'm happy to join in the application.

I'm sorry.  The government consents.

MR. COHEN:  They can do theirs on Friday.

THE COURT:  Yes, I'm sure.  So I don't know when we'll

have the charging conference, but it will be before summations,

don't worry.  But the charge is going to be very bare bones.

It's just the law.  I don't present the parties' arguments.

O2TDPER4                          Fuchs - Direct

MR. COHEN:  Okay.

THE COURT:  It's not going to be -- if you've looked at any of my prior charges, they're just the elements of the crime, and the necessary definitions, and those charges that the law requires me to give.  So it will be up to you with respect to summations to argue the facts.

With respect to summations, I want time limits.  I want to be able to guarantee to the jury that they're going to get this case on Monday.  If we start -- if we, you know, end early on Friday and don't start summations until Monday morning, I want to make sure we do all the summations and the jury charge on Monday.

So think about that over lunch.  You talk with each other.  Good.  Have a good lunch.

MR. COHEN:  Thank you, your Honor.

(Recess taken)

(Continued on next page)

THE COURT:  Counsel.

MR. BERGMAN:  Thank you.

BY MR. BERGMAN:

Q.  Hello, SOS Fuchs.  I think when we left off we were just looking at GX 701.  Just to reorient ourselves.

Mr. Carbone, could you please pull GX 701 back up.

Going down to the bottom of this email chain, can you just please read for us, again, who this email is from.

A.  Laura Perryman, Laura@stimwave.com.

Q.  And can you just also read who this email is to.

A.  Jeffrey.dann@AUIhealth.com and Michelle Smith, MichelleS@stimwave.com.

Q.  What is the date of this email?

A.  Saturday 21, September, 2019.

Q.  Thank you.

Pulling out from this email do you see down the page a Dropbox link?

A.  Yes.

Q.  And can you just read the first part of that hyperlink beginning with WWW and ending with dot com.

A.  Www.Dropbox.com.

Q.  Can you read the portion of the link beginning with PNS and ending right before ending at Rev B.

A.  PNS Genicular training 4KREVB.

Q.  I'm now going to show the attachment which was sent by

O2T4PER5                         Fuchs - Direct

Ms. Perryman to Mr. Dann?

MR. BERGMAN:  Mr. Carbone, can you please play the file link to this video just three minutes and 30 seconds to four minutes.

MR. HARAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

(Video playing)

MR. BERGMAN:  Thank you.  You can pull that down.  No further questions.

THE COURT:  Cross?

MR. HARAN:  No questions.

THE COURT:  You may step down.

Mr. Kochevar?

MR. KOCHEVAR:  The government rests, your Honor.

THE COURT:  Mr. Cohen?

MR. COHEN:  The defense calls Justin Bilyeu.

THE COURT:  Mr. Bilyeu, if you could come up here please and take the witness stand.

JUSTIN BILYEU,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

THE COURT:  If you could pull your chair up and that mic moves, if you could move it down under your chin and keep your voice up.

THE WITNESS:  Yes, ma'am.

O2T4PER5                    Bilyeu - Direct

THE COURT:  Please state your full name.

THE WITNESS:  Justin William Bilyeu.

THE COURT:  And how do you spell your last name?

THE WITNESS:  B-I-L-Y-E-U.

THE COURT:  Counsel.

MR. HARAN:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. HARAN:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Why are you here today?

A.  I was subpoenaed to be here.

Q.  By the defense?

A.  Yes, sir.

Q.  Where do you live?

A.  Louisville Kentucky.

Q.  How long have you lived in Louisville?

THE COURT:  Counsel, I'm going to ask you to use the mic.

A.  Take away school, my entire life.

Q.  What do you do for a living?

A.  Medical sales professional.

Q.  How far did you go in school?

A.  Master's degree.

Q.  What did you study?

O2T4PER5                    Bilyeu – Direct

A.   Biblical studies.

Q.   About when did you finish your schooling?

A.   2012.

Q.   How long have you been in the medical device sales
business?

A.   2016 until 2020, eight years.

Q.   Where do you work now?

A.   I work for a company called TELA Bio.

Q.   When did you start working with that company?

A.   March of 2020.

Q.   Where did you work before TELA Bio?

A.   Stimwave.

Q.   When did you start at Stimwave?

A.   I believe it was March of 2018.

Q.   What was your job at Jim?

A.   Sales professional.

Q.   And can you just tell us, generally speaking, what were
your responsibilities as a sales professional at Stimwave?

A.   My responsibilities were to find pain management physicians
who practiced neuromodulation, which is the device that's used,
and see if our device was something they were interested in
using for their patients.

Q.   And did Stimwave, generally speaking, how many different
devices were you working with while you were at Stimwave?

A.   Essentially one device with subtle changes based on where

the pain relief was needed for the patient.

Q.   OK.  And you said subtle changes.  What were the different applications?

A.   Spinal cord stimulation.  That device had eight contacts, I think is what they were referred to and then peripheral nerve stimulation, that device had four contacts.

Q.   Were you trained on how to perform your duties at Stimwave?

A.   Yes, sir.

Q.   Tell us about your training at Stimwave?

A.   When I started with the company we had sales training for everyone who started at that time, a group of 20 or 25.  We met at a hotel in Florida.  We were there for two weeks.  And they trained us on the device, how it worked, everything that we might need to know to be educated in the field.

Q.   And who was leading those trainings, if you recall?

A.   The person I remember most frequently was Chad Andresen.

Q.   OK.  And were there other folks as well besides Mr. Andresen who were conducting the training?

A.   Yes, for that two-week sales process they hired someone to help with the education and then various engineers and people throughout the company would assist.  But for the most part I remember Chad doing the bulk of the training.

Q.   By the way, do you know who the CEO was company was?

A.   Yes.

Q.   Who was that?

O2T4PER5                      Bilyeu - Direct

A.   That was Laura Perryman.

Q.   Do you see Laura Perryman in the courtroom?

A.   I do, yes.

Q.   OK.  Can you just, for the jury, tell us where she is seated and if you could identify her by an article of clothing she is wearing?

A.   Back row and a navy or black blazer, white shirt underneath, blonde hair.

         MR. HARAN:  I would like the record to reflect the witness identified Ms. Perryman.

         THE COURT:  Yes, it may.

Q.   Was Ms. Perryman present at the two-week training you just mentioned?

A.   She was.

Q.   After the two-week training, was there additional training over the course of time?

A.   Yes, nothing specific.  Like there was not a cadence *per se*, but if throughout maybe something needed to be clarified we had a weekly phone call that the entire sales force, the entire company would participate in so kind of a training as needed for those that completed their new rep training.

Q.   Who, if anyone, took the lead in that additional training?

A.   Mostly Chad, again but everyone was present.

Q.   Did you receive training about the PNS device?

A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  Was that during the initial two-week training?

A.  Yes.

Q.  And did that also occur over the course of time?

A.  It did.

        MR. HARAN:  I'm going to just approach and hand you, is this Exhibit 2 -- just for the record, I'm handing the witness Government Exhibit 3.

Q.  I ask you if you recognize that?

A.  Yes, I do.

Q.  What is it?

A.  This is a kit for a peripheral nerve permanent implant.

Q.  Okay.  And when is the last time you've seen one of those?

A.  2020, four years ago.

Q.  OK.  I'm not going to ask you to necessarily use the kit, but to the extent it's helpful to you to refer to it, it's there for you.

A.  OK.

Q.  How does the kit work if you know?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Sustained.

Q.  Are you familiar with that kit?

A.  Yes.

Q.  Are you familiar with the contents of that kit?

A.  Yes.

Q.  From you trained by Mr. Andresen regarding how that device

works?

A.  Yes.

Q.  What were you trained by Mr. Andresen concerning how that device works?

A.  So the device would come out of a package like this (indicating) I don't remember if it was a blue stylet or green implanted.  Basically what the blue and the green were -- their purpose was to be a rigid -- allow the lead to be rigid so that it could be placed in the patient to cover their area of pain. And then once the physician was happy with where the lead was placed, the physician would then pull this blue handle and the green rigid wire that was inside of it, it would pull that completely out.  And then based on -- based on the location of the implant, we would then instruct the physician to use either the pink or the White Stylet to insert inside of the lead.

Q.  OK.  And when you said the blue handle, was that also referred to as a blue stylet?

A.  I don't recall.

Q.  OK.  From what you were trained -- pardon me.

How were you trained about how the device would provide pain relief?

A.  Two options -- are you talking this device specifically?

Q.  Yes.

A.  OK.  Again, two options based on the location of --

Q.  Sure go ahead my bad.  Continue?

A.   Based on how much, for lack of a better term how much real estate that was available.  So sometimes if being a peripheral nerve there is let's say someone's forearm, for an example, you wouldn't want to put the lead across a joint because that joint articulation could use the lead to move and then the patient would not receive their relief.  So there is two bands on the device.  I don't remember what the first one was called.  The second set was called the channel marker bands.  There would either be one or two.  One signified Channel A.  And two bands signify Channel B.  And then we could determine on an x-ray for programming, I want to program Channel A for this way, program Channel B that way.  If there wasn't -- if our space was limited, then we use the White Stylet because it could be cut, and then the device -- it could be cut after this first band making a shorter length.  If there was more room we would use the Pink Stylet because it could not be cut unless it was after the second band.  That was my understanding.

Q.   Thank you.

     OK.  And how would -- what was your understanding of how the power would be delivered to, I'm not sure what you called the four --

A.   Contacts or electrodes.

Q.   Yes.

A.   So the -- for a peripheral nerve, I was told that the chip in the lead itself had a receiver and because it was

superficial to the skin then the external battery could power it with the wearable.  And so that wearable could be directly over the chip and then power it.

Q.  OK.  So when you -- I think you referred to a wearable. Could you explain to the jury what the wearable is?

A.  Sure.  A wearable, in neuro modulation in order to turn -- this is going to be layman's terms -- in order to make the electrode work it had to have some power source.  The advantage of Stimwave was that the power source did not have to be implanted.  So many devices have something about this big maybe bit smaller that was physically connected to similar type leads, that was the battery, it could be recharged but all that had to be implanted.  With Stimwave the only implant was the lead itself and then however the tech -- I don't know how the technology worked but there was a rectangle-ish pad connected to a battery.  When that battery was turned on then it would power the lead and the patient could experience pain relief.

Q.  OK.  And you mentioned a Pink Stylet and a White Stylet?

A.  Yes.

Q.  Did you have any understanding if there were any difference betweens the Pink Stylet and the White Stylet?

A.  The White Stylet was plastic and the Pink Stylet contained copper.  I could cut the white.  After that first band I could not cut the pink until after the second band.

Q.  How did you come to learn that the white was made of, if

it's OK to say a medical-grade plastic?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Do you know what type of plastic the white was made out of?

A.  No idea.

Q.  How do you come to learn that the white is made out of plastic?

A.  That's what -- training.  That's what we were taught.

Q.  And was there any expression that you used to describe the White Stylet?

A.  In a previous interview the phrase "dummy" came to mind. It was something I used.  So it was either that or the White Stylet.

Q.  OK.  Putting aside the previous interview, when you -- is the expression, dummy stylet a term you heard before?

A.  Yes.

Q.  What is it?

A.  Just in reference to the White Stylet.  Honestly, I haven't thought much about it.  It's just kind of how we refer to it.

Q.  And were you -- if you -- I think you said you would use -- well, just to be clear, under what circumstances would you use the White Stylet?

A.  If I needed to cut the lead after the first marker band.

Q.  And when you say --

A.  Or the physician, sorry.

Q.   When would the pink be appropriate?

A.   When there was enough implantable space or in spinal cord, for example the, lead was placed underneath bone and dense tissue.  So it would be hard to power the chip over the top through the skin.  So what the copper allowed in spinal cord stimulation was the lead would be placed essentially behind the spinal cord but underneath the bones of the spine and it would then be tunnel superficially underneath the skin lower than the area that it was implanted so that the back portion of this lead in between these two marker bands, this was just basically right underneath the skin.  So that allowed the lead to be poured from that point because the chip wasn't accessible because it was further underneath the skin.

Q.   And were there times when pink could be used during peripheral as well?

A.   I don't remember, maybe.

Q.   Well, if you are not on the forearm, for example, if you have more real estate?

A.   I would like to say that for sacral nerve around your hips there was more real estate, and I did use it at that point.

Q.   OK.  And were you trained about the pink and the white in connection with PNS?

A.   Yes.

Q.   By who?

A.   Corporate, Chad, yeah.  Same people that --

Q.  Were there any other problem -- well, with the pink were there any other move to withdraw.

I think you testified that the white could be cut.

A.  Correct.

Q.  Could the pink be cut?

A.  Only behind the channel markers at that second band.

Q.  Why not?  Why couldn't it be cut anywhere else?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained, form, but you may inquire.

Q.  Did you have a sense of why it could not be cut in the same manner that the white could be cut?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.  Form.

Were you trained by Chad or someone at Stimwave with respect to where the Pink Stylet could be cut?

THE WITNESS:  Yes.

THE COURT:  Tell us what you were trained.

THE WITNESS:  We were trained specific to cutting it could only be after the channel marker, after the second set.

Q.  Were you trained on how to speak to doctors about the device?

A.  Yes.

Q.  Can you tell us about that?

A.  Because the device was different than what they were used to, this was the only wireless device let's say, without a

generator then they just had questions about how the device worked, similar to my explanation earlier that is how we were trained to explain it.

Q.  And did you participate in any -- were you present when any implantations took place?

A.  Almost always.

Q.  And what was your job?  What were you trained to do during those implantation procedures?

A.  Answer questions, give best practices so the physician could place the lead in such a way that a good outcome was very likely.

Q.  And when you say a good outcome, a good outcome for who?

A.  The patient.

Q.  Did you -- when you spoke to doctors, were you truthful with them?

A.  Always, to the best of my knowledge.

Q.  Were you ever instructed that the White Stylet contained metal or copper?

A.  Not that I remember.

Q.  Were you ever trained or instructed to mislead doctors?

A.  Never.

Q.  When you talked to doctors, did you use the expression "dummy stylet"?

A.  I don't think so.

Q.  Is that because you were trying to mislead them?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  No, I think it was just like a house term that we had ways that we referred to things amongst ourselves that, you know.

Q.  Were you trained on the applicable reimbursement codes?

A.  Yes.

Q.  And were you trained on how to speak to doctors about reimbursement codes?

A.  Yes.

Q.  Can you tell us, please.

A.  We were trained on the wording of the code.  Doctors would ask, let's see, we were educated on the code for our own education, but we were told we are not coders.  If they have questions about it, you can give them this pamphlet.  If they have further questions they can call and ask.

Q.  Were you ever instructed to -- withdrawn.

Were there -- did the company have any resources available for reimbursement issues?

A.  Yes.

Q.  Please tell us.

A.  Again, it was that pamphlet, depending on peripheral nerve or spinal cord stimulation.  We had a pamphlet with relatable codes.  And on that pamphlet there was number they could all if they had further questions.

Q.  Do you remember if there were codes for trial versus

permanent implant?

A.   I believe the pamphlet had several codes that related.

Those were included, I believe, but there were others as well.

Q.   OK.  Do you remember -- you testified that the lead had a

receiver within it?

A.   That was my understanding.

Q.   Do you have a recollection of what the appropriate -- what

the code was for PNS trials and implants?

A.   I do not.

        MR. KOCHEVAR:  Objection.

        THE COURT:  Overruled.

Q.   Do you remember training about how procedures might fit

within CPT codes?

A.   I don't understand the question.

Q.   You were trained about the device?

A.   Correct.

Q.   And were you provided training about the appropriate codes?

A.   I understood that some codes related specifically to

peripheral nerve and other codes related specifically to spinal

cord stimulation.

Q.   OK.  Did there -- and you left the company in about when?

A.   March of 2020.

Q.   Prior to being subpoenaed by the defense, had you been

approached by anyone else?

