O31DPER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                          23 CR 117 (DLC)

LAURA PERRYMAN,

                Defendant.

------------------------------x          Trial

                                         New York, N.Y.
                                         March 1, 2024
                                         9:00 a.m.
Before:

                    HON. DENISE COTE,

                                         District Judge
                                          -And A Jury-

                        APPEARANCES


DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
STEVEN JOHN KOCHEVAR
MONICA PILAR FOLCH
JACOB MAX BERGMAN
KIMBERLY RAVENER
     Assistant United States Attorneys

WALDEN MACHT & HARAN LLP
     Attorneys for Defendant
BY:  DEREK COHEN
     JENNIFER BERGER
     SEAN T. HARAN
     JOHNSON LIN

O31DPER1

(Trial resumed; jury not present)

THE COURT:  Please be seated.

Good morning, everyone.

I thought about the charging conference and what I thought we'd do is after the evidence closes today and I dismiss the jury, hopefully there will be time for a lunch break.  I'll give you a copy of the charge then, and about 2:00 we'll have our charging conference.

I have a criminal matter in the courtroom at 1:00, so you can leave a lot of your things here but you have to clear at least some of the space for other counsel.  Anyway, we'll see how the schedule goes.

I want to advise you, with respect to the charge, as you know, it's the job of the judge to charge the jury on the law, and, therefore, I don't want your summations to include pages from the charge or a PowerPoint on the elements of a crime.  You're to argue the facts from the record in the case, not the law.

For instance, you can ask the jury in your summation, how do you know the defendant acted in good faith, and then argue the facts, or the reverse if you think she didn't act in good faith, but not the law.  I expect the government is going to have a computer, a clean computer on which all of the exhibits received in evidence can be loaded.  I want to make sure the parties cooperate fully, so they're comfortable that

O31DPER1

only exhibits from the government and the defendant that were received in evidence are on the computer and available to the jurors.

Of course you'll review the instructions that you give with the computer to the jurors, and -- I guess I shouldn't assume. I assume you're going to provide them an electronic set of exhibits, but maybe you're going to provide a hard copy instead.

Mr. Kochevar, what's the government's intention?

MR. KOCHEVAR: We intend to provide an electronic copy I believe, yes.

THE COURT: Good.

I think you should cooperate in terms of a redacted indictment. If there is a need to redact any information, there often is, review that with each other and have that ready Monday morning.

There are a couple things in the proposed charge which may be unnecessary, but I've included them so that you can tell me what you want. Also, we'll give you a draft of the verdict form, so you can look at that. It's very simple.

Does the government have anything to address this morning?

MR. KOCHEVAR: Just a flag on the charge. I believe the government will be requesting a conscious avoidance instruction. We can -- it sounds like now is not the time

O31DPER1

perhaps to do that, but I'm just flagging for the Court that process wise -- I mean, I think we're prepared to ask for it, so I'm flagging that.

And the other item from the government is that we're moving to strike the testimony of Dr. Dann from yesterday, and I can go into the reasons for that now if helpful or --

THE COURT:  Sure.

MR. KOCHEVAR:  So Dr. Dann's testimony was confusing, prejudicial, and ultimately factually inaccurate in a very fundamental and important way.  Upon reviewing the transcript, he was asked when his consulting arrangement started with Stimwave, and I believe he originally said 2018.  And then he was shown a document, and I don't know exactly why this happened, because perhaps I misunderstand how it happened.  He was shown a document, invoice no. 8, which was from fall 2019, and then he said, oh, yes, it was 2019.  And then the examination continued on.

That is a factual inaccuracy we believe.  We believe he began his consulting arrangement -- and there are invoices and other emails, this was in the 3500 for him -- that he actually began a year earlier, so we think that's an important factual --

THE COURT:  What year?

MR. KOCHEVAR:  2018, his original answer on the stand.

In addition, if you look at his testimony yesterday,

much of it is basically unnoticed expert testimony about CPT coding.  And he gave this long discourse about how they're made and all of that.  We think all of that should be stricken as, one, expert testimony, but also confusing and prejudicial.

Just one point, I think we objected to showing him that document that had the 2019 date on it, because as far as we could tell there was no -- he gave the right answer the first time I guess.  He didn't say he didn't know.  He gave an answer, and then was shown a document and he changed I guess is the issue there, and that was part of our objection.

The broader point here, though, is that we're concerned that the defense is going to try to put a knowledge defense in play, i.e., that the defense was consulting with a CPT coding consultant, right, and, therefore, she was acting in good faith.  But Dr. Dann told her eventually that the code 645 did not work for her.  He was also never told about the White Stylet.  He was also a urologist.

He didn't know she was using the code at all, and, in fact, after she consults with him in the urology space, he sets her up with a T code, which is a new temporary code, and once you have a T code, you can't use the other code at all.  So he never knew she was using 64590, and he told her that was not appropriate.  So all of that right now is not in the record, and, instead, what we have is a factually sort of inaccurate moment where it looks like the defendant went to a consultant

O31DPER1

in like the fall of 2019 and tried to get help with her coding. And so that we think is prejudicial and misleading and fails in certain fundamental ways, particularly the timing.

And so we think given all that, his entire testimony should be stricken.

MR. COHEN:  Your Honor, it's the government who put the emails in to Dr. Dann.  We can pull them.  The government put Dr. Dann into this case, inserted Dr. Dann into this case by showing that the -- what they allege to be the inaccurate slide and vignettes with regard to -- the PNS devices were sent to Dr. Dann in September of 2019, and they -- this was -- this is important because one of the arguments the government has been making is that false information was shared with doctors.

They have put into evidence, and I'll get the exact exhibit number for the Court, Government Exhibit -- Government 101.

If we could pull it up for the Court.

The government has put this in to Dr. Dann.

Maybe blow it up for the Court, Peter.

She is seeking his advice, not on an urology product but on the PNS device, 64590.  She's working with inhouse reimbursement people, which Michelle Smith.  The government put this into evidence, and the government was trying to give the impression that this was going to a doctor with the intent to deceive the doctor.

And we called Dr. Dann to show that he was not a recipient of this in order to sell him the PNS device.  It was to obtain CPT consulting advice.  And the -- what I showed him was not -- was to bring him to this exact point where it's relevant.  September of 2019.  Because what factually occurs is that he attends the meeting.  They're trying to see if they can get any societies to back the 64590 for this.  He tells -- they go to the meeting.  The meeting, ultimately they come out of it and he says, listen, you had a reasonable argument, but they're not going to go for it.  You should get a new code.

And then the evidence that the government put into the record yesterday during its summary witness is after that, Laura tells internally, we have to start using 64999.  We hit the end of the road here.  This is September, the end of September 2019.  She's out of Stimwave in five weeks from this.  But this is -- there's nothing inaccurate about this.  They put an email in to Dr. Dann.  We called Dr. Dann to explain why he was getting that email, because otherwise they're going to give the impression that they were trying to sell a device to a doctor and this was being misled.

She was providing him with the materials, and he was specifically retained to be a CPT expert.  She was going to him in good faith and guidance.  The fact that he was a urologist is relevant to us to show she wasn't trying to sell him the device.  She was going to him for his expertise.  The man wrote

64590.  And so she was going to him for guidance on that.

That's highly relevant to her good faith.  It's also highly relevant with regard to Dr. Dann.  We talked about this, your Honor, at the sidebar.  Your Honor said we would --

THE COURT:  You mean last night?

MR. COHEN:  Yes, last night.  We talked about this at the sidebar.  The Court assured we got what we needed from Dr. Dann to make this point.

THE COURT:  Well, I asked for a proffer.

MR. COHEN:  Right.  You said you got that -- you told us at the sidebar we could link it to the email.  We weren't allowed to show him the email --

THE COURT:  So this part I don't remember a discussion at the sidebar of this email.  I don't remember this email being a part of the --

MR. COHEN:  Well, perhaps we could pull up the transcript.  My recollection of it -- so we can all confirm it.  My recollection was, Judge, I need to show him the email that they've put into evidence to show that he wasn't being -- he wasn't being mislead.  And your Honor, my recollection of it, and I will have a transcript so we don't have to guess, my recollection of it was that your Honor said --

Do we have the transcript?

Okay.  When we find the right part -- my recollection is -- okay.  So yesterday, at page 1566.

O31DPER1

THE COURT:  Can you give me just one second here?

MR. COHEN:  Sure.

THE COURT:  So --

MR. COHEN:  Your Honor, can I --

THE COURT:  I've read pages 1566 to a portion of 1568.

Mr. Cohen.

MR. COHEN:  I would also point out on page 1570, the government asked that -- said, "we may have a motion to strike all of it, and we may have a request for cross-examination or something like that."

"The Court:  I gave you the opportunity to cross."

On 1570.

THE COURT:  Yes.

MR. COHEN:  So I believe --

THE COURT:  I asked the government at 1568, did the government wish to ask a question of the doctor?

Mr. Kochevar said no, not right now, your Honor. Thank you.

MR. COHEN:  Right.  So he had the opportunity to cross.  He was told that the witness was not coming back on. This motion is too late.  And it's also inconsistent with what the judge ruled at the sidebar.

MR. KOCHEVAR:  Can --

THE COURT:  So, Mr. Kochevar.

MR. KOCHEVAR:  Yes.  A few points.  We have offered to

O31DPER1

stipulate that, at the time of the email, Government Exhibit 101, Dr. Dann was a urologist, not a doctor using the PNS system.  We think that is the only --

THE COURT:  When did you offer that?

MR. KOCHEVAR:  That stipulation, this morning, as a way to not -- you know, to avoid the situation that we're in essentially.

Also, this email, the point of this was to prove the defendant's knowledge of these documents, right, which are -- in the email they say, like Stimwave PNS procedures and product.

THE COURT:  Excuse me one second.

Thank you.  I'm sorry to interrupt.

MR. KOCHEVAR:  Yes.  So this document is proving up the defendant's knowledge of these documents that are attached to it, but --

THE COURT:  What are those attached documents?

MR. KOCHEVAR:  Can we pull up 101?

THE COURT:  Well, you can just describe them to me.

MR. KOCHEVAR:  It's a PowerPoint slide that's talking about the coding, and it has the vignettes that have been shown at various times.  You know, this is the steps you take, and this is how you get 64590, and the White Stylet is pictured and called a receiver.

So the point is that, regardless of who she was

sending it to, she knew about these documents.  She was sending it to someone.  She understood there were vignettes trying to get the 64590 code, and calling the White Stylet a receiver both in pictures and in text.

So we are happy to stipulate that Dr. Dann was a consultant for urology far away from PNS.  That doesn't change the point of the relevance of Government Exhibit 101.

THE COURT:  Okay.  So I now have a much better understanding of the context.

So I have a motion from this morning -- to put what's happening now in context, I have a motion from the government to strike Dr. Dann's testimony as a whole.

You believe you are prejudiced because?

MR. KOCHEVAR:  Because -- and the alternative is to strike it in part, such that it just shows that he was a urologist, not a doctor using PNS.  I think that would also be fine.  We want to strike all the part where he has his discursus on CPT code.  We want to strike the factually inaccurate part about the timing and --

THE COURT:  Well, how are you prejudiced by the factual inaccuracy?

MR. KOCHEVAR:  Because they're going to use it to say he was a CPT coding consultant and the defendant was operating in good faith the whole time.

THE COURT:  Well, he is a CPT coding consultant.  He

testified that he began consulting with her I think in the fall of 2018, if I remember what he testified to.  I understand that that's factually wrong as far as the government's concerned.

MR. KOCHEVAR:  Well --

THE COURT:  I --

MR. KOCHEVAR:  I'm sorry.

THE COURT:  Let me make sure we have no other issue to deal with.

Does the government have any other issue besides this?

MR. KOCHEVAR:  No, your Honor.

THE COURT:  Okay.  Does the defendant have any other issue?

MR. COHEN:  No, your Honor.

On this point, just so you have a clear record, because I think this may put an end to this discussion --

Can we pull up Government Exhibit 109 for the Court?

Your Honor, this is another email they put into evidence to Dr. Dann.  This email attaches the video which they've shown on a loop here, and specifically makes clear that she's seeking Dr. Dann's advice with regard to the PNS code, saying 90 percent it have goes to urologists.

Do we have it on the screen for the judge?

Government Exhibit 109, please.

Okay.  Can you blow it up for the judge?

Your Honor, take a look at that.

O31DPER1

THE COURT:  It's also from September of 2019.

MR. COHEN:  Correct.  And this is -- the point makes very clear what she's seeking.  She's sending all the materials they say are false, and she's saying, "I want to introduce you to the director of reimbursement.  We'd like to set up a call for you to discuss Stimwave 64590 for PNS."  It's not PTNS.  This is what she's asking about him.  She sends it to him, and she's hired him for this.

This is evidence of good faith.  They can argue whatever they want about knowledge, but the fact she's hiring outside people and sharing materials and seeking advice is direct evidence of good faith.

THE COURT:  So let me just say this, the government has a very good point about so much of his introductory language which went on and on and was utterly confusing to me as to why he was on the stand, about his relationship with CPT codes and the process of CPT coding, and I think there was laughter in the courtroom, because it was just strange.  Let me just say, simply strange.

MR. COHEN:  It was lengthy.

THE COURT:  Well, counsel, it --

MR. COHEN:  But, again, at that point the government has not been shy about objecting.  They could have at that -- the moment in time to object and move to strike something was then, not a day later.

O31DPER1

THE COURT:  Well, you're not supposed to interrupt an answer to object.

MR. COHEN:  Well, they could have done it at the end.

THE COURT:  Well, certainly at the end of the day, when we were in the sidebar situation, the government could have said whatever it wanted to say about, don't dismiss him; we want to cross-examine him; all of this information is inappropriate for X, Y, or Z reasons.

So, fine, it didn't.  The issue is now what do I do with this testimony, and it seems to me, from what I understand, and I did not have the pieces to the puzzle in my mind as we were hearing this, what the government -- what the jury has heard is that he began his consultancy in September or in the fall of 2019, that he's a urologist, with experience in CPT code.  I guess when you combine it with these two government exhibits, it's going to be that the defendant sought his services with respect to the appropriateness of 64590 in September of 2019, and sends him materials, written materials that did not disclose that the White Stylet was not a receiver, but, instead, described it as a receiver and asked for his advice.

The parties will be able to argue from that what they will argue.  So the issue is I think how much of this extended soliloquy about the background of the CPT creation process should be stricken, if any.

So if the government has an application there, it should identify the lines and the particular passages.  I'm not striking Dr. Dann's testimony as a whole.  I'm leaving in the date, September 2019, even though that is apparently an inaccurate date, but it's relevant to the emails received as Government Exhibits 101 and 109.

Again, if the government wanted to cross-examine or object or give me more background, it had an opportunity to do so last night.  Sadly, I dismissed the man, partly because I thought he was -- I couldn't understand his relevance.  I asked for a proffer from defense counsel.  I got the proffer, reflected on the record.  That was all we needed from him from defendant's point of the view, they had what they needed, given the proffer, the fact that he was a urologist had been highlighted by the government's voir dire, the fact that he really was potentially subject to argument by counsel, not the right person to consult about application of these codes to the device at issue, that's all available for argument.  Okay.  I'm not going to -- I don't have -- have not, don't think I can force somebody to stipulate.  A stipulation is an agreement.

But I will hear the government in terms of striking some of the, quote, unquote, improper expert testimony and background on the CPT coding process, or the creation of CPT code.

I think it's time for a break.

O31DPER1

MR. COHEN:  Thank you, your Honor.

MR. KOCHEVAR:  Thank you.

(Recess taken)

THE COURT:  Please be seated.

Bring in the jury.

(Continued on next page)

O31DPER1                        Spruce - Direct

(In open court; jury present)

THE DEPUTY CLERK:  The jury is entering.

THE COURT:  Good morning, ladies and gentlemen.

Mr. Cohen, you may call your next witness.

MR. HARAN:  The defense calls Jennifer Spruce.

THE COURT:  Ms. Spruce, if you could come up here, please, and take the witness stand.

If you could stand up and raise your right hand.

(Witness sworn)

THE COURT:  Please be seated.

You can move that chair up.  That microphone moves, and so you can put it under your chin, and keep your voice up.

What's your full name?

THE WITNESS:  Jennifer Nicole Spruce.

THE COURT:  How do you spell your last name?

THE WITNESS:  S-p-r-u-c-e.

THE COURT:  Counsel.

JENNIFER SPRUCE,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARAN:

Q.  Good afternoon, Ms. Spruce.

A.  Hi.

Q.  My name is Sean Haran.

O31DPER1                     Spruce - Direct

Have we spoken before?

A.  No, we have not.

Q.  Why are you here this morning?

A.  I was subpoenaed.

Q.  By the defense?

A.  Yes, sir.

Q.  And you have a lawyer, correct?

A.  Yes, sir.

Q.  Without getting into anything privileged, do you have an understanding that I've asked to speak to you a number of times?

A.  Yes.

Q.  And you have declined?

A.  I followed the advice of my attorney.

Q.  Fair enough.  Thank you.

What do you do for a living?

A.  I am in medical device sales.

Q.  Who do you work for?

A.  Curonix.

Q.  Is Curonix the successor to Stimwave?

A.  Yes, it is.

Q.  What do you do for Curonix?

A.  I am a trainer for new reps, and also for physicians in the field.

Q.  And are there any particular products that you focus on in

O31DPER1                          Spruce - Direct

your training of sales reps?

A.   Our Freedom system, a peripheral nerve stimulator, and we also have a spinal cord stimulator.

Q.   Okay.  And are those -- when did you -- let's just take a step back.

What's your educational background?

A.   I have a degree in biochemistry, physical therapy, and an M.B.A.

Q.   And when did -- when did you get into the medical device business -- industry?

A.   I believe it was about 2003 or 2004.

Q.   Okay.  And did there come a time when you joined Stimwave?

A.   Yes.

Q.   When was that?

A.   2018.

Q.   Okay.  So between 2003 or so and 2018, could you just give us a general high level overview of what you did?

A.   I was a sales rep for first a biotech-type company, and then a few device companies such as Stryker, Innovative Neurotronics, Boston Scientific.

Q.   Okay.  And were you -- was Boston Scientific the last job before Stimwave?

A.   Yes, it was.

Q.   Can you just tell us about how you joined Stimwave?

A.   I was living in Atlanta, Georgia, while working for Boston

O31DPER1                          Spruce - Direct

Scientific.  I wanted to move to Florida, my home state, and there was not a job available, so began a job search.  And was contacted by a recruiter for Stimwave.

THE COURT:  You have to keep your voice up.

THE WITNESS:  Okay.

THE COURT:  You can move that mic under your chin, and speak more loudly.  Great.  Thank you.

THE WITNESS:  Sorry.