A.   I received a phone call from the FBI.

Q.   And what happened?

A.   I talked with one of their agents on the phone and met with one of their agents at their local office.

Q.   Were you truthful with them?

A.   I was.

MR. HARAN:   Nothing further.

CROSS-EXAMINATION

BY MR. KOCHEVAR:

Q.   Good afternoon, Mr. Bilyeu.

A.   Good afternoon.

Q.   You joined Stimwave in March of 2018, is that right, about?

A.   About, yeah.

Q.   And you said you had some training right about when you started?

A.   That's correct.

Q.   And you said that Ms. Perryman participated in that training; right?

A.   She was there, yes.

Q.   She was the CEO of Stimwave then?

A.   Correct.

Q.   And throughout your time there?

A.   I don't remember when that title changed but for the most part that was her position.

Q.   And even though she was the CEO, she still led part of that training; right?

A.   Yes.

Q.   Was she very hands on at the company?

A.   To my knowledge she participated in most things that the company put on, most trainings, phone calls, *et cetera*.

Q.   And Mr. Andresen you said also led that training; right?

A.   That's correct.

Q.   Ms. Perryman and Mr. Andresen led it together; right?

A.   Ms. Perryman was there, but the bulk of the training was Chad Andresen to my best recollection.

Q.   OK.  And at that training that's when they taught but how Stimwave's devices worked; correct?

A.   That's correct.

Q.   And you told us about two Stimwave devices the SNS and PNS; right?

A.   Correct.

Q.   All PNS kits you saw had a Pink Stylet and a White Stylet in them; right?

A.   To my knowledge that sounds right.

Q.   And the kits the ones that had a White Stylet in them sold for about $15,000?

A.   I don't remember the price.  It varied based on several factors.

Q.   I ask you to take a look at the second paragraph of the page I showed you.

          THE COURT:  And what's the exhibit number?

MR. KOCHEVAR:  I'm sorry, it is marked 3505-3 three.

THE COURT:  Just read that to yourself, and when you finish, just put it down.

A.  OK.

Q.  Does that refresh your recollection of about how much those kits sold for?

A.  Yes.

Q.  They sold for about $15,000; right?

A.  Correct.

Q.  So that kit that you have in front of you there, you sold that for about $15,000?

A.  About, yeah.

Q.  And you had a quota to sell about $80,000 worth of devices a month; correct?

A.  Correct.

Q.  And all those kits you sold had a White Stylet in them; right?

A.  All the peroneal nerve kits or spinal cord kits?

Q.  Peripheral nerve kits.

A.  Yes, they did.

Q.  I think you told us a second ago, is there a White Stylet in that kit in front of you?

A.  Yes, there is.

Q.  Could you please hold it up.

And at the training that we just talked about, folks

called that the dummy stylet; right?

A.   I don't believe that that was what we referred to it at training.  Most of the time in training and formal settings we refereed to them by the color of the handle.  So I just referring is to as a dummy stylet with colleagues.

Q.   But in formal settings you said you would call it the White Stylet?

A.   That's correct.

Q.   And the PNS system got implanted in people's bodies; right?

A.   Yes.

Q.   You were taught to call something the dummy stylet that was going to be put in people's bodies?

          MR. HARAN:  Objection.

          THE COURT:  Overruled.

A.   To my knowledge, the dummy stylet and peripheral nerve had nothing to do with the capability of the lead.

Q.   But my question is that dummy stylet got put into people's bodies?

A.   That's correct.

Q.   And you were in the room; right?

A.   That's correct.

Q.   And you would hand the White Stylet to the doctor?

A.   I wouldn't touch.  This kit was terminally sterile, and the only people who would touch this kit were sterilized.  So I did not touch the kit.

Q.  I'm sorry, absolutely right.  But I think you testified before you couldn't recall using a Pink Stylet in your PNS kits that you sold; right?

A.  I do remember, again, this has been four plus years ago. There is a certain -- it's all based on how much tissue was available.  So there is -- and it's safe to understand there is more tissue in the back than in the forearm or lower leg.  So I do recall using the pink in some peripheral nerve stimulation.

Q.  Do you recall using the white in some peripheral nerve system cases?

A.  I do, yes.

Q.  In many cases?

A.  Most.

Q.  Most cases used the White Stylet?

A.  Right.

Q.  And that's the one you called the dummy stylet informally?

A.  Yes.

Q.  You watched as doctors put that into someone's body?

          THE COURT:  Counsel lower your voice.

A.  I did, yes.

Q.  You didn't call it a dummy stylet in front of doctors?

A.  I did not.

Q.  With doctors you called it the White Stylet?

A.  The White Stylet.

Q.  You couldn't use both the white and Pink Stylet in a single

O2T4PER5                    Bilyeu - Cross

implant; right?

A.   No.

Q.   It was one or the other?

A.   One or the other.

Q.   After that initial training you had weekly training calls at Stimwave; right?

A.   The call was not a training call.  The call was an all staff, a circling of the wagons.  But just to talk sometimes it was training, sometimes it was other information.

Q.   Everyone had to join those calls; right?

A.   That's correct.

Q.   And Mr. Andresen initially led those calls; right?

A.   Most often, yes.

Q.   But as more people were hired, Ms. Perryman led those calls; right?

A.   I don't recall.

Q.   I'm going to show you again what's marked down here at 350-5003.

         THE COURT:  Just read that to yourself.

Q.   Could you take a look at the second paragraph down, please.  Does that refresh your recollection about whether Ms. Perryman led those call after more people were hired?

A.   I may have misspoken or that may have been taken down incorrectly.  To my knowledge she was always present on the calls.  That doesn't mean she led the calls.  To my knowledge

Chad Andresen led them quite a bit.  As more people were hired, VP of sales, and some other people led them, but to the best of my knowledge, I don't remember the majority of those calls being led by Laura.

Q.  I think you testified on direct that you talked to the Federal Bureau of Investigation at some point about this matter?

A.  I did.

Q.  And you testified you were truthful there?

A.  I was.

Q.  So do you remember telling the Federal Bureau of Investigation that Ms. Perryman led those calls after a little while?

A.  I don't remember telling them that, no.

Q.  OK.  Part of your job was to introduce Stimwave to doctors; right?

A.  That's correct.

Q.  And the doctors that you talked to generally were not engineers; right?

A.  Correct.

Q.  They didn't necessarily understand how the device worked?

A.  Correct.

Q.  You told them how the device worked?

A.  Correct.

Q.  And they relied on what you told them?

A.   That's correct.

Q.   They relied on your training and your knowledge?

A.   That's correct.

Q.   You are not an engineer, right, Mr. Bilyeu?

A.   I'm not.

Q.   And what you learned about the opinions system you learned from people at Stimwave?

A.   That's correct.

Q.   Ms. Perryman told you about the PNS system?

          MR. HARAN:  Objection.

          THE COURT:  Overruled.

A.   One of many, yes.  She was part of it.

Q.   And you gave the doctors instructions on how to use the stylets; right?

A.   That's correct.

Q.   But for the surgeries, it was your decision on which stylet to use; right?

          MR. HARAN:  Objection.

          THE COURT:  Overruled.

A.   Correct.

Q.   Doctors would do whatever you suggested?

A.   Correct.

Q.   And sometimes you told them to put the dummy stylet into people; right?

A.   I told them to put the White Stylet.

Q.   Right.   When you told the doctor you said White Stylet; right?

A.   Correct.

Q.   But in informal settings you called it the dummy stylet; right?

A.   Yes.

Q.   The same sytlet you told the doctor to put into people though?

A.   White Stylet, yes.

Q.   Stimwave provided you with a pamphlet to give to the doctors regarding billing codes; right?

A.   Correcter.

Q.   And that pamphlet had a phone number for doctors to call with any questions; right?

A.   Correct.

Q.   And Ms. Perryman instructed you to refer doctors for the phone number for the Stimwave home office regarding billing codes; right?

A.   I don't recall what phone -- I don't recall which phone number that was.  We had a customer service phone number but also worked with a third party.  I think their name was Tam Net.  So their phone number could have been the reference number on the pamphlet.  I don't recall.

Q.   But Ms. Perryman instructed you to give some phone number for doctors for them to call about billing; right?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.  Correct.

Q.  And Mr. Andresen gave you that same instruction about giving them the phone number; right?

A.  If we had questions we were instructed to give them this pamphlet.

Q.  At some point, Mr. Bilyeu, you questioned whether Stimwave products worked; right?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.  I did.

Q.  And you left Stimwave because you weren't sure they worked; right?

A.  I left Stimwave for multiple reasons.

Q.  Was that one of them?

A.  That was one of them.

Q.  Also you often didn't get paid on time; right?

A.  Early on, paychecks were late.

Q.  It seemed like a fight to get paid by Stimwave; right?

A.  It was.

Q.  For about six months to a year you never got paid on time; right?

A.  Something like that.

MR. KOCHEVAR:  One moment please, your Honor.

O2T4PER5                     Bilyeu - Redirect

Nothing further.

THE COURT:  The witness has kindly pointed out that counsel, you dropped something on the floor there.

MR. KOCHEVAR:  Thank you.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MR. HARAN:

Q.  So there were times when your pay was late?

A.  Correct.

Q.  And you held Ms. Perryman responsible for that?

A.  Yes.

Q.  Do you still feel that she was responsible for that to this day?

A.  Yes.

Q.  OK.  Did Ms. Perryman ever instruct you to lie to anybody?

A.  No.

MR. KOCHEVAR:  Objection.

THE COURT:  I'm going to let you inquire.  But rephrase.

Q.  Well, you were trained on how to speak to doctors?

A.  Correct.

Q.  And the prosecutor asked you a bunch of questions whether Ms. Perryman was part of that training?

A.  Correct.

Q.  Were you trained to mislead doctors?

MR. KOCHEVAR:  Objection.

THE COURT:  Yes.  I will allow you to inquire, but I am sustaining that objection.

Q.  Did you know at the time whether or not, and at the time is during the period 2018 through your employment, the entire employment term you had at Stimwave, that's the timeframe.  OK?

A.  OK.

Q.  During that time, did you have -- did you know whether the White Stylet had any metal or copper in it?

A.  I knew the White Stylet was plastic.

Q.  For the entire time you were there?

A.  That was my understanding.

Q.  Did you ever tell a doctor anything else other than -- did you -- withdrawn.

Did you at any point make any false statements to doctors about the White Stylet?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Did you ever tell any doctors that there was copper in the White Stylet?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Did you ever tell any doctors that there was metal in the White Stylet?

A.   No.

Q.   Did you talk to doctors about the White Stylet?

A.   Yes.

Q.   Did they ever ask you questions about the White Stylet?

A.   If they did I don't remember the specifics.

Q.   OK.  To the extent they did, do you recall -- were you -- the prosecutor asked you a bunch of questions about being present when the White Stylet was used in procedures?

A.   Correct.

Q.   And the prosecutor asked you questions about whether that was because you suggested the use of the White Stylet in procedures?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Sustained.

Q.   Do you recall the prosecutor asking you questions about the White Stylet?

A.   I do.

Q.   OK.  At that time did you believe there was anything wrong with the White Stylet being used in a procedure?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Overruled.

A.   No.

Q.   Did you believe you were doing anything wrong with respect to the White Stylet, in your job?

        MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  To this day, do you feel like you did anything wrong in your job with respect to the White Stylet?

A.  No.

Q.  Did any doctor at any point -- did any doctor at any point express concern about using the White Stylet?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  No.

MR. HARAN:  Nothing further.

MR. KOCHEVAR:  No recross.  Thank you.

THE COURT:  You may step down.

Next witness.

MR. HARAN:  The defense calls Anthony Schuler.

THE COURT:  Mr. Schuler, if you could come up here and take the witness stand.

ANTHONY SCHULER,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

Witness sworn.

THE COURT:  State your full name.

THE WITNESS:  Anthony Schuler.

THE COURT:  And spell your last name.

THE WITNESS:  S-C-H-U-L-E-R.

MR. HARAN:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. HARAN:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Why are you here today?

A.  I was subpoenaed to testify today.

Q.  Can you -- where do you live?

A.  Tampa area, Tampa, Florida.

Q.  How far did you go in school?

A.  I have a bachelor degree in nursing.

Q.  What do you do for a living?

A.  Currently I'm a medical device sales rep for a spinal cord stimulator company.

Q.  When did you start there?

A.  August of 2022.

Q.  What is your -- just again what's your professional background?

A.  I was a registered nurse for nine years before I got into medical device sales with Stimwave and then I am currently in medical device sales with Nevro, a spinal cord simulator company.

THE COURT:  I forgot to tell you.  Move your chair up and that mic moves so you can place it under your chin and keep your voice up.  Thank you.

O2T4PER5                          Schuler - Direct

Q.   I think you mentioned that you worked at Stimwave?

A.   Yes, sir.

Q.   When did you start there?

A.   I started in July of 2019.

Q.   How long did you work there?

A.   Just over three years until August of 2022.

Q.   What was your job at Stimwave?

A.   I was a clinical specialist.

Q.   Please tell the jury what that means.

A.   As a clinical specialist, my role on the team was everything clinical in nature.  I worked with physicians, patients, doctor's offices, surgery centers, hospitals, on a day-to-day operations basis I would work mainly with patients, reprogramming the device, adjusting settings, talking with patients to see how well they are doing, during a trial period or post permanent implant.  I would also work in the operating room with the physicians placing -- not myself placing the device but, you know, supervising and bringing product to the operating room and answering any questions physicians would have about the placement of the device.

Q.   You said programming the device.  Can you explain what that means.

A.   Sure.  The device is a neuro stimulator used to create chronic pain and everybody's symptoms are a little different.  We are essentially delivering electrical current to a nerve in

the body.  Each nerve requires different types of settings and amplitudes and pulse widths, and a lot of different electrical engineering terms, that would be adjusting those setting based on how well or not well the patient is doing.

Q.  Is there a programming component the implantation procedure?

A.  Yes, you would test the device enter operatively.

Q.  Was there ongoing programming that you needed to work with?

A.  Yes, sir.  Yeah.  So it would -- you would program in the operating room to test the device, you would program in the recovery area of the hospital.  You would sometimes reprogram at the post-op appointment or any subsequent appointments that were to follow depending on how well the patient is doing if they were getting relief or not.  If they wouldn't you would obviously be adjusting settings to help them get as much relief as possible.

Q.  Is it fair to say that after a procedure a patient would -- might continue to still be in touch with you?

A.  Very regularly, yeah.

Q.  So you could make adjustments to the programming?

A.  Yes, sir.

Q.  Were you trained at Stimwave?

A.  Yes, I was trained.

Q.  Tell us about that.

A.  So initial training was, from my recollection, was a week

or two of online modules and tests, and, you know, videos about the device and how it works and how to place it in the body per different nerves in the body.  And then there was a one week in person training.  It was held in Fort Lauderdale, Florida.  It was for just a week.  And when you came back to the field to your territory.  I call it on-the-job training, you would see as many surgical cases as possible, be in as many preprogrammings as possible, learn the device in your territory.

Q.  Who at the company handled the training?

A.  There was a lot of people involved.  From my recollection, in my -- the online training, the videos, the majority of them had Chad Andresen as the head of telling us what to do in each procedure.  There was a couple other people involved.  The in-person training was ran by Chad Andresen, who I believe, I think at the time was head of marketing, maybe.  I don't know his exact title, but he, kind of, led the in-person training with us.  There was a lot of regional sales directors from around the country.

Do you want know elaborate on names or?

Q.  Thank you.  If there is any significant names that specifically had a significant role, feel free.

A.  Yeah.  The head of clinical I believe at that time was Andrea Berry.  She would have presented them.  I think my clinical manager for our region was Christian Scott at the time

I remember them being there.

Q.   Jennifer Spruce, does that name ring a bell?

A.   Yeah.  I don't remember exactly if she was in a training role at that time.  She may have been.  I don't know for sure if she was part of that training.