Q.  Okay.  And so you -- I believe you said you were in touch with a recruiter?

A.  Yes, sir.

Q.  And that's how you got in touch with Stimwave?

A.  Yes.

Q.  Do you recall who you dealt with at Stimwave in connection with joining Stimwave?

A.  I also knew someone.  His name was Mike Baja.  And we have a like social acquaintance, and once the recruiter contacted me, I also spoke with him, because I knew that he worked for the company.  So --

Q.  Okay.

A.  Yeah.

Q.  So you had a connection with Mr. Baja, and the recruiter also was putting you in touch with Stimwave?

A.  Correct.

Q.  And then how did things proceed from there?

A.   I interviewed with the sales leader for the east, Mike Cioffi, for a sales position in West Palm.  And initially I was told that I was a candidate, but I ended up not getting the sales position.

Q.   Okay.  What happened next?

A.   A few months later Mike Baja contacted me about the trainer position, and asked if I would be interested in looking at it.

Q.   Okay.  And what happened next?

A.   I interviewed with Chad Andresen, I interviewed with Laura, and I talked with Mike Baja again.  And then they offered me the job.

Q.   Okay.  And you mentioned Laura.  Is that Laura Perryman?

A.   Yes, sir.

Q.   Do you -- if you saw Laura Perryman today, would you recognize her?

A.   Yes.

Q.   Okay.  Can you take a look and see if you see her in the courtroom?

A.   Yes, I see Laura.

Q.   Okay.  Could you just tell the jury where she is and identify her by something she's wearing?

A.   I see Laura wearing a -- sorry, a black sweater standing with the blonde hair.

Q.   Thank you.

          MR. HARAN:  May the record reflect the witness has

O31DPER1                    Spruce - Direct

identified Ms. Perryman?

THE COURT:  Yes.

Q.  And, by the way, everyone has a problem with the microphone when they stand up to identify --

A.  Okay.

Q.  -- my client.

Okay.  So did there come a time that you actually joined Stimwave?

A.  I joined Stimwave sometime in September or October of 2018. I don't remember the exact start date.

Q.  And what was your position when you joined?

A.  I was a field trainer.

Q.  How long were you a field trainer?

A.  About a year.  About 12 months.

Q.  Okay.  And did you receive any information or training from Stimwave to help you perform your job as a field trainer at Stimwave?

A.  Yes.

Q.  Can you tell us about that?

A.  I -- when I joined the company, I came into the corporate office in Pompano, and I worked with Chad Andresen at the time, who was director of marketing I believe.  There were also three individuals there from Germany who were training to be new sales reps as well.  We spent three to four days in the office training.

O31DPER1                         Spruce - Direct

Q.  Okay.  Just so -- do I have it right that Chad was providing the training to yourself and some folks from Germany?

A.  Yes.

Q.  And can you just at a high level cover what did that training -- what topics did that training cover, to the extent you can recall?

A.  I don't remember everything, but it was, you know, a general overview of the procedure to try and implant this device, and some basics of how the device worked.

Q.  Okay.  And when you say "this device," they're talking about the PNS?

A.  The PNS and SCS device.

Q.  And is that the PNS and the SCS device -- are those the same -- the same devices pretty much that you continue to work with today?

A.  Yes.

Q.  Okay.  Did the -- besides the device and how it worked, did you cover other topics?

A.  I don't remember.

Q.  Okay.  Was there other training, besides that, the few days with the folks from Germany and Mr. Andresen?

A.  Some on-the-job type learning with Mike Baja and maybe Steve, who was also on the training team.

Q.  Okay.  And how about Mr. Andresen?  Was there on-the-job training with Mr. Andresen over the course of time?

O31DPER1                    Spruce - Direct

A.   Possibly.  I don't remember exactly.

Q.   Was there -- were there -- did you receive handouts?

A.   I remember slide decks.  I don't remember if I had copies of them.

Q.   Okay.  And what do you remember about the slide decks and what do you remember about who, if anyone, handled those slide decks?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   What do you remember about the slide decks?

A.   In terms of content?

Q.   Yeah.

A.   I don't remember exact content.  As I said, it was a general overview of the procedure.

Q.   Okay.  Did you -- did that cover -- it sounds like that covered the PNS device?

A.   Yes.

Q.   Did it cover -- are you familiar with the Pink Stylet?

A.   Yes.

Q.   Did that training that you received cover the Pink Stylet?

A.   It could have.  I don't remember all of the details of the training.

Q.   Okay.  Did you feel that you received sufficient training to be able to do your job effectively?

MR. KOCHEVAR:  Objection.

O31DPER1                    Spruce - Direct

THE COURT:  Overruled.

A.   I think I did.

Q.   Did you feel like you were able to obtain enough information to perform your responsibilities?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.   I felt like that at the time.

Q.   Okay.  Did you -- were you trying to do as good a job as you could?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Can you just tell the jury how you approached performing your duties during the time period 2018, 2019?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Have you heard of the White Stylet?

A.   Yes.

Q.   Who did you learn about the White Stylet from?

A.   I don't recall exactly.

Q.   Okay.  But how about a general recollection?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   And what were your -- what were some of the things you did as a field trainer?

A.   I participated in the training classes for new reps, and I

was in the field quite a bit.  I would cover cases in the field with reps in areas where we did not have a rep.

Q.  Okay.  As part of the training you received -- I'm just going to step back.  Okay?

The information that you received, did that include information about reimbursement?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  It could have.  I don't recall exact topics.

Q.  Okay.  Did it include information about the reimbursement -- the general -- the applicable reimbursement codes that might apply for the PNS procedure?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Did you receive any information about what codes might be relevant to the PNS procedure?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  I learned the two codes that would be used with this procedure, yes.

Q.  And how did you learn the two codes?

A.  Can you clarify that?  You mean in what format did I learn them?

Q.  Yes.  Your recollection of how you went about learning about those codes.

O31DPER1                         Spruce - Direct

A.   I don't remember how it was, how the information was provided to me specifically.

Q.   Okay.  But information was provided to you?

A.   I understood there were two codes, so it was provided in some way, yes.

Q.   Okay.  And, again, did you feel like you were able to obtain sufficient information from the company in order to perform your job?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Well, is there anyone else besides Mr. Andresen who you remember providing you with any information --

MR. KOCHEVAR:  Objection.

THE COURT:  Yes.  I don't think the question was finished.

MR. KOCHEVAR:  I apologize.

THE COURT:  Was it finished?

MR. HARAN:  Not yet.  Thank you.

Q.   -- about the device?

MR. KOCHEVAR:  Objection.

THE COURT:  Let's have a complete question.  Let's have a complete question.

Q.   You mentioned that you testified that Mr. Andresen provided you with training.

A.   Correct.

Q.  I'd like you to just not say any -- talk about anything that Ms. Perryman may have said back then.

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

So, counsel, I think you already inquired as to who provided the training, so I think we have that in the record.

MR. HARAN:  Fair enough.

THE COURT:  But I may be wrong.

MR. HARAN:  Okay.

THE COURT:  If you want to ask one more time who provided the training, you may have her identify the names.

Q.  If there is anyone else that you recall, because we're going to move on -- is there anyone else other than Mr. Andresen that you recall?

A.  Providing any training?

Q.  Yes, to you.

A.  Do you mean one-on-one or just as a general learning experience?

Q.  I mean at all, everything.

A.  I could have learned from Mike Baja.  I could have learned from Steve Grumman.  And there were engineers in the company, and we had company-wide calls that Laura would participate in. All of those were learning opportunities.

Q.  Okay.  And is it fair to say that you were trying to gather as much information as you could at the time to do your job

effectively?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.   I did want to do my job effectively.

Q.   Right.  Okay.  Thank you.

And then let's talk about your job as a field trainer. What are some of the things -- well, I think you testified that you were trained -- you were involved in training new reps?

A.   Yes.

Q.   And that you were out in the field helping one-on-one with reps?

A.   Yes.

Q.   Okay.  Did you also train clinical specialists?

A.   Yes.  I classified them as reps as well, yes.

Q.   Okay.  But there's a difference between the two?

A.   Somewhat.

Q.   What are the differences between sales reps and clinical specialists?

A.   It sort of depends on who you ask, but my opinion is, the clinical specialists tend to do more of the work with the patient, and the sales reps tend to do more of the business growth with the physicians.

Q.   Okay.  And were there -- were there classes that you offered?

A.   We had training classes when new reps came into the

company, yes.

Q.  Okay.  And were there clinical discussions that would be held from time to time?

A.  Yes.

Q.  And who was Andrea Berry, or Berry?

A.  She was the -- I may not have the title right, but I think she was director of clinical services at the time.

Q.  Okay.  And did you provide any -- did you host or help provide any clin -- any trainings in this clinical discussion area?

A.  I could have.

Q.  Okay.  Can we pull up Defense Exhibit 507 just for the witness and counsel?

        Okay.  Showing you what's been marked for identification as Defense Exhibit 507.

        Do you recognize that document?

A.  It has a familiar look to it, but I don't recognize it per se.

Q.  Okay.  Do you want to flip through it, just page -- next page, next page.

A.  It looks like what could be a training document, but I don't have a specific memory of it.

Q.  Okay.  But does it look like one of the -- I want you to just take a look at it.

        Does that look like a clinical discussion that you

would have lead at the time?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Well, I'm going to ask you again.

Does it refresh your recollection that it's a clinical discussion that you read?

MR. KOCHEVAR:  Objection.

Q.  I can ask again.

A.  It does not.

Q.  It does not.  Okay.

What did -- when you were trained about the device, how -- and this is in 2018, when you started, okay, so my question's going to be limited from 2018 into 2019, okay?

A.  Okay.

Q.  What were you trained about how the PNS device worked?

MR. KOCHEVAR:  Objection.

THE COURT:  Do you remember your training on the PNS device during 2018 and '19?

THE WITNESS:  As a general understanding or specific?

THE COURT:  Either.

A.  I can speak to what I believe I knew at the time.

Q.  That's all we're asking.

A.  Okay.

Q.  Yeah.

A.  But what specifically do you want to know?

O31DPER1                          Spruce - Direct

Q.  Okay.  Well, was there any part of the lead that helped the device actually provide stimulation for the patient?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Did you at the time -- well, you know how the device works today?

MR. KOCHEVAR:  Objection.

Q.  Can we start there?  Do you know how the device works today?

MR. KOCHEVAR:  Objection.

THE COURT:  Counsel, first of all -- well, I think the question may be confusing, so let's go back to 2018 and '19, and start there.

Q.  Okay.  Were you -- okay.  We asked -- we've talked briefly about the Pink Stylet, correct?

A.  Yes.

Q.  And we've talked briefly about the White Stylet, correct?

A.  Yes.

Q.  And were you trained back at the time, when you started, about the differences between the two?

A.  I -- yes.  I received some training about both of those pieces of product.

Q.  Tell us about that, please.

A.  They were -- I'm not sure exactly what you're asking.

Q.  Well, did you -- did you, at the time, understand what the

O31DPER1                    Spruce - Direct

Pink Stylet -- the purpose of the Pink Stylet?

MR. KOCHEVAR: Objection.

THE COURT: As part of your training, were you trained as to the purpose of the Pink Stylet?

THE WITNESS: Yes.

Q. Do you remember that training?

A. I don't remember a specific training. I remember under -- I can speak to what I think I understood at the time.

Q. Please do.

A. The Pink Stylet was placed inside the lead, so that we could move the antenna further away from the circuitry, and it was -- it helped power the device.

Q. Okay. And aside from being able to move the antenna further away from the circuitry, what other functions did it serve?

THE COURT: If any.

Q. If any.

A. In regard to what I knew at the time, it served that function, and it also was inserted inside the lumen of the lead, so it filled the lumen of the lead.

Q. Okay. And what was the benefit of that filling the lumen?

MR. KOCHEVAR: Objection.

THE COURT: As to form, sustained.

Q. Were you trained about whether there were any benefits aside from the fact that the Pink Stylet filled the lumen?

O31DPER1                     Spruce - Direct

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.  I'm sorry.  Repeat that.

Q.  Were you trained back then that there were any other benefits associated with the fact that the Pink Stylet filled the lumen?

A.  Filling the lumen would also limit biologic materials from entering the device.

Q.  Okay.

A.  So --

Q.  Fair enough.

And it would also support the chip inside the device, correct?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Well, were there other benefits that you haven't mentioned yet --

MR. KOCHEVAR:  Objection.

Q.  -- to the fact that the Pink Stylet --

THE COURT:  Okay.  So let's just have a full question.

MR. HARAN:  That's actually what I'm trying to do --

THE COURT:  Good.

MR. HARAN:  -- right now.

Q.  Were there other benefits associated -- that you were trained on at the time that were associated with the fact that

O31DPER1                      Spruce - Direct

the Pink Stylet filled the lumen that you haven't already mentioned?

A.   To the best of my memory, the Pink Stylet had the function of power and moving the antenna further away, filling the lumen, which would, yes, support the chip and block biologics.

Q.   Okay.  And when you say supporting the chip, can you be -- can you just explain what you mean to the lay people here who aren't in the business?

A.   I understand it from a lay person as well.  It's -- if there's something in the lumen of the lead, which is a hole, then there's no longer a hole, so --

Q.   So the support is sort of structural and physical integrity?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Sustained.

Q.   Well, can you elaborate a little more on the fact that there's a hole, and after you put the Pink Stylet in that, there's no longer a hole?  What benefits, if any, did you understand from your training that that served?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Overruled.

A.   I just remember being told that that's what it did.  I don't remember seeing any official evidence of what the result of it was.

Q.   Okay.  Fair enough.  But that was the training that you

O31DPER1                         Spruce - Direct

received?

A.   I believe so, yes.

Q.   Okay.  And did you have, at the time, any reason to doubt it?

A.   No.

Q.   Did it make sense to you at the time?

A.   Which part?  All of it?

Q.   All of the things that you've told us about.

MR. KOCHEVAR:  Objection.  Objection.

THE COURT:  Sustained.

Q.   Is there anything that you've testified about thus far that at the time didn't make sense to you?

A.   No.

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

Q.   Thank you.

Okay.  Now, did you understand whether there was copper in the Pink Stylet?

A.   I did.

Q.   And that's because you were trained on that?

A.   I was -- yes, I was trained on that.  I could also see it.

Q.   Fair enough.  Thank you.

And the copper is what allowed --

THE COURT:  Excuse me, counsel.  Form.

Q.   What were you trained about at the time, the purpose of the

O31DPER1                        Spruce - Direct

copper in the Pink Stylet?

A.   It transmitted the radio frequency energy along the length of the lead to the circuitry.

Q.   Okay.  And were you trained back then that one of the ways to -- one of the -- excuse me.  Withdrawn.  Sorry.

          Were you trained back then about the Pink Stylet being a receiver?

A.   Yes.

Q.   What training did you receive about that?

A.   I was told it was a receiver.

Q.   And what made it a receiver?

A.   Because it could transmit energy.

Q.   Okay.  And the signal from the external transmitter to the chip, correct?

          MR. KOCHEVAR:  Objection.

          THE COURT:  Yes, counsel.

          I'm going to ask you, please, do not lead the witness.  Thank you so much.

          MR. HARAN:  I'm going to ask for permission to treat the witness as a hostile witness.

          THE COURT:  Denied.  Denied.

Q.   Okay.  You mentioned this chip that's in the lead, correct?

A.   Yes.

Q.   What other terms were you trained about as to what the -- other names for the chip?

O31DPER1                         Spruce - Direct

A.   There was an acronym, ASIC, A-S-I-C, that was sometimes used.

Q.   Okay.  And what did the chip do?

          MR. KOCHEVAR:  Objection.

Q.   What were you trained about what the chip did?

A.   To the best of my memory, it converted the radio frequency to electrical current.

Q.   Okay.  Were you trained that it received the signal?

A.   I don't recall.

          (Continued on next page)

Q.  Well, were you trained that it's also known as a receiver?

A.  I don't recall that.

Q.  OK.  Did you have an understanding that it was a receiver?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Let's turn to the White Stylet.  You also received training about the White Stylet?

A.  Yes.

Q.  And what training did you receive about the White Stylet?

A.  Can you be more specific.

Q.  Well, maybe it would be helpful -- if there are any differences and similarities between the White Stylet and the Pink Stylet, it may be helpful for you to start there, if that's helpful to you.

MR. KOCHEVAR:  Objection.

THE COURT:  Counsel, I am going to let you inquire, but I'm going to ask you to rephrase your question.

Q.  Were you trained about whether there were any differences between the Pink Stylet and the White Stylet?

A.  The White Stylet did not contain copper, so that was one key difference.

Q.  And when were you trained about that?

A.  I'm not sure at what point I received that, but I -- as I said, I could see copper in the Pink Stylet.  So I could see no copper in the White Stylet.

O314PER2                    Spruce - Direct

Q.   OK.  And did you ever -- were you ever told otherwise that there actually is copier in there?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.   I don't recall ever being told.

Q.   OK.  Fair enough.

The fact that it didn't have copper, what, if anything, did that mean to you?  Or what part of the -- what did it mean to you that it had no copper?

A.   In terms of how I used it?

Q.   Sure.

A.   I was training that the White Stylet was to be used when you needed the lead to be cut shorter.

Q.   OK.  And could you cut the lead shorter with the Pink Stylet?

A.   I was trained not to.

Q.   Were you trained as to why that's a no, no?

A.   My understanding at the time was that it had some impact on transmitting the power, but I'm not an engineer, so I don't know the specifics of it.

Q.   And you testified about some of the -- or you were trained about some of the benefits it was Pink Stylet.  Do you recall those questions and answers?

A.   Yes.

Q.   Were you trained about what the benefits and purposes of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O314PER2                        Spruce – Direct

the White Stylet were?

A. Yes.

Q. Please tell us.

A. My understanding at the time was that the White Stylet supported the chip, filled the lumen of the lead and thus stopped biologics from getting inside the lead.

Q. And this supporting the chip, this was the physical sort of integrity portion we are talking about?

A. Correct.

MR. KOCHEVAR: Objection.

Q. Provided some structure to the device, some structural rigidity?

MR. KOCHEVAR: Objection.

THE COURT: Sustained.

Q. Those were benefits that you were trained on at the time?

A. Yes.

Q. By Mr. Andresen and his team?

A. Yes.

Q. OK. And is it fair to say that you don't remember specifically what day or what session you learned those things?

A. Correct.

Q. But it's also fair to say that that was your understanding during the entire time period of 2018 through 2019?

A. Through sometime in the fall of 2019, I believe.

Q. OK. We'll get there.

We talked about the fact that the White Stylet does not -- you were trained that the White Stylet does not have copper; correct?