Q.   Were there any sort of regular clinical sessions?

A.   Yeah.  So we would have, I believe at the time it was a weekly, if not a monthly call, a Zoom call to discuss clinical evidence or clinical practice, and best practices in your area what you see is working well and isn't working well.  And it's this device is placed all around the body on different nerves and different nerves react differently to stimulation.  It helps to share.  So that was like a clinical call that we would have to discuss things.  And then we would have periodic trainings, I believe at least ones a year in person whether it be at the sales meeting, a sales meeting usually involves some type of training on the device or how it's used or different nerves in the body or, you know, how different nerves react to stimulation.

Q.   Were quizzes part of these trainings?

A.   I believe so, yeah.

Q.   Up until the late 2019, do you know who the CEO of the company was?

A.   It was Laura Perryman.

Q.   If you saw Ms. Perryman would you recognize her?

A.   Yeah.

Q.   Do you know if she is in the courtroom today?

A.   Can I stand up?   Sorry.   Yeah, she is here.

Q.   OK.   Can you just tell us where she is and identify her by an article of clothing?

A.   Black shirt, maybe dark blue jacket, standing over there.

MR. HARAN:   Let the record reflect the witness has identified Ms. Perryman.

THE COURT:   Yes.

Q.   Did you -- were you trained about the device and how it worked?

A.   Yes, yeah.

Q.   Generally speaking, how did -- what was the device and how did it work?

MR. KOCHEVAR:   Objection.

THE COURT:   Sustained.

Q.   What was your training about how the device worked?

A.   I was trained that the device is an electric -- electrode array or a lead is what we refer to it as.   It had a couple different components.   It had a microchip in the actual lead itself.   It had electrodes where the energy was released to the nerve.   There was a -- there was in the kit that came, there was an introducer needle that would use to introduces it down to the nerve that you are stimulating or attempting to stimulate.   There was two different stylets in the kit.   There

was a White Stylet and a Pink Stylet, those were used.  So there was a separate transmitter that would send a signal through the skin into the lead to transmit the signal to the microchip of the lead itself and create an electrical field around the nerve.

Q.  OK.  And you mentioned -- you mentioned some stylets?

A.  Yes.  So there was two stylets.  There was a Pink Stylet and a White Stylet.  Those were used based on which -- essentially which body part you were going to stimulate or which nerve in the body you were going to stimulate.  So for instance, if you were going to -- I'll use the knee as an example or the superior genicular nerve are deeper in the body.  So you would have to use the Pink Stylet, which extended the area of the lead that you would talk to -- I'll use the term "talk to" -- from the transmitter.

To counteract that, if you were to use the lead in an arm, so to speak, in a forearm for let's say an ulnar nerve.  If you were Tuesday the Pink Stylet it would usually be too long to use in the forearm.  It would not fit in that area as the receiver area of the Pink Stylet had to stay straight.  You couldn't bend it or kink it or turn it, or the signal would not be transmitted from the transmitter to that wire.  So you would use the White Stylet which would essentially shorten the length of the wire or the lead itself that was stimulating the nerve so that it would fit in the body part that you were attempting

O2T4PER5                     Schuler - Direct

to stimulate.

Q.   Were you trained about the differences between the White Stylet and the Pink Stylet?

A.   Yes.

          (Continued on next page)

O2TDPER6

(In open court; jury present)

Q. Go ahead.

A. The Pink Stylet, obviously -- sorry, not obviously, was longer in nature. So it extended the wire, the lead itself. If you needed to, like I said, stimulate a deeper nerve in the body and you couldn't send the signal to the receiver, so you would use the Pink Stylet, which would extend the length of the lead to make it more shallow to talk to -- the Pink Stylet was copper. It was -- you know, physically, it was -- it had a pink handle on it. That's why we called it the Pink Stylet. And it had a copper segment on it that was gold color in nature. The White Stylet was the same length as the Pink Stylet. It just did not have copper on it, and it had a white handle.

Q. And were you trained on whether or not the White Stylet had copper in it?

A. From my recollection, I don't believe the White Stylet had copper in it. I don't remember being trained that it did. My understanding is it was made of PEEK, which is a medical grade plastic.

Q. Okay. And do you have a sense of if you were -- were you trained about if you're not going to use the pink, why it would be useful to use the White Stylet?

MR. BERGMAN: Objection.

THE COURT: Sustained.

O2TDPER6

BY MR. HARAN:

Q. Were you trained about the purposes of the White Stylet?

A. Yes. So the White Stylet was -- you had to add a stylet to the device in order to use it, whether it was a Pink or a White Stylet. If we used the White Stylet, you could cut the lead shorter to shorten the space that it would fit. The purpose of the White Stylet was to fill the void or the lumen inside the wire to keep out any bio burden or fluids from the body or anything, because this is implanted in the body. So this would fill the lumen, the use of it.

Q. Okay. And that was part of your training?

A. Yes, sir.

Q. And you mentioned an expression, bio burden.

A. So bio burden is a term I use. When you're sterilizing medical instruments, if there's -- you know, what you're killing out is the bio burden. It's anything from the body, biological in nature, whether it's blood or fluid or anything from the body, tissue.

Q. Okay. How many -- in a typical kit, how many Pink Stylets would be in a kit?

A. I believe there was two in each kit, Pink Stylets.

Q. What was your understanding of why there'd be two?

A. So because it was made of copper.

MR. BERGMAN: Objection.

THE WITNESS: And it was a very small lumen.

O2TDPER6

THE COURT:  Sustained as to form.

Q.  Were you trained on why the kits included two Pink Stylets?

A.  Yes.  The Pink Stylet was made of a copper -- was a copper wire, which was very thin and difficult to feed into the lumen itself, and could kink easily.  From my understanding, that -- if there was a kink, you would not be able to transmit a signal as well as, you know, if you didn't have a kink.

So if you were feeding the wire into the stimulator lead itself and it kinked, we would have an extra one in case we needed it.

Q.  Okay.  And were you trained on how to interact with doctors?

A.  In --

Q.  Beyond what we've already discussed?

A.  I don't understand.

Q.  Okay.  Were there -- did you -- were you trained concern -- were you trained about pre-surgical or sort of pre-implant -- pre-implantation meetings?

MR. BERGMAN:  Objection.

THE COURT:  Do you understand the question?

THE WITNESS:  I think so, yes.

THE COURT:  Go ahead.  You may answer.

A.  So I would -- yes, I was, you know, trained that during a procedure itself, you know, the physician would tell you, you know, this patient has lower back pain, so we're going to do,

O2TDPER6

for instance, a cluneal nerve stimulation trial.  And you would plan that procedure with the physician based on, one, the pain location in the body, the nerve that innervated that painful area, and how you would approach that nerve to put a stimulator next to it.

So, yes, there was -- you know, I talked regularly with physicians, whether it be just a few minutes before a surgical procedure in the hallway about, hey, this is the plan to, you know, approach that nerve, and how it's going to work best for the patient.

Q.  And did you, during the course of time, speak to doctors about the White Stylet?

A.  Yes.  I believe in the operating room it would get brought up, or in the pre-planning meeting -- I call it a meeting.  It could be an interaction in the hallway -- this is the nerve we're going after.  This is what we're going to have to use.

For instance, if we're attack -- not attacking.  If we're going to approach an ulnar nerve and the Pink Stylet would make the lead too long, we could not use that one.  We would have to use the White Stylet.  So I would remind the physician, hey, we will probably use the White Stylet.  We will measure and plan this out as we get in the operating room, but just to be fresh in your head before you get in.

Q.  Were you ever -- were you trained to mislead doctors about the White Stylet?

O2TDPER6

MR. BERGMAN:  Objection.

THE COURT:  Sustained.

Q.  Did you ever tell any doctors that the -- well, did you ever tell any doctors that there is copper or metal in the White Stylet?

A.  I did not.

Q.  Did you ever tell any doctors that the White Stylet is a receiver and receives signal?

MR. BERGMAN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Can I --

Q.  You can answer.

A.  I don't believe so.  Can you repeat the question?  I'm sorry.

Q.  Yeah.  Did you ever tell doctors that the White Stylet conducts a signal?

A.  I did not.

Q.  Okay.  Were you ever -- were you ever asked by anyone at Stimwave to mislead doctors?

MR. BERGMAN:  Objection.

THE COURT:  Sustained.

Q.  Did you ever mislead any doctors?

MR. BERGMAN:  Objection.

THE COURT:  Sustained.

MR. HARAN:  Nothing further.

CROSS-EXAMINATION

BY MR. BERGMAN:

Q.  Good afternoon, Mr. Schuler.

A.  Good afternoon.

Q.  You worked in Stimwave, correct?

A.  Yes, sir.

Q.  And you started in July 2019; is that right?

A.  Yes, sir.

        MR. BERGMAN:  And, Mr. Carbone, can you show what's already in evidence as GX 221?

        And can you blow up this top slide, please?

Q.  And, Mr. Schuler, can you please read this slide?

A.  "Stimwave Wave Academy Live Intensive Class 5, July 21, 2019."

Q.  And this is the training that you went to, right?

A.  Yes, sir.

Q.  The one that was down in Fort Lauderdale?

A.  Yes.  Yes, sir.

        MR. BERGMAN:  Mr. Carbone, can you please turn to slide 25?

        And just blow up that group one for me.

Q.  And that's you listed in group one, the second name down; is that right?

A.  Yes, sir.

Q.  So you were there in Fort Lauderdale at that training in

group one?

A.  Yes, sir.

Q.  And Ms. Perryman was at that training as well, right?

A.  Yes, she was there.

          MR. BERGMAN:  Mr. Carbone, could you please go to slide 23?  Thanks.

Q.  Can you tell me what it says in big letters in the middle there?

A.  "Lunch with Laura Perryman CEO 12:30 p.m."

Q.  And I think you said Jennifer Spruce was at this training as well; is that right?

A.  I believe so.

          MR. BERGMAN:  Mr. Carbone, can you please go to page five of this training?

Q.  And she's listed there in the second bullet down; is that right -- sorry, in the third bullet down?

A.  Yes, sir.

Q.  And Chad Andresen is listed at the top as well?

A.  Yet.

Q.  And Andrea Berry, one of the other people you mentioned?

A.  Yes, sir.

Q.  And at this training, Stimwave trained you on billing; is that right?

A.  I'm sure billing was touched on at the training.  I was a clinical specialist in job title and role on my team.  I'm sure

it was -- I don't know exactly -- I don't remember exactly what was, you know, taught at that training for it, but yes, I would imagine there was something.

MR. BERGMAN:  Mr. Carbone, can you please go to page 41?

Q.  Right there on day two, it says "reimbursement role play."

Do you see that?

A.  I do, yes.

Q.  So you had reimbursement role play as part of your training?

A.  I don't remember specifically.  I would imagine so, if it's on the training slide.

Q.  Do you think if it's on the training slide, that this was part of your training?

A.  I can't say for certain if I was in that specific breakout. I don't -- is there a -- that first group you had had names on it.  Was that specific to that --

Q.  And you took a -- you took exams about reimbursement; is that right?

A.  Specifically about reimbursement -- I'm sure there were some questions about reimbursement on the exams we took, but one specifically for reimbursement, I don't remember that.

Q.  At this training, the company told you that the White Stylet was a receiver; is that right?

A.  I don't remember that, if they did.

Q.  Okay.

        MR. BERGMAN:  Mr. Carbone, can you please go to page 28?

        And can you blow this slide up?  Thank you.

Q.  And do you see here in this slide from the Stimwave presentation that you attended where it calls the White Stylet a receiver?

        MR. HARAN:  Objection.

        THE COURT:  Overruled.

        MR. HARAN:  Foundation.

        THE COURT:  Overruled.

        Do you see that?

        THE WITNESS:  It says, the Freedom 4A white receiver stylet, 13 centimeters.  Yes, I see what it says.  Yeah.

Q.  Okay.  So is it correct the White Stylet is being called a receiver here?

A.  It appears to on this screen, yes.

Q.  And this is -- what it says on the screen, this is a slide from the training that you attended, right?

A.  I believe so.

Q.  Well, we saw just a moment ago that your name was on the slide for this training, correct?

A.  My name, yes, was on the slide earlier, yes, that I was at the training.  If this is what was presented then, yes, I was there.

O2TDPER6                         Schuler - Cross

MR. BERGMAN:  And, Mr. Carbone, could you please go to page 29?

Q.  And here again, in this slide from the Stimwave presentation that you attended, it calls the White Stylet a receiver; isn't that right?

A.  It does.  It says W. receiver stylet.

Q.  And it also says it on DC -- in the highlighted portion it says it?

A.  Yes.  That would --

Q.  Okay.

A.  Yes.

Q.  And it says it again on the slide on the left at the bottom, correct?

A.  Yes, sir.

Q.  So twice on this slide from the presentation that you attended, the White Stylet's being called a receiver, correct?

A.  It appears so, yes.

Q.  In fact, the company taught you that the White Stylet and the Pink Stylet performed the same function, right?

A.  No, not necessarily.  The --

Q.  It's just -- you're saying they didn't tell you that they performed the same function?

A.  I mean, the Pink Stylet was used to extend the receiver area.  The White Stylet was used to shorten the lead itself.  The White Stylet was used to fill in the lumen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2TDPER6                         Schuler - Cross

Q.   Sorry.  One moment.  Is this --

THE COURT:  So, it's 3:15.  We'll take an afternoon recess.

Ladies and gentlemen, let Mr. Whertvine know when you're ready to resume.

(Continued on next page)

(In open court; jury not present)

THE COURT:  So, Mr. Haran, are there things to discuss at the break?

MR. HARAN:  No, your Honor.

THE COURT:  Mr. Kochevar, are there things to discuss at the break?

MR. KOCHEVAR:  No new matters, your Honor.  Thank you.

THE COURT:  Thank you.

So what, counsel, should I be prepared to tell the jury at 5:00 today as I dismiss them is our expectation as to when the evidentiary portion of this trial will end?

MR. COHEN:  I think we could safely say it should end before the end of the day tomorrow to be safe.  I think realistically, so that we may be -- what is it?  Under promise and over deliver?  Tell them the end of the day, probably be done by lunchtime between us, but I think maybe -- I leave it to the Court's discretion obviously, but I think tomorrow.

THE COURT:  So why don't I say this, to capture your idea.  I say, we expect the evidence will end tomorrow.  It may end as early as noon, but it will certainly end before the break of the day, which will be no later than 3:30.

MR. COHEN:  I think that's fair.

Okay.  Yeah.  Our concern is we promise them noon, and we start going past it, that we'll -- I think it might be safer to say it will be done by the end of the day tomorrow.

O2TDPER6                        Schuler - Cross

THE COURT:  Okay.  Fine.  I'll tell them that we expect that the case -- the presentation of evidence in the case will be completed before they leave at 3:30 tomorrow.

MR. HARAN:  Thank you.

MR. COHEN:  Thank you, Judge.

THE COURT:  Good.  Good.

Have the parties finished talking about any potential charge on consultation with counsel, or are you still discussing that?

MR. COHEN:  From the defense perspective, we don't think it's applicable or necessary.

MR. KOCHEVAR:  I think the government is inclined to agree with that at this point, with the caveat that if the defense brings it up again in some way, either in closing or eliciting testimony on it, we might renew our request for that, but I think at this point --

THE COURT:  Good.  Defense counsel has said they're not intending to bring it up, so I think we can call that one done.

That leaves us I think with one outstanding issue, which is Defense Exhibit 623.  Have the parties concluded their discussion of that?  Is there anything for me to address?

MR. KOCHEVAR:  I'm sorry.  We have not concluded our discussion of that.

THE COURT:  That's fine.

O2TDPER6                    Schuler - Cross

MR. KOCHEVAR:  We continue to object to that, so yes.

THE COURT:  Good.  Good.  We'll deal with that at 5:00.