A.   Yes.

Q.   And that you could see that with the naked eye; correct?

A.   I could, yes.

Q.   And you always knew it had copper to the extent you ever looked at it or thought about it; correct?

A.   I don't remember when I came to know that, but --

Q.   But sometime in 2018?

A.   That would be accurate, yes.

Q.   OK.  And did you consider the White Stylet to be a receiver?

A.   In the sense of transmitting energy, no.

Q.   Thank you.

Did you ever train anybody that the White Stylet was a receiver?

A.   In the sense of transmitting energy, no.

Q.   Well, did you ever train anybody that the White Stylet is a receiver in any sense?

A.   I don't recall that.

Q.   OK.  And the White Stylet couldn't transmit energy as far as you understood and were trained; correct?

A.   Yes.

Q.   OK.  So if the device -- if the White Stylet was going to

O314PER2                    Spruce - Direct

be inserted as part of a procedure, how did you understand the device was able to operate?

A.  If you placed the antenna over the circuitry you could activate the device.

Q.  And what about the circuitry allowed one to activate the device?

A.  I don't know the intricacies of the technology.

Q.  But you were trained there was a receiver in the device?

A.  I don't know if I was trained to that specific point, but I was trained that the antenna over the circuitry could activate it.  So it had the capability of turning on.

Q.  OK.  Now, when you were training the sales reps for that one year plus, 2018 into the 2019, were you being candid with the sales reps?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Sustained.

Q.  Can you tell us about the approach you took to training the sales reps?

A.  In terms of was I truthful to the best of my knowledge at the time.  I was provided the information I was trained on.

Q.  Did anyone suggest to you that you should be untruthful to the sales reps?

        MR. KOCHEVAR:  Objection.

        THE COURT:  Excuse me, Counsel.  Sustained.

Q.  OK.  Did you also interact with physicians?

A.   In the field when I covered cases, yes.

Q.   And same question, how did you approach your interactions with physicians?

A.   I provided the information that I was provided at the time. I was truthful to the best of my knowledge at the time.

Q.   OK.   Thank you.

And so you didn't hide anything from physicians?

MR. KOCHEVAR:   Objection.

THE COURT:   Sustained as to form.

Q.   Did the White Stylet come up sometimes in connection with procedures?

A.   Not that I recall in any procedures I participated in.

Q.   OK.   Now, you did, in fact, provide ongoing training to sales reps during the period of time about commonly asked questions, is that fair to say?

A.   I could have, yes.

Q.   And commonly asked questions with respect to the SCS procedure and the PNS procedure?

A.   Yes.

Q.   And some of the commonly asked questions might be when should one use the Pink Stylet, and when should one use the White Stylet; correct?

MR. KOCHEVAR:   Objection.

THE COURT:   Sustained.

MR. HARAN:   Can we pull up Defense Exhibit 509 for

O314PER2                          Spruce - Direct

identification for the witness and counsel.

Q.  Take a look at that and let me know when you are ready.
We'll go to the next page.

A.  What's the question?

Q.  Have you had a chance to take a look at it?

A.  OK.

Q.  Do you recognize that?

A.  I don't remember it specifically.  I see that my name is on
it.

          MR. KOCHEVAR:  Objection.

          THE COURT:  Overruled.

Q.  You see your name is on it?

A.  I see that my name is on it, yes.

Q.  Who is Steve Belter?

A.  He was a regional sales director at that time in Texas, I
believe.

Q.  Is he someone you would work with and communicate with at
your job?

A.  It appears that way.

          THE COURT:  I'm sorry.  This document isn't in
evidence yet.  So you are not being asked what this document
appears to be.  You are just being asked, based on your current
recollection.

          Place your question, Counsel.

Q.  I know it's in front of you --

O314PER2                       Spruce - Direct

THE COURT:  Let's take it down.

Q.  Let's take it down for a second.

Did you communicate by email with Steve Belter during the course of your responsibilities at Stimwave?

A.  I certainly could have.  As a regional sales director that would have been normal.

Q.  Is there any doubt in your mind, as you sit here today, that you emailed with Steve Belter as part of your job?

MR. KOCHEVAR:  Objection.

THE COURT:  You may answer.

A.  I would not be surprised that I did.  I cannot tell you a specific case of me mailing, him but that would not be surprising.

Q.  OK.  Sure.  Just to be clear, you worked at a bunch of medical device companies?

A.  Yes.

Q.  For years?

MR. KOCHEVAR:  Objection.

MR. HARAN:  Can I just ask a couple questions here, I mean --

THE COURT:  So, Mr. Haran --

MR. HARAN:  Yes.

THE COURT:  The government is entitled to object if it believes that.

MR. HARAN:  You are right.  I'm sorry.

THE COURT:  Thank you.  Place your next question.

Q.  During the period 2018-2019, did you feel and believe that Stimwave might be different in some respects, but it essentially operated as a typical medical device company?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  So you emailed with your colleagues?

A.  Yes.

Q.  All right.  Is Chad Andresen someone that you emailed with?

A.  I would have, yes.

Q.  About what?

A.  There could be many topics.  He was director of marketing. So --

Q.  And in you were providing -- how would you provide your presentation on best practices and commonly asked questions, back in 2019?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.  You have to lay a foundation, Counsel.

Q.  Did you -- I think you already testified that part of what you did as a trainer was to train; correct?

A.  Yes.

Q.  And I think you already testified that one of the ways you trained was to provide periodic training on commonly asked questions?

A.  That's -- yes, that's reasonable.

Q.  And I think you testified already that Andrea Berry would be one of the coordinators that set up periodic clinical discussions?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Did you periodically provide training to sales reps and clinical specialists?

A.  That -- I could have, yes.  I don't remember exact trainings.

Q.  Fair enough, and when you did that, you would set up a Zoom; correct?

A.  Yeah.

THE COURT:  How would you provide those trainings? What was your format for providing the trainings?

A.  We would do -- there were probably Zoom calls so we could show materials, yes.

Q.  And at the time -- and you would, in fact -- you would in fact share those presentations with Mr. Andresen as part of the ordinary course of doing your job?

MR. KOCHEVAR:  Objection.

THE COURT:  Yes, Counsel, the witness is being cooperative but you need to ask non-leading questions.

Q.  Well, did you ever keep Mr. Andresen in the loop on the clinical discussions?

O314PER2                         Spruce - Direct

THE COURT:  OK.  When you provided those trainings, who did you keep in the loop on what you were providing training about, if you remember?  And again, this is during the period 2018 and '19.

THE WITNESS:  It would have been everyone involved in training, so Chad would have been included as well as others.

MR. HARAN:  Could we pull 509 up again, please.

Q.  I ask you to take a look at that and let me know when you're ready.

MR. KOCHEVAR:  Objection.  This is the same document that was --

THE COURT:  So I'm going to ask you to read it to yourself.  And the question, I take it, Counsel, is do you recognize that?  You were asked that before.

MR. HARAN:  I have a different question.

THE COURT:  OK.  Take it down, please.

Q.  Does that refresh your recollection that you would share with Mr. Andresen the presentations that you would provide to sales reps?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Wasn't that an email that you sent to Chad Andresen?

THE COURT:  Counsel.

MR. HARAN:  OK.

Q.  What's a dry lab?

A.   It's a term to describe an in-service.  It's called a dry lab because there is no cadaver body involved.  You just show the product and talk about how the procedure would be performed.

Q.   OK.  And did you train folks on dry labs?

A.   I could have, yes.  I was probably more likely the one performing those.

Q.   Okay.  Did you have an -- did you have at the time an outline for dry labs that you generally followed?

          MR. KOCHEVAR:  Objection.

          THE COURT:  How did you prepare for dry labs?

          THE WITNESS:  Well, just as a trainer you kind of have that sort of knowledge of how you teach reps in the class.  And you would use that as your guide to how you would do it in an office with a physician as well.

          THE COURT:  And did you have materials that you used in connection with that preparation work?

          THE WITNESS:  It's possible.

          THE COURT:  Do you remember what kinds of material you used?

          THE WITNESS:  I don't remember specific notes.  I tend to just speak off the cuff.

BY MR. HARAN:

Q.   OK.  Do you -- you didn't have an outline, as far as you recall?

O314PER2                        Spruce – Direct

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

MR. HARAN:  Can we pull up for the witness, Defendant's Exhibit 546 please.

Q.  Take a look at that.  Let me know when you are ready.

A.  OK.

Q.  Who is Christian Scott?

A.  She joined the training team at some point in 2019, I believe.

Q.  And without looking at the document, who is Michelle Smith?

A.  She was a regional sales director initially and eventually some time in 2019 she moved into healthcare reimbursement role.

Q.  Do you recognize Defense Exhibit 546?

A.  I saw it in preparation for the testimony.  I don't specifically remember this email.

Q.  But it's an email you sent at the time; correct?

A.  It has my name on it.  So --

Q.  Do you have any doubt that you sent that email?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Do you recognize this document as something that you were either sent or received in 2018 or '19?

THE WITNESS:  I do not remember it from that time period.  I've seen it in preparation for this testimony.

MR. HARAN:  I'm going to offer it.

O314PER2                    Spruce - Direct

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  Does that -- does that refresh your recollection that you -- that you had an outline back then for dry labs that you generally followed?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

You've read this document.

THE WITNESS:  Right.

MR. KOCHEVAR:  Take it down, please.

Now you are being asked, having looked at that document, now you have a current recollection that back in 2018 or 2019 you used -- what was the phrase, Counsel, outlines?

MR. HARAN:  An outline for a PNS dry lab that you generally followed.

THE WITNESS:  I don't remember this, and I don't remember that outline from back then, five years, six years ago.  It does not refresh that it happened then.

Q.  It doesn't trigger a present recollection --

A.  It does not.

Q.  -- that you had an outline back then that you generally followed?

A.  No.

Q.  OK.  When you -- the dry lab again, I apologize if you -- if I didn't get it.  What's a dry lab?  One more time, sorry.

O314PER2                           Spruce - Direct

A.  It would be just presenting the product and the procedure to a physician that might not be familiar with it.  It's basically a sales call.  That's just how you would describe it, maybe a little more detail than just the sales part of it.  You are telling them how the procedure works.

Q.  And when you were giving training and how those dry labs should be handled, did you work with sales reps on how to discuss the difference between the White Stylet and the Pink Stylet?

MR. KOCHEVAR:  Objection.

THE COURT:  If you remember.

A.  I don't remember specific trainings around dry labs, I could have but I don't remember the specific trainings.

Q.  OK.  Forgetting specifics, you did train on dry labs back then?

MR. KOCHEVAR:  Objection.

THE COURT:  I think she just said she didn't remember that.

Q.  Forgive me.  You don't remember specifics?

A.  I don't remember training reps to do dry labs.

Q.  OK.  And Defense 546, one more time, please for the witness take a look at that again.

Does that refresh your recollection that you conducted dry labs back then, even though you don't remember specifics?

MR. KOCHEVAR:  Objection.

O314PER2                    Spruce - Direct

THE COURT:  Counsel, take this down, please.

Q.  Does that refresh your recollection?

THE COURT:  Sorry, Counsel.  You just switched the question.

As we understand from listening to you, you are inquiring about two things.  Did she conduct dry labs, which are basically sales calls with doctors.  Separately, did she train others on how to do dry labs.  OK.  So there are two things I think you are asking about, if I understand correctly.

Q.  Let's go with the first.  Do you remember conducting dry labs yourself?

A.  That would have been something I would have done.  I don't remember specifically ones that I did.  But that would have been something that fell under my duties, yes.

Q.  And did you also train folks on how to conduct dry labs?

A.  I don't remember training people to do those.

Q.  OK.  And do you recall -- does that -- are you refreshed now that you conducted dry labs at the time, yourself?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.  During the dry labs that you presented yourself, from the period 2018 through 2019, did you make a distinction to the physicians you were meeting with, the Pink Stylet and the White Stylet?

A.  In terms of?

Q.  In terms of explaining to the physician the purpose of each one?

A.  That's possible, yes, certainly.

Q.  OK.  And did you explain to them that the purpose of the white was to --

THE COURT:  During those dry labs, what do you remember?

Q.  What do you remember about the differences that you explained to the physicians during those dry labs?

A.  I would have trained physicians the way that I was trained.

Q.  OK.  And that's -- that's how -- we already covered that.

A.  Right.

Q.  And that would be the same way you would train sales reps as well as physicians?

A.  That's correct.

Q.  And that would include the purposes of -- OK.  Withdrawn.

Are you familiar with the CPT code 64590?

A.  Yes.

Q.  And the CPT code 64555?

A.  Yes.

Q.  What training did you receive with respect to those CPT codes at Stimwave at the time?

A.  At what time?

Q.  2018, let's start there.

A.  OK.  When I first came to the company I learned 64555, was

O314PER2                    Spruce – Direct

the trial code.  64590 was the code that you added in for implant.

          MR. HARAN:  Okay.  Can we pull up 224 in evidence, Government Exhibit.  If we could just sort of highlight the top half of the document, please, Peter.

Q.  Were you familiar at the time with the procedure description for each of those codes, 64555 and 64950?

A.  From a general standpoint, yes.  It was not a heavy focus. It was a trial code and implant coated.  That's how I understood it.

Q.  Did you understand at the time, and were you trained at the time that which stylet a physician chose to use was relevant to the reimbursement code?

          MR. KOCHEVAR:  Objection.

          THE COURT:  Sustained.

Q.  For a permanent implant, I think you testified that that 64590 was the code?

A.  Correct.

Q.  And at the time I think you testified that you knew the White Stylet didn't act as a receiver; correct?

A.  I knew that it did not transmit energy, correct.

Q.  OK.  And can you explain your understanding and how you were trained about whether the 64590 code would be appropriate for a permanent implantation if the White Stylet was used in the procedure?

O314PER2                          Spruce - Direct

A.   I understood the 64590 was the implant code.  I don't recall a differentiation about one being right and one being wrong, I don't remember that, one stylet being right and wrong. I don't remember that.

Q.   I was just asking, that was the permanent implant code, regardless of whether it was the Pink Stylet or the White Stylet; correct?

A.   That was my understanding at the time.

Q.   Right.  That's all I'm asking.

And you understood and were trained that 64590 covered insertion or implantation of a receiver; correct?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Do you see the word "receiver" in there for 64950?

A.   I do see that, yes.

MR. KOCHEVAR:  Objection.  Sorry.

THE COURT:  Overruled.

Q.   That's a yes?

A.   I do see that, yes.

Q.   And you knew the White Stylet was not a receiver?

A.   I knew it did not have the copper in it, and it could not transmit energy, yes.

Q.   At the time, did you train people that the white was a receiver?

A.   I don't recall I trained people that it was a receiver, no.

Q.   At the time when you were meeting with physicians in these dry labs, were you telling them that the white was a receiver?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.   No.  I don't recall I was doing that.

Q.   In your head, at the time, what was your understanding of how the 64950 code might apply to a permanent implantation if the White Stylet was part of the procedure?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

A.   I don't recall a heavy focus on these codes at the time.  I was -- I came from a background of a trial code and an implant code, at a different company.  When I came to Stimwave I was taught a trial code and implant code.  I had no reason to question it at the time.

Q.   Were you trained that the PNS device had a pulse generator in it?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Is it fair to say that the training you received was that the 64590 code applied because there was an integrated or embedded receiver in the device already?

MR. KOCHEVAR:  Objection.

THE COURT:  Sustained.

Q.   Did you have a sense at the time of how -- did there come a

O314PER2                    Spruce - Direct

time when you were trained that there might be an issue with the 64950 code?

MR. KOCHEVAR:  Objection.

THE COURT:  You may answer.

A.   Can you repeat that.  I'm sorry.

Q.   In 2018 --

A.   Correct.

Q.   -- you understood that the 64590 code applied for permanent implantations even if the White Stylet was implanted; correct?

A.   That's how I understood it then, yes.

Q.   And throughout 2019 up until September, you had the same understanding; correct?

A.   I believe that's the correct timeframe.

Q.   And what happened in September of 2019?

A.   Around that time we started to have some questions from, I believe, facilities, and I think there was something in the marketplace that was stating that an integrated or internal receiver did not fit the code.

Q.   And what significance, if any, did that have?

A.   So it brought into question if we did have an integrated receiver or if we were meeting the code.

Q.   OK.  And what was your sense up until that time about whether the device had a receiver in it already?

MR. KOCHEVAR:  Objection.

THE COURT:  Overruled.

O314PER2                          Spruce - Cross

A.   I had not had a reason to think about it.  It wasn't something that I really thought about because I just knew that the code was the code.

          MR. HARAN:  OK.  One moment, your Honor.

          Nothing further.

CROSS-EXAMINATION

BY MR. KOCHEVAR:

Q.   Good morning, Ms. Spruce.

A.   Hi.

Q.   You joined Stimwave in 2018; right?

A.   Yes.

Q.   And you worked there as a trainer at Stimwave; right?

A.   Correct.

Q.   And I think some of those trainings were online; is that right?

A.   Meaning like virtual?

Q.   Yes.

A.   Yes.

Q.   And some of them were in person; is that right?

A.   Are you talking about trainings I've led?

Q.   I'll make it more specific.  I'm sorry.  Trainings that you led, were some of those in person?

A.   Yes, new rep training classes were in person.

          MR. KOCHEVAR:  Mr. Carbone, could you pull up what's in evidence as Government Exhibit 221.

Q.  Ms. Spruce, I'll ask you, let's scroll down to page 5 of this.

         Ms. Spruce, is this a training slide deck from one of the trainings that you worked on?

A.  It does look like that, yes.

Q.  And so your name is here on the training team?

A.  Yes, sir.

Q.  OK.  And now if we could go back to the first page.

         What does Wave Academy live intensive mean?

A.  Wave Academy was just the term they used to talk about to describe our class, our training program.  Live intensive was -- this was an actual live training class for new reps.

Q.  What does the Class Five mean there?  Does that mean it was the fifth in a series of these?

A.  Correct, it was the fifth training class in a series for Stimwave.

Q.  And below that is the date of the training, is that what that is?

A.  That is the date, yes.

         MR. KOCHEVAR:  So we can back out of this blowup, Mr. Carbone.  Maybe we can scroll slowly through Slide Five.

Q.  How did you use decks like this in the training?

A.  Well, we would have general sessions with slide decks that we would go through materials, and we would also have small groups.

Q.  So this was like a visual aid that you would have up on a screen or something like that?

A.  Yes.

MR. KOCHEVAR:  Mr. Carbone, we could take this down and put up just for the witness and the Court what's marked Government Exhibit 226.

Q.  Ms. Spruce, this is another one of those Wave Academy training decks; right?

A.  Yes.

Q.  If we could turn to page 4 here.

That's your name there on the page?

A.  Yes.

MR. KOCHEVAR:  The government offers Government Exhibit 226.

MR. HARAN:  Objection.  Can I have *voir dire* briefly?

THE COURT:  Sure.

MR. HARAN:  Do you have a recollection of this deck?