Have a good break.

MR. COHEN:  Thank you, Judge.

(Recess taken)

THE COURT:  Please be seated.

Bring in the witness.

Bring in the jury.

(Continued on next page)

(In open court; jury present)

THE DEPUTY CLERK:  The jury is entering.

THE COURT:  Counsel.

BY MR. BERGMAN:

Q.  Mr. Schuler, you testified before that the White Stylet was about filling the lumen, right?

A.  Yes, sir.

Q.  And it was about preventing fluid ingress, right?

A.  Yes, sir.

MR. BERGMAN:  Mr. Carbone, I want you -- could you please pull up page 28, again, from GX 221?

And could you just blow up that slide for me, please?

Q.  And this is the slide we were looking at from your training before, right?

A.  Yes, sir.

Q.  And this slide doesn't say anything -- and this slide talks about the white receiver stylet, correct?

A.  Yes.  Yes, sir.

Q.  And this slide doesn't say anything about fluid ingress, correct?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.  I don't see that there, no.

Q.  And this slide doesn't say anything there about filling the lumen, correct?

O2TDPER6                    Schuler - Cross

A.   Correct.

MR. BERGMAN:  Mr. Carbone, could you please go to page 29?

Q.   And this is the other slide about the White Stylet from your training, correct?

A.   Yes.

Q.   And this slide doesn't say anything about fluid ingress, right?

A.   No, I don't see anything.

Q.   And this slide doesn't say anything about filling the lumen, right?

A.   No.

Q.   What this slide says is that the receiver stylet has a 13-centimeter cut length, right?

A.   Yes.

Q.   And it has a little antenna with little radio waves above it, right?

A.   It does.

Q.   And even on the left it has a little antenna with little radio waves next to it, right?

A.   Yes.

Q.   And on the Pink Stylet, it just describes a different cut length, right?

A.   Yes.

Q.   And nowhere on this slide does it discuss fluid ingress,

O2TDPER6                    Schuler - Redirect

correct?

A.  Not that I see.

Q.  And nowhere on this slide does it discuss filling the lumen, right?

A.  No.

Q.  You could look through this whole presentation, this whole presentation doesn't discuss fluid ingress, right?

A.  This slide does not.  I don't have the entire presentation with me.

Q.  One moment.

MR. BERGMAN:  Nothing further.

REDIRECT EXAMINATION

BY MR. HARAN:

Q.  Mr. Schuler, you were asked questions by the prosecutor about your training?

A.  Yes.

Q.  And what were you trained about the White Stylet and what it was made of?

A.  The White Stylet was what I call PEEK, which is a medical grade plastic.  Clear.  It was clear in color.

Q.  Prior to being served with a subpoena by the defense in this case, had you heard from anyone else?

A.  Yes.  I was questioned by two FBI agents prior to being subpoenaed.

Q.  Did they ask you questions about the White Stylet?

O2TDPER6                    Schuler - Redirect

A.   Yes.

          MR. BERGMAN:  Objection.

          THE COURT:  Overruled.

Q.   Did they ask you questions about your training?

A.   Yes.

Q.   Did you tell them the truth?

A.   Of course.  Yes.

Q.   Nothing further.

          THE COURT:  Any recross?

          MR. BERGMAN:  Nothing further from the government.

          THE COURT:  You may step down.

          Next witness.

          MR. HARAN:  The defense calls Dr. George Arcos.

          THE COURT:  Dr. Arcos, if you could come on up here, please, and take the witness stand.

          No need to rush.

          THE WITNESS:  Okay.

          THE COURT:  Right over here, toward me.

          If you could take the stand and remain standing.

          THE WITNESS:  Sure.

          THE COURT:  Please raise your right hand.

          (Witness sworn)

          THE COURT:  Please be seated.

          THE WITNESS:  Thank you.

          THE COURT:  You can move your chair up.

O2TDPER6                      Arcos - Direct

THE WITNESS:  Okay.

THE COURT:  That mic moves, and you can move it under your chin, and keep your voice up.

THE WITNESS:  Okay.

THE COURT:  What is your full name, please?

THE WITNESS:  George J. Arcos.

THE COURT:  How do you spell your last name?

THE WITNESS:  A-r-c-o-s.

THE COURT:  Counsel.

 GEORGE J. ARCOS,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARAN:

Q.  Good afternoon, Dr. Arcos.

A.  Good afternoon.

Q.  Were you served with a trial subpoena by the defense?

A.  I was.

Q.  Is that why you're here today?

A.  Yes.

Q.  What do you do?

A.  I'm an anesthesiologist and pain physician.

Q.  Where?

A.  Sarasota, Florida.

Q.  How long have you been doing that?

O2TDPER6                          Arcos - Direct

A.   Thirty-six years.

Q.   Generally speaking, what sorts of therapies do you use with your patients, generally speaking?

A.   Spinal injections, minimally invasive spine procedures, some medication, trigger point injections, bursa injections, whatever is needed.

Q.   Okay.  And are you familiar with Stimwave, the company?

A.   Yes, sir.

Q.   Did there come a time when you began to work with Stimwave, the company?

A.   Yes.  I was using the product and --

         THE COURT:  I think that you've answered.  Yes.

         THE WITNESS:  Okay.

Q.   Did there come a time when you began to train on behalf of Stimwave?

A.   Yes, sir.

Q.   When was -- when did you begin, to the extent -- to the best of your recollection?

A.   It was very early on when the company started.  So I would say probably 2013, maybe 2014.

Q.   Okay.  And for how long did you continue to train on behalf of the company?

A.   Through 2020.

Q.   Without getting into specific -- well, are you familiar with the devices that Stimwave manufactured and sold?

A.   Yes, sir.

Q.   Can you, just very generally, which devices are those and which devices did you train about?

A.   Stimwave had a three-platform technology.  So they had what's called DRG, dorsal root ganglion stimulation, spinal cord stimulation, and peripheral nerve stimulation.  So all three of those were utilized and I trained in, and she taught those to me.

Q.   Okay.  I'm going to limit my questions to the PNS device?

A.   Okay.

Q.   Who did you interact with, for example, at Stimwave in connection with your training?

A.   Sure.  I mean, the primary interface was with Chad Andresen.  Chad was the engineer, but he also ran a continuing education.  So Chad would put together webinars or teaching labs and assignments and things of that nature.  So we had interaction with Chad primarily, also Laura and some of the support staff.

Q.   Okay.  And when you say Laura, are you referring to Laura Perryman?

A.   Yes.

Q.   Do you -- do you see Laura Perryman in the courtroom today?

A.   Yes.

Q.   Okay.  Can you just describe an article of clothing she's wearing?

A.   Blue.  Blue Blazer.

Q.   Okay.

          MR. HARAN:  Can the record reflect the witness has identified Ms. Perryman?

          THE COURT:  It may.

          MR. HARAN:  Thank you.

Q.   Did you -- in the course of your training, were you familiar, did you become familiar with the PNS device and how it worked?

A.   Yes.  I was a primary instructor.

Q.   Okay.  And what did you -- who was your point -- who were your points of contact for Stimwave with respect to the PNS device and how it operated?

A.   Chad.

Q.   Okay.  And how often -- how many trainings did you provide?

A.   A lot.  Thirty maybe.  In that range, 20, 30, somewhere around there.  I mean, it was quite a few.

Q.   Okay.  Just tell us generally speaking who would attend the trainings and, just generally speaking, what the trainings would cover with respect to the PNS device?

          MS. RAVENER:  Objection.

          THE COURT:  Sustained.

          MR. HARAN:  What, if anything, did Chad Andresen tell you about how the PNS device system operated?

          MS. RAVENER:  Objection.

O2TDPER6                         Arcos - Direct

THE COURT:  Sustained.

So the issue is you had a question with many, many parts.

MR. HARAN:  Fair enough.  Okay.

Q.  Did you -- who did you learn about the device from?

A.  Well, there's a training for physicians, and that's usually run by Chad and Dr. Perryman.  And we go through that program first, but then if there is a technical question, we were directed to Mr. Andresen to answer those.

Q.  Okay.  And I don't want to get into any specifics, and I don't want to cover this topic, but did you in your practice use the devices?

A.  Yes.

MS. RAVENER:  Objection.

THE COURT:  Sustained.  Stricken.

MR. HARAN:  Okay.

Q.  What would you cover in the trainings that we're talking about?

THE COURT:  The trainings that you conducted on behalf of Stimwave, what were the topics that you covered?

THE WITNESS:  The topics that I covered from training, these were mostly cadaver labs for physicians.  So the labs would have two parts, and there would be a didactic part in the morning, and the afternoon was a cadaver lab.  So most physician trainers were involved with a cadaver lab where we

O2TDPER6                         Arcos - Direct

would instruct physicians on the device, and how to use it, and demonstrate for them the techniques in the different peripheral nerves and how they were approached.

Q.   What was your understanding of how the device operated?

          MS. RAVENER:   Objection.

          THE COURT:   Sustained.

Q.   Are you familiar with the Pink Stylet?

A.   Yes.

Q.   Are you familiar with the White Stylet?

A.   Yes.

Q.   Are you familiar with the lead?

A.   Yes.

Q.   Did you train physicians with respect to those components?

A.   I did.

Q.   What did you train physicians about with respect to the lead?

A.   You have to elaborate a little bit on the device.

          THE COURT:   So what you're being asked to tell the jury about is what you did when you trained physicians.

          THE WITNESS:   Okay.

          THE COURT:   Did you train the physicians about the lead?

          THE WITNESS:   Well, we trained the physicians on how to use the device and how the device worked, and part of it was the lead, yes.

THE COURT:  Okay.  So now you're being asked to tell us what you told physicians during those trainings about the lead.

THE WITNESS:  Okay.  So for peripheral nerve stimulation, we would tell the physicians that there were superficial peripheral nerves and then there were deeper structures, and most of the time, the vast majority of the time we were usually approaching deeper structures.  So for that particular approach, we would show them how to use the yellow introducer, and then use the Pink Stylet for deeper structures, because that was indicated for depth penetration.

For very superficial structures, we would tell them that they had an option if anatomically they didn't have room to use the Pink Stylet, which was quite long, up to 17 centimeters.  So if you didn't have the room, then you would use the White Stylet, and you'd be able to cut that lead down to a much smaller, you know, device, so you could place it in that narrow area.

Q.  Did you teach about the differences between the Pink Stylet and the White Stylet going beyond what you've already testified?

A.  Well, I mean, the differences were primarily the --

THE COURT:  This is, again, asking what you taught.

A.  Yeah.  We taught the physicians that the stylet depended on the approach, depth, and nerve that was being targeted.

Q.  Did you teach about whether the White Stylet and the Pink Stylet were made of different materials?

MS. RAVENER:  Objection.

THE COURT:  Sustained.

Q.  You've testified already I believe that you would teach that the Pink Stylet would be appropriate if there was more room, right?

A.  Correct.

Q.  And the White Stylet might be -- the White Stylet would be more appropriate if there was less, for lack of a better term, room, correct?

A.  Correct.  I mean, the --

MS. RAVENER:  Objection.

THE COURT:  Yes.  So there's no question pending. You've answered the question, so --

Q.  Did you teach how the power would be provided to the lead?

A.  Yes.

Q.  What did you teach?

A.  Yes.  Well, that was an integral feature.  You have to remember this was a new technology at the time, so the device itself is totally powerless.  So it's a wireless system, which was unique.  So what we taught was that -- the literature that was given to us, you know, before we started training, was very important, and that literature showed that the --

MS. RAVENER:  Objection.

THE COURT:  Excuse me.  So I know this is hard, Doctor, but I'm going to ask you to focus with care on what you trained doctors to do in the lab.

THE WITNESS:  Right.

THE COURT:  Okay.

THE WITNESS:  I am.

THE COURT:  So we want to know what you said to the doctors you were training.

THE WITNESS:  All right.

Q.  And you can leave out for now what you learned or were told.  It's just what you trained.

A.  Well, that was based on literature.  So what I trained the doctors to know was that the Pink Stylet was an extended dipole or antenna.  And I told them that the device had in itself, in it's nano tech -- microtechnology, had a dipole, about an inch. But the Pink Stylet was an extended dipole, and you needed to extend the antenna to get depth.

The White Stylet was not a dipole.  The White Stylet was used for smaller space, and, in that case, we instructed the physicians to stimulate directly over the microcircuitry with the implanted -- the pre-existing dipole, and that's how we taught.

Q.  Are there other words for dipole?

A.  Antenna.

Q.  Are there other words for antenna and dipole?

O2TDPER6                         Arcos - Direct

A.   Receiver.  And sometimes the terms were used interchangeably.

Q.   Okay.  So is it fair, just -- just to frame -- no framing. No framing.  My bad.

Okay.  What did you teach about whether the white or pink could be cut?

A.   Yes.  I mean, part of the Stimwave system involves cutting the lead past the marker band, so, you know, we taught appropriately that beyond the second marker band, you could cut the lead.  And, you know, the stylets were different lengths, so of course the White Stylet allowed you to cut much closer, and made the total divide much smaller.

Q.   Okay.  Could you cut the pink shorter?

A.   You could only cut past the second marker band, so it was a fixed length at that marker band.  So it was quite long.

Q.   Why couldn't you cut the pink shorter?

MS. RAVENER:  Objection.

THE COURT:  Yes.  Again, you may be doing this, Doctor, but we need to hear that you're doing it.  We need to know what you said to other doctors during your training.

THE WITNESS:  Okay.

THE COURT:  Okay.

A.   I mean, we told them to cut beyond the second marker band.

Q.   Did you teach that a doctor could cut the white shorter?

A.   Yes.

Q.  Okay.  Did you teach -- did you explain and teach doctors about why the white could be cut shorter but the pink couldn't?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

A.  We taught that the White Stylet was a space occupying stylet compared to the Pink Stylet, which was more of an extended antenna.  So they had different properties.

Q.  Can you explain what you mean by a space occupying whatever you just said, please?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

When you were -- well, yes, sustained as to form.

Q.  To the extent that you were training the physicians that the White Stylet occupied space in the lumen, can you explain to the jury what you trained the doctors on that topic?

MS. RAVENER:  Objection.

THE COURT:  Did you say anything more about the issue of space occupying?

THE WITNESS:  Yes.  I mean, we would explain to the physicians that there had to be something placed in the lumen, because there's micro circuitry and a mini battery storage, so you couldn't leave the lumen open for blood or secretions to fill the lumen.  And of course you had to put form to the lead itself.  If it didn't have some rigidity to it, then it could migrate or be damaged.  So we explained to them that you had to

O2TDPER6                        Arcos - Direct

have some form and substance to the lead, so it could be anchored.

Q.   Where did you first receive this information from?

MS. RAVENER:   Objection.

Q.   I can rephrase.

Did you receive any of this information from the company?

A.   Yes.

MS. RAVENER:   Objection.

THE COURT:   Sustained.   Stricken.

Q.   Did you speak to Chad Andresen about these topics?

A.   Yes.

MS. RAVENER:   Objection.

THE COURT:   Overruled.

A.   Yes, I did.

Q.   What did Chad Andresen tell you about the White Stylet?

A.   Chad Andresen instructed me that the White Stylet was to fill up the space in the lumen, and that microcircuitry could be stimulated directly, and that we needed to employ the White Stylet to be able to cut that lead short and secure it to the soft tissue.

THE COURT:   So, ladies and gentlemen, this testimony I'm receiving not for the truth, but simply for the fact that it was said, according to this witness.   He's relating a conversation to you.   Thank you.

Q.   You mentioned that it was useful for anchoring?

A.   Yes.

Q.   Can you explain, first, what you taught about the anchoring with respect to the White Stylet?

A.   Okay.  If you are using the White Stylet, you are using that for a short peripheral nerve superficially, but still, if that lead migrates, then you're going to lose stimulation, so it has to be anchored.  There's two ways we taught that for the Stimwave product.  One was to use what they call the tined lead, which helps a little with the subcutaneous tissue from moving.  But you also had to secure the lead with either a formal anchor or suture to the fascia or some weight, so the lead coul be secured and wouldn't move and stimulation would be maintained.