THE WITNESS:  Not a specific recollection of this one, no.

MR. HARAN:  Objection.

MR. KOCHEVAR:  We could go back up to the first page please.

BY MR. KOCHEVAR:

Q.  Ms. Spruce, do you remember you became the director of training at Stimwave in late; right?

A.  Correct.

Q.  And you were asked to put together, sort of, a new training when you started?

A.  Meaning a different training than we had already been doing?

Q.  You started leading trainings after you started as director of training; right?

A.  Yes, I started leading them, yes.

Q.  And the first one of those was in December of 2019; right?

A.  Yes.

Q.  And that was an in-person one?

A.  Yes.

        MR. KOCHEVAR:  Your Honor, the government offers Government Exhibit 226.

        MR. HARAN:  Objection.  *Voir dire*?

        THE COURT:  Well, I'm going to let Mr. Kochevar try to set a foundation for this, and then I will let you have a *voir dire* if you still want one.

Q.  At that training you led in December when you were the director of training, did you use a PowerPoint at that training?

A.  Most likely.  We generally did.  So --

Q.  Would it have had your name on it as the leader of the training?

A.  Yes, probably.

Q.  And would it have had the name Wave Academy and the date like the one we looked at before?

        MR. HARAN:  Objection.

        THE COURT:  Overruled.

A.  Yes, most likely, yes.

Q.  And you would have used the slides there to help you conduct that training; right?

A.  Yes.

        MR. KOCHEVAR:  Your Honor, I offer Government Exhibit 226.

        MR. HARAN:  Objection.  *Voir dire*.

        Do you recognize this document as the training that you gave?

        THE WITNESS:  It looks familiar, and I see the name and the date.  I can't say I remember this specific slide deck on December of 2019.  I led several trainings.

        MR. HARAN:  Objection.

BY MR. KOCHEVAR:

Q.  So could we go down --

        MR. HARAN:  Objection, your Honor.

        THE COURT:  Well, it hasn't been received in evidence yet.  So Counsel is asking further questions.

        MR. KOCHEVAR:  Your Honor, I offer this exhibit again. I believe the witness answered questions to lay a proper foundation for it.

THE COURT:  Why don't you let the witness see the document.  Do you have a physical copy?

MR. KOCHEVAR:  Yes.

Q.  Ms. Spruce, I've just handed you a physical copy of what's marked Government Exhibit 226.  If you could just take a look through that.  Does that look like a slide deck you used in the December 2019 training for the Wave Academy?

A.  It looks like one that could be used, yes, absolutely.

Q.  And you led that training; right?

A.  I did lead the training.

Q.  And your name is on page 4 of that slide deck?

MR. HARAN:  Objection.

THE COURT:  Overruled.

Q.  Do you see your name on there?

MR. HARAN:  Objection.

THE COURT:  Sustained.

Counsel is just directing your attention to page 4.

THE WITNESS:  I see my name.

MR. HARAN:  Objection.  Move to strike.

Q.  Were slide decks used at the December 2019 training that you led?

A.  Yes.

THE COURT:  Can you identify that as one of the slide decks that was used at that training?

THE WITNESS:  It has the date.  It does look like it.

I can't say I have a specific memory of this slide deck.  I mean, it does appear to be the slide deck, but I can't remember it today, six years later, five years later.

MR. KOCHEVAR:  Your Honor, I offer Government Exhibit 226.

MR. HARAN:  Objection.

THE COURT:  Sustained.

MR. KOCHEVAR:  So we can take this one down.

So Ms. Spruce or Mr. Carbone, can we put up on the screen just for the witness what's marked Government Exhibit 227.

Q.  Do you recognize what this is, Ms. Spruce?  This is another slide deck from a Wave Academy class; right?

A.  It is, it looks like it.

Q.  And that's from March 2019; right?

A.  Yes.

Q.  And it says Class four in the Wave Academy Live Intensive?

A.  Yes.

Q.  If we could turn to page, I think, 7 of this, please.

And your name is there; right?

MR. HARAN:  Objection.

THE COURT:  I'm sorry.  Counsel, is this in evidence or not?

MR. KOCHEVAR:  No, it is not.

THE COURT:  Sorry, I lost track.

O314PER2                    Spruce - Cross

Sustained.

So just look at that page on the screen. Read it to yourself.

Q. Is this a slide deck of a training you participated in, Ms. Spruce?

A. It does appear to be that, yes.

MR. KOCHEVAR: Your Honor, I offer Government Exhibit 227.

MR. HARAN: Objection. May I *voir dire*, please.

THE COURT: Sure.

MR. HARAN: Do you know whether you gave that presentation at that time as you sit here today?

THE WITNESS: The entire presentation? Or --

MR. HARAN: Any part of it? Do you know? Is that the document that you know you presented?

THE WITNESS: I don't remember a specific slide deck. At this point in time I taught, at this point, probably 20 classes.

MR. HARAN: Objection.

MR. KOCHEVAR: OK. We can take this down.

BY MR. KOCHEVAR:

Q. Ms. Spruce, you do remember training decks being used at trainings you were at that time?

A. Yes.

Q. Those in-person trainings with sales reps; right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes, sir.

Q.  And I think you testified before --

A.  Pardon me.

Q.  -- that you understood that the White Stylet was not a receiver in 2018, and 2019; right?

A.  Yes.  At some point in 2018, I did know that.  I don't know exactly when.

Q.  And I want to be careful about that because I believe before you said before you had a training at the start when you first started at Stimwave; right?

A.  I did have a training in the beginning.

Q.  And you talked about how you learned about the Pink Stylet at that training; right?

A.  I learned an overview of all, the device, the procedure and the device.  I don't remember a specific conversation about the pink or the white.

Q.  Your testimony then is you can't remember exactly when you heard about the White Stylet, the details about it not having copper; right?

A.  Correct.

Q.  So it could have been after that first training that you talked about; right?

A.  It could have been, yes.

Q.  So not everything you learned about the device came from that first training; right?

O314PER2                        Spruce - Cross

A.   Right.

Q.   You might have learned about the White Stylet not having copper a little more informally later on; right?

A.   It's possible.

Q.   And I believe you also said -- but you think it was in 2018 that you learned that it was not a receiver; right?

A.   Yes.  Yes.

Q.   And I believe you also testified that you never trained anyone that the White Stylet was a receiver; right?

A.   I did not refer to it that way, that I recall.

        MR. KOCHEVAR:  Mr. Carbone, could you please pull up Government Exhibit 221.  This is in evidence.

Q.   Ms. Spruce, we've already talked about this one.  This is the training deck from the July 21, 2019, training; right?

A.   Yes.

Q.   That's the in-person training?

A.   Yes.

Q.   The Wave Academy Live Intensive?

A.   Yes.

        MR. KOCHEVAR:  Mr. Carbone, can we go to page 5 of this.

Q.   I think I already asked you, you were there for this one, right, Ms. Spruce?

A.   Yes.

Q.   You were listed there as a field trainer?

A.  Yes.

MR. KOCHEVAR:  Mr. Carbone, could we please turn to page 28.  Blow up this page.

Q.  Ms. Spruce, on the left side could you read the first line of the table there?

A.  FRE4-short.

Q.  No, no, I'm sorry.  The table on the right, I apologize. The first line of the table on the right.

A.  FR4A white receiver stylet 13 centimeters.

Q.  Now, could you read the third line down on that table please?

A.  FR8A white receiver stylet 17 centimeters.

Q.  Could we please turn to the next slide in this deck, please.

Could you read the left side of this page starting with stylet handle.  Or actually, I'm sorry, could you read on the top of the left side.  What does it say there?

A.  FR4A stylet and antenna.

Q.  Below that, what does it say?

A.  Stylet handle color legend.

Q.  Could you read the text inside that one?

A.  Receiver stylet short.

Q.  And what's next to that -- is there a circle there with a W in it?

A.  Yes.

O314PER2                        Spruce - Cross

Q.  It's a white circle; right?

A.  Yes.

Q.  And there's a little picture of an antenna next to it?

A.  Yes.

Q.  In the middle of the page, could you just read the text at the top?

A.  Receiver type.

Q.  And there is a little antenna next to that one too; correct?

A.  Correct.

Q.  Down below that, could you read what that says?

A.  Receiver stylet short.

Q.  And there is a little circle next to that; right?

A.  Yes.

Q.  And there is a W in it?

A.  Yes, sir.

Q.  It's hard to read, but it says "antenna" if you turn your head 90 degrees and vertical.  It says "antenna" underneath there in the picture; right?

A.  Yes.

        MR. KOCHEVAR:  We can take this down.

Q.  Ms. Spruce, you testified before, you became director of training at Stimwave in August 2019; right?

A.  Yes.

Q.  Ms. Perryman promoted you to be director of training;

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

right?

A.   Yes.

Q.   She left the company just a few months later; right?

A.   I believe it was a few weeks.

Q.   And we talked before about that December 19 or I'm sorry the December 2019 training that you led after you became director of training?

A.   Yes.

Q.   That's the one you couldn't remember any specific slide decks around; right?

A.   Yeah, correct.

Q.   Yeah.  You don't remember exactly what you said there; right?

A.   In terms of what?

Q.   You don't remember what slide decks you used that that training; right?

A.   No, I don't have a specific memory of slide deck.

Q.   When you were doing that class, Ms. Perryman tried to come into Stimwave's office and take things; right?

          MR. HARAN:  Objection.

          THE COURT:  Overruled.

          You may answer.

A.   She succeeded.

Q.   She succeeded in entering the office and taking things?

A.   Correct.

Q.   And I believe you said you became the director in August of 2019, and she left five weeks later.  So that was before December 2019; right?

THE COURT:  What was before?

Q.   Sorry.  As in when she came back and took things from the office, she'd had been gone from the company before then; right?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.   Yes.  She was gone from the company when that happened.

Q.   So it was a pretty memorable training in December 2019 then, huh?

A.   That part was certainly memorable.

Q.   Ms. Spruce, your background is in physical therapy; right?

A.   Yes, sir.

Q.   You are not an engineer; right?

A.   I'm not.

Q.   And you are not a doctor; right?

A.   I'm not.

Q.   Ms. Spruce, you handled cases in the field when you worked at Stimwave; right?

A.   Yes.

Q.   But you don't recall any case where you used the White Stylet; right?

A.   I did not.

O314PER2                    Spruce - Cross

Q.  So you actually remember you never used the White Stylet?

A.  I'm -- I do not remember ever using it.

Q.  That's because your preference is to use the Pink Stylet for your own cases; right?

A.  That was my preference?

Q.  And, in fact, if the device needed to be implanted in a small area of the patient's body, you told doctors to bend around the Pink Stylet a little bit to make it fit; right?

A.  I did.

Q.  And you would rather have a doctor do that than put in the White Stylet; right?

A.  I did choose that option.

Q.  Ms. Spruce, the White Stylet was recalled; right?

A.  It was, yes.

Q.  And you still work at Curonix, right, the successor to Stimwave?

A.  Correct.

Q.  You don't sell the White Stylet anymore; right?

        MR. HARAN:  Objection.

        THE COURT:  Overruled.

A.  No, it has not been in the product kit since early 2020, I think.

        MR. KOCHEVAR:  One moment, please, your Honor. Nothing further, your Honor.

REDIRECT EXAMINATION

O314PER2                    Spruce – Recross

BY MR. HARAN:

Q.  Ms. Spruce, did anything the government showed you during their cross-examination change the testimony you already provided about what you told doctors and sales reps about the White Stylet's function at the time?

A.  No.

        MR. HARAN:  Nothing further.

        MR. KOCHEVAR:  Recross.

RECROSS EXAMINATION

BY MR. KOCHEVAR:

Q.  Ms. Spruce, I believe you testified on direct that the training you got was the same as the training you gave to reps was the same as the training you gave to doctors; right?

A.  Yes.

        MR. KOCHEVAR:  Mr. Carbone, could you please pull up Government Exhibit 221.

        MR. HARAN:  Objection.

        THE COURT:  To the extent this is about functionality, I'll permit it.

Q.  Ms. Spruce, going back to this, these Wave Academy classes were the trainings that you gave to reps; right?

A.  Yes.

        MR. KOCHEVAR:  Mr. Carbone, could you go to page 28.

Q.  Again, I'll have you read the first line of the table on the right, please, Ms. Spruce.

O314PER2                          Spruce - Recross

A.   FR4A White receiver stylet 13 centimeters.

Q.   And the third line down as well, please.

A.   FR8A white receiver stylet 17 centimeters.

          MR. KOCHEVAR:  Mr. Carbone, could you take this down

and could you please put up Government Exhibit 213?

          MR. HARAN:  Is this in evidence?

          MR. KOCHEVAR:  I believe it's in evidence.  Can we

confirm that?  Yes, it's in evidence.

Q.   Ms. Spruce, this is a live intensive training with Wave

Academy on November 1st through 4th, 2018; right?

A.   Yes.

          MR. KOCHEVAR:  If we could turn to page 8, please.

I'm sorry, one before this, Mr. Carbone.  I apologize.

Q.   And that's your name there at the bottom of the slide,

Ms. Spruce?

A.   Yes.

Q.   OK.  Now, could we turn to page 17, please.

          Ms. Spruce, could you read on the table on the right

the first line there.

A.   FR4A white receiver stylet 13 centimeters.

Q.   The third row down, please read.

A.   That FR8A white receiver stylet 17 centimeters.

          MR. KOCHEVAR:  Let's go to the next slide, please,

Mr. Carbone.  Let's below blow this up.

Q.   Ms. Spruce, what does it say?

O314PER2                    Spruce - Recross

THE COURT:  Is this similar to the other slide Counsel has directed your attention to from the other slide deck?

THE WITNESS:  Yes, ma'am.

MR. KOCHEVAR:  One moment, please, your Honor.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(In open court; jury present)

BY MR. KOCHEVAR:

Q.  In late August 2019, you had to remind yourself not to call the White Stylet a blank, right?

        MR. HARAN:  Objection.

        THE COURT:  Overruled.

A.  I had to remind myself?  I didn't call it a blank.

Q.  You had to remind others not to call it a blank -- or, I'm sorry, you made a note, though, to make sure that it should not be called a blank, right?

A.  I did I believe, yes.

Q.  And you knew that that was important for coding reasons, right?

A.  I did not want it to be called a blank because I believed it had a function.

Q.  But you understood at that time that it was not a receiver?

A.  I did.

Q.  But the document we're looking at up on the screen right now, that's from November 2018, right?

A.  Yes.

Q.  And on this page two, it's hard to see but if you turn -- does it say "antenna" here under the line in the middle of the page?

A.  Yes.

        MR. HARAN:  Objection.

O31DPER3                    Spruce - Recross

THE COURT:  Overruled.

Q.  And above that, it says after a circle with a W in it, "receiver stylet short," right?

A.  It does say that, yes.

Q.  And above that, is that the little picture of an antenna again?

A.  It is.

Q.  And that same little picture of an antenna is over there in the box at the left?

A.  Yes.

Q.  And next to that at the top it says, "receiver stylet short," right?

MR. HARAN:  Objection, asked and answered.

THE COURT:  Overruled.

A.  Yes.

Q.  So can we go back to the first page of this document?

MR. KOCHEVAR:  Actually, Mr. Carbone, could you pull up -- it's not in evidence, just for the witness, what's identified as Government Exhibit 227?

Q.  Ms. Spruce, you can't remember the specific slide deck that you had used at the Wave Academy Life Intensive Class Four on March 28, 2019, right?

MR. HARAN:  Objection.

THE COURT:  Overruled.

A.  I don't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  So you can't remember that one in March.

We can pull up Government Exhibit 221 that is in evidence and let everyone see that.

MR. HARAN:  Objection, just in terms of the scope of this, your Honor.  I asked one question.

THE COURT:  On the functionality.  I will permit it.

Q.  And so we just talked about -- I showed you the November 2018 training that your name was on.

We looked at those slides, right?

A.  Yes.

Q.  You can't remember the specific slide deck from March of 2019.  And now this one is the July 2019 Wave Academy Life Intensive Class Five training deck, right?

A.  Yes.

Q.  And if we go to page 28 of this one.

MR. HARAN:  Objection.  I can't even tell if it's in evidence or an identification.

MR. KOCHEVAR:  This is in evidence.  It's Government Exhibit 221.

MR. HARAN:  Fair enough.  Thank you.

Q.  And this is the one we looked at before, right?

MR. HARAN:  Objection.

THE COURT:  Do you remember looking at this page?

A.  I think this is the one we just looked at a few minutes ago.

O31DPER3                    Spruce - Recross

Q.   Yes.

A.   Yes.

Q.   Please read the advance -- the adjustable -- the advance
programming table.

A.   FR4A white receiver stylet, 13 centimeters.

Q.   And what's the next line?

A.   FR4A pink receiver stylet, 23 centimeters.

Q.   What's the next line?

A.   FR8A white receiver stylet, 17 centimeters.

Q.   And what is the last line?

A.   FR8A pink receiver stylet, 27 centimeters.

Q.   And if we could go to the next slide, please.  We can blow
this up.

        What does it say at the top of this page, Ms. Spruce?

A.   FR4A stylet and antenna.

Q.   And could you read the second box down?

A.   Receiver stylet short, plus 0 centimeters.

Q.   And there's a W in a circle next to that?

A.   Yes, sir.

Q.   And in the middle there's a thing at the top that says
"receiver type?"

A.   Yes.

Q.   And below that what does it say on the left?

        MR. HARAN:  Objection, your Honor.

        THE COURT:  Yes, counsel.  I think we've been through

this.  Thank you.

MR. KOCHEVAR:  One moment, please, your Honor.

Q.  You gave presentations on other trainings too, Ms. Spruce?

A.  Yes.

MR. KOCHEVAR:  Nothing further, your Honor.

MR. HARAN:  Nothing further, your Honor.

THE COURT:  You may step down.

Next witness.

MR. COHEN:  The defense calls Dr. Richard North.

THE COURT:  Dr. North, if you could step up here, please, and take the witness stand.

If you could remain standing, and please raise your right hand.

(Witness sworn)

THE COURT:  Please be seated.

Counsel, I think there's a document to remove.  You could --

MR. COHEN:  I'll get it.

THE COURT:  So if you could move your chair up.  That microphone moves, and if you could just place it under your chin, and keep your voice up.

Please state your full name.

THE WITNESS:  Richard Boydston North.

THE COURT:  How do you spell your second name?

THE WITNESS:  B-o-y-d-s-t-o-n.

THE COURT:  We can't hear you.

MR. COHEN:  Dr. North, could you move the microphone closer to you?  There you go.  Try that.

THE COURT:  Spell your second name again.

THE WITNESS:  B-o-y-d-s-t-o-n.

THE COURT:  How do you spell your last name?

THE WITNESS:  N-o-r-t-h.