Q.   Okay.  Just for the people who don't do this for a living, what does it mean to migrate?

A.   If the lead --

        MS. RAVENER:  Objection.

        THE COURT:  Overruled.

A.   Excuse me.  Lead migration is common with all types of neuromodulations.  It's one of the major complications.  So if a lead moves, you know, even several millimeters in one direction or the other, you could lose stimulation over the target, and lead migration is a problem.  So that's why we're developing anchoring techniques to prevent that from happening.

Q.   And you mentioned there were tines, correct?

A.   Correct.

Q.   Where were the tines, and what did you teach about the tines?

          MS. RAVENER:  Objection.

A.   I mean, the tines were in the lead body, and they were like little arrowheads that essentially grabbed the soft tissue, so it doesn't slide.  And it just gave it more resistance.

Q.   Is it fair to say the tines --

          THE COURT:  What did you teach about those?

A.   We taught tines are very helpful in terms of a smooth lead, and it would help to minimize migration, but it wasn't sufficient by itself.

Q.   Where were the tines on the lead?

          MS. RAVENER:  Objection.

          THE COURT:  Overruled.

Q.   The back or the front?

A.   The front.

Q.   With respect to the back of the lead --

A.   Yes.

Q.   -- how did you anchor the back of the lead and how did you teach the anchoring of the back of the lead when using the White Stylet?

A.   Well, we taught the anchoring techniques to be past the marker band, and then you create a pocket, and you suture the

end of that lead to the fascia in that pocket to make sure that it didn't migrate.

Q.   And did you teach that it was -- the White Stylet was useful in that process?

A.   Yes, I did.

Q.   Where did you -- was there anyone at Stimwave who -- well, I'm just going to leap.  Did you speak to Chad Andresen about these topics?

         MS. RAVENER:  Objection.

         THE COURT:  Overruled.

A.   Yes.

Q.   What, if anything, did Chad Andresen say about these topics?

A.   Just what I told you.  I mean, essentially, that the -- the White Stylet was inert, that it was to take up space, and we would use that for the short, small, superficial nerves that didn't have room or need a deeper penetration.

         So the White -- the White Stylet was for that purpose, and the Pink Stylet was for the longer, deeper nerves, and especially when we needed depth penetration for the micro -- this high frequency stimulation.

         THE COURT:  So, again, ladies and gentlemen, I'm allowing this witness to describe his conversations with Mr. Andresen not for you to receive the statements as truthful or conveyance of information by Mr. Andresen, but simply for

O2TDPER6                          Arcos - Direct

the fact that this witness says Mr. Andresen told him just what he's described.

Q.  You testified that you and Mr. Andresen spoke about the fact that the White Stylet is inert?

A.  Yes.

Q.  What -- in this context, what do you mean by inert?

A.  It wasn't a conductor.

Q.  Okay.  Why wasn't it a conductor?

A.  It wasn't metal.

Q.  What was it made out of?

          MS. RAVENER:  Objection.

          THE COURT:  Sustained.

A.  My understanding, is it was some type of --

          THE COURT:  Excuse me.  You can't answer.

Q.  It was --

          THE COURT:  Excuse me.  There was an objection.

          That's okay.  That's fine.

Q.  You testified it wasn't metal.

A.  Yes.

          MS. RAVENER:  Objection, your Honor.

          THE COURT:  Yes.  That was stricken.  So you may inquire into this area, but form matters here.

Q.  Okay.  Did you speak to Mr. Andresen about whether the White Stylet was inert?

          THE COURT:  I think you need foundation first.

Q.   Was the White Stylet inert?

THE COURT:   Okay.   So --

MR. HARAN:   Okay.   Go ahead.   I'm sorry.   I'm sorry.

THE COURT:   Did you train at all --

MR. HARAN:   Yes.   That's exactly where I was going to get.

Q.   Did you train other doctors during the trainings you were giving that the White Stylet was inert?

A.   Yes.

Q.   What did you train those doctors with respect to that concept of being inert?

A.   Well, I trained them to use the White Stylet in the fashion that I described, and to use the stimulation, the receiving antenna over the microprocessor directly.

Q.   And can you put that in layman's terms?

A.   Yes.   I mean, the lead has essentially a nano tech battery and electronics that's inside the lead, and inside that technology was a small dipole or small antenna that's about an inch, inch and a half.   You could stimulate directly over that micro circuitry without a stylet, if it was superficial and you stimulated over that micro processor, it would acknowledge the signal.

Q.   Okay.   And did you train doctors concerning the materials that were used in the White Stylet?

A.   No.

Q.  Did you train doctors that there's copper in the White Stylet?

MS. RAVENER:  Objection.

THE COURT:  Sustained.

Q.  Okay.  Do you -- did you ever train at events called a master class?

A.  Yes.

Q.  Do you recall how many master classes there were?

A.  No, I don't remember.

Q.  Do you have any recollection of a master class in Boca Raton?

A.  Yes.

MR. HARAN:  Okay.  Can we pull up, just for the witness, Defense Exhibit 917?

Q.  Okay.  I'd like you to take a look at Exhibit 917, and tell me if you recognize it.

A.  Yes.  It's communication, an email communication.

Q.  Okay.  Do you recognize it?

MS. RAVENER:  Objection, your Honor.

THE COURT:  Sustained.  Stricken.

A.  Yes, it's from my --

THE COURT:  Take it down.

Don't read it, please.

Q.  Okay.  What do you remember about the master class in Boca Raton?

A.   It was a class where most of the trainers were present, and I think maybe an expert I think, Dr. Slaben was there.  And it was just another Stimwave training of it.

Q.   Okay.  Do you remember when it was?

A.   March of 2019.

Q.   Do you remember the exact date?

A.   I think March 23.

Q.   In Boca Raton, Florida?

A.   Correct.

Q.   Were you present for that?

A.   Yes.

Q.   Do you remember who else was there?

A.   Dr. Kloth, my other trainers, Dr. Kloth, Dr. Weiner from Dallas, Dr. Panchal from Tampa, Dr. El-Saied from Chicago, and I think that was most of it.

Q.   Okay.  Was anyone from Stimwave there?

A.   Chad was there.

Q.   Okay.  Do you remember whether Ms. Perryman was there?

A.   Yes.

Q.   Okay.  Did Ms. Perryman say anything about the White Stylet that you recall at that meeting?

            MS. RAVENER:  Objection.

            THE COURT:  That's a yes or a no.

            THE WITNESS:  No.

Q.   Did Ms. Perryman tell a room full of doctors at that

O2TDPER6                    Arcos - Direct

meeting that the White Stylet has copper in it?

MS. RAVENER:  Objection.

THE COURT:  Sustained.

THE WITNESS:  Not that I recall, no.

THE COURT:  Excuse me.  It's stricken.

Thank you.

Q.  Did the topic of the White Stylet come up at that meeting?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

Counsel.  It's okay.

MR. HARAN:  I'm sorry.  I'm sorry.

Q.  You can answer that question.

A.  No, not in my recollection.  There was no discussion about the White Stylet other than the regular training purposes of what to do, but nothing in particular, no.

Q.  Okay.  Did you tell -- did you train anyone at the master class that there's copper in the White Stylet?

MS. RAVENER:  Objection.

THE COURT:  Sustained.

THE WITNESS:  No, I did not.

THE COURT:  Stricken.

I'm sorry, Doctor, when there's an objection, and I rule, it means you can answer or not answer.

THE WITNESS:  Okay.

THE COURT:  But that's up to me.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE WITNESS:  Okay.  Sure.

Q.  Do you remember anything about a hubbub --

MS. RAVENER:  Objection.

Q.  -- at the master class?

MS. RAVENER:  Objection, your Honor.

THE COURT:  Sustained.

Counsel, move on to your next topic.

MR. HARAN:  Your Honor.

THE COURT:  Ah.  Move on to your next topic.

MR. HARAN:  Okay.

Q.  During the trainings that you provided, were there open and candid conversations from what you recall among yourself and the doctors you were training?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

A.  Yes, of course.  Trainings.  Trainings.

Q.  And was Mr. Andresen at most of those trainings or all of those trainings?

A.  Yes.

Q.  What role did he play at those trainings?

A.  Chad was the lead engineer, and he was the coordinator for all technical questions, and he set up the labs, and set up the training and events, and communicated with the doctors.

Q.  And did you feel that you were able to give truthful and candid information to the folks who were training at those

O2TDPER6                           Arcos - Direct

meetings?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

A.  Yes.  Absolutely.

Q.  And did that include truthful and candid information about the purposes of the White Stylet?

MS. RAVENER:  Objection.

THE COURT:  Overruled.

A.  Yes.  As part of the system, sure.

Q.  Okay.  And truthful and candid information about how the lead operated?

A.  Yes.

Q.  And truthful and candid information about the dipole slash computer chip in the lead?

A.  Yes.

Q.  And truthful information about the inert nature of the White Stylet?

A.  Correct.

Q.  And truthful and accurate and candid information about the purposes of the White Stylet?

A.  Correct.

(Continued on next page)

Q.  Did anyone from Stimwave ever ask you to give anything less than truthful and candid information when you trained other physicians?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

A.  No.

THE COURT:  Stricken.

MR. HARAN:  Can we pull up for the witness Defendant's Exhibit 915.

Q.  Take a look at it, and tell me if you recognize it.

A.  Yes.

Q.  What is it?

THE COURT:  Generally speaking.

A.  It's an email invitation from Dr. Trescot for the master class.

Q.  Is that an invitation for the master class in Boca in late March, 2019?

A.  It is.

MR. HARAN:  I would offer it.

THE COURT:  Received.

(Defendant's Exhibit 915 received in evidence)

Q.  Can you please tell the jury what this is and who some of the folks are who are listed in this invitation?

A.  Sure.  This is an invitation that usually comes out from Stimwave to the instructors if they have a class coming up they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

will send a mass email like this to ask if we can attend.  And this was -- some of these were reps.  Mike Baja is one of the reps of the company.  Dr. Trescot, Doctor Weiner is an instructor.  Dr. Kloth, Dr. Slavin is a nerve stimulation expert at Northwestern.  Chad is the engineer, and Dr. Panchal is an instructor.

Q.  Were these, generally speaking, the folks that you recall were at the master training in Boca?

A.  Yes.

Q.  On March 23, 2019?

A.  Correct.

          MR. HARAN:  Nothing further, your Honor.

CROSS-EXAMINATION

BY MS. FOLCH:

Q.  Good afternoon, Dr. Arcos.

A.  Good afternoon.

Q.  Dr. Arcos, you've known Laura Perryman for a long time; is that right?

A.  I would say so.

Q.  And you talked to Ms. Perryman about her company, Stimwave many times over the years; right?

A.  Over the years, certainly.

Q.  And we just saw on the screen that you've attended her master classes at Stimwave; right?

A.  Correct.

O2T4PER7                          Arcos - Cross

Q.   And actually Laura Perryman ran a couple of those master classes; is that right?

A.   Well, I think Laura would talk --

Q.   My question is Laura Perryman helped run some of those master classes; right?

A.   Sure.

Q.   Sure.

     And she also ran training for sales representatives; right?

A.   Yes.

Q.   And you also talked a little bit about Mr. Andresen; right?

A.   Yes.

Q.   And you got information to convey to other doctors from Laura Perryman and Chad Andresen; right?

A.   Correct.

Q.   And we talked about how you attended -- well, you attended these classes and part of that was for you to learn; right?

A.   Sure.

Q.   Because 90 percent of doctors don't know anything about physics, electronics at all; right?

A.   Correct.

Q.   And they are not engineers; right?

A.   That's correct.

Q.   They just need to know from the company how to put in the device; right?

A.   Yeah.   And they want to know how it works, sure.

Q.   And they need to be told that interest from the company; right?

A.   Yes.

Q.   In your case you were getting that information from Ms. Perryman and Mr. Andresen; right?

A.   Correct.

Q.   And I believe you described that Mr. Andresen was the coordinator for all the technical questions; right?

A.   Yes.

Q.   So Stimwave as a company, you knew Ms. Perryman was the founder; correct?

A.   Yes.

Q.   And so Stimwave's technology was totally new; right?

A.   Absolutely.

Q.   So the only way to learn about it in the PNS system in particular was from the company; right?

A.   From the company and the publications, yes.

Q.   Well, you learned from the company; right?

A.   From the company --

Q.   And when you --

     THE COURT:   Excuse me.   Don't cut off the witness.

A.   From the company and from the published literature that some of those people produced, yes.

Q.   That some of those people produced; right?

O2T4PER7                          Arcos - Cross

A.   Correct.

Q.   You are talking about Ms. Perryman's literature; right?

A.   Ms. Perryman was primarily one of the publishers, yes.

Q.   You talked about instructing other doctors, training them; right?

A.   Correct.

Q.   And so you taught other doctors about Stimwave products; correct?

A.   Correct.

Q.   You taught about the PNS device among other things; right?

A.   Yes.

Q.   And when you did that, you included instructions information about how to use all the parts of the device; right?

A.   Correct.

Q.   And you did that from early on when the company first started; right?

A.   Correct.

Q.   You were one of the earlier people teaching courses for them?

A.   Yes.

Q.   Fair to say you were much more knowledgeable than the average doctor?

A.   That's true.

Q.   You were more knowledgeable than some of the trainers?

A.   Yeah, they would come to me with questions.

Q.   You continued doing that until maybe 2020 or so?

A.   That's correct.

Q.   And you were part of this small group of doctors providing instruction to other physicians to help get the PNS device out there in the market; right?

A.   Yes.

Q.   And that included Dr. Weiner; right?

A.   Yes.

Q.   Dr. Kloth; right?

A.   Yes.

Q.   And Dr. Trescot also participated in those training; right?

A.   Excuse me?

Q.   Dr. Trescot also participated in those trainings; right?

A.   She was still living in Alaska so it was difficult sometimes for her.

Q.   But she was the chief medical officer of Stimwave, is my question.

A.   She wasn't at all the labs.

Q.   She participated; right?

A.   She did.

Q.   And Chad Andresen would set up these trainings; right?

A.   Yes.

Q.   And you is it conferences; right in different?

A.   Yes, uh-hum.

Q.  And you did webinars; right?

A.  Correct.

Q.  And, for example, you and Dr. Weiner did webinar training for Stimwave; right?

A.  We did.

Q.  And Chad Andresen helped set that up?

A.  He did.

Q.  OK.  And because you were getting the information about the device from Ms. Perryman and Chad Andresen, you always ran your material by both of them when you were doing a course; right?

A.  I did.

Q.  And you would go to Ms. Perryman and Mr. Andresen to make sure what you were telling doctors was right; right?

A.  Correct.

Q.  And you relied on them; right?

A.  Correct.

Q.  And you told them that what you were going to talk about in advance; right?

A.  Yes.

Q.  You told them what you were going to say; right?

A.  We told them what they were going to cover.  They didn't ask for a transcript.  We just told them what we were going to cover.

Q.  I would like to show you -- hold on a moment.  Let's just talk about something else.

O2T4PER7                        Arcos - Cross

We talked about how the White Stylet was inert; right?

A.   Yes.

Q.   According to you; right?

A.   That's what we were told.

Q.   And you described it as a space-occupying stylet; correct?

A.   Correct.

Q.   And you don't actually know what it was made of apart from it being filler; correct?

A.   Correct.

Q.   And according to you, you knew it wasn't -- the White Stylet was not a receiver; right?

A.   That's correct.

Q.   You knew that; right?

A.   Yes.

Q.   OK.  Let's turn to what's been marked as Government Exhibit 114 just for the witness and counsel.  Do you see that?

A.   Yes.

Q.   OK.  And do you recognize it?

A.   The DRG webinar.

Q.   What is it?

A.   Dorsal root ganglion stimulation.

         MS. FOLCH:  The government offers Government Exhibit 114?