THE COURT:  Counsel.

MR. COHEN:  Thank you, your Honor.

RICHARD BOYDSTON NORTH,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. COHEN:

Q.  Dr. North, are you currently retired?

A.  Yes, sir.

Q.  What did you do before you were retired?

A.  I was a neurosurgeon for many years.

Q.  And can you just give the jury a -- tell the jury briefly your educational background?

A.  Yes, sir.

     So after high school in New Jersey, I went to Harvard for two years, got early acceptance to Johns Hopkins Medical School.  After getting my M.D., I studied biomedical engineering, and worked in the implanted stimulator field

beginning at that time.  I interned at Duke.  That was my one year away from Johns Hopkins.  Worked between '68 and 2005 when I retired as a professor of neurosurgery, anesthesiology, and critical care medicine.  The latter had to do with my teaching non-neurosurgeons to do procedures such as stimulators.

And since retiring from Hopkins, I spent several years in clinical practice at Sinai Hospital in Baltimore, and then retired from clinical practice, and continued as the president of a non-profit educational institution, the Neuromodulation Foundation, which has to do with the same field.  And until a year ago, I was also president of the Institute of Neuromodulation, another non-profit charitable educational institution.

Q.  And what's neuromodulation?

A.  Neuromodulation is the treatment of disease using implanted electrical stimulation and drug delivery devices.

Q.  And I think you testified you were a professor of neurosurgery; is that right?

A.  Yes.

Q.  And did you also, during your years in active practice, have a clinical practice?

A.  Oh, yes.

Q.  And what sorts of things would you do as part of your clinical practice?

MS. FOLCH:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O31DPER3                      North - Direct

THE COURT:  You may briefly describe.  You may answer.

THE WITNESS:  Yes, well --

THE COURT:  Briefly.

THE WITNESS:  Well, I treated neurosurgery patients and pain patients doing a range of operations from brain surgery to spinal surgery, but about half of my practice over many years involved implanted stimulators.

Q.  Okay.  Did there come a point in time that you became aware of a company called Stimwave?

A.  Yes, sir.

Q.  And how did you become aware of Stimwave?

A.  2012, I was at a neuromodulation meeting at which Laura Perryman introduced herself to me.

Q.  Okay.  Without getting into -- after those conversations, without getting into the details of the conversation, did you become a member of the medical advisory board of Stimwave?

A.  Yes.  I became a medical advisor with a consulting contract.

Q.  Okay.  I'd like to show you Defense Exhibit 916 for identification.

Did you have an agreement, a written agreement to be on the medical advisory board, Dr. North?

A.  Yes, I did.

Q.  Is this that agreement?

A.  Yes, it is.

O31DPER3                         North - Direct

MR. COHEN:  I want to offer that into evidence.

THE COURT:  Received.

MR. COHEN:  You can take that down.

Q.  Dr. North, as part of your work with Stimwave, did you gain a familiarity with the PNS device?

A.  Yes, I did.

Q.  And are you familiar with the component of the PNS device that's become known as the Pink Stylet?

A.  Yes.

Q.  What role, if any, did you have in the creation of the Pink Stylet?

A.  I was an inventor or co-inventor.

Q.  And what led you to participate in the invention of the Pink Stylet?

A.  Well, I was aware of the need for improving signal delivery to the Stimwave electrode and receiver assembly, which, in some applications, would be deep under the skin, and, therefore, hard to transmit energy from the transmitter worn on the surface.  And in some cases the electrode and receiver assembly would be at a distance or in a location where a patient couldn't easily apply the transmitter, sometimes because it would be painful to put it there, and in those circumstances, having an extended or remote antenna as part of the receiver would be useful.

Q.  Okay.  And what did the application of the Pink Stylet --

O31DPER3                         North - Direct

and, also, was it included subsequently in PNS to your

knowledge?

A.   Yes.

Q.   And what -- could you describe for the jury what role, if

any, the Pink Stylet conducts with regard to the operation of a

PNS system?

            MS. FOLCH:   Objection.

            THE COURT:   So if we could put some dates on this and

so that we can understand the witness's involvement with

respect to this issue and the Pink Stylet -- actually, I'm

being reminded by Mr. Whertvine it's time for our mid-morning

recess.   So have a break now.   Don't discuss the case, and tell

Mr. Whertvine when you're ready to resume.

            Thank you.

            (Continued on next page)

(In open court; jury not present)

THE COURT:  Doctor, hi.

THE WITNESS:  Yes, your Honor.

THE COURT:  You may step down during the break.

So one thing I want the parties to do during the break is for the government to present to the defendant the passages it wishes to strike from Dr. Dann's testimony.  To the extent there's agreement, that's great.  To the extent there's a dispute, I'll come back shortly in about five minutes to address the dispute, or you can tell Mr. Whertvine you don't need to see me.

Does the government have anything else it wishes to address?

MS. FOLCH:  Not right now, your Honor.

THE COURT:  Mr. Cohen?

MR. COHEN:  Yes, your Honor.  We have two issues. During the cross-examination of Ms. Spruce, the government elicited from Ms. Spruce that Ms. Perryman came back to the company and, quote, unquote, took stuff from the company.  This is other crimes evidence, not charged with, highly prejudicial. We ask for a curative instruction with regard to that, that she's not charged with taking any stuff, and it should be stricken.

The other thing they elicited from --

THE COURT:  So which do you want?  Do you want it

O31DPER3                         North - Direct

stricken or do you want a limiting instruction?

MR. COHEN:  Both.  I want it stricken, and I want them told she's not charged with anything.

The other component that raised an issue is they elicited from the witness that Curonix currently doesn't market the White Stylet.  We have not been able to get in anything that's happened presently in this case.  We think that that should be stricken.  It's irrelevant what another company decides or doesn't decide to do with its components.

THE COURT:  Does the government wish to respond?

MR. KOCHEVAR:  Yes.  On the first point, first, it's direct evidence of consciousness of guilt that the defendant returned to the company and attempted to take things.

THE COURT:  Excuse me.

MR. KOCHEVAR:  Sorry.  It's direct evidence of consciousness of guilt that the defendant returned to the company inappropriately and took things.  In addition, it went to the witness's memory.  She had just denied remembering something that happened the same day.  However, we inquired about a quite memorable event that occurred contemporaneously that she recalled, tartly saying Ms. Perryman succeeded.  So both of those purposes are -- although completely appropriate questions -- neither instruction nor striking is warranted.

With respect to asking questions about Curonix's current sale of the product, I believe that the defense

inquired on that point on direct examination.  There were seven questions about what is your understanding of the device now, and I believe they went past that.  So that is also proper questions on cross-examination.

MR. COHEN:  If I could just be heard on the first point.  Obviously, the fact that the government wants to argue consciousness of guilt based on that is -- it showed exactly the prejudice.  There's been no evidence about what was taken, what the circumstances were, and, in fact, this was one of the subjects of our motion, where we talked about any intellectual property disputes and things that were going to be kept out, because that's what this dealt with.  She was going back to get her things.  And we had a discussion about this, and the government said they were not going to get into it. Regardless, it's highly prejudicial, and our request stands.

THE COURT:  So taking these one by one, I'm not going to strike the reference to Curonix no longer marketing the White Stylet.  It's already in the record that there was a recall.  The jury would understand there's no White Stylet on the market now based on the record as its exists, so there's no prejudice or additional information.  That's very important in that regard.  But it was relevant to the examination of the witness, and the effort to impeach her credibility.

With respect to the first issue, I'm happy to give a limiting instructions, but I'm not going to strike the

cross-examination about the defendant's return to the office. It was used in the context of trying to draw the jury's attention to the failure of recollection, and I think they would have received it in that context.  But obviously there is no charge here that there was any wrongdoing associated with that office return, and I'm happy to give an instruction. That's not the crime she's charged with, and there's not a sufficient basis to know whether that return to the office permitted or un-permitted was connected to the crimes at issue here.

So I'm happy to tell the jury they should just consider it in connection with their evaluation of the witness's credibility and ability to recall events clearly and nothing further.

Good.  So I'll give you a chance to talk about the Dr. Dann testimony -- oh, I wanted to mention, with this current witness, so it's not clear to me from the time line that this witness had any involvement with respect to the Pink Stylet in connection with the PNS device, that his acts of creation may have been before the PNS device incorporated the Pink Stylet --

MR. COHEN:  Well, that --

THE COURT:  So you need to set out a time line here in your questions, counsel, if you would --

MR. COHEN:  Okay.

THE COURT:  -- to make sure there's an appropriate

foundation.

MR. COHEN:  Okay.

THE COURT:  Thank you.

(Recess taken)

THE COURT:  Please be seated.

Do we have consent with respect to what matter may be stricken from Mr. Dann's testimony?

MR. KOCHEVAR:  I'm sorry.  We're still working on it.

THE COURT:  Oh.  I thought you were done.

MR. KOCHEVAR:  No.  I apologize.

THE COURT:  Continue working.

THE DEPUTY CLERK:  All rise.

(Recess taken)

THE COURT:  Please be seated.

While Mr. Whertvine checks to see if the jury is ready, counsel, do you have agreement or not?

MR. KOCHEVAR:  We don't have complete agreement.  We proposed highlights.  I think the defense is okay with some of them.  There's also a correction to be made to the transcript that we have an agreement on, and there are a few places where there is still disagreement where we propose to strike and they oppose that.

So if the Court wants, we can hand this up.  The yellow highlighting is what the government proposed to strike.  Where there is green highlighting next to it is where the

defense disagree and would like to keep that material in.  And then there are a few -- just to take care of this so we don't have to return to it, on the record at page 1563 of the transcript, line three, the word "neurological" should be urological.  So that -- my question:  "And you were providing consulting services about the PTNS system at that time; is that right?  The urological one."  I think there was an extra N that got added, which is completely understandable given the --

THE COURT:  Okay.

MR. KOCHEVAR:  Thank you.

THE COURT:  I can see that it's going to take me a little time to review.  I'm almost done.  Well, I'll just stick with --

Bring in the witness.

Bring in the jury.

(Continuing on next page)

(In open court; jury present)

COURTROOM DEPUTY:  The jury is entering.

THE COURT:  Is someone going to bring in the witness?

MR. COHEN:  Yes.  We having someone going right now.

THE COURT:  Mr. Cohen, give me just one second, please.

MR. COHEN:  Sure.

THE COURT:  Ladies and gentlemen, I wanted to give you a very brief instruction about the testimony you heard from the last witness, Ms. Spruce.  At some point she referred to the fact that during one of her training sessions I think it was, and at a period of time after the defendant had left Stimwave, the defendant returned to the Stimwave office.  I am reminding you that the defendant is on trial here only for the crimes charged in the indictment, and that evidence about her return to the office after she had left Stimwave was being received as part of the cross-examination of this witness for whatever light it shed, if any, on the witness's ability to recall, her credibility, the witness's memory.  It's not being received at all in connection with any charges against the defendant. Okay?

Thank you.

MR. COHEN:  Thank you, your Honor.

Can we pull up Defense Exhibit 916 in evidence, please?

Can we bring up the top, first paragraph?

Q. Dr. North, this consulting agreement you entered into, do you see the date of the agreement?

A. Yes, sir.

Q. And what's the date?

A. January 1st, 2016.

THE COURT: So if you could lower that mic a little bit, so there's less feedback.

Thanks.

Q. And could we go to page ten of this?

And could you pull up services?

Do you see where it says "the company's primary objective is to develop products for the treatment of peripheral nerve pain, targets in the body below the neck?" Do you see that?

A. Yes.

Q. Was that the services you had been engaged to provide consulting with?

A. Yes.

Q. Take that down, please.

So in 2016, were you still engaged in the development of the Pink Stylet you were talking about before the break?

MS. FOLCH: Objection.

THE COURT: Overruled.

A. Yes, I was.

Q.  During that involvement, was it your understanding you were looking at SCS and PNS applications?

A.  Yes, sir.

Q.  And what objectives were you seeking through the creation of the Pink Stylet?

MS. FOLCH:  Objection.

THE COURT:  Sustained as to form.

What was the purpose of the Pink Stylet, in your mind?

MR. COHEN:  Thank you, Judge.

THE WITNESS:  Well, the Pink Stylet replaced a stiff steel stylet that is within the lead to stiffen it, make it more rigid, and allow it to be inserted and steered with authority to a particular location in the body, but once that's done, the steel stylet is withdrawn for the permanent configuration.  And so instead of inserting a separate antenna alongside the receiver electrode assembly, which would be another way to do it, there was an obvious opportunity to put a stylet, replacement stylet right inside it.  And that would have the additional advantages of stiffening and strengthening the lead, so that it would be less likely to kink, to collapse, to break, as sometimes happens over the years with these implants.  And it would also facilitate anchoring it, because a suture or sometimes a more elaborate structure is put around the lead to hold it still so that it won't migrate with the passage of time.

O31DPER3                         North - Direct

Q.   Does filling the lead achieve any other objectives?

          MS. FOLCH:  Objection.

          THE COURT:  Overruled.

A.   What was the --

Q.   Does filling the lumen --

A.   Filling?

Q.   Yeah.

A.   Oh, another advantage of doing that is that it reduces ingress of body fluid into the lead where they can get around the sensitive electronics.  Body fluids are basically like sea water, and it's corrosive.

Q.   What part, if any, of the Pink Stylet allows it to conduct the electricity?

          MS. FOLCH:  Objection.

          THE COURT:  Sustained.

Q.   Could you describe how the Pink Stylet acts?  You described a number of different functions; is that right, Doctor?

A.   Yes.

Q.   And one function you described was that it helps prevent fluid ingress; is that right?

A.   Yes.

Q.   And another on you described is it helps provide some stiffening and rigidity; is that correct?

A.   Yes.

          MS. FOLCH:  Objection.

O31DPER3                        North - Direct

THE COURT:  Overruled.

Q.  And I think a third function you described was that it also allows the power to be extended; is that right?

A.  Yes.

Q.  How does the Pink Stylet achieve the power extension?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  By conducting electricity.

Q.  Is it --

A.  It has --

Q.  Go ahead.  I'm sorry.

A.  The Pink Stylet has about 2 percent copper in it.  The rest is PEEK, which is plastic used in a lot of medical implants.

Q.  And if you were to take out the 2 percent copper, would it still conduct the power?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

THE WITNESS:  No.

Q.  If you took --

A.  Not significantly.

Q.  If you took out the 2 percent copper, would it still stiffen the lead and provide strength to it?

A.  Yes.

Q.  If you took out the copper, would it still provide fluid ingress?

O31DPER3                    North - Cross

        MS. FOLCH:  Objection.

        THE WITNESS:  Yes, it would --

        THE COURT:  Overruled.

A.  Well, it would reduce it, yes.

Q.  Okay.  I've got nothing further.

CROSS-EXAMINATION

BY MS. FOLCH:

Q.  Good morning, Dr. North.

A.  Good morning.

Q.  You testified that you invented the Pink Stylet?

A.  I was a co-inventor.

Q.  You were a co-inventor of the Pink Stylet; is that right?

A.  Yes.

Q.  You didn't invent the White Stylet, right?

A.  It had no color when I was involved in inventing it.

Q.  Dr. North, you invented the Pink Stylet, right?

        THE COURT:  So the stylet that you created --

        THE WITNESS:  Yes.

        THE COURT:  -- whatever color it was --

        THE WITNESS:  Yes.

        THE COURT:  -- it had 2 percent copper?

        THE WITNESS:  Yes.

        THE COURT:  Okay.  Good.  We're going to talk about
that one.

Q.  Dr. North, you recall getting questions on direct about the

O31DPER3                        North - Cross

stylet that you invented, right?

A.  My major contribution was to point out that a replacement stylet could be inserted after the steel one was withdrawn, with the electrode in place.

Q.  I understand.

A.  And it would serve all these functions, including as an antenna.

Q.  You invented --

A.  Color had nothing to do with it.

Q.  Understood.

Dr. North, you testified that you invented a stylet that had copper in it, right?

A.  I don't recall specifically limiting it to copper.

Q.  Dr. North, you were a consultant for Ms. Perryman, right?

A.  For the company.

Q.  And the company was run by Ms. Perryman; is that right?

A.  Yes.

Q.  She hired you, right?

A.  Yes.

Q.  And she signed the contract that we saw a moment ago, right?

A.  I believe so, yes.

Q.  That was back in 2013?

MR. COHEN:  Objection.

A.  No.

O31DPER3                         North - Cross

Q.   That was back in 2016?

A.   That was in 2016.

Q.   Right.  You've known her since 2013, though, right?

A.   Or maybe 2012, yes.

Q.   You've known Ms. Perryman since 2012?

A.   I believe so, yes.

Q.   And I believe you testified that you were listed on Stimwave's strategic advisory board; is that right?

         MR. COHEN:  Objection.

         THE COURT:  I don't know.

         THE WITNESS:  I don't know that I was listed, but the agreement that we saw I believe referred to the advisory board.

Q.   And you were listed on Stimwave's promotional materials, right?

A.   I'm not sure.  I might have been.

Q.   You were also an investor in Stimwave, right?

A.   I was not personally.  My wife was.

Q.   So your family invested under your wife's name, right?

A.   Yes.

Q.   You didn't want it to look like there was a conflict of interest, right?

A.   Would you repeat that?

Q.   You didn't want it to look like there was a conflict of interest if you invested in Stimwave, right?

         MR. COHEN:  Objection.

O31DPER3                          North - Cross

THE COURT:  Overruled.

A.  Well, I had a consulting agreement with another start-up neuromodulation company that was in place when I met Ms. Perryman, and that didn't allow me to have ownership interest in another company.

Q.  So you had your wife invest in Stimwave, right?

A.  Yes.

Q.  And you lost money on the Stimwave investment, correct?

A.  Yes.

Q.  And on January 21, 2021, Ms. Perryman contacted you and your wife, right?

A.  I don't recall that specific date.

Q.  Dr. North, Ms. Perryman, in January 2021, contacted you about a $35 million investment opportunity, right?

A.  I don't recall that.

MS. FOLCH:  Mr. Carbone, could we please pull up for the witness and counsel what's been marked for identification GX 1902?

Q.  Take a look at that, sir, and see if that refreshes your recollection about a $35 million investment opportunity brought by Ms. Perryman.

MR. COHEN:  Objection.

THE COURT:  Overruled.

Just read it to yourself.

A.  Okay.  Yes.

THE COURT:  Don't read it out loud.  Just read it to yourself.

Q.  Dr. North, Ms. Perryman --

THE COURT:  Now that you have read that document --

Q.  Now that you have read that document --

A.  Yes.

Q.  -- does it refresh your recollection about an ask for a $35 million investment?

Does it, Dr. North?

A.  Well, yes, the figure appears there, but --

THE COURT:  Excuse me.