         MR. HARAN:  May I *voir dire* briefly?

         THE COURT:  Sure.

MR. HARAN:  DRG is different than PNS?

THE WITNESS:  Dramatically.

MR. HARAN:  I object.

MS. FOLCH:  Let's turn to page --

MR. HARAN:  I objected.

THE COURT:  I know.  Counsel is going to try to lay a better foundation, I think.

BY MS. FOLCH:

Q.  So you see this here, sir, you recognize that?

A.  Yes.

Q.  OK.  And you understand that the PNS uses -- that the DRG uses a PNS component; right?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.  Well, the DRG is more closely related to the SCS system than the PNS system.

Q.  But the systems are closely related?

A.  Yes.

Q.  DRG is closely related to SCS; right?

A.  Yes.

Q.  And they are closely related to PNS?

A.  They are related.

Q.  And if I could ask you to turn to --

MR. HARAN:  Objection, your Honor.

THE COURT:  This isn't in evidence yet.  So she is

O2T4PER7                          Arcos - Cross

laying a foundation.  And she is asking for assistance in moving to another page that the witness could look at.

Q.  And if we could turn to what's bearing Bates stamped 13679.

Tell me when you can see that, sir.  Bear with our technology.

MS. FOLCH:  Sorry.  Let's turn to the page marked 136368 first.

Q.  Do you see what's in front of you?

A.  Yes.

Q.  Do you recognize what device that depicts?

A.  This is a four contact and an eight-contact lead.

Q.  This is the PNS device; right?

MR. HARAN:  Objection.

A.  Well, they are just showing the lead.  So it's hard to say.

Q.  This is describing the FR4A; right?

A.  Right.

Q.  And those are components of the PNS system; right?

A.  Well, they are a four-contact lead.  They made a four contact and an eight contact.  So we would use those for PNS but we could also use it for DRG and other things.

MS. FOLCH:  If we could also turn to --

THE COURT:  Counsel, I think you laid a foundation.

MS. FOLCH:  Thank you for clarifying, your Honor.  The government offers GX 114.

THE COURT:  Received.

O2T4PER7                     Arcos - Cross

(Government's Exhibit 114 received in evidence)

MS. FOLCH:  If we could start with publishing page 1 to the jury.

Q.   Dr. Arcos, please read this slide.

A.   Stimwave academy webinar DRG.

Q.   What is the date?

A.   March 6, 2019.

Q.   Who do we see a photo of on the front?

A.   Andrea Trescot.

Q.   Let's turn to the next page.

Please read this slide?

A.   DRG background and anatomy.

Q.   And do you see the photograph there?

A.   Yes.

Q.   Is that you, sir?

A.   Yes.

Q.   Is that -- that has your name George Arcos; is that right?

A.   Correct.

Q.   And it has the letters DO?

A.   Right.

Q.   Why is that?

A.   Doctor of osteopathic medicine.

MS. FOLCH:  If we could turn to -- apologies, Mr. Carbone.  If we could turn to page 136368.  This is the Bates number Stimwave 136368 on Government Exhibit 114.  If we

could publish that to the jury.

Q.   And Dr. Arcos, you see where it says for permanent implant?

A.   Yes.

Q.   And you see where it says freedom 4A?

A.   Yes.

Q.   Freedom 4A refers to part of the PNS system; right?

A.   Yes.

Q.   And you see how it says underneath that receiver; right?

A.   I see that.

Q.   It says receiver white or pink; right?

A.   Correct.

Q.   OK.   Let's turn to what's Bates stamped Stimwave 136378.

Can you read the text there, sir?

A.   Create receiver pocket, incision for sub Q receiver coil pocket.

Q.   Let's turn to the next page, which is bearing Bates stamped Stimwave 00136379 of Government Exhibit 114.

Dr. Arcos, do you see here in your presentation the slide labeled choosing a receiver?

A.   Yes.

Q.   And do you see all the way to the left it says stylet handle color.  Do you see that?

A.   I do.

Q.   And do you see underneath it where it says receiver stylet, short white?

A.   Correct.

Q.   And it has a little antenna to the left?

A.   I see that.

Q.   And underneath it it says receiver stylet long pink; right?

A.   Right.

Q.   And if we look in the center of the slide it says receiver option with a little antenna; correct?

A.   Correct.

Q.   And underneath that it says white receiver stylet short; right?

A.   Correct.

Q.   And then to the right it says pink receiver stylet long; right?

A.   Correct.

Q.   Let's turn to the next page, which is Bates stamped Stimwave 00136380.

        So why don't you read this page of your -- the text of this page of your presentation, sir?

A.   It says couple receiver white handle receiver for short cut-length.

        MS. FOLCH:  And if we could turn to the next page.

A.   This one says turn to insertion wound.  Pull receiver to lay straight.

Q.   You testified earlier, sir, that -- I believe your testimony was that you felt you could give truthful and candid

info to doctors in the trainings you gave; right?

A.   Correct.

Q.   And that was your testimony here today?

A.   Correct.

Q.   And you are expected to be truthful and candid in court here today under oath, aren't you, sir?

A.   Yes.

Q.   It's your testimony that Mr. Andresen was very clear with you that the White Stylet was designed to take up space; right?

A.   Correct.

Q.   And you knew it wasn't actually a coupling device; right?

A.   Correct.

MS. FOLCH:   Could we turn back to Government Exhibit 114, the prior page.   And this is Stimwave 136380 of Government Exhibit 114.

Q.   This is the part of your presentation where it says couple receiver white handle receiver for shortcut length; right?

A.   Right.

Q.   You knew that the White Stylet was not a receiver; right?

A.   It was not a receiver.   The receiver was embedded in the --

Q.   There is no question pending, Dr. Arcos.

Dr. Arcos, you knew that a lot of issues came with whether you could use that long stylet; right?   You described challenges with using the length of the Pink Stylet; right?

A.   Challenges with the Pink Stylet -- can you clarify.

O2T4PER7                      Arcos - Cross

Q.   Yeah.  You found that because of its language the Pink
Stylet -- it was hard to put the Pink Stylet into a small lead;
right?

A.   A small space; correct.

Q.   Yeah.  And actually you begged Chad Andresen to make a
shorter one; right?

A.   Yes.

Q.   And that's because it was tough to thread the Pink Stylet;
right?

A.   Well, threading of the stylet was very difficult.  The Pink
Stylet was long and it was very, very fragile.  So if it kinked
you have to discard it.

Q.   So you begged Chad Andresen to make a modification because
doctors weren't using Stimwave device because it was
challenging; right?

A.   That's the feedback we received with doctors we trained.

Q.   By the way, you had known Ms. Perryman and Stimwave dating
back to 2013/2014; correct?

A.   Probably that long.

Q.   So you were familiar with the first generation was PNS
device; right?

A.   Yes.

Q.   And you knew that the PNS system worked without any of the
stylets; correct?

A.   Right.  It had a dipole antenna.

Q.   It worked without any of the sometimes?

A.   Correct.

Q.   And you knew that when you asked Chad Andresen to make a shorter stylet?

A.   No.  I asked him to make a stylet adaptor that we could put the stylet in without having a kink.

Q.   Let's go through the chronology to make sure we are clear. You started working with Stimwave in approximately 2013, 2014; right?

A.   Yes.

Q.   And sometime around then or later they had the original first generation PNS system; right?

A.   Correct.

Q.   And knew that had no stylets; right?

A.   Correct.

Q.   No Pink Stylet; right?

A.   Correct.

Q.   No White Stylet; right?

A.   Correct.

Q.   And it still worked; right?

A.   Yes.

Q.   And you then know that they developed the Pink Stylet; right?

A.   Yes.

Q.   That was added; right?

A.  Yes.

Q.  And this was all part of what you needed to know so you could do your training for doctors; right?

A.  Yes.

Q.  And when they added the Pink Stylet, as we just discussed and you just testified, you begged Chad Andresen to make a shorter stylet because it was difficult to use the long Pink Stylet; right?

A.  No.

Q.  Because it was --

        MR. HARAN:  Objection.

        THE COURT:  Excuse me.  Don't interrupt the witness. You may answer.

A.  I repeatedly asked Chad to make some type of cone device that would allow threading of the Pink Stylet to go smoothly so doctors working under the operating room lights would have a much easier time seeing this very small thin filament And try to thread it together without kinking.

Q.  By the way, you begged Chad to modify that Pink Stylet but they never did modify Pink Stylet according to you; right?

A.  Correct.

        MR. HARAN:  Objection.

        THE COURT:  Overruled.

Q.  You also talked with Laura Perryman about her business at various points?

A.    With what respect.

Q.    You tried to give her advise about her business sometimes; right?

A.    Yes, sure, clinically, yes.

Q.    You tried to steer her away from the PNS side of the business; right?

A.    I think that was my opinion.  I think that they --

Q.    Sir --

THE COURT:  Excuse me.  Just listen to the question that's asked and just answer that question.

A.    OK.

Q.    Sir, you tried to steer Laura Perryman away from the PNS side of the business; correct?

A.    I don't think that's correct, no.

Q.    OK.  Well, Ms. Perryman told you she was going to go all in on PNS; right?

A.    That's correct.

Q.    And she wanted to change the whole direction of the company toward PNS; right?

A.    Yes, she had a major push in that direction, yes.

MS. FOLCH:  One moment, your Honor.

Q.    Actually, you had hoped at one point or talked to Ms. Perryman about becoming the chief medical officer at Stimwave yourself; right?

A.    We had a brief conversation early on.

O2T4PER7                        Arcos - Cross

Q.  You believed you were Ms. Perryman's choice to be the chief

medical officer; right?

A.  That was my understanding.

Q.  And if we could just pull up Government Exhibit 115.  And

this is just for the witness and counsel.  Sir, take a look at

that document.  Do you recognize it?

A.  I don't recognize it but I see it's an email communication

from Chad and from Dr. Kloth.

Q.  Do you recognize that email, sir?

A.  It's just wasn't communications.  I would assume it's

valid.  I don't remember it exactly but it's a communication

from Mr. Andresen.

Q.  I was going to ask you what it is, but you just described

it's a communication from Mr. Andresen; right?

A.  Right.

Q.  It's actually a communication to you among others?

        MR. HARAN:  Objection.

A.  Right to all the trainers.

        THE COURT:  Overruled.

        MS. FOLCH:  Your Honor, the government offers

Government Exhibit 115.

        MR. HARAN:  Objection.  Hearsay.

        THE COURT:  Overruled.

        MS. FOLCH:  Government offers Government Exhibit 115.

        THE COURT:  Received.

O2T4PER7                          Arcos - Cross

(Government's Exhibit 115 received in evidence)

MS. FOLCH:  If we could just publish this to the jury. If we could just look at the top of the email.

Q.  And you see at the top line where it says from Dr. Arcos. It's from Chad Andresen, that's the name written there?

A.  Yes.

Q.  And that the date is December 8 of 2018; is that right?

A.  That's correct.

Q.  And it's sent to a few people; right?

A.  Yes.

Q.  Including those trainers you talked about; right?

A.  Yes.

Q.  Dr. Kloth; right?

A.  Yes.

Q.  Dr. Weiner; right?

A.  Yes.

Q.  Laura Perryman; right?

A.  Yes.

Q.  Dr. Panchal; right?

A.  Correct.

Q.  Dr. Trescot; right?

A.  Correct.

Q.  You, George Arcos; right?

A.  Correct.

Q.  And cc'd is someone named Michael Baja; right?

A.   Yes.

Q.   And you see in the decks Mr. Andresen writes, thank you for the comments.  I will work on implementing those comments and conceptions.  And then he writes for reference we do use white receiver stylets, right?

A.   Yes.

Q.   And you see how he tells you, the white receiver stylets are included in the FR4A kits; right?

A.   They were, yes.

Q.   Those are the PNS kits, right, sir?

A.   This is the DRG kit.

Q.   The FR4A you know is part of the PNS system as well; right?

A.   This is a DRG communication, so I assume it's the DRG kit.

          MS. FOLCH:  One moment.

Q.   Dr. Arcos, you don't work for Stimwave any more; right?

A.   No, I don't teach courses any more.

Q.   And you knew the wire frauds was recalled don't you, sir?

A.   I understood that, yes.

          MS. FOLCH:  No further questions.

REDIRECT EXAMINATION

BY MR. HARAN:

Q.   Dr. Arcos, the prosecutor just showed you some documents where the White Stylet was referred to the white receiver stylet; correct?

A.   Correct.

Q.   Was the White Stylet a receiver?

A.   No, it was a stylet.

Q.   What, if any effect -- did you receive some of those documents at the time?

A.   Yes.

Q.   Did that change your view of whether the White Stylet was a receiver?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.   No.  The terminology --

THE COURT:  No, you've answered your question.  Thank you.  You said no, that's terrific.

Q.   Can you explain how it is that didn't change your view or understanding of the White Stylet?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.   Yes.  I mean, within these classes that were put together some of the terminology was very loosely used.  So sometimes you'd see antenna receiver, stylet, all used simultaneously.  So there was a lot of overlap in the terminology.  So this case, the White Stylet was a stylet.  And the receiver was the embedded part in the micro circuitry.

Q.   The embed receiver in the lead?

A.   Correct.

Q.   The prosecutor also asked you a lot of questions about how

you learned about the device?

A.   Yes.

Q.   And how it worked?

A.   Yes.

Q.   And you testified that you learned from Chad Andresen about the device?

A.   Somewhat, some from him, yes.

Q.   And she asked you questions about whether you learned about the device from Laura?

A.   Yes.

Q.   Perryman?

A.   Yes.

Q.   And you gave some other ways that you learned about the device and how it worked; correct?

A.   Correct.

Q.   How did you learn about the device?  And how did you learn about how it worked?

             MS. FOLCH:  Objection.

             THE COURT:  Sustained.  Move on to the next topic, Counsel.

Q.   The prosecutor asked you a bunch of questions about Laura Perryman leading trainings of physicians; correct?

A.   Correct.

Q.   And did Laura, in fact, lead some trainings?

A.   Yes.

O2T4PER7                          Arcos - Redirect

Q.   Did Laura talk about when she gave those trainings the purpose the White Stylet?

            MS. FOLCH:  Objection.

            THE COURT:  Sustained.

A.   No, not that I recall.

            THE COURT:  Excuse me, there is no question.

            THE WITNESS:  I'm sorry.

Q.   The government showed you Government Exhibit 114, page 32; correct?  Can we pull that up.

            They showed you this slide.

A.   Yes.

Q.   And it appears that this was one of the slides, page 32 apparently in a Wave Academy presentation that you might have been involved in or led concerning the DRG system; correct?

            MS. FOLCH:  Objection.

            THE COURT:  Overruled.

A.   Correct.

Q.   Did you prepare this slide?

A.   No.

Q.   Did you go into that training intending to deceive anybody?

            MS. FOLCH:  Objection.

            THE COURT:  Overruled.

A.   No, not at all.

Q.   Did you deceive anybody?

            MS. FOLCH:  Objection.

A.  No.

           THE COURT:  Sustained and stricken.

Q.  OK.  Well, did you -- do you recall speaking about the White Stylet during the DRG training?

           MS. FOLCH:  Objection.

           THE COURT:  Overruled.

A.  No, during the DRG training.

           THE COURT:  Sir, you answered.  You said no.  Great.

Q.  Did you -- and just very briefly, yes or no, we talked about PNS trainings; correct?

A.  Yes.

Q.  And you apparently gave training on the DRG system?

A.  I did.

Q.  And you gave training on the spinal cord system; correct?

A.  Yes, I did.

Q.  And in any of those trainings, did you tell -- did you train anybody that the White Stylet has metal in it?

A.  I did not.

Q.  Did you, at the trainings that Laura Perryman -- you attended trainings that Laura Perryman was speaking at?

A.  I did.

Q.  And you attended trainings where Laura Perryman was leading the training?

A.  Yes.

Q.  Was there ever any point where Laura Perryman trained

anyone that there was metal in the White Stylet?