THE WITNESS:  -- not referring to an investment on my wife's part or our part.

Q.  Dr. North --

We can take that down.

Dr. North, on January 21, 2021, Ms. Perryman contacted you to ask you for $100,000 in funding, correct?

MR. COHEN:  Objection.

THE WITNESS:  Well, I no --

THE COURT:  Overruled.

THE WITNESS:  -- longer have the exhibit in front of me, but I believe that was the amount, yes.

Q.  In January 2021, January 21, 2021, Ms. Perryman emailed you and your wife asking for $100,000 in funding, correct?

MR. COHEN:  Objection.

O31DPER3                      North - Cross

THE COURT:  Overruled.

A.  You've asked the same question, and I answered you.  Yes.
Yes.

Q.  She did?

A.  Yes.

Q.  Okay.  And on January 21, 2021, Ms. Perryman emailed you
about an investment opportunity for $35 million; is that right?

A.  No.  That was not an investment opportunity for me or my
wife.

Q.  Can we pull up GX 1902 again, please, just for the witness
and counsel?

        Dr. North, does that refresh --

A.  Yes, ma'am.

Q.  I'm sorry?

A.  Yes, ma'am.

Q.  Does that refresh your recollection as to whether
Ms. Perryman contacted you about a $35 million investment on
January 21, 2021?

A.  That's not what I see as the words on this paper.

Q.  Doctor, I'm not asking you about --

A.  It refers to a $35 million cap on a conversion, and then
two paragraphs later there's a reference --

        THE COURT:  So, Doctor --

        THE WITNESS:  Yes.

        THE COURT:  -- the document is not in evidence.  So

the issue is just --

THE WITNESS:  Yes.

THE COURT:  -- read it to yourself, and it either gives you a recollection of an event or it doesn't.  And feel free to say it doesn't.  If you have no recollection or you don't agree with the questioner, then you can just say no.

THE WITNESS:  Yes, your Honor.

Now, I recall this event, but I was mislead by a reference of $35 million.

MS. FOLCH:  You can take that down, Mr. Carbone.

Q.  I believe you testified Ms. Perryman did contact you on January 21, 2021, about a $35 million cap on a conversion; is that right?

MR. COHEN:  Objection.

THE COURT:  Sustained.

Q.  And on January 21, 2021, she contacted you about a $500,000 need for new funding; is that right?

A.  Yes.  Had they referred to it that way and mentioned the entities involved, then I would have been much more able to answer it immediately.

Q.  Thank you, Dr. North.

On that same communication on January 21st, 2021, Ms. Perryman asked you about moving money over from off-shore in the Bahamas; is that right?

A.  I would have to look at the exhibit again.

Q.  Can we bring up GX 1902, please, again, just for the witness and counsel?

Does that refresh your recollection, Dr. North?

A.  Well, it -- I don't see a reference to moving money from the Bahamas.  I see a reference to --

MR. COHEN:  Objection.

THE COURT:  Yes.

THE WITNESS:  -- keeping things under the old Bahamas infrastructure.

THE COURT:  So this is a distinction that we're making that may be hard to capture, but the document's not in evidence, so we don't read from it.  Okay?

So you're just to read it to yourself.

Let's take it off the screen.

MS. FOLCH:  Let's take it off the screen.

THE COURT:  Then having looked at the document --

BY MS. FOLCH:

Q.  Have you looked at the document, Dr. North?

A.  Yes.  I just looked at the document again.

Q.  Does it refresh your recollection as to whether Ms. Perryman communicated with you about moving money out from under the old Bahamas infrastructure?

A.  It refreshes my recollection that that was among the issues at the time.

Q.  Dr. North, you claim that you helped create the Pink Stylet

O31DPER3                    North - Cross

in 2016; is that right?

A.   It might have been earlier.  I think it was earlier, 2015, or maybe even 2014.

Q.   You claim that you helped create the Pink Stylet 2014, 2015, 2016, at some point in that range; is that right?

A.   Yes.

Q.   And you told defense counsel that you were a co-inventor of the Pink Stylet; is that right?

A.   Yes.

Q.   And the Pink Stylet was sold by 2017; is that right?

A.   I believe that's when it was approved, yes.

Q.   And Ms. Perryman got a patent for it, right?

A.   Perryman, LeBaron are the listed inventors on the patent.

(Continued on next page)

O314PER4                     North - Cross

Q.  Ms. Perryman, is one of the listed inventors in the patent for the Pink Stylet; right?

A.  Yes.

Q.  In 2021 she tried to add your name to that patent; right?

A.  Yes.

Q.  That was the patent for the Pink Stylet; right?

A.  Yes.

Q.  That was after Stimwave went under; right?

A.  That was not a single event, Stimwave going under.

Q.  But it was after -- it was after the bankruptcy; right?

A.  I'm not sure.  It was after she left Stimwave.

Q.  OK.  It was after she reached out to you about the hundred thousand dollars in the Bahamas; right?

A.  I don't know.  It was after I requested that may name be added as an inventor.

        MS. FOLCH:  @Let's look back at GX 1902 to make sure we get the dates right.  This is just for the witness and counsel.

Q.  Does this refresh your recollection as to the date Ms. Perryman communicated to you about moving $100,000 away from the Bahamas structure?

A.  Yes.

Q.  So that says January 20th, 2021; right?

A.  Yes, ma'am.

Q.  And we talked about Ms. Perryman trying to put you on the

O314PER4                        North - Cross

Pink Stylet; right?

A.  On the patent, yes.

        MS. FOLCH:  Could we pull up just for the witness and counsel, GX 1904, and if you turn to page 2.

Q.  Do you recognize this document, Dr. North?

A.  Yes.

Q.  What is it?

A.  This is a certificate, a form from the US patent office. It is used to correct the listing of inventors on a patent and it's signed by three of us, Ms. Perryman, Mr. LeBaron and myself.

Q.  And what's the date on it?

A.  2/2/21.

Q.  And it just says that --

        THE COURT:  This isn't in evidence yet.

        MS. FOLCH:  I'm sorry.  The government offers.

        MR. HARAN:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 1904 received in evidence)

Q.  So Dr. North this is a submission to add your name to the patent for the Pink Stylet; right?

A.  Yes.

Q.  And it just says that your name was just omitted in error; right?  That's the only justification it provides?

A.  OK.  Yes.  Well --

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

O314PER4                        North - Cross

Q.  Dr. North, that's the justification it provides; right?

A.  Yes, it's very brief, yes.

Q.  It's very brief; right?

A.  Yes.

Q.  And the date on it it's February 2, 2021; right?

A.  Yes.

Q.  And we just looked at the communication well, we just established right that Ms. Perryman asked you for $100,000 to be moved from the Bahamas January 20, 2021?

A.  On an entirely different matter, but yes it was near the same thing.

Q.  Right.  That's, what, 13 days before?

A.  If you say so.

          MS. FOLCH:  OK.  You can take this down.

Q.  Dr. North, you are aware that Stimwave recalled the White Stylet; correct?

A.  Yes, I have seen that.

Q.  And you received the notice that the White Stylet was recalled; right?

A.  I have seen information that it was recalled, yes.

          MS. FOLCH:  If we could pull up GX 1908.  I'm sorry, 1907 just for the witness and counsel.  I'm sorry.  Take this down.

Q.  Do you recall that Ms. Perryman contacted you about the recall of the White Stylet?

O314PER4                        North - Cross

A.  Not specifically, no.

          MS. FOLCH:  Could we you please pull up what's been marked for identification as GX 1907.

Q.  Do you recognize this document, Dr. North?

A.  Well, it's an email from my wife, forwarding an email that she received from Laura.

          MS. FOLCH:  The government offers GX 1907.

          MR. COHEN:  Objection.

          THE COURT:  Do you recognize this document?

          THE WITNESS:  I read this email, and it refers to an attachment, a PDF file.

          THE COURT:  But you recognize the email?

          THE WITNESS:  Yes.

          THE COURT:  Received.  The attachment is a separate issue.

          (Government's Exhibit 1907 received in evidence)

          MS. FOLCH:  Mr. Carbone, could we please pull up just for the witness and counsel, GX1 908.

Q.  Do you recognize this document, Dr. North?

          MS. FOLCH:  Mr. Carbone, if you could click through.

Q.  Do you recognize this document?

A.  I've seen this before, yes.

Q.  What is it?

A.  It is a recall notice and a form that would be sent out to practitioners.

Q.  And this was attached to the email that your wife sent you?

A.  I think so.  I think that's how I saw it.

MS. FOLCH:  The government offers GX 1908.

MR. COHEN:  Objection.  It's an email from a spouse.

THE COURT:  Excuse me, Counsel.

MR. COHEN:  Sorry.

THE COURT:  I'm going to reserve on this.  We will just take this one step at a time.

Ask your next question.

MS. FOLCH:  Mr. Carbone, if we could please pull GX 1907 back up.  And this is in evidence.

Q.  Dr. North, could you please read the first email that's being forwarded to you.  Who was that from?

A.  The first one?

Q.  The email that was being forwarded.

A.  That was being forwarded, yes.  So that's from Laura to my wife, Tatiana.

Q.  It's from Laura Perryman.  What's the date on that?

A.  8/19/20.

Q.  And what's the time on it?

A.  1:28 a.m.

Q.  And what's the subject?

A.  Forward, Stimwave recall undisclosed to investors.

Q.  So she's sending it to Tatiana Shine, that's your wife; right?

A.   Yes.

Q.   Sunil Panchal that's another investor and Gilbert Bao, another investor?

A.   He is or was with Micron Medical that was an affiliate of Stimwave.

Q.   And the attachment on there is called 2020/8/6, that's August 6, 2020, Stimwave recall notice.  Do you see that?

A.   Yes.

Q.   And then your wife, Tatiana Shine who receives the email from Ms. Perryman forwards it to you, Richard North; is that right?

A.   Yes.

MS. FOLCH:  The government offers this document into evidence.

THE COURT:  Well, this email is in evidence.

MS. FOLCH:  Sorry.  Yes.

Q.   Dr. North, we've just established the attachment to this email is called Stimwave recall notice?

A.   Yes.

Q.   And it's being with sent to your wife Tatiana Shine?

A.   Yes.

THE COURT:  Counsel, you laid a foundation for the attachment being received through the answers already given. I'm reserving the decision for other reasons, so go to your next series of questions.

Q.  Dr. North, we established that you were familiar with the recall of the White Stylet; right?

A.  I recall seeing this, yes.

Q.  And --

A.  Although specifically --

THE COURT:  Just answer the question.

A.  You said specifically the White Stylet.  I saw --

Q.  Dr. North, I'm just asking you about your familiarity with the recall.  I think you already established that.  So I'm asking now, my other question is, you are aware, correct, that the recall was justified in -- the recall stated that the White Stylet was a nonfunctioning component of the PNS device; correct?

A.  Would you put that up again, please.

THE COURT:  You may show him the passage to which he is referring.

MS. FOLCH:  If we could please pull up GX 1908.

Mr. Carbone, if you could go to the next page.  The one after that.

Q.  If you could look at the final paragraph.  Pull that up, and the bold writing.

THE COURT:  Just read that to yourself.

A.  OK.

Q.  Does that refresh your recollection, Dr. North, that the recall notice referred to the White Stylet as a nonfunctioning

O314PER4                       North - Redirect

component of the device, meaning the PNS device?

A.   Yes.

          MR. COHEN:  Objection.

          THE COURT:  Overruled.

          MS. FOLCH:  If I could have a moment.

          Mr. Carbone, if we could please pull GX 1907 back up.

Q.   Dr. North, I remind you this is the email forwarding the recall notice.  Again, who was it that sent your wife the email originally?

A.   It was from Laura Perryman.

Q.   And the subject was Stimwave recall undisclosed to investors; right?

A.   Yes, I took that to be the point of the message that was sent.

Q.   And all that Ms. Perryman said was all products include receivers built into the body the device; correct?

A.   Well, yes.

Q.   Is that what the email said.

A.   Yes, those are the word on the paper.

Q.   Thank you, Dr. North.

A.   This whole thing is utterly clueless, in my humble opinion.

Q.   Thank you, Dr. North.

          THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. COHEN:

Q.  Dr. North, how many patents have you been part of in your career?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  35 or so.

Q.  And what was your title at John's Hopkins?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  Professor of neurosurgery, anesthesiology, and critical care medicine.

Q.  And have you served in any professional associations?

A.  Oh, yes.

Q.  Could you name a few?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  The American Association of Neurological Surgeons, Congress of Neurological surgeons, American Academy of Pain Medicine, North American Neuromodulation Society, International Neuromodulation Society.  There are a great many.

Q.  Have you written in the area of peripheral nerve stimulation?

A.  Yes.

MS. FOLCH:  Objection.

THE COURT:  Overruled.

Q.  Have you presented in the area of peripheral nerve

O314PER4                        North - Redirect

stimulation?

A.  Yes.

Q.  Have you presented in the United States on peripheral nerve stimulation?

A.  Yes.

Q.  Have you presented around the world on it?

A.  Yes.

Q.  The prosecutor asked you a number of questions about a request for an investment.  Do you recall that?

A.  Yes.

Q.  Do you recall that she then asked you about its relation to the request to correct the patent?

A.  I took it that she was trying to make such a connection, yes.

Q.  Is there a connection?

A.  No.

Q.  Did you have some sort of side deal with Laura Perryman?

          MS. FOLCH:  Objection.

          THE COURT:  Overruled.

Q.  Did you have a side deal with Laura Perryman with regard to putting your name on the patent?

A.  No.

Q.  Did you have any sort of side deal with Laura Perryman with regard to your testimony?

          MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  No.

MR. COHEN:  Could we pull up Government Number 1907 in evidence, Mr. Carbone.  I've been dying to say it.  Could we pull up what Laura Perryman says there.

Q.  All products include receivers built into the body of the device.  Do you see that?

A.  Yes.

Q.  Is that consistent with your understanding of the device?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

A.  Yes, that there is a receiver built.

Q.  Right into the device itself?

A.  Yes.  This is a major are innovation.

MR. COHEN:  Can we go up to the top email, if you just get, Mr. Carbone.

Q.  Tatiana Shine, what's her message to you there?

MS. FOLCH:  Objection.

THE COURT:  Overruled.

Q.  The email, what's her email to you?

A.  My wife's message to me?

Q.  Yes.

A.  It says, I love you.

MR. COHEN:  We can take that down.

Q.  Do you recall some questions you were just asked with

regard to the recall notice?  Do you remember being asked just now by the prosecutor about the recall notice?

A.  Of course.

Q.  And do you recall the prosecutor asking you specifically if the recall notice referred to the White Stylet as a nonfunctioning component?

A.  Yes.

Q.  Is that your opinion, sir?

        MS. FOLCH:  Objection.

        THE COURT:  Overruled.

A.  As I testified earlier, it has a number of functions besides being an antenna because it is a stylet.

Q.  And what are those functions?

A.  Like the steel stylet that starts off in the same position, it stiffens the lead, and it resists collapse of the lead, kinking of the lead.  Is it stabilizes it to facility anchorage so it won't move.  And it occupies the lumen and reduces ingress of fluids.

Q.  In your view, would you refer to the White Stylet as a --

        THE COURT:  I'm sorry.  This is not about the White Stylet.  His testimony is about the Pink Stylet performing these functions.

        MR. COHEN:  Nothing further.

        THE COURT:  Am I right, Counsel?

        MR. COHEN:  Nothing further.

O314PER4                    North - Redirect

THE COURT:  Any recross?

MS. FOLCH:  Nothing further, your Honor.

THE COURT:  You may step down.

Mr. Cohen?

MR. COHEN:  May I have one moment, your Honor.

The defense rests.

THE COURT:  Ladies and gentlemen, there is one evidentiary issue that I have to address with counsel that we've been talking about during the day.  But with that one issue aside, the evidence in the case is closed.

So this is our plan, we'll meet together with you, 9:30 Monday morning.  And we will have, what are called closing statements or summations from counsel.  There will be three of them.  Why three?  The burden is on the government to prove guilt beyond a reasonable doubt.  So the government sums up first.  Defense counsel has an opportunity to give a summation, and then the government can give a brief reply.  After that I will give you my charge as to the law, and you will begin your deliberations.

Now, it's so important that you not discuss this case.  Don't discuss it with anyone in your family, friends, anyone else.  Don't do any research about this case.  Don't update your status on some social networking product.  Come back to us on Monday the way you are leaving us today with that set of knowledge and nothing more.  And don't even discuss it with

O314PER4                    North – Redirect

each other until I instruct you that you may begin your

deliberations.  And with that, I wish you a good weekend.

Thank you.

            (Continued on next page)

(Jury not present)

THE COURT:  So I reserved on the recall notice because I did not know how much material was in there that should be excluded for purposes entirely irrelevant to the issues of this trial.

Mr. Cohen?

MR. COHEN:  Your Honor, I think it is hearsay.  Also we would object on -- it's part of a spousal communication.  We think the whole things was improper.  It was forwarded from his wife to him.  That whole communication should be privileged.  Literally she is saying I love you.  Whatever else is going on in their discussion shouldn't be a part of this.  We ask that it be stricken.

THE COURT:  OK.  I certainly haven't thought about the spousal privilege in connection with the email.  I'm not sure it would cover anyway what was forwarded to him, but I'll reflect on that.  And if counsel have any legal authority to give to me by tomorrow, I will look at it further, but I think the government inquired of the witness the reason for, as far as it was concerned, for getting the recall notice in, and I don't need to receive the recall notice itself.

Am I right as far as the government is concerned.

MS. FOLCH:  Yes, your Honor.

THE COURT:  So we are not going to receive the recall notice into evidence.  I don't think I need to tell the jury

that because I did not receive it into evidence while they were here.  So as far as they know, it is not received into evidence.  So the other issue I'm aware of -- I need to make a note to myself about spousal privilege.  The other issue I'm aware that is open is the redactions to the Arcos material.

MR. COHEN:  Dr. Dann.

THE COURT:  I'm sorry, Dr. Dann.  Thank you.

MR. COHEN:  Can I just address it while your Honor is considering?  I just want to try to make what we were trying to do in context.

THE COURT:  Well, give me a little credit here.  I've already said that some of your objections are well taken in my little mark ups.  So --

MR. COHEN:  I didn't know that.

THE COURT:  OK.  But I am, I think, aware of what you might be saying to me, Mr. Cohen.

MR. COHEN:  Thank you, Judge.

THE COURT:  So why don't I describe what I did already to narrow the issues, and as I mentioned I haven't read the passage yet.  I'm looking at page 1555.  I would strike the sentence that -- before I do that, let me describe what I'm doing.  The government's request to strike are in yellow. Where there is no green I assume there is consent.  So what I have focused on is where there is green, that is where the defendant requests that I not strike the material.