MS. FOLCH:  Objection.

THE COURT:  Sustained.

MR. HARAN:  Nothing further.  Thank you.

THE COURT:  Any recross?

MS. FOLCH:  No, your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MR. COHEN:  Defense calls Dr. Jeffrey Dann.

THE COURT:  Dr. Dann, if you could come up here please, this way.  This way.  If you could take the witness stand and remain standing.

JEFFREY DANN,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

THE COURT:  Please be seated.  And that chair moves up.  You could move it up.  Good.

THE WITNESS:  Pull it in?

THE COURT:  Pull it in, that's good.

That mic moves you can place it under your chin and keep your voice up.

THE WITNESS:  Can you hear me?

THE COURT:  Yes, that's great.

What is your full name.

O2T4PER7                      Dann - Direct

THE WITNESS:  Jeffrey Arthur Dann.

THE COURT:  Thank you.

Counsel.

DIRECT EXAMINATION

BY MR. COHEN:

Q.  Dr. Dann, can you describe your background, education and work experience for the jury?

A.  Sure.  So I'm a urologist by trade.  I trained at Cornell Medical School right up the block here.  From there I went to Boston and trained at Mass General Hospital the Harvard system. After that I joined a practice, also simultaneously got a masters in business from the Harvard Business School.  From there I joined a practice at UMass Medical Center.  It was an academic practive, nice center, terrific center.

And then about 18 years ago I went to Florida and practiced down in Florida in a private practice, private practice down there.  I also had spent about 20 years in this whole interim period where I was chair or a participant in the American Urological Association Coding and Reimbursement Committee.  So I developed a certain level of expertise in coding, reimbursement, and really helped with a lot of different codes that were urological codes and some that were tangential to urology log but impacted up one way or another.

And then five or six years ago I rotated off that opportunity.  I did it long enough and felt we needed a

succession plan and began to do it privately for mainly startups, small companies that needed help in that area. So that's my background.

Q. When you said you were on a coding committee, what does that mean?

A. What the coding and reimbursement committee did was it looked at several things. In coding there are multiple steps that you have to take to get a code, how would I say, recognized by CMS and second of all get if reimbursed. It's actually a long process. It's not a short process. Typically, we do we look at a code. We look at what we would call the descriptor, what we were looking for, how to describe the surgical procedure. We would then take that code, bring it to the committee, the American Medical Association called the CPT Editorial Committee, that would look at your application, judge whether it was either ready for prime time, to get reimbursed, or whether it was still experimental or not ready to go reimbursement. So there was almost a split in the road. And there were a variety hurdles of criteria that we would use. Is it FDA approved, the technology? Is it efficacious in the literature? Has it been used by doctors across the United States with good enough frequency that it deserved a higher grade code? If not it would be relegated to a lesser code, that experimental code. And the company would be obligated to gather information about it and finally meet those higher

hurdles, FDA, literature, frequent uses.  We used to call before graduating from CPT.  Once you get through CPT, this takes a little while, once you get through CPT, you have to go through something called the RUC process.  That's relative value update committee process.  That's also another AMA type organization.  That actually, how would I say determined along with CMS, determined the value of that code.  And there are two parts to the value --

THE COURT:  I think we have the background we need, Doctor.  I'm going to thank you so much.

THE WITNESS:  I'm just getting to the exciting part.

THE COURT:  I think we are going to --

Q.  Doctor, don't ruin the ending.  OK.

Doctor, in your role of the CPT committee, did you become familiar with the CPT code called 64950?

A.  Yes.

Q.  What role, if any, did you have in the creation of 64950?

A.  That's an older code.  That was created sometime in the late 1990s for an incontinence device by a company called Medtronics.  It was a two-step procedure.

Q.  What role did you have in that?

A.  I got it.  I'm sorry.  I thought you meant describe the code.

Q.  Just what your role was.

A.  So I was involved in helping construct that code.

O2T4PER7                    Dann - Direct

Q.   OK.  So you have some familiarity with its history?

A.   Yes.

Q.   OK.  So did there come a time you were engaged by Laura Perryman to consult with regard to CPT issues?

A.   Yes.

Q.   Do you recall when that was?

A.   It was approximately the fall of 2018.

Q.   Eighteen or --

A.   I thought it was 18.

Q.   OK.  Let me --

A.   Yeah.

Q.   Why don't we do this --

A.   Might have been '17.

            MR. KOCHEVAR:  Objection.  He gave an answer.

            THE COURT:  That's fine if you have something to assist him with.

            MR. COHEN:  Can we go to Defense Exhibit 902.

            THE COURT:  This is Defendant's Exhibit.

Q.   Do you recognize this?

A.   Yes.  It looks like it was --

            THE COURT:  No, no, no.  So, Doctor, you are not to read from the document.  It's not in evidence.  So all you are being asked to do is read it quietly to yourself.

            THE WITNESS:  OK.

            THE COURT:  When you are finished reading it, it will

O2T4PER7                    Dann - Direct

be taken off the screen and then counsel will ask you a

question.

THE WITNESS:  OK.

Q.  Having reviewed that --

THE COURT:  Take it down, please.

Q.  Do you now recall when you are consulting arrangement was?

A.  Yeah.

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.  You may answer.

A.  September 2019.

Q.  2019.

And what were you being engaged to do in September of

2019?

A.  The major issue was to look whether the proposed device was

going to fit into the category of 64590, that code.

Q.  And were you engaged to provide consulting in that regard?

A.  Yes.

Q.  And can you describe -- what's the American Urological

Association?

A.  What is it?

Q.  Briefly.

A.  It's just -- what is a urological organization that most of

the urologists to join to advance education, advance research

and advance coding for our codes.

Q.  What, if any, role do medical associations like that have

in the CPT process?

A. A major role.

Q. How so?

A. Pretty much each of the different subsocieties and societies are represented at CPT, at the panel. So that makes it possible for organizations to come forth with codes or, in some cases argue that some shouldn't get a code.

Q. As part of your consulting arrange with Stimwave, did you attend a meeting at the American Urological Association?

MR. KOCHEVAR: Objection.

THE COURT: Sustained.

Q. Can you describe some of the things you ask as part of your consulting for Stimwave?

MR. KOCHEVAR: Objection.

THE COURT: Let's put a period of time on this.

Q. In September 2019 what services were you providing Stimwave with regard to CPT consulting?

A. They have approached the American Urological Society through me to see whether their peripheral nerve device, the PTNS device -- these are two disease for treatment -- whether that fitted to the code of 64950.

Q. As part of that, what actions did you take?

A. At that time I looked at the code. I looked at the device. I was uncertain whether it actually was apropos for that code. I was somewhat questioning whether it really meat the criteria

for 64590.  And I made the --

THE COURT:  Doctor, this is important process point.
A question will be posed, and then counsel, on the opposing
side have a right to object or not.  So they're anticipating
you are going to answer that question and if you talk about
something else, it's very difficult for this process to work.
OK.  So it's important to listen to the question that's asked,
and answer that question.  OK?

THE WITNESS:  OK.

THE COURT:  Thank you.

Q.  Dr. Dann, did part of your consulting services during
September 2019 include providing voice on your interpretation
of the code?

A.  Yes.

Q.  Did your consulting services in September of 2019 involve
advocacy with medical associations?

MR. KOCHEVAR:  Objection.

THE COURT:  That's a yes or no.

A.  Yes.

MR. KOCHEVAR:  Ask to *voir dire*?

THE COURT:  Yes.

MR. KOCHEVAR:  Dr. Dann, you said before that PTNS is
different from PNS; right?

THE WITNESS:  Say it again.

MR. KOCHEVAR:  I believe you said before that PTNS is

O2T4PER7                          Dann - Direct

the T is different than PNS; is that right?

THE WITNESS:  That's true.

MR. KOCHEVAR:  Can you explain one versus the other, please.

THE WITNESS:  One of them treats peripheral nerves, typically for pain.  The other one treats a particular peripheral nerve called the posterior tibialis, hence PT, for incontinence.

MR. KOCHEVAR:  I believe you said you are an urologist?

THE WITNESS:  That's correct.

MR. KOCHEVAR:  The PT in that system, is that in the urology field?

THE WITNESS:  Yes.

MR. KOCHEVAR:  And the PNS system, that's in the neurology field?

THE WITNESS:  That's correct.

MR. KOCHEVAR:  So the PNS system is about pain; right?

THE WITNESS:  Correct.

MR. KOCHEVAR:  Whereas, the PTNS system, that's about, incontinence and our logical issues; right?

THE WITNESS:  Correct.

MR. KOCHEVAR:  When you were providing consulting services, did you go to the American Urological Association?

THE WITNESS:  Correct.

MR. KOCHEVAR:  And you were providing consulting services about the PTNS system at that time, is that right, the neurological one?

THE WITNESS:  I thought that's what we were doing, yes.

MR. KOCHEVAR:  Objection.

THE COURT:  Yes.

BY MR. COHEN:

Q.  Dr. Dann, as part of your discussion did you also discuss the PNS device?

THE COURT:  I'm sorry.  Discussions with whom?

Q.  First, was part of your consulting around the coding for the PNS device?

A.  Yes.

MR. KOCHEVAR:  Objection.

THE COURT:  Yes.  We are still talking about September.

Q.  It's only September that this consulting occurred; is that correct?

A.  Correct.

Q.  It was a one-month consulting?

A.  Correct.

Q.  And during that month, did you have an understanding that Stimwave was trying to obtain consulting with regard to its PNS system?

O2T4PER7                      Dann - Direct

MR. KOCHEVAR:  Objection.

THE COURT:  So we're not going to have a discussion of PTNS.

MR. COHEN:  I'm not asking about PTNS.

THE COURT:  I think actually that's where we were headed before this.  Counsel, I'm going to ask you to focus your questions.

Q.  Dr. Dann, my questions are only about PNS.  Do you understand that?

A.  OK.

MR. KOCHEVAR:  May I?

THE COURT:  Yes.

MR. KOCHEVAR:  Is your field in urology or neurology?

THE WITNESS:  Urology.

MR. KOCHEVAR:  Do you have any expertise in the PNS system?

THE WITNESS:  I do not.

MR. COHEN:  OK.  Let me ask it this way.  Let me try to cut to the case.

BY MR. COHEN:

Q.  As part of your consulting, did you have an understanding that there was Stimwave was seeking advise on whether getting the code approved in one area would assist in the other area.

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

O2T4PER7                         Dann - Direct

Counsel -- ladies and gentlemen, we have spared you sidebars, and I'm just going to praise counsel because, as I told you, we meet at 9:00 every morning and we often stay way past 5:00, but we are going to have a little sidebar here.

(Continued on next page)

O2T4PER7                        Dann - Direct

(At sidebar)

THE COURT:  This doesn't sound like there is going to be admissible to me, so make your case.

MR. COHEN:  I'll connect it right now.

He is provided -- he is the doctor who was provided the PNS slides repeatedly, that have been shown.  I wanted to establish that he, as a urologist, he wasn't a customer for this.  And he was being sent it in the capacity of being a consultant for the CPT.  I can show him the emails and we'll move on.

THE COURT:  That's fine.  No, so what next?  So he sent the slides --

MR. COHEN:  So they are not being sent to trick doctors to purchase the device.  They were sending it to him for his advice with regard to how to treat CPT codes.  She was sending him the vignettes --

THE COURT:  I'm sorry, Counsel.  He has no relevant information with respect to neurology.

MR. COHEN:  But, your Honor, so we are clear, the government has put in emails to him in evidence.  And the implication of it is --

THE COURT:  Excuse me.  We are getting a rowdy crowd here.

(In open court)

THE COURT:  So ladies and gentlemen, I'm just going to

O2T4PER7                      Dann – Direct

ask you to keep your voices down.  Thanks so much.

            (At sidebar)

            MR. COHEN:  All I'm asking to be able to do at this

point is to show him the emails that were sent and ask why they

were sent to him so that they can't give the impression he was

trying to fool doctors.  The point is that he is not relevant

to this.  Does that make sense?

            THE COURT:  OK.  I sorry.  I think we already have

that.  He said who he is, and what his expertise is.  So we

have his name.  We have the spelling of his name.  If he is on

an email, and you want to be able to tell the jury who this

person is, we now know.

            MR. COHEN:  Very good.  Do you want me to get any more

background?

            THE COURT:  No, I think we are done.

            MR. COHEN:  Got it.

            (Continued on next page)

(Jury present)

THE COURT:  Doctor, I think you are excused with our thanks.  I think we have the information from you that we need.  And thank you very much for coming today.  You can step down.

THE WITNESS:  Am I here tomorrow?

THE COURT:  No, not tomorrow either.  Thank you so much.  Did the government wish to ask the question of the, Doctor?  Hold on.

MR. KOCHEVAR:  Not right now, your Honor.  Thank you.

THE COURT:  Good.  Doctor, you may leave.

The next witness is?  I think we won't do another witness we are close to 5:00.

You may leave.  Thank you so much, Doctor.

So I want to give the jury a sense of where we stand in terms of our timing.  As I said this morning, we are making good progress, and the parties expect that the evidence will be completed before you leave tomorrow.  Remember, tomorrow you are leaving at 3:30.  You will be excused no later than 3:30.  So again we will just see how tomorrow unfolds but that's our current best expectation.  What that would mean is that it's our expectation -- again, do not discuss the case with anyone including with each other.  Our expectation is that on Monday the parties would have an opportunity to give you their closing arguments.  I'll give you my charge as to the law and thereafter either on Monday or first thing Tuesday morning, you

O2T4PER7                         Dann - Direct

would begin your deliberations.  So that's our overview

expectation right now.  No guarantees.  Good.  Don't discuss

the case.  Have a good evening.

                    (Continued on next page)

O2TDPER8

(In open court; jury not present)

MR. KOCHEVAR:  Your Honor, just because that was slightly confusing, we would just request the opportunity to review the transcript, and we may have a motion to strike all of it or we may have a request for cross-examination or something like that.

THE COURT:  I gave you the opportunity to cross.

MR. KOCHEVAR:  Okay.

THE COURT:  So you can have your motion to strike all of it, but you had a representation as to why he was called, not for any substantive testimony, but so that the jury could hear that Ms. Perryman consulted with a urologist about CPT codes.

MR. KOCHEVAR:  Okay.  Thank you.  We will review the transcript.

THE COURT:  You'll reflect overnight.

MR. KOCHEVAR:  Thank you.

THE COURT:  Good.  But we're not bringing the doctor back.

MR. KOCHEVAR:  Okay.

THE COURT:  So what witnesses are the -- is the defendant calling tomorrow?

MR. COHEN:  I believe our current plan is Dr. Haider, Laura Spruce, and Dr. North.  I'm sorry.  It's not Laura Spruce.  It's Jennifer Spruce.  I have Laura on mind.

O2TDPER8

THE COURT:  Dr. Haider is about training sessions he lead?

MR. COHEN:  That -- it's about training he received from Stimwave, and --

THE COURT:  In these --

MR. COHEN:  -- he'll talk --

THE COURT:  In these weekly --

MR. COHEN:  He'll talk about attending in person trainings, ongoing webinars, a variety, emails.  He has a long history of performing these, and he'll be able to talk about how that informed his application.

THE COURT:  So his testimony will not be about performing the surgeries in the field.  He can talk about the training he received.

MR. COHEN:  Okay.  Understood.

THE COURT:  I take it that this, again, was principally training by Chad Andresen?

MR. COHEN:  I believe so.  I'll confirm.

Given that narrowing, let me talk to the doctor and see whether it makes -- it will advance the ball enough to make sense.  I feel like it may be so narrowed now that I'm not sure it's worth it, so let me talk to the doctor.