So far the first request from the defendant to maintain testimony is on page 1555 line 17, the question, I'm sorry, the statement "I also had spent about 20 years."  I would not strike that material.

There is the next sentence that begins at line 20. "So I developed a certain expertise."  I would strike that sentence.

The next passage with green markings is on page 1557 beginning at line 14.  I would keep that material including up to the first two lines on page 1558.

The next passage in dispute is at page 1559 to 60, beginning at line 25 on page 1559 and concluding at line 7 on page 1560.  I would strike that material.

Page 1561, lines 11 to 19, there is a dispute.  I would strike that material.

On page 1563 there is a dispute between the parties regarding material at line 9 through line 25.  I would include -- I would reject the government's request with respect to lines 18 to 22 and otherwise grant the government's request. Now, there is a lot of colloquy in there.  So that's not all testimony.

So counsel, you have seen my preliminary rulings.  OK. Why don't we do this, why don't I give you the draft jury charge, which we will mark as a court exhibit.  Why don't we break for lunch.  I'm going to see you at 2:00.  You will have

an opportunity to discuss Dr. Dann's testimony further with me at 2:00, and we will have a charging conference.

Is there any other requests, Mr. Kochevar?

MR. KOCHEVAR:  I just want to flag, I anticipate we will be moving to strike portions of Dr. North's testimony as well because he was opining at length about the White Stylet and defense counsel was asking him questions about the White Stylet.  At the end your Honor said you were talking about the Pink Stylet.  That was not my understanding of the questions asked or answers given, and I understood that not to be in the appropriate scope of his testimony.  So we will clarify that when we look at the transcript.  But I think we are going to have that motion, and I want to flag that because it just happened.

MR. COHEN:  Your Honor, the door was kicked open by the prosecutor showing the document and showing hearsay to him and eliciting to him his reaction to a document that said it was a nonfunctioning component of the device, and I was asking him his opinion on that document that they opened the door on.

THE COURT:  So the government in its cross-examination regarding the recall used that, in my view, properly to try to impeach the witness.  But the issue is to what extent that opened the door for testimony about the White Stylet.  And I'm going to look at those pages, and I'll hear the government and counsel at 2:00 on any motion to strike passages from the last

O314PER4                    North - Redirect

witness' testimony.  Thank you.

Did you need me to address something else right now, Mr. Kochevar?

MR. KOCHEVAR:  We may not be able to get the transcript to talk to you at 2:00 p.m. in detail about this. We get it at night.  I think there is going to be questions of what he was asked on direct as well, so we need to be able to see all of that to make those arguments.  The Court may have live stream, I don't think we have it is what I'm saying.

THE COURT:  OK.  Hold on one second.  I think that Mr. Whertvine may be able to assist counsel.

MR. KOCHEVAR:  Thank you so much.

THE COURT:  See you at 2:00.  Have a good lunch.

Oh, wait, we need to give you the document.  So we are giving you a draft of the jury charge and the verdict form. And we are about to mark those as court exhibits.

THE DEPUTY CLERK:  Court Exhibit 6 for the draft jury charge and 7 for the draft verdict.

THE COURT:  Thanks so much, Counsel.

(Lunch recess)

(Continued on next page)

O31DPER5

AFTERNOON SESSION

2:00 p.m.

(In open court; jury not present)

THE COURT:  Please be seated.

Let's start with the jury charge, and then we'll turn to the remaining evidentiary issues.

Does the government have any requests with respect to the jury charge and, if so, what page do you wish me to turn to?

MR. KOCHEVAR:  Yes, your Honor.  Taking it in order, the first is at page 33.

THE COURT:  Please stand.

MR. KOCHEVAR:  Oh, I apologize.

At page 33, Count 3, securities fraud, first element material.  We would request the addition of a sentence, matters that are "material may also include fraudulent half-truths or omissions of material fact."

THE COURT:  Could you dictate that more slowly, please?

MR. KOCHEVAR:  I'm sorry.  Yes.  Matters that are "material may also include --

THE COURT:  Slow down.

MR. KOCHEVAR:  May also include fraudulent half-truths or omissions of material --

THE COURT:  Slow down.

O31DPER5

Okay.

MR. KOCHEVAR:  -- fact.

MR. COHEN:  Your Honor, can we be heard on this?

THE COURT:  Hold on.

So, counsel, I think --

Then of course, Mr. Cohen, I'll give you a chance to be heard, and the government as well.

What I propose to do is change the first sentence.  So that sentence reads, in the securities fraud context, and instead of using the word "information," the sentence would be revised to read as follows:  "In the securities fraud context, statements or omissions may be material."  And leave it at that.

MR. KOCHEVAR:  No objection from the government. Thank you.

MR. COHEN:  Your Honor, we would object.  We think that that would conflate the materiality component with the falsity component, which is covered in the proposed instruction before it, which specifically states, "deceitful statements or half-truths or concealment of material facts and the expression of an opinion not honestly entertained may also constitute false or fraudulent statements."

So we think that that -- it would be a conflating of two different elements, one, the falsity component, and, one, the materiality component.

O31DPER5

THE COURT:  Okay.  So I was going to say something longer, which was to repeat the phrase, and I'm happy to do that.  Instead of the phrase "information," repeat the phrase from the preceding page.

So it would read, "in securities fraud context, deceitful statements or half-truths or concealed facts or the expression of opinions not honestly entertained may be material."

MR. COHEN:  Obviously that would be worse from our perspective, not better.  So we don't think you should do either one, but if you're going to do one, we would prefer the first proposal that your Honor suggested.

THE COURT:  Okay.

Next, from the government.

MR. KOCHEVAR:  With respect to the good faith defense charge at pages 43 and 44, we have three points to make.  The first is that it sort of appears that two of the paragraphs may be slightly repetitive.  I'm not sure if the Court intended to provide slightly different instructions on good faith defense with respect to Count 3, the securities fraud, and Count 2, the health care fraud charge.  It sort of reads that way, but I'm not sure.

And I think we had initially proposed having just sort of one of the second or third paragraphs, which seems to be the substance of the charge.  I think if that consideration --

O31DPER5

depending on if that consideration is accepted or not, we have specific proposals regarding the language, including --

THE COURT:  So, just assume it's going to stay as it is.  Do you want me to change any language?

MR. KOCHEVAR:  Yes.  So we would request the removal of the sentence, "however misleading or deceptive."

THE COURT:  Where?

MR. KOCHEVAR:  I'm sorry.  At page 43, in the second paragraph, the fourth sentence down.

THE COURT:  Okay.  I think that's -- I have your objection.

MR. KOCHEVAR:  Okay.

THE COURT:  I'm going to check the cases from which -- I'm not going to --

MR. KOCHEVAR:  Yes, I would just --

THE COURT:  I think the cases that are principally relied on here, with the Supreme Court case *Hochfelder*, and the Second Circuit case *Scully*, but we are going to check, and, again, your objection is to the "however misleading or deceptive a plan may be?"

MR. KOCHEVAR:  Yes.

THE COURT:  Next.

MR. KOCHEVAR:  We would propose the addition of language that's basically taking from the government's proposed charge at page 34.  I can read it out if you'd like.  Let me

O31DPER5

know how slowly or fast in the first instance I should just read it or --

THE COURT:  I think I have your requests.  Let me pull them --

MR. KOCHEVAR:  And in connection with this --

THE COURT:  Hold on.

MR. KOCHEVAR:  Okay.

THE COURT:  What page?  Thirty-four.

MR. KOCHEVAR:  Thirty-four.

THE COURT:  Okay.  I'm going to interrupt this proceeding.  You can stay right where you are.

(Recess taken)

THE COURT:  Returning to the trial, I'm on page 34. Where should I look?

MR. KOCHEVAR:  The second and the third paragraphs, but mainly the second paragraph.

THE COURT:  What do you want me to include?

MR. KOCHEVAR:  Both sentences, but particularly the second sentences of the second paragraph we would ask be included.  We also have a --

THE COURT:  Counsel, can you read slowly what you would like to be included?

MR. KOCHEVAR:  Yes.

THE COURT:  Is it the entirety of the second paragraph on page 34 or something else?

O31DPER5

MR. KOCHEVAR:  The entirety of the second paragraph.

THE COURT:  So the paragraph beginning "in considering whether or not."

MR. KOCHEVAR:  Yes.  Or, I'm sorry.  One moment.

MR. HARAN:  Your Honor, I'm sorry.  This is the "in considering paragraph?"

THE COURT:  The second paragraph on page 34, beginning "in considering whether or not."

MR. HARAN:  Yes.  Thank you.

MR. KOCHEVAR:  I apologize.  I actually think the third paragraph captures more of what our concern is here, but really both of those, I think the point is that -- and we have an example, a recent example charge if helpful to hold up that there is often language included sort of about the limits of the good faith defense and what the outer limit of that is.  And I think some addition of language like that would be --

THE COURT:  Do you have a Second Circuit case you'd like me to look at?

MR. KOCHEVAR:  I'm sorry.

THE COURT:  I don't see one cited.

MR. KOCHEVAR:  You're right.  I don't see a Second Circuit case cited there.  What we were mainly looking at is other jury charges from the district court.  If it's helpful, we can look for a Second Circuit site.

THE COURT:  Okay.  Let me just read this material.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O31DPER5

One moment.

I can see that the substance of the material on page 34 of the government's request is not captured by my charge. This request reminds me of circumstances in which fraudulent activity is engaged in, but the defendant expects that the victim of the fraud will not ultimately be harmed as in suffering -- usually by suffering any financial loss.  And I'm reminded of cases, I think one of them from the Second Circuit was *Resmondo*, and I think that is still good law.

So I'll look at this, and we have time for me to try to fashion something from the law that captures this.

MR. KOCHEVAR:  And if your Honor may allow, we can hand up *U.S. v. Guiler*, which I think had a little bit more on point language.  I can --

THE COURT:  Is that a Second Circuit case?

MR. KOCHEVAR:  No.  It's a charge from Judge Engelmayer in 2022.

THE COURT:  Great.  So provide it to counsel and to me.

MR. KOCHEVAR:  Okay.

THE COURT:  You can do that later today.

MR. KOCHEVAR:  Okay.  Thank you.

THE COURT:  Next.

MR. KOCHEVAR:  The government requests the addition of a standard charge about preparation of witnesses.  The defense

O31DPER5

has repeatedly in cross-examination brought up that issue, and we believe it's appropriate in light of the record to have just I think, you know, the standard instruction on that.  It was included in the government's proposal starting at page 51, request number 21.

THE COURT:  Okay.

MR. KOCHEVAR:  And then the final point is a fairly minor one, but at page 45 in the venue section --

THE COURT:  Yes.

MR. KOCHEVAR:  -- at the one, two, third paragraph, which I believe is just one sentence, the third line in, we would request and say, by sending to or receiving from or -- I'm sorry.  We basically want to add in there, capture the idea of receiving a communication sent from the Southern District of New York.  Right now it sort of sounds like by --

THE COURT:  I think a line was dropped here.  You're talking about the conspiracy charge?

MR. KOCHEVAR:  No.  I'm sorry.  I'm at page 4.

THE COURT:  Became -- I'm sorry, paragraph three on page 45.

MR. KOCHEVAR:  Yes.

THE COURT:  Thank you.

MR. KOCHEVAR:  Oh, I'm sorry.  Yes, it is the conspiracy charge.  I'm sorry.  Yes.

THE COURT:  So, you want it to be changed to read, "by

O31DPER5

sending a communication to this district, by telephone, mail or wire, in furtherance of the conspiracy, or by causing a communication to be sent from this district in furtherance of the conspiracy?"

MR. KOCHEVAR:  Yes.  I think that would work.  Or we were also trying to capture the idea of if a communication is sent from here and received by the defendant elsewhere, but I believe I guess that's captured by what your Honor is proposing.

THE COURT:  So the clause would read, "by sending a communication to this district, by telephone, mail, or wire, in furtherance of the conspiracy, or by causing a communication to be sent from this district, in furtherance of the conspiracy?"

MR. KOCHEVAR:  Yes, your Honor.  Thank you.

THE COURT:  Anything else?

MR. KOCHEVAR:  No, that's all from the government.  Thank you.

THE COURT:  Mr. Cohen.

MR. COHEN:  Your Honor, I will just address some of these if I may.

THE COURT:  Mr. Haran.  Thank you.

MR. HARAN:  Thank you.  On the good faith instruction, your Honor --

THE COURT:  So let's go to the page again.

MR. HARAN:  Okay.

O31DPER5

THE COURT:  Sorry.

MR. HARAN:  That's okay.

THE COURT:  Page 43.

MR. HARAN:  Page 43.  I was simply going to say that we'd ask that your Honor keep your language, which we think accurately states the law.  You've used it before and it works, so we request that you stick with it.

THE COURT:  Okay.  So let me just say, with respect to individual pages, if I make any material changes, I'm going to send them to counsel.  So you'll have another opportunity to object on Monday morning or request a further change.  This could be anything material.  I mean, if I change punctuation or see a typo, I'm not doing it, right.

You're nodding.  Thank you.

MR. COHEN:  Yes, your Honor.  Thank you.

MR. HARAN:  On page 41 there's a conscious avoidance charge.  We don't think it's appropriate here.  We don't think it should be given.  None of the government's theory in this case was that the defendant consciously avoided knowing there was a scheme.  In fact, their entire theory of the case was the defendant was the leader of the scheme; that she got on the phone with sales reps and told them, there's copper in it, even if you can't see it; she met with physicians; specifically lied to physicians that she was the one who started the entire thing by walking into the room back in 2017 by saying, we need a new

O31DPER5

component in order to fool everybody to sort of pay for our device.  So we just don't think a conscious avoidance charge has anyplace in the case, your Honor.

MR. KOCHEVAR:  This charge is particularly important in light of the coding issue in this case, which has in many ways been put at issue by the defense.  They appear to be putting forward this idea that at some point the defendant -- if, in fact, their theory is based on, we've talked about it in theory with Dr. Dann and so forth, the defendant was sort of weakly trying to -- not weakly, but gently or in a very limited way perhaps get some consultation on coding from, for instance, people in unrelated -- a urologist, or something like that.

We think if that's where the defense is going, and other evidence points in that direction of the case, that they appear -- or they appear to be framing that way, we think a conscious avoidance instruction is important on that point, to the extent the defendant is saying I didn't know anything about the coding or something like that.

The key point, though, and I apologize for not leading with this, defense has said basically, she's CEO, and their company got bigger, there were all these people doing different things.  And the conscious avoidance instruction is important on that point as well, the idea that if the defendant CEO was sort of looking away, turning the other way, as, you know, people did things, I think that is why the conscious avoidance

O31DPER5

charge is appropriate.  Specifically with respect to Mr. Andresen.

THE COURT:  So, I am going to give this charge.  The government certainly is pursuing the case that the defendant designed the fraud, that the coding issue and the use of the White Stylet and calling it a receiver was at the heart of the fraud, because it permitted a flow of funds that would support the expansion of the business by encouraging use of the PNS device even when the Pink Stylet could not be used.  And it permitted billing under the NI -- and I'm so sorry I can recite this number, the 64590 code could be used.

That's certainly the government's principal argument, that she designed this and ran this and controlled it, and that she controlled, in minute detail, the operations of the company.  A defense here has been, however, that she's the CEO, that she had other people in charge of a variety of functions, she had somebody in charge of quality control, somebody in charge of training, somebody in charge of reimbursement, somebody in charge of engineering.  She was busy, and she wasn't even present during all the trainings.  And the principal training with respect to coding was done by somebody else.  The principal training with respect to engineering and design was done by somebody else, that Mr. Andresen was a principal wrongdoer here, nobody liked him, he wasn't trusted, he wasn't invited to go to the new company with the defendant,

O31DPER5

he's the fraudster.  And so the government has tried to, through its questioning of witnesses and its development of evidence, put forth also a conscious avoidance defense, and so I think this charge is appropriate.

Next.

MR. HARAN:  May I just be two sentences on that, your Honor?

THE COURT:  I think I heard you.

MR. HARAN:  Okay.  Thank you.

On the misbranding charge, could --

THE COURT:  Oh, yes.  You see.  I hope you see.  I hope the bolding --

MR. HARAN:  We certainly noticed, your Honor.

THE COURT:  Okay.  Yes.  I bolded this -- we're on page 58 -- because I'm not sure this should be here at all, and I wanted to make sure that I flagged it for counsel.

So, Mr. Haran, what's your view?

MR. HARAN:  Yeah.  Our view is we don't think it has anyplace in the case for a variety of reasons.  It would be government sort of started to first float the misbranding instruction in the context pretrial of they were going to seek to elicit testimony from a FDA witness about the various -- the enforcement regime for misbranding.  They didn't call anyone from the FDA.  They didn't charge misbranding or mislabeling.  They could have charged that the securities fraud took place,

O31DPER5

because there was -- the device was mislabeled, yet she hid that from them.  There's nothing about they didn't -- there's nothing about misbranding or mislabeling in the indictment.

We think this charge, if you look at it, I think you can see it sort of -- it kind of says, to the extent it's relevant -- but I think that's going to be nothing more than confuse the jury, because we would submit it sort of raises more questions than it answers with respect to, you know, why it's --

THE COURT:  So I actually thought this was more the defense.  In part it's been, to my mind, something that's been argued to me for a long time by the defendant, that this is just a pure misbranding case, and I think there was some questions that I'm not sure got elicited information, because I think there were objections to it, to those questions, about, hey, all you had to do was change the label and not call it a receiver, and then we're just fine, because it had this other functionality.  So there was no harm, no foul.  It's just a little labeling problem.

So are you telling me that there is going to be no argument in the defense summation about this was just a labeling issue?

MR. HARAN:  Your Honor -- well, I think I'll make -- if I could make one point, and then Mr. Cohen will be handling the summation.

O31DPER5

THE COURT:  Okay.

MR. HARAN:  But the real problem here is this is a variance.  This would be a variance from the indictment.

THE COURT:  No, I'm not charging -- it's one of the three counts on which they can convict the defendant.

MR. HARAN:  If the case had been indicted as a misbranding case or as misbranding or mislabeling was part of the securities fraud count, we would have defended that differently -- we would have defended the case a different way.

THE COURT:  This charge is in here because of what I heard the defendants doing, not because of what I heard the government doing.  So I need to know if the defendant is going to be arguing something about labeling and this is just a labeling problem.

MR. COHEN:  Well, I think in part it depends on what the government's arguing.  If the government's going to rely on the fact that the labels were misbranded, then I'm going to have to respond to that.

THE COURT:  Well, there's no surprise here that the government's theory depends on the following:  That the White Stylet was labeled as a receiver, and because of that, or in connection with that, 5490 was used for reimbursement.