THE COURT:  If he's planning to testify about training he received from the defendant --

MR. COHEN:  It's not the defendant.

O2TDPER8

THE COURT:  Okay.

MR. KOCHEVAR:  I think this is a hearsay issue.  I mean, if it didn't come from Chad --

THE COURT:  We can't hear you.

MR. KOCHEVAR:  If the training did not come from Chad Andresen, and I don't have my notes in front of me, but I believe he couldn't identify that name, then I don't -- I think there's a hearsay issue.  He's not -- he's not a doctor trainer, he's just a regular doctor who went to the trainings, such as the ones given by Dr. Arcos that we heard about this afternoon.

THE COURT:  So when I read the January 22, 2024, Rule 26.2 disclosure, and I had a marked up copy, I saw next to nothing that he would be permitted to testify about. Certainly, to the extent he seeks to testify as an expert about what doctors generally would understand, or how doctors generally would do things, he would be testifying as an expert, and that's not what is being represented.

MR. COHEN:  Your Honor, we're going to withdraw Dr. Haider from the witness list.

THE COURT:  Okay.  So --

MR. COHEN:  It will be Spruce and North tomorrow.

THE COURT:  How long do we expect that to take?

MR. COHEN:  I think Ms. Spruce is probably about half an hour, 40 minutes on direct.  I would think Dr. North is

O2TDPER8

about the same on direct, maybe less.

THE COURT:  Okay.  So there's a good chance we will end midday as you thought might be likely, and so I have a joint application from counsel to delay summations until Monday.

Did you talk about time limits with each other?

MR. KOCHEVAR:  I'm sorry, your Honor.  We did not.  We can confirm.

THE COURT:  Why don't you do it just now.

MR. COHEN:  Your Honor, my proposal -- I think, for the defense, I probably need two hours, maybe 90 minutes.  My proposal would be that I get the same amount of time that the government gets for their total presentation.

MR. KOCHEVAR:  We have the burden, and so I think typically we would have equal length closings, and then an additional period of time for rebuttal.  I think we had considered 60 minutes or 90 minutes for the closing, and then half an hour for rebuttal.  That's where we are.

THE COURT:  I think that's what we'll do.  The two main summations will be an hour apiece, and the rebuttal will be probably about 20 minutes.  The government's expected to anticipate the defenses that they'll hear about in the defense summation.  Do not hold back and wait to address those things in the rebuttal.  Obviously, in fairness, you wouldn't want to do that, but I'm going to be alert to that.

O2TDPER8

You know what?  I'll give you the whole day, except for my jury charge.  So we'll spend the morning with the two principal summations, so you each get 90 minutes, an hour and a half.

MR. COHEN:  Thank you, your Honor.

THE COURT:  Then we'll give the jury the lunch breaks. There'll be a rebuttal summation after lunch, and then I'll give the jury my charge.  Of course there's some housekeeping as we dismiss the alternates.  So the case will go to the jury tomorrow afternoon.  I don't know if they'll have time to deliberate tomorrow, but hopefully they will at least get organized.

MR. COHEN:  You mean Monday.

THE COURT:  Monday.  We do nothing but sit on trial here, right?  Doesn't it feel like that?

Yes.  Good.  I know we have Defense Exhibit 623 to talk about, but I don't want to forget to do the allocution of the defendant.

So, Ms. Perryman, I want you to stand, and I know counsel will stand with you and pull a mic near you.  I'm going to start with just a little speech here.

You're facing serious criminal charges in an indictment, three counts.  Under our Constitution, you have a right to be represented by counsel, and you're well represented by counsel in this case.  It's very much in a defendant's

O2TDPER8

interest to be frank with their attorney, tell them whatever is relevant, and also to listen with care to what their attorney has to say to them, and those communications are confidential. I'm not going to inquire about them, but it's important for any defendant in a criminal case to have such serious, complex, engaged conversations with counsel. That's why you have counsel.

But unlike with some decisions, the decision of whether to plead guilty or go to trial is ultimately a defendant's personal decision made after consultation with counsel. Similarly, the decision of whether or not to take the stand and testify at their own trial is a decision that a defendant must make themselves after those meaningful conversations with their attorney.

Do you understand what I've just said?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So, again, I don't want to inquire as to the substance of any conversation with counsel.  I don't want to know what your attorneys advised you.  I just want to know, did you have discussions with your lawyers about the issue of whether you should testify at this trial, yes or no?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Have you made a decision as to whether or not you will testify at this trial, yes or no?

THE DEFENDANT:  Yes.

O2TDPER8

THE COURT:  Do you wish to testify at this trial?

THE DEFENDANT:  Is that another yes or no?

THE COURT:  Yes.  Are you going to -- I'll put it differently.  Are you going to take the stand and testify at this trial?

THE DEFENDANT:  No.

THE COURT:  Is that your personal decision after consultation with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Does the government wish me to place any additional question to the defendant on this topic?

MR. KOCHEVAR:  No, your Honor.  Thank you.

THE COURT:  Mr. Cohen, do you wish me to place any additional question to your client on this topic?

MR. COHEN:  No, your Honor.  Thank you.

THE COURT:  Thank you, Ms. Perryman.  You may be seated.

I find a knowing and voluntary waiver of the right to take the stand at this trial.

So this morning defense counsel gave notice of a desire to offer DX 623.

What is the government's position?

MR. KOCHEVAR:  It remains as it was before.  We oppose, and we don't think the factual record has changed on this.  It would be prejudicial and confusing, and there's no

O2TDPER8

foundation that's laid to properly admit it.

THE COURT:  I don't have a copy of Defendant's Exhibit 623.  I have the February 29 letter.

MR. COHEN:  Can you pull it up, 623?

Can we go to the -- can you go to page two?

Your Honor, on the screen before you is the key language that we seek to put in.  And the reason we want to put it in -- we disagree with the government about whether there's a foundation.  As your Honor has heard, there was evidence that pursuant to the MDSAP audit program, there was a routine audit conducted on behalf of the FDA in February 2019 in which the White Stylet was disclosed and examined and included in part of the audit.  There was testimony from Ms. Greene about that. There was also testimony from Mr. LaViolette with regard to the program and how it operates.

I think it appears that despite that record, the government seeks to give the misimpression during closings that this somehow was not the -- a substitute for a routine audit, and it is an objective fact, as stated on the official FDA.com website, and I read into the record, the FDA will continue to accept MDSAP audit reports as a substitute for routine agency inspections.

And that objective fact exists.  We tried to put it in with the witness.  And we can't imagine, other than wanting to argue otherwise to the jury, why the government would object to

this statement, having fought us on calling someone from the FDA, that this -- and we laid out the law with regard to admissibility.  We also laid out the law that the Court could also just take judicial notice of that's what it says.  But our concern is that if there is even a crack of sunlight, that could -- they could try to suggest to the jury that there's an ambiguity where there's none.

And this is a really important point, because the disclosure to the FDA is a critical point to this case, and if we're not having FDA witnesses testify about this, then certainly under the rules it's both self authenticating, it's an exception to hearsay, and, again, the third option -- second option would also be for the Court to take judicial notice.  But our real concern is either put this in or preclude the government from suggesting otherwise when it knows the objective truth here of the FDA's position.

THE COURT:  So, first all, I don't think the FDA witnesses were scheduled to talk about this topic at all, or anything like that.  So I'm just going to put that to the side.

I need my memory refreshed with respect to this issue, but, as I remember, there was a document that reflected the MDSAP audit, and it had many pages.  And one set of lines concerned a review of an audit trail, the documentation of an audit trail for a purchase order from a third party of the White Stylet.  It was not a review in any way of the

O2TDPER8

functionality of the White Stylet, or what I remember on the screen was not a review of what is the White Stylet. It was a paper audit trail to make sure that documentation was kept for the purchase of PEEK material connected with the White Stylet.

Am I remembering what you're referring to?

MR. COHEN: And I put it up on the screen, also.

Your Honor, there are two points about this. One, the government has argued that it was hidden and not disclosed to the FDA. This shows that it was disclosed to the FDA. That just objectively is disclosed.

THE COURT: What was disclosed?

MR. COHEN: The existence of the White Stylet was disclosed. The existence.

THE COURT: So what is disclosed here is a purchase order.

MR. COHEN: No. I'm sorry, your Honor.

THE COURT: Then they looked at a packing slip, a certificate of conformance.

MR. COHEN: Highlight the drawing.

THE COURT: The drawing --

MR. COHEN: The drawing, your Honor, is the actual engineering drawing that was put into evidence here of the White Stylet. They got to look at the actual drawing of it, and they also examined to see there was no tearing or cracks in it. They examined the White Stylet. It wasn't just checking

off a box on a purchase order.  They got the actual diagram, which would have shown it was all PEEK.

THE COURT:  But out of context that's just meaningless.  This is a review of an audit trail of documentation for a purchase order.  So, you know, I'm glad we're all talking about the same thing.  Good.  So I actually think it would be quite confusing, to the extent -- I mean, I don't know anything and this isn't going to help me know anything about what a routine agency inspection looks at.  I assume it could look at lots of things.

Here there was a choice to look at almost nothing with respect to the White Stylet, and certainly out of context --

MR. COHEN:  But the point here, certainly the government could argue what the nature of and how invasive the review was, but what the government can't argue was that it was not disclosed.  It's disclosed.  They could argue that maybe it wasn't tested and it didn't do anything about the functionality, they can make whatever arguments they want, but what they shouldn't be allowed to do is argue it was not disclosed, when objectively it was disclosed.

THE COURT:  So the word "it" is doing a lot of work there.

MR. COHEN:  The White Stylet was disclosed.

THE COURT:  Okay.  Well --

MR. COHEN:  They checked the material.  They got the

O2TDPER8

engineering.  They absolutely make sure the material meets the drawing requirement.  They confirm there's no tears in it.  They're holding it.  They see it's just PEEK.  This is not checking off a -- this is not an audit trail of a purchase order, your Honor.

THE COURT:  Well, I'm not an accountant, so I'm sure I'm not describing this correctly, but this is not an audit of a PNS device.  This is an audit of the documents related to a purchase order, excuse me, and if I remember correctly, someone explained that this was important, that when you're buying material from a third party, that that third party manufacturer has to themselves be qualified in providing compliant material to you when you order it.

So I think it's right that the government can't misrepresent in its summation, but neither can the defendant, and to the extent there was an audit here of -- and the words, I don't think, White Stylet are even used here, but the --

MR. COHEN:  Part number.

THE COURT:  -- part number is used, 0724 I think.

It's just incorrect to say that the FDA -- well, it depends on what the argument is, whether it's a fair argument or not.  I don't want to put words in somebody's mouth that you may never utter.

So, anyway, now that we know I'm thinking of the same piece of evidence that came in, I'll hear from the government

O2TDPER8

as to why they oppose the receipt of DX 623.

MR. KOCHEVAR:  Yes, your Honor.

DX 623 would be confusing and prejudicial in part because of what defense counsel just said.  They appear to be trying to confuse the jury by representing that this thing is more than what it is.  And an additional confusing document will be further confusing and prejudicial.

I would just add that what we were just looking at was an audit conducted by a European auditor of a quality management system.  That is what -- and there's ample testimony from Ms. Greene explaining that.  And all of that testimony indicated that, as your Honor just pointed out, this audit was very far away from the issues of this case.

There is nothing in there about what this part was used in.  There is no review of the PNS system there.  There is no mention of the White Stylet.  Your Honor characterized it correctly, as Ms. Greene testified about, that the point of this was to check quality management systems.  And so to get a purchase order and be like, is the documentation for this, does it check out, that's what that page represents.

Further -- so that's one point.  In addition, though, I believe they inquired of witnesses about the document they are trying to get in now to see if a witness had used that or relied on it or anything like that.  As far as I am aware, they did not.  There was no connection to any actual witness

O2TDPER8

testimony or the facts of the case for this new document they're trying to put in.

So I think, for the new document, certainly relevance, also 403. I think there's also still a lack of foundation, because, I mean, I don't fully understand exactly what that document -- I guess that is more 403, but there are some foundation issues for the document they're trying to get in now as well.

MR. COHEN: Your Honor, that's the exact argument we're trying to prevent the jury from hearing. It's not a European regulator. It's an audit being done on behalf of the FDA.

MR. KOCHEVAR: That is I believe a mischaracterization.

Can we pull up 629 again? We can look. It said on there who the auditor is.

MR. COHEN: But it's part of that program, that's the issue.

THE COURT: Well, see, here is what I don't understand. I can imagine the FDA saying, look, if you had one of these MDSAP audits and it looked at X, Y, and Z, that's going to be enough if we want to look at X, Y, and Z, but our audit may cover other things if we choose to do so.

MR. KOCHEVAR: And I would just add we know what X, Y, and Z is here. It's specifically quality management systems,

which is not anything to do with the substance of -- I don't want to use a pejorative term, but what your medical devices do.  It's not about that.  It's about quality management systems.

THE COURT:  So I think the record is sufficient for the defendant to argue that, during the MDSAP audit, that the company, Stimwave, provided the documentation as reflected at this passage we've just discussed, and I think there was also testimony about those audits being available to the FDA or something like that.  You probably have the transcript testimony at your fingertips.

MR. COHEN:  Yes.

THE COURT:  Good.  So we're not going to -- I will sustain the objection to the receipt of Defense Exhibit 623 on 403 grounds, finding that it would be misleading and confusing and not assist the jury as it tries to sort out the facts here.

Okay.  So I don't think we have open issues.  I'll see you at -- the issue is the charging conference.  We have options.  I can give you a jury charge first thing Monday morning.  I have to give it to you before your summations to look at.

Again, it's just the elements of the crimes and other ordinary charges.  I think there -- I have included an other acts charge, because of the brief testimony from Ms. Greene.  I can get that set if counsel needs to see that.  Let me see if

O2TDPER8

there are any other pages that would be very helpful for you to see tomorrow, and then we'll do the formal charging conference first thing Monday, okay, so we don't take up too much time tomorrow.

Good.  See you tomorrow at 9:00.

(Adjourned until March 1, 2024, at 9:00 a.m.)

                        INDEX OF EXAMINATION

Examination of:                                    Page

 CHRISTOPHER GHARIBO

Direct By Ms. Folch (Continued) . . . . . . .1329

Cross By Mr. Cohen . . . . . . . . . . . . . .1351

Redirect By Ms. Folch . . . . . . . . . . . .1376

Recross By Mr. Cohen . . . . . . . . . . . . .1380

 ISABELLA FUCHS

Direct By Mr. Bergman . . . . . . . . . . . .1382

JUSTIN BILYEU

Direct By Mr. Haran . . . . . . . . . . . . .1455

Cross By Mr. Kochevar . . . . . . . . . . . .1469

Redirect By Mr. Haran . . . . . . . . . . . .1479

ANTHONY SCHULER

Direct By Mr. Haran . . . . . . . . . . . . .1483

Cross By Mr. Bergman . . . . . . . . . . . . .1496

Redirect By Mr. Haran . . . . . . . . . . . .1507

 GEORGE J. ARCOS

Direct By Mr. Haran . . . . . . . . . . . . .1509

Cross By Ms. Folch . . . . . . . . . . . . . .1532

Redirect By Mr. Haran . . . . . . . . . . . .1551

JEFFREY DANN

Direct By Mr. Cohen . . . . . . . . . . . . .1557

                        GOVERNMENT EXHIBITS

Exhibit No.                                    Received

1602    . . . . . . . . . . . . . . . . . .1386

405 and 501    . . . . . . . . . . . . . . .1386

405 and 501    . . . . . . . . . . . . . . .1386

114    . . . . . . . . . . . . . . . . . . .1541

115    . . . . . . . . . . . . . . . . . . .1550

                    DEFENDANT EXHIBITS

Exhibit No.                                Received

 915    . . . . . . . . . . . . . . . . . .1531