So assume that's going to be argued by the --

MR. COHEN:  Then I would have to respond, but I think there's two issues.  The other issue is they essentially want

O31DPER5

to give a full instruction on the elements of the crime, of misbranding that talks about deemed misbranded, in determining whether it's misbranded -- it really invites the jury in a way that I think is unfair and incorrect in this context to weigh in on whether they believe something was mislabeled.

Sure, it says at the beginning that the defendant has not been charged with a crime, but then it goes on and is going to charge them on mislabeling -- or misbranding, rather, on the same way it's going to hear these substantive counts of this indictment. And so to the extent your Honor feels there needs to be something on misbranding, then I think we need to -- and maybe we would ask for the opportunity to put something shorter in. It doesn't read like it's a charge -- like the other charges that they're being asked to consider. This I think is going to confuse the jury, and it's highly prejudicial.

It would essentially be a jury charge one would give if, in fact, she were charged with misbranding.

THE COURT: Well, you're right. It's the law. So my effort was to give a description of the law in the charge in anticipation that the defense summation would relate to a theme that the defendant has introduced at this trial through its examination of witnesses, that this is nothing more than a simple mislabeling issue.

Of course I think, in fairness, reading this charge, you'd know you couldn't convict the defendant of the first

O31DPER5

three counts because they found it was simply a misbranding problem.  This misbranding charge isn't even in the part of the charge that discusses the elements of the crime -- or the crimes.  It's just there because I anticipate the jury's going to need to understand what this is legally, because I anticipate it's going to be part of the summation arguments, particularly by the defendant, and what I'm hearing is I'm right.

MR. COHEN:  I think you are.  I think your Honor's recitation sounded like a pretty good part of the closing, yes.

THE COURT:  Okay.

MR. COHEN:  Yes.  I think you're right on that, but I would ask, would your Honor allow us at least the ability to put in a substitute for your Honor's consideration on this issue just because that captures what your Honor is trying to capture without it having be read as though it's a charge that's under consideration.

THE COURT:  Absolutely.  You'll be -- we'll talk about a schedule for any further submissions.

MR. COHEN:  Okay.  Thank you, your Honor.  I understand.

THE COURT:  Does the government want this in or not?  If the government doesn't want it in, I guess both sides don't want it in.

MR. KOCHEVAR:  No.  The government would like it

O31DPER5

included for the reasons stated.

THE COURT:  Okay.  I'm going to, at a minimum, unbold the heading.

MR. COHEN:  No objection.  No objection.

MR. HARAN:  We'll remember.

THE COURT:  Next, Mr. Haran.

MR. HARAN:  I think that's it for us, your Honor.

THE COURT:  So let's turn back to page 43.

I'm afraid I created the problem here when the Second Circuit affirmed me in *United States v. Dupre*, 462 F.3d 139. Obviously I'm going to look at the government's request on page 34, but part of the charge I gave in the *Dupre* charge was however misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith.

So we'll keep that in mind as we look at the good faith charge again.

MR. COHEN:  Your Honor, could I ask a question about closing?

I know your Honor gave a reference to the jury charge instructions during summations, and I just want to make sure I understand the Court's parameters on it.  Are we okay referring to the language in it as long as we don't refer to it as the instruction itself?  In other words, you're going to hear from the Court X, Y, and Z.  But, for instance, could we say, evidence shows she was acting in good faith because of X, Y,

O31DPER5

and Z?

THE COURT:  Please do.

MR. COHEN:  All right.  As long as we don't reference the jury --

THE COURT:  Right.

MR. COHEN:  The judge is going to instruct you this.

THE COURT:  Yes.

MR. COHEN:  Okay.

THE COURT:  I expect you to address very much so, was this conduct done knowingly?  Was this done intentionally?  Was it done in good faith?

MR. COHEN:  Okay.  I just wanted to make sure I didn't run afoul and we have nice, smooth summations.

THE COURT:  Good.

How do you know the Southern District of New York was involved in this activity?

MR. COHEN:  Okay.  Fair enough.  Thank you.

THE COURT:  Yes.  So I think we are now in clean up mode with respect to Dr. Dann.  I gave you my preliminary rulings of what was in and what was out before the break.

Any further objections?

MR. KOCHEVAR:  For Dr. Dann, we are okay -- I'm sorry.  I was confused.  There's the Dr. North issues as well, but I think with Dr. Dann we don't have further concerns.  Thank you.

THE COURT:  Okay.  Is the defendant -- are the rulings

O31DPER5

I outlined before the lunch break with respect to Dr. Dann's testimony agreeable to the defendant?

MR. COHEN:  Yes, your Honor.  That's fine.  Thank you.

THE COURT:  Okay.  For clarity of the record, I'm going to issue a little order striking page, line, from here to there, so you can all confirm what's in and out and know that before your summations.

MR. COHEN:  Thank you.

How was the Court planning to inform the jury about that?

THE COURT:  Well, as you know, I told the jury there were a couple little open issues.

MR. COHEN:  Okay.

THE COURT:  So when we get done, and I think it's Dr. Dann and also Dr. North, when we get done with what we're going to do today, then we'll talk about how I inform the jury of that.

MR. COHEN:  Okay.

THE COURT:  So they know what the record is.

MR. COHEN:  So we'll talk about that later?

THE COURT:  Yes, in just a moment hopefully.

MR. COHEN:  Okay.  Thank you, your Honor.

THE COURT:  So with respect to Dr. Dann, to just --
I'm sorry, Dr. North, to just get us organized, I think there were two issues:  The marital privilege issue and whether

anything is required.  And I think the government may potentially move to strike something if I remember correctly, because of defense counsel's redirect, and the discussion of the Pink and White Stylet.

So Mr. Whertvine was kind enough I think to give you the rough draft, realtime transcript, so we could all look at the material together.  Let me tell you what I understand about the marital privilege issue, and, again, I'm happy to take legal assistance on this issue.  I'd like to think about these issues as if we did not have an internet and email functionality in our lives.

So, back in the day of a simpler age, if an envelope had been handed to Dr. North's wife that contained a written submission with an attachment, and she had passed that envelope on to her husband, could the government inquire of Dr. North did he open the envelope, did he look in the message, did he read the attachment?  And I don't think any of that involves or implicates the marital privilege.  I think the marital privilege concerns communications of substance between a husband and wife.

As I think I've already admitted on the record, I didn't think about the marital privilege as this testimony was coming in I'm sorry to say, but I think partly I didn't think about it because the substance of the email was clearly not the communication between the husband and the wife.  It was what

O31DPER5

was forwarded and what had been received by the wife from a third party.

So, one, my legal analysis is right or wrong, and you can help inform me about that. I don't know if you've already researched it or if you'd like the opportunity, but assuming it is right, I actually don't know that we need to do anything. I think the amount of marital communication that would be protected by the privilege is heartwarming, but minimal. It was one phrase that was beautiful to receive by Dr. North, but not substantive.

But if anybody has a different analysis or an application to make on that issue, I'll hear you.

MR. COHEN: We understand the Court's view. If we see something different, we'll bring it back to the Court's attention, but otherwise we'll assume the Court's ruling will stand.

MR. KOCHEVAR: Yes. No -- I think the Court is correct on this. Thank you.

THE COURT: Okay. So I think we're down to, may I hesitate to say, one remaining issue?

MR. COHEN: Who knows, and the defense might have one more issue when we're done.

THE COURT: Okay.

MR. COHEN: I don't want to --

THE COURT: Okay.

O31DPER5

MR. COHEN:  Thank you.

THE COURT:  I won't start to relax too soon.

MR. COHEN:  I know.  We are ahead of schedule, though.

THE COURT:  So Dr. North was not declared as an expert in this case.  He is here as a fact witness.  There was no foundation that I was aware of that would permit him to discuss the White Stylet.  My understanding was that that was invented, or perhaps the better word is created, and made part of Stimwave's product package, part of the kit, at a point in time after the Pink Stylet had been invented, and that there is no indication that Dr. North was consulted with respect to the creation of the White Stylet.

I permitted Dr. North to testify about his role in creating the Pink Stylet.  I think we all know he'd talk about his functionality as the purposes he viewed it as serving, which certainly supports the defendant's defense here, or one of her defenses, the fact that the White Stylet couldn't function as a receiver is perhaps not so important, because it had other functions to serve within the body.

So Dr. North took the stand, talked about the Pink Stylet, talked about its functionality in his view, as a fact witness, because he was a co-inventor involved intimately with the creation of the project.  This was I think over the government's objection, but that's fine.  I let it in.

Okay.  Cross-examination, the government pursued at

least two themes:  One, that the witness is biased, and, two, confronted him with evidence of the recall and whether he knew the recall of the White Stylet came with a statement that it was not functional.  And the doctor acknowledged that he was aware of that statement in connection with the recall, but it was not his opinion, and it did not change his opinion to know that fact.

As far as I'm concerned, we're fine to that point. Then Mr. Cohen stood up and asked a series of questions, very short redirect.  Part of it was addressed to the bias theme, and another part was addressed to the functionality theme. Now, the question was premised by a reference to the government's cross-examination.  Mr. Cohen asked, do you recall the prosecutor asking you specifically if the recall notice referred to the White Stylet as a non-functioning component? And the doctor recalled that.  And then he was asked, is that your opinion?  There was an objection.  I overruled the objection.  And the doctor gave his testimony.

So about -- gave his testimony about these other attributes that he considered helpful and part of the function of the White Stylet.  The government chose not to recross, and I don't criticize that decision at all.

So do I personally think we need to do anything with this record?  No.  The jury has been very attentive.  Who knows what the jury will do here.  But I think one thing they know,

O31DPER5

and I expect each of them knows, that the White Stylet does not function as a receiver, and that the White Stylet has no copper, and the White Stylet was called a receiver by Stimwave. I think they know those three things.

They also know that, essentially, the only difference between the White and the Pink Stylet are the absence of the copper from the Pink Stylet -- from the White Stylet. So even if there hadn't been any of this redirect examination, I think defense counsel could have argued to the jury, you know the Pink Stylet has functionality in a variety of ways besides being a receiver, and you know there is no difference between the Pink and White Stylet except for the presence or absence of copper. Therefore, you may find, and I urge you to find, that the White Stylet had this other functionality.

Anyway, that's my understanding of what came in here, and how it fits in the whole context of the case. I don't think we need to do anything about the record with respect to Dr. North.

Counsel.

MR. KOCHEVAR:  Can I just make one point on that, though?  The issue is actually I believe at the end of the defendant's direct. I agree that the defendant may be able to argue what your Honor just said, but they can't elicit that from an unnoticed expert. And at the end of the direct, the defense asked three questions. He said:  What if you took the

O31DPER5

copper out of the Pink Stylet?  Would it still strengthen?
Would it block the fluid?

Those were omitted over the government's objection,
and I think that is where the improper expert testimony began.
He should not have opined, because that's opinion.  He didn't
have anything to do with the White Stylet.  And I agree with
the Court, a basis has been laid to argue an inference, but I
don't think that this person, who was sort of pseudo qualified
as an expert, should be allowed to opine on that in front of
the jury.

(Continued on next page)

O314PER6

THE COURT:  OK.  Thank you.

So your objection is really to my overruling the objections made during the direct testimony.

MR. KOCHEVAR:  At the very end, which were then basically repeated on the redirect.  He got to say the White Stylet then, but the functional difference between the Pink Stylet without copper, as the Court just said, everyone knows what that means, and the door was not open at that point.

THE COURT:  OK.  So I'm not going to strike testimony. It is what it is in terms of the record.  All I can do is rule on these objections as best I can in the moment.  And I don't feel ultimately the prejudice to the government is so severe that I should try to strike testimony at this point.

So Mr. Cohen you said you had another issue.

MR. COHEN:  I'm going to let Mr. Haran handle this.  I think it's probably going to come a game changer, your Honor.

MR. HARAN:  Are you ready?

THE COURT:  I am.  I have my pen.

MR. HARAN:  I wanted to wait until we've done all the instructions to make our application.  I hope it's not too late for a judgment of acquittal pursuant to Rule 29.  It's our view if we start with the securities fraud count, Count Three, that on the facts, both in the government's case and as well as the defense case there is no rational jury could find beyond a reasonable doubt.  That the --

O314PER6

THE COURT:  Excuse me, one second.  Please continue, Mr. Haran.

MR. HARAN:  Sure.  As we discussed the thrust of the securities fraud count is that the key false statement is that the device had achieved regulatory clearance, and that the next part of the false, the key false statement is that the White Stylet had achieved regulatory clearance as we know from the stipulation that that issue is essentially, in our view, off the table and those statements from factually true.  The device had achieved regulatory clearance, and there was no need to go back for any additional regulatory clearance with the introduction of the White Stylet.  The government isn't alleging that.  Therefore, there could be no false statements about the device having achieved regulatory clearance at any point.

There is also some additional sort of -- in the indictment, a couple of allegations about false statements concerning the components, false statements that the components were reimbursable.  And as the evidence makes clear, components aren't reimbursable, procedures are reimbursable.  The key to when we come to that is the allegation that investors purchased the device based on false statements concerning the White Stylet and concerning the reimbursement issues.  As the evidence shows and in the government's case, it was clear from the evidence and from the investors' own investment materials

and investment analysis that a reimbursement was not an issue at the time.  And therefore, at --

THE COURT:  Reimbursement was not an issue?

MR. HARAN:  At the time of the investment.  And that was, in fact, the investor's own analysis from their own due diligence from their own consultants looking into it, kicking the tires of the industry and meeting with folks who were purchasing the Stimwave products.

THE COURT:  I think the first investor said they heard there was some reimbursement issues.  But the record is what it is.

MR. HARAN:  Right.

On the basis that no rational juror could find beyond a reasonable doubt that any statements were false first of all, but they could make out the count.

Counts One and Two, I think as we pointed out a few times, one of the key allegations is that the device, the White Stylet had no medical function whatsoever and that it was created for purposes of fraud.  We don't believe that any juror on this record could find beyond a reasonable doubt that the device was created for purposes of fraud -- I'll get to that in a second -- or that the device had no medical function.  We believe this goes to evidence of intent.  Our view is that, given the evidence in the case the government cannot prove to a rational juror beyond a reasonable doubt intent with respect to

O314PER6

the creation of the device, the design of the device being for the purpose of fraud, given all the evidence in the case.

THE COURT:  Thank you, Mr. Haran.

Again, who knows what the jury will do, but I'm going to deny these motions.

With respect to the securities fraud it was, I think on this record, a jury could find that there was a material omission and also a very misleading statement stating that the device was cleared without a definition of what the device was. That is something that did not have the White Stylet in it is extraordinarily misleading because the company was emphasizing the development of the PNS system.  It was having trouble --I'm sorry, the defendant is shaking her head, but this is my chance to speak.

The PNS system was having pushback because of the length of the Pink Stylet and the difficulty of having something that you couldn't bend.  Bending it would interfere with its functionality as an antenna.  And so the jury could find that there was a meeting in which the defendant was the ultimate decision maker for the creation of the White Stylet.

And again the financial fraud is driven by the deceit involved with how one describes the White Stylet as a receiver when it is undisputed it was not.  And obviously when the board learned about the White Stylet being included in the PNS kits, and reimbursement being sought under a code for receivers,

O314PER6

whether it's a procedure related to receivers is defined there, I think for this purpose is not terribly material, a procedure in which the White Stylet was used was devastating to the company. And they did the voluntary recall. They felt they had to tell the FDA, and the investors lost their money. So there was deceit. A jury could find in connection with the solicitation of investments from the misleading statements regarding FDA clearance, and the omission of very material facts.

You made a point about reimbursement, and my notes are too fragmentary, but I think I captured that on the securities fraud. I'm sorry if I haven't responded to everything.

Counts One and Two, is this the most perfectly crafted indictment known to man or known to the U.S. Attorney's office in the Southern District of New York? No.

Has the defendant been misled in any way with respect to the crimes with which she is charged? No.

Is there a variances here? No.

The functionality at issue is whether it can function as a receiver, that's what supported the financial benefits to Stimwave. That was a major part of why it was created a jury could find. They could find there was fraudulent intent in the creation of the White Stylet, fraudulent intent with respect to how it was labeled and marketed, fraudulent intent with respect to the training.

O314PER6

So the functions that Stimwave chose to point to when seeking reimbursement was the functionality of the receiver. As we talked about in the beginning, this case is fundamentally about financial crimes. It's about getting insurance reimbursement, which was not honestly obtained. It's about wire fraud, which involved money. And it's about securities fraud, which involved an investment in a company that was doing very shady things, and those shady things were at the heart of its financial health. And when that was discovered, the company, essentially, I guess, imploded based on the evidence I heard here. So the Rule 29 motion is denied.

So let's talk about a schedule. I think the things I owed you are: A rewrite of the good faith charge, and an order giving you a record of what portions of Dr. Dann's testimony have been stricken so there's clarity about that. I have to give you a charge on witness preparation.

OK. I think that's what I owe you. I think you wanted an opportunity to submit additional law to me or additional charging language. I'm going to ask that additional submissions to me come in sooner rather than later, but no later than Saturday morning at 10:00 a.m.

OK. Mr. Kochevar, anything else we need to do?

MR. KOCHEVAR: There is a very minor highlighting point. There was an error in the transcript. It reads currently at page 1191, 3 to 6 that Government Exhibit 269 was

O314PER6

admitted.  That should read Government Exhibit 629 instead.  So I'm just --

THE COURT:  On consent the transcript is changed.

MR. KOCHEVAR:  Thank you.

THE COURT:  Mr. Cohen, anything else?

MR. COHEN:  Just one technical housekeeping question with regard to summation.  We are going to be showing exhibits and so forth on the screen.  How does the Court normally handle this with regard to counselor being able to see the screen?

THE COURT:  As far as I'm concerned, the only limitation is the wiring in the courtroom.  I'm going to let you talk about that with Mr. Whertvine.  It would be fine with me if folks could move, I don't know if you can, that podium, so it's in the center of jury box and you are facing the jury directly when you speak with them.  So why don't you work with Mr. Whertvine a little bit this afternoon, and we will do what we can to accommodate counsel's desires.

MR. COHEN:  Thank you so much your Honor.  Have a good weekend.

(Adjourned to Monday, March 4, 2024 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 JENNIFER SPRUCE

Direct By Mr. Haran . . . . . . . . . . . . . .1605

Cross By Mr. Kochevar  . . . . . . . . . . . .1648

Redirect By Mr. Haran  . . . . . . . . . . . .1663

Recross By Mr. Kochevar  . . . . . . . . . . .1663

 RICHARD BOYDSTON NORTH

Direct By Mr. Cohen . . . . . . . . . . . . . .1671

Cross By Ms. Folch . . . . . . . . . . . . . .1687

Redirect By Mr. Cohen  . . . . . . . . . . . .1703

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1904   . . . . . . . . . . . . . . . . . . .1697

 1907   . . . . . . . . . . . . . . . . . . .1